UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLADYS YOLTON, WILBUR MONTGOMERY,
ELSIE TEAS, ROBERT BETKER, EDWARD
MAYNARD, and GARY HALSTEAD, on behalf
of themselves and a similarly situated class,

              Case No. 02-CV-75164
        Plaintiffs,  Hon. Patrick J. Duggan

v.

EL PASO TENNESSEE PIPELINE CO., and
CASE CORPORATION, a/k/a CASE
POWER EQUIPMENT CORPORATION,

        Defendants.

| | |
|---|---|
| KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO | KIENBAUM OPPERWALL HARDY & PELTON, P.L.C. |
| By:   Roger J. McClow (P27170) | By:   Thomas G. Kienbaum (P15945) |
| Attorneys for Class Representatives |   William B. Forrest III (P60311) |
| 400 Galleria Officentre | Attorneys for Defendant El Paso |
| Suite 117 | 280 North Old Woodward, Ste. 400 |
| Southfield, MI 48034-8460 | Birmingham, MI 48009 |
| (248) 354-9650 | (248) 645-0000 |
| | |
| HONIGMAN MILLER SCHWARTZ AND COHN LLP | FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP |
| By:  Norman C. Ankers (P30533) | By:  Stephanie Goldstein |
| Attorneys for Defendant Case | Co-Counsel for Defendant El Paso |
| 2290 First National Building | One New York Plaza |
| 660 Woodward Avenue | New York, NY 10004-1980 |
| Detroit, MI 48226 | (212) 859-8000 |
| (313) 465-7000 | |
| | |
| McDERMOTT WILL & EMERY LLP | |
| By:  Bobby R. Burchfield | |
|   Douglas G. Edelschick | |
| Co-Counsel for Defendant Case | |
| 600 Thirteenth Street, N.W. | |
| Washington, DC 20005-3096 | |
| (202) 756-8000 | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF EL PASO TENNESSEE PIPELINE
CO.'S MOTION FOR APPROVAL OF ADMINISTRATIVE CHANGES**

**INTRODUCTION**

This Court recently requested that counsel for Plaintiffs and El Paso Tennessee Pipeline Co. ("El Paso") identify provisions of the 1990 Group Benefit Plan (the "Plan") relevant to El Paso's pending motion for approval of administrative changes.[1]

The Plan reflects the parties' understanding that Plan administration is a fluid process that allows for adjustments that serve the twin goals of providing quality healthcare services for the members while maintaining a reasonable level of healthcare costs incurred by the Plan. To that end, the parties agreed: (1) that the Plan would be modified to incorporate any cost savings resulting from the enactment of federal healthcare legislation; (2) that they would work together to develop wellness programs aimed at reducing healthcare costs incurred by the Plan; and (3) that the company and the UAW would meet annually to discuss Plan administration issues. The parties clearly intended the Plan to be administered in a cost-effective, flexible, and efficient manner.

The Case retirees, however, now vehemently oppose (and refuse to even discuss) sensible administrative changes that would significantly reduce costs incurred by the Plan <u>without diminishing their benefits</u>. These proposed administrative procedures are commonplace in today's health insurance plans. Indeed, many of the procedures – including the use of a PPO – were incorporated into the plan for <u>active</u> Case employees years ago. There is no legitimate reason that El Paso should be prevented from adopting these updated procedures in order to eliminate waste and reduce the amount that both El Paso and the retirees currently pay for healthcare – thereby insuring the viability of the Plan.

---

[1] The underlying (and disputed) issue of whether Plaintiffs' health insurance benefits vested under the Plan is not the subject of this motion. That issue will be addressed on the merits at trial.

## **DISCUSSION**

**A.     The Parties Sought to Ensure The Viability of the 1990 Group Benefit Plan by Minimizing Plan Costs When Possible.**

El Paso shared a great deal of information with Plaintiffs in accordance with this Court's suggestion that the parties attempt to agree upon permissible administrative changes without the Court's intervention.  Nevertheless, Plaintiffs declared that they were unwilling to agree to <u>any</u> changes in the way benefits are administered – even the most nominal change – unless it were in the context of overall settlement.  This irrational position is implicitly at odds with the Group Benefit Plan, which contains several provisions demonstrating that the parties sought to minimize costs incurred by the Plan whenever possible.

For example, the parties agreed that in the event federal healthcare legislation was enacted, the Plan would be modified to achieve cost savings resulting from the legislation:

> This confirms our understanding that if, during the term of the 1990 collective Bargaining Agreement, any Federal health security act is enacted or amended to provide hospital, surgical, medical, prescription drug, dental benefits, vision care, or hearing care for employees, retired employees, surviving spouses and dependents, which duplicate or may be integrated with the benefits of the Group Benefits Plan, then in such event, the benefits under the Group Benefits Plan will be modified so as to integrate or eliminate the duplication of such benefits with the benefits provided by such Federal law. Ex. 1, p. 62.

Clearly any such federal plan could not be identical to the Plan benefits it might displace.  The parties thus contemplated the possibility of changes in this sensible context.

The parties also agreed to work together to develop wellness programs aimed at reducing healthcare costs incurred by the Plan.  *Id.*, p. 69.  ("By encouraging employee, retiree, and dependent involvement, it is expected in addition to physical well-being there is a potential for reduction in health care costs").

Importantly, Case and the UAW also established annual meetings between members of the International UAW (including the UAW's Social Security Department), Case's benefits directors, and the insurance company for the express purpose of discussing Plan administration issues:

> [A]n annual meeting will be held at which one representative from the UAW Ag—Implement Department and one representative from the UAW Social Security Department and one insurance representative from each plant location will meet with the Company Benefits and Industrial Relations Directors or their representatives, and representatives of the insurance carrier to discuss insurance plan administration. *Id*., p. 67; see also, Ex. 2, 1990 CBA, p. 89.

These high-level meetings were created as the vehicle for addressing future Plan administration issues. Despite these provisions, Plaintiffs are now totally callous to the Plan's escalating costs and insist that El Paso administer the Plan in an outdated and unnecessarily expensive manner.

As explained in El Paso's prior brief and Mr. Barbour's declaration attached thereto, the administrative changes El Paso seeks to make are not novel or unique. They are contained in the vast majority of all healthcare plans today. Indeed, most of the administrative changes that Plaintiffs refuse to accept have been part of the health insurance plan for active Case employees for some time. For example, the 1998 Group Benefit Plan includes a PPO:

> Case provides affordable, comprehensive health care through local Medical Networks of physicians and hospitals to employees regardless of when hired, and their eligible dependents. The network is available in a majority of locations. This is a Preferred Provider Option (PPO) managed care program. Employees may choose to be treated in or out of the network each time they need medical treatment. Ex. 3, 1998 Group Benefit Plan, p. 22.

This is a mandatory program, with increased charges for out-of-network providers.

This brings us to the central point El Paso seeks to make: There is no express contract language that prohibits the administrator from making sensible, non-benefit impacting, changes

3

in the manner healthcare is being delivered. In contrast, there are various provisions mentioned above that contemplate plan amendments over time. Tellingly, Plaintiffs have not submitted any extrinsic evidence by way of affidavit that would suggest that such changes were not contemplated as a possibility. The expectation of a retiree is a key determinant as to what vesting means in this context and there is no reasonable basis to expect that no changes would be made in the plan to reflect changes in the delivery of healthcare services.[2]

The Seventh Circuit in *Zielinski v. Pabst Brewing Co.,* 463 F.3d 615, 619 (7th Cir. 2006), made this very point when it said:

> Pabst's lawyer acknowledged however the possibility of an intermediate position - that any reduction in benefits below the level specified in the shutdown agreement had to be reasonable. And his brief had referred us to affidavits from an expert on health insurance that the changes that Pabst made in the plan it inherited were reasonable in light of changes in health care since 1971 that had affected health insurance; the expert stressed the greatly increased availability of generic substitutes for brand-name drugs. Adamant that the level of benefits could not be reduced by even a penny, the plaintiffs presented no counterevidence; and in this court, continuing in that vein, they dismiss the expert's affidavits as irrelevant.
>
> Pabst is on to something. <u>The most sensible interpretation of the shutdown agreement, the interpretation that steers between implausible extremes, is that it obligates the company to provide prescription-drug benefits at a level "reasonably commensurate"</u> (to quote earlier cases, broadly similar to this one) <u>with the 1971 Blue Cross-Blue Shield plan</u>. *Diehl v. Twin Disc, Inc.*, *supra*, 102 F.3d at 311; *Barker v. Ceridian Corp.*, 122 F.3d 628, 638 (8th Cir. 1997); *Poole v. City of Waterbury*, 266 Conn. 68, 831 A.2d 211,

---

[2] As indicated in El Paso's prior briefing, ERISA requires an express assumption of ongoing medical benefits in order for those benefits to be deemed vested. This is reflected in the structure of ERISA, which treats vesting of pension plans versus medical plans differently. In particular, ERISA recognized the potential for dramatic changes in healthcare services and costs and that express language must be included in the plan to vest such benefits. In this case, there is no express prohibition against reasonable plan amendments to provide more cost effective delivery of such healthcare services.

4

> 233-34 (2003). <u>Holding Pabst to the literal terms of that ancient plan in today's marketplace would give the retirees an insanely generous plan relative to today's norms, rather than a plan that would provide them with the same coverage, *mutatis mutandis*, that they would have had in 1974.</u> (Emphasis added.)

This common-sense approach is supported by what was occurring between the UAW and Case: Various contract provisions contemplated changes concerning developments such as HMO's and Federal healthcare legislation. The annual meeting designed to discuss such issues underscored that sensible changes might be forthcoming.

Plaintiffs no doubt will point to the absence of specific contract language expressly permitting modest and sensible changes such as mandated PPO participation (there is no significant gain in merely permitting voluntary participation – the only savings occurs as a result of mandated participation with additional costs being incurred if the retiree nevertheless chooses not to participate). But the point is that discussions about the subject – with the possibility of such changes – had to put Plaintiffs on notice that reasonable steps would be considered, and thus might be taken.

**B.     After The Administrative Changes Are Implemented, Plaintiffs Will Still Receive Benefits That Are Fully Commensurate With Those Set Forth in the 1990 Group Benefit Plan.**

The Group Benefit Plan provisions identified by Plaintiffs' counsel and El Paso's counsel at the Court's request are attached as Exhibit 1. Those provisions relate to El Paso's pending motion as follows:

**1.     <u>Prescription Drugs</u>.** The Group Benefit Plan provides that the company will pay the cost of "covered prescription drugs." *See*, Ex. 1, § I, p. 27. A $5 co-payment applies when a doctor prescribes a brand name drug, and a $2 co-payment applies for a generic drug. *Id.*, § I(1)(d). The Group Benefit Plan further identifies categories of "maintenance drugs" that must

5

be dispensed in certain doses. *Id*., § I(2)(d), p. 28. Finally, the Group Benefit Plan provides an optional mail order program for maintenance drugs. *Id*., § J, p. 30.

El Paso proposes, with the Court's approval, that the mail order drug program be mandatory. This would allow retirees to fill an original prescription and two refills for a drug at a retail pharmacy, but then require any subsequent refills to be obtained through a mail order pharmacy. In addition to its convenience, the mail order program would save the retirees money because: (1) there is no co-payment for mail order drugs; and (2) mail order pharmacies are able to dispense 90-day supplies, whereas retail pharmacies are generally limited to dispensing 30-day supplies, and they require a co-payment every month. The program would also lower the Plan's costs because mail order pharmacies offer greater discounts (and lower dispensing fees) than retail pharmacies. This would have absolutely no impact on Plaintiffs' prescription drug benefit. Such programs are commonplace in today's healthcare market, and are utilized in the plan covering active Case employees, as well as the other plans that El Paso administers. Furthermore, the mail order drug program provides access to all of the same prescription drugs that are available today.

El Paso further proposes to implement a mandatory generic drug program. This would require a retiree to accept a chemically identical generic drug in place of an expensive brand name drug when the generic alternative is available. If the retiree insists on the brand name drug instead, a charge would be paid for the difference in cost between the brand name and generic drug. The Group Benefit Plan does not provide the retirees with the contractual right to pick between brand name and generic drugs. Rather, the Plan establishes different co-payments for brand name and generic drugs as "specified by a physician." *Id.,* § I(1)(d). The mandatory generic program would encourage physicians to prescribe the less expensive (yet chemically

identical) generic drug. This would yield substantial cost savings for the Plan and would not negatively impact the retirees' healthcare.

Finally, El Paso seeks to implement a formulary, which is a list of preferred brand name drugs when generic equivalents are not available. There are no provisions in the Group Benefit Plan that prohibit (or otherwise address) the use of a formulary. The formulary segregates drugs into different therapeutic classes and identifies which drugs within those classes are preferred based on their effectiveness and cost efficiency. This encourages the physician to prescribe the more effective, less expensive drug when different options are available to treat the same condition. Utilization of a formulary would not negatively impact the retirees' healthcare because non-formulary, brand name drugs are available at the same cost when medically necessary. For these reasons, formularies have become the norm in both private and government healthcare plans today. *See*, 1/9/07 Barbour Declaration, ¶ 15 ("As early as 1995, 80% of managed care plans had implemented drug formularies; the percentage using formularies today is closer to 100%"). El Paso should be permitted to implement a formulary, which would lower Plan costs without a reduction in Plaintiffs' benefits.

**2.** **Preferred Provider Organization.** The Group Benefit Plan has no provisions addressing a PPO. The Plan does provide, however, that the retirees may participate in an optional Health Maintenance Organization ("HMO").[3] *See*, Ex. 1, pp. 58-59, 65. Few (if any) retirees ever opted to enroll in the HMO.

El Paso seeks to implement a mandatory PPO, which would save the company and the retirees substantial amounts of money while maintaining a commensurate level of benefits. As

---

[3] HMO's and PPO's are both managed care organizations. An HMO generally requires patients to use doctors and hospitals within its network and will not pay for services outside the network. A PPO allows patients to use any doctor or hospital, but charges the patient a co-insurance (in this case 20%) for using out-of-network providers.

explained in El Paso's prior brief, 76% of the physicians and healthcare facilities treating the retirees <u>are already in the existing PPO network</u>.  1/9/07 Brief, p. 15.  El Paso is paying retail prices to these providers, rather than the substantially lower PPO rates, for more than 80% of the retirees' total claims.  *Id*.  This is a senseless waste.  For the minority of retirees whose doctors are not already in the PPO, those doctors are free to join it.  If they choose not to, the retirees may utilize a doctor within the PPO or opt to use an out-of-network doctor and pay 20% of that doctor's charges.  Again, there would be no impact on the quality or level of care Plaintiffs have been receiving.  Such PPO programs are commonplace in today's healthcare market.  *See*, 1/9/07 Barbour Declaration, ¶ 4 ("94.8% of all health plans and 98% of all collectively bargained health plans in the Towers Perrin [database] use one or more networks of healthcare providers to deliver healthcare services at discounted rates").  This includes the plan covering active Case employees, as well as the other plans that El Paso administers.

    **3.**  **<u>Utilization Review, Care Management, and Case Management</u>.** The Group Benefit Plan contains a pre-certification requirement that applies to non-emergency hospital admissions.  *See*, Ex. 1, pp. 51-52.  A retiree who fails to comply with this procedure must pay a $200 deductible plus 20% of the hospital charges up to $750 per employee and $1,500 per family.  *Id*.

    In addition to non-emergency hospital admissions, El Paso's proposed utilization review program would apply to other physician services such as certain elective surgeries.  Under this approach, a clinician reviews potentially inappropriate procedures in advance.  This would not negatively impact Plaintiffs' benefit.  To the contrary, it would increase the quality of care.  A retiree that bypasses the pre-certification provisions would be assessed a $100 fee.  This is substantially less than the $200 deductible plus the 20% additional fee currently in place.

The Group Benefit Plan does not contain provisions addressing case management and care management programs. Plaintiffs' brief did not contest El Paso's right to institute those programs. As explained previously, these programs are common in health insurance plans today and will increase the quality of care while reducing costs.

## CONCLUSION

The law generally favors sensible approaches. At the very least the party opposing a sensible result should be able to point to contract language which expressly prohibits that result. Plaintiffs cannot do so; nor can they argue that maintenance of an irrational status quo is what a reasonable person could anticipate.

                Respectfully submitted,

                KIENBAUM OPPERWALL HARDY
                  & PELTON, P.L.C.

                By: s/Thomas G. Kienbaum
                    Thomas G. Kienbaum (P15945)
                    William B. Forrest III (P60311)
                Attorneys for Defendant El Paso
                280 North Old Woodward, Ste. 400
                Birmingham, Michigan 48009
                (248) 645-0000
                tkienbaum@kohp.com

Dated: March 30, 2007

107611

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 30, 2007, I electronically filed the foregoing document and its exhibits with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Roger J. McClow, Norman C. Ankers, Bobby R. Burchfield, Douglas G. Edelschick, and I hereby certify that I have mailed by United States Postal Service the foregoing document to the following non-ECF participants:

    Stephanie Goldstein
    FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
    One New York Plaza
    New York, NY 10004

    s/Thomas G. Kienbaum
    280 North Old Woodward Avenue
    Suite 400
    Birmingham, Michigan 48009
    (248) 645-0000
    Email: tkienbaum@kohp.com
    (P15945)