UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

GLADYS YOLTON, WILBUR MONTGOMERY,
ELSIE TEAS, ROBERT BETKER, EDWARD
MAYNARD, and GARY HALSTED, on
behalf of themselves and a class of persons
similarly situated,

      Plaintiffs,

v.

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

      Defendants.

Hon. Patrick J. Duggan

Case No. 02-CV-75164

**CLASS ACTION**

---

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.
By:   Roger J. McClow (P27170)
       Samuel C. McKnight (P23096)
Counsel for Plaintiffs
400 Galleria Officentre, Suite 117
Southfield, MI  48034
(248) 354-9650

HONIGMAN MILLER SCHWARTZ
AND COHN LLP
By:   Norman C. Ankers (P30533)
Counsel for Defendant CNH America, LLC
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7000

McDERMOTT WILL & EMERY LLP
By:   Bobby R. Burchfield
       Douglas E. Edelschick
Counsel for Defendant CNH America, LLC
600 13th Street, N.W.
Washington, D.C.  20005-3096
(202) 756-8000

KIENBAUM OPPERWALL HARDY
& PELTON, P.L.C.
By:   Thomas G. Kienbaum (P15945)
       William B. Forrest III (P60311)
Counsel for Defendant El Paso
325 South Old Woodward Avenue
Birmingham, MI 48009
(248) 645-0000

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON
By:   Stephanie Goldstein
Counsel for Defendant El Paso
One New York Plaza
New York, NY 10004-1980
(212) 859-8000

---

**PLAINTIFFS' RESPONSE TO
EL PASO'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS
MOTION TO MODIFY THE CONTRACTUAL HEALTH CARE PLAN**

**I.      INTRODUCTION**

El Paso's motion has been pending since July 2005. In the fall of 2006, at the Court's suggestion, El Paso and Plaintiffs discussed at length possible interim changes to the health care plan. On September 13, 2006, Plaintiffs presented El Paso with a proposal which would, *inter alia*, 1) permit El Paso to institute an agreed upon PPO plan as an *option* to the current contractual indemnity plan; 2) provide a financial incentive for Class Members to join the optional PPO (in most cases, at no cost to El Paso); 3) modify the current prescription drug co pay to encourage use of generic drugs; 4) provide for Class Counsel to send an agreed upon letter identifying the benefits of the optional PPO and encouraging Class Members to use generic drugs.

At the status conference of September 20, 2006, the parties informed the Court of their discussions and counsel for El Paso, Steve Meisgeier, confirmed that Plaintiffs had in fact made a serious proposal for interim changes which El Paso was reviewing. In the end, El Paso rejected the proposal outright and continued to demand that it be permitted to implement a mandatory PPO despite the complete absence of any possible claim that the 1990 Group Benefit Plan permitted such a unilateral modification of its terms. In light of these facts, El Paso's claim that Plaintiffs "vehemently oppose (and refuse to even discuss) sensible administrative changes" is astounding, untrue and deeply troubling.

As the terms of the 1990 Group Benefits Plan make clear, and as the parties' actual discussions demonstrate, El Paso has never sought to implement administrative changes – it seeks to entirely eliminate the negotiated contractual indemnity plan with a managed care plan that the 1990 Plan only contemplated *as* an option. It seeks to make the optional mail order drug program mandatory for maintenance drugs. To make mandatory what the 1990 Plan expressed as optional, at a cost to the participants for non compliance, is *not* administrative – it is substantive. El Paso

2

seeks, over the objection of Plaintiffs (and here the objection is vehement) to unilaterally rewrite the contractual plan and substitute a plan that saves El Paso money by shifting costs to the retirees and surviving spouses. El Paso's motion must be denied.

## II.     ARGUMENT

### A.     THE APPLICABLE LAW

The argument that El Paso makes here has been roundly rejected by the Sixth Circuit and by district courts in this Circuit. In *UAW v. Loral Corp.*, 107 F.3d 11, 1997 WL 49077 (6th Cir. 1997) (unpublished opinion) (copy attached), the defendant argued, as El Paso does here, that a court should presume that the parties to a retiree health care plan agreement expected future changes and modifications to the vested benefit scheme. The Sixth Circuit, in no uncertain terms, disagreed:

> [I]f the employer retained discretion to cut benefits somewhat, there is nothing to give us a standard by which to distinguish a 1% cut from a 99% cut that would be virtually equivalent to a complete revocation. It might well be sensible for parties to agree to allow the employer to retain some flexibility to deal with future vicissitudes, but such an arrangement must be agreed to in the contract. It cannot be imposed unilaterally by the employer or the courts.

*UAW v. Aluminum Co. of America*, 932 F. Supp. 997 (N.D. Ohio 1996), is directly on point. There, the court held that the CBA required Alcoa to provide lifetime health care benefits for retirees. The court then held that the company's unilateral implementation of a managed health plan violated that obligation. In reaching this decision, it cited a particular provision of the CBA as "especially relevant." That provision stated that the parties (Alcoa and the UAW) would review "group practice" plans with a view to reaching a "'mutual agreement' regarding the desirability of offering employees a choice of coverage." 932 F. Supp. at 1009. The court stated the obvious:

> This provision can only be interpreted to mean that the parties intended to make any modification in coverage a mutual decision between the union and Alcoa and not a unilateral modification by Alcoa.

932 F. Supp. at 1009.

In its 1/9/07 Response to Plaintiffs' Supplemental Brief, El Paso cites *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996) and *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615 (7th Cir. 2006). In both cases, the Seventh Circuit addressed an entirely different situation. In light of those factual differences, those decisions are not at all inconsistent with *Loral*.

In *Twin Disc*, the court determined that a shutdown agreement negotiated between the company and the union, not the underlying collective bargaining agreement, required the company to provide lifetime health care benefits. It also noted that, prior to the shutdown, retirees had been covered under three *different* health insurance plans, depending upon the date of retirement. The court also determined that the benefits for retirees who had previously retired had been modified in labor contracts prior to the negotiation of the shutdown agreement. Thus, unlike in this case, the court determined that retiree health care benefits had *not* vested under the labor agreements but only by virtue of the plant shutdown agreement. The underlying labor contracts simply provided that retirees would be entitled to coverage provided under the "insurance program . . . as set forth in the insurance section of the company's Employee's Manual," a manual which contained a reservation of rights clause. 102 F.3d at 303. Unsurprisingly, in *Twin Discs*, the court expressed the issue of the level of benefits to which the various groups of retirees were entitled as one of vagueness. Id. at 309.

Here, there is no such issue of vagueness. The 1990 Group Benefit Plan provides both the promise of lifetime benefits and the unified level of benefits to be provided. It does not refer to an independent insurance booklet for a determination of the level of benefits provided. It set forth the precise level of benefits *and* the precise method of paying for them in great detail – detail that had been carefully hammered out in negotiations between Case and the UAW. The problem of determining the level of benefits in the face of uncertainty faced by the court in *Twin Disc* is simply absent here. Because here the benefit level itself as well as the duration of the entitlement comes

4

from the collective bargaining agreement itself, there is no possible issue of vagueness. In fact, El Paso has never claimed that it needs judicial guidance in determining the level of benefits or the manner in which they must be provided – it simply seeks to unilaterally modify admittedly specific contractual provisions.

The decision in *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615 (7th Cir. 2006), is indeed curious. And, it certainly defeats any possible claim by El Paso and CNH (Case) that the retirees under the 1987 and 1993 Shutdown Agreements do not have lifetime health care benefits. As to the issue raised here, however, like *Twin Disc* and unlike the current situation, *Zielinski* involves the absence of any identifiable collectively bargained plan of benefits. There, the unilateral changes precipitating the litigation dealt with prescription drug benefits. The court found it significant that unilateral changes in prescription drug benefits had been implemented in the past without protest. Most compelling to the court, however, was the fact that the *only* evidence of the terms of any prescription drug plan was an old Blue Cross Blue Shield brochure – not a collective bargained agreement at all – that predated the 1982 shutdown agreement by eleven years. The brochure itself was vague and incomplete. As the court concluded: "[s]o the drug provision in the shutdown agreement contains gaps. Filing gaps is a standard activity of courts in contract cases." 463 F.3d at 619-20.

Here, there are no gaps to be filled. To the contrary, the 1990 Group Benefits Plan contains a detailed schedule of health care benefits and prescription drug benefits and detailed procedures for the delivery of the benefits. When, as here, there are no contractual gaps, the "standard activity of courts in contract cases" is to enforce contracts as they are unambiguously written. *Federal Insurance Co. v. Hartford Steam Boiler Inspection and Insurance Co.*, 415 F.3d 487, 495 (6th Cir. 2005). Again, as the Sixth Circuit stated in *Loral*,

5

>   It might well be sensible for parties to agree to allow the employer to retain some flexibility to deal with future vicissitudes, but such an arrangement must be agreed to in the contract. It cannot be imposed unilaterally by the employer or the courts.

**B.     PROPOSED ELIMINATION OF THE INDEMNITY PLAN**

El Paso concedes that the contractual plan of health care benefits set forth in the 1990 Group Benefits Plan is an indemnity plan – a plan where a participant can be treated at the hospital or by the physician of his or her choice. (3/26/07 Joint Submission at page 6). It claims, however, that unilateral implementation of a PPO plan was somehow contemplated by the parties to the 1990 CBA. To the contrary, and as held by the district court in *Alcoa*, requiring a 20% co payment on out of network services that were paid in full under the indemnity plan violates the contractual plan.

The provision cited by the Court in *Alcoa* is similar to the HMO Letter of Understanding in the 1990 Group Benefit Plan. The HMO Letter limits Case's ability to offer HMOs "to the right of the Union to accept or reject implementation of the HMO." It also requires "mutual agreement between [Case] and the Union" for implementation of a "group practice direct service prepayment plan *as an alternative* to the Company's group health insurance plan." (Joint Submission at page 7)(emphasis added). In other words, even with the Union's assent to an HMO, the resulting HMO would only be an alternative to the contractual plan of benefits.

As in *Alcoa*, the HMO Letter can only be interpreted to mean that any modifications to the contractual plan of benefits can be made only by mutual assent. Here, El Paso rejected Plaintiffs' proposal to permit an agreed upon PPO to be offered as an alternative. Having scorned the contractual method of providing such an alternation, El Paso now seeks this Court's approval to implement changes unilaterally and make the implemented provisions mandatory. But, as the Sixth Circuit stated in *Loral*, changes not contemplated by the contract itself "cannot be imposed

6

unilaterally by the employer or the courts." El Paso's motion must be denied.

El Paso cites the 1998 Group Benefits Plan that was negotiated between the UAW and Case for post-IPO employees and retirees. In that agreement, the UAW and Case mutually agreed upon the elimination of the indemnity plan of benefits and the substitution of negotiated HMOs and PPOs. Of course, the fact that this agreement was reached through negotiations and compromise with the UAW entirely undermines El Paso's argument here that it has the unilaterally right implement a PPO plan here. In negotiating the PPO in 1998, the UAW, through negotiations, obtained improved benefits for retirees (hospice benefits, home health care, etc.) *and* the elimination of the worst aspects of the indemnity plan (the Type C annual deductible, 20% co payment and $50,000 lifetime maximum and the Type B $25,000 per illness limitation).

Here, El Paso seeks to implement a PPO *in the absence* of any such agreement *and maintain the worst features of the indemnity plan* – the Type C deductible, the Type C lifetime maximum and the Type B $25,000 per illness limitation. (See 1/09/07 El Paso Response, Exhibit 1). In the end, El Paso's reference to the 1998 Group Benefits Plan simply proves Plaintiffs' point. If El Paso wants to substitute a mandatory PPO for the contractual indemnity plan, it must obtain Plaintiffs' agreement.

To permit El Paso to implement a health care plan which is not contemplated by the 1990 Group Benefits Plan at this late stage in the litigation would lead to confusion on the part of retirees and surviving spouses. It would also lead to unnecessarily complex damage calculations if Plaintiffs ultimately prevail. If Plaintiffs are successful, subsequent damage calculations will include an examination of every payment made under a mandatory PPO to determine whether it required retirees to pay more that under the terms of the contractual indemnity plan.

Even if El Paso had some authority to implement some form of a managed care plan, it has

7

never provided sufficient information on structure or the benefit levels it intends to impose. During discussions with Plaintiffs last summer and fall, El Paso was unable to provide even a summary of the benefits it intended to implement. The bare bones two-page comparison summary El Paso finally in its 1/9/07 Response is completely inadequate to give the Court any idea of the actual level of benefits El Paso proposes to implement. For example, the 1990 Group Benefits Plan contains at least twelve pages detailing the terms of the indemnity plan (Exhibit A to Joint Submission, at 15-26). There is nothing similar before this Court that details the benefits available under the proposed PPO plan.

The specific details of any proposed PPO plan, like the implementation of the plan itself, are absolutely critical and must be subject to negotiation and agreement of the parties. And, as Plaintiffs have always contended, and especially on the eve of the filing of motions for summary judgment, those negotiations must necessarily be directed toward the final settlement of the litigation, not at interim modification of benefit levels. El Paso's motion must be denied.

### C.  PROPOSED ELIMINATION OF THE CONTRACTUAL PRESCRIPTION DRUG PROGRAM

#### 1. Mandatory Generic Drugs

The contractual prescription drug plan permits a *Class Member to choose* whether to purchase a brand name drug at $5.00 or a generic drug for $2.00. If a participant chooses a brand name drug when there is a generic drug available, he or she pays an extra $3.00. The changes El Paso proposes would eliminate these contractual provisions. Elimination of specific contractual benefits is not an administrative change in any sense of the word.

Although El Paso has been extremely circumspect in describing to the Court the actual terms of the prescription drug plan it intends to implement, and the described terms of the plan continue to vary, the effect of any mandatory generic drug provision would be that, if a retiree purchased a

8

brand name drug when a generic drug was available, he would pay a penalty which is substantially greater than the contractual difference of $3.00. At one time, El Paso stated that the retiree would be responsible for the generic drug co-pay plus the difference in cost between the brand name drug and the generic drug.[1] Thus, a retiree could be required to pay hundreds of dollars for a prescription he has been receiving for the contractual co payment of $5.00.

And, according to El Paso at another time, the cost of the generic drugs would increase as well. Under the contractual plan, the co pay for generic drugs (and for brand name drugs with no generic available) is $2.00 per prescription. But, according to El Paso's original motion, the change to a "mandatory generic drug" provision would also "limit the benefit for generic drugs to the median cost of the generics available."[2] (Initial Brief at page 5). Apparently, given the obvious difficulty of describing this change as "administrative," El Paso now simply states that a Class Member can still obtain generic drugs at the contractual price. Because of these kinds of shifts and discrepancies in El Paso's position, Plaintiffs *are* vehement as to one thing – that any and all changes to the contractual benefits be subject to negotiation and mutual agreement.

### 2. Mandatory Mail Order Maintenance Drugs

The "mandatory mail order maintenance drug" provision would require class members to "receive their prescriptions only through mail service, and not through retail pharmacies."[3]

---

[1] This information is from page 29 in El Paso's August 24, 2006 "Documentation of Proposed Administrative Changes" provided in response to Plaintiffs' request for details on El Paso's proposed changes. Plaintiffs provided this information to the Court in its December 15, 2006 Supplemental Brief.

[2] The actual cost of generic drugs would be dependent on a calculation by an undisclosed third party, of the "median cost of the generics available."

[3] El Paso claims that this provision would provide helpful oversight by allowing the mail order pharmacist to review "the entire spectrum of drugs an individual may be taking." (Initial Brief at 5). That statement is simply not true. A mandatory maintenance drug provision would require a retiree to obtain drugs from *different* pharmacists – non-maintenance drugs from a retail pharmacy

9

This is a direct violation of the contractual plan. Under the 1990 Group Benefit Plan, a participant can receive all covered drugs, including maintenance drugs, through a retail pharmacy. Use of the contractual mail order program is as an option, not a requirement. The Plan states: "Prescription drugs that are dispensed for an extended period *can be purchased utilizing the mail order prescription drug option*." (Joint Submission at page 1). Although El Paso concedes that use of the contractual mail order program is optional, it claims that it has the right to make it mandatory. Of course, El Paso cannot provide any contractual basis for this asserted right because its argument flies in the face of the plain language of the 1990 Group Benefits Plan. If implemented, a mandatory maintenance mail order drug program would e eliminate the contractual retail pharmacy drug benefit with respect to maintenance drugs.

A mandatory maintenance mail order program would violate the contract for the same reason a unilaterally imposed PPO would. A Class Member who purchased maintenance drugs from a retail pharmacy, expressly permitted by the 1990 Group Benefit Plan for a $2.00 or a $5.00 co payment would, under the mandatory mail order program, either pay a penalty or the full cost of the prescription. Put simply, under the proposed mandatory mail order program, a retiree who followed the contractual plan would be required to pay more for prescription drugs than the contract requires. Such a modification, without mutual agreement of the parties, constitutes an obvious breach of the 1990 CBA. *See Alcoa*, *supra*, 932 F. Supp. at 1002, 1009.

### 3. Formulary Drug List

El Paso admits that the 1990 Group Benefits Plan contains no provisions relating to a formulary drug list. And, the change to a "formulary drug list" would mean, according to El Paso, that drugs not on the preferred formulary list "are either not covered, or covered at a lower benefit

---

and maintenance drugs from a mail order pharmacist. In such cases, a mandatory mail order program would *prevent* a single pharmacist from overseeing all of the drugs that a person is taking.

level than the preferred drugs." (Initial Brief at page 6).  In its more recent submissions, El Paso claims that "[n]on-generic and non-formulary drugs will only be covered if determined to be medically necessary." (Exhibit 1 to 1/9/07 Response). Obviously, for the reasons set forth above and under the principles announced in *Loral* and *Alcoa*, this is a substantive change in the level of benefits.  It involves the unilateral implementation of a limitation in the absence of a negotiated agreement of the parties.  If a physician prescribed a formulary as the most appropriate drug, but not as medically necessary, a participant would have to pay the full cost of the drug rather than $5.00 as provided in the contractual plan.  Not only would retirees be unable to obtain drugs at the existing benefit level ($2.00 and $5.00) but the "no benefit" provision clearly violates the contractual plan which covers, for example, all "legend drugs" regardless if they are on some unilaterally promulgated formulary list

### D.  IMPLEMENTATION OF DIFFERENT UTILIZATION REVIEW PROGRAM

At first, El Paso "propose[d] that benefits be reduced by 20% for individuals who do not comply with utilization review requirements." (Barbour Initial Declaration at p. 3). More recently, El Paso has stated that the penalty would be $100.00.  Given this constant fluctuation in El Paso's description of what it intends to impose, the Court can understand why Plaintiffs prefer agreement to unilateral implementation.  Plaintiffs, and thus the Court, have no idea what El Paso actually intends to do (or what El Paso will do if the Court finds it has authority to do something other than follow the terms of the 1990 Group Benefit Plan.).  As in each other instance, of course, El Paso has proposed a substantive change from the specific provisions of the contractual plan.

The pre-certification provision in the contractual plan has a $200.00 deductible and a 20% co pay up to a maximum of $750.  It does not apply to participants who are Medicare eligible (the vast majority of Class Members are Medicare eligible) and has express safeguards which indicate exactly when it applies and when it does not. (Joint Submission at page 8).  El Paso has never

11

explained why this provision is not satisfactory or why it needs to impose a utilization review procedure for one that was specifically negotiated. Unless Plaintiffs agree to a specific plan, El Paso must be required to follow the contract.

### E. UNILATERAL INTERIM CHANGES MUST NOT BE IMPLEMENTED THIS LATE

Any modification of the current benefit plan would take weeks or months to implement. There would invariably be disruptions and confusion, as there always is with even the most simple administrative changes. El Paso admits that 24% of the doctors and hospitals do not fall within the network it proposes to implement.[4] Thus, hundreds of retirees, surviving spouses and dependent spouses would necessarily have to find new physicians and hospitals disrupting their care and creating enormous anxiety. Any of the retirees who decided to continue treatment with a physician or go to a hospital which is not in the network proposed by El Paso would incur a substantial increase in the cost of staying healthy. There is simply no reason to permit this kind of disruption so late in the litigation. El Paso's motion must be denied.

### F. THE NEED FOR AN EVIDENTIARY HEARING

Because El Paso has failed to provide this Court with sufficient information (and continuously changing information) on the changes it seeks to implement, the motion must be denied. The parties can then devote their energies to litigating this case to conclusion or negotiating a final settlement. In the event the motion is not denied, Plaintiffs request that the Court or a Magistrate conduct an evidentiary hearing at which time Plaintiffs can explore the specific changes El Paso intends to implement and to present evidence to the Court on the financial impact those

---

[4]The more significant problem, and one that illuminates the bankruptcy of El Paso's argument, is that, if El Paso has the authority to unilaterally select and implement a managed care plan that does not include 24% of the health care providers for the Class, it has the authority to implement a managed care plan that fails to include 50% or 99% of those providers. This, of course, is the slippery slope problem the Sixth Circuit identified in *Loral*.

changes will have on Class Members.

The retirees are living on fixed incomes. If required to change physicians, or to pay substantially more for their health care and prescription drugs, the modification will cause economic hardship for them, even in the short run. In fact, the increased costs of the changes will necessarily fall disproportionately on those who are the most vulnerable – those who use medical care and expensive drugs most often. Before the Court sanctions any interim changes, it should have all of the necessary information – on the nature of those changes and on the impact those changes will have on class members.

### III.   CONCLUSION

For the many reasons set forth above and in their prior briefs, Plaintiffs respectfully request that this Honorable Court deny El Paso's motion to modify the preliminary injunction. In the alternative, Plaintiffs request an evidentiary hearing to determine the actual scope and impact of the changes proposed by El Paso.

        Respectfully submitted,

        By:   /s/ Roger J. McClow
            Roger J. McClow (P27170)
            KLIMIST, McKNIGHT, SALE,
            McCLOW & CANZANO, P.C.
            Attorneys for Class Plaintiffs
            400 Galleria Officentre, Suite 117
            Southfield, MI  48034
            (248) 354-9650
            rmcclow@kmsmc.com

Dated: April 23, 2007

## CERTIFICATE OF SERVICE

      I hereby certify that on this date, April 23, 2007, I electronically filed Plaintiffs' Response to El Paso's Supplemental Brief with the Clerk of the Court using the ECF system.

                    /Roger J. McClow
              Roger J. McClow (P27170)
              KLIMIST, McKNIGHT, SALE,
              McCLOW & CANZANO, P.C.
              Attorneys for Class Plaintiffs
              400 Galleria Officentre, Suite 117
              Southfield, MI  48034
              (248) 354-9650
              rmcclow@kmsmc.com

P:\UAW\International\Case Corp\Pleadings\Response to El Paso supp brf re admin changes.wpd