UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLADYS YOLTON, WILBUR
MONTGOMERY, ELSIE TEAS, ROBERT
BETKER, EDWARD MAYNARD, and
GARY HALSTEAD, on behalf of themselves
and a similarly situated class,

       Plaintiffs,                   Case No. 02-75164

v.                                     Honorable Patrick J. Duggan

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

       Defendants.

_____/

## OPINION AND ORDER DENYING CNH AMERICA LLC'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 7, 2008.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

In this lawsuit, a Class of retirees of the Case Corporation ("Case") and surviving

spouses of those retirees seek fully funded, lifetime retiree health care benefits. Plaintiffs

allege two counts against Defendants in their complaint. In Count I, Plaintiffs claim that

Defendants breached labor agreements in violation of Section 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185. In Count II, brought under

Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1132(a)(1)(B), Plaintiffs seek to recover benefits due and to clarify their rights to benefits under an employee welfare benefit plan. Presently before the Court is CNH America LLC's motion for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, filed June 4, 2007. The motion has been fully briefed and the Court held a motion hearing on November 20, 2007.

CNH America (hereafter "CNH") raises two arguments in support of its pending motion. First, CNH contends that it is not the same company that entered into the labor agreements by which Plaintiffs assert their right to vested retiree health insurance benefits. Asserting that it is a significantly different company than the company that employed Plaintiffs or their spouses, CNH argues that it is not contractually liable for the costs of Plaintiffs' health care benefits. Second, CNH argues that Plaintiffs are barred from recovering the above-cap costs of their health care benefits from the company, because the UAW entered into an "accord and satisfaction" on Plaintiffs' behalf with "the new Case Corporation" (now CNH) in 1998. CNH contends that it agreed to contribute substantial funds to a trust to defray the above-cap costs of Plaintiffs' health care benefits in this agreement, and in return, the UAW agreed that CNH's contribution completed the company's funding of those costs.

Plaintiffs respond that CNH is the same entity that employed them or their spouses. Accordingly, Plaintiffs contend that CNH is contractually obligated under the "old" Case's and the UAW's collectively bargained agreements to pay the above-cap costs of their retiree health insurance benefits. With respect to CNH's second argument,

Plaintiffs respond that the UAW was not the retirees' agent and otherwise lacked the authority to bargain away the retirees' vested benefits. Therefore, Plaintiffs contend that they did not agree to release Case from liability for the future costs of their health insurance benefits in the 1998 Agreement.

## I.    Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual and Procedural Background

J.I. Case was established in 1842 and became a wholly owned subsidiary of Tenneco, Inc. (now El Paso) in 1970. The company was renamed the Case Corporation in 1990. Plaintiffs are retirees or surviving spouses of the J.I. Case Company or the Case Corporation.[1] The International Union, United Automobile, Aerospace and Agricultural Workers of America ("UAW") represented Case employees in collective bargaining over the years. In this lawsuit, Plaintiffs claim that they are entitled to vested lifetime retiree health insurance benefits based on collectively bargained labor agreements between the UAW and Case.

In 1994, Tenneco underwent a reorganization to spin off its own and Case's agriculture and construction business assets. To accomplish the reorganization, Tenneco first formed a new corporation, Case Equipment Corporation. Then, pursuant to a Reorganization Agreement and Benefits and Compensation Allocation Agreement ("Allocation Agreement"), Tenneco transferred its and Case's agriculture and

---

[1]Although some Plaintiffs or their spouses retired while the company was named J.I. Case, the Court will refer to the company only as Case or the "old" Case in this Opinion and Order.

4

construction business assets to Case Equipment.  Included in the transferred assets was all of the "Case Business" (defined as the farm and construction equipment business of Tenneco).  Pursuant to both agreements, the transfer did not include Tenneco's Case stock, certain demand notes and subordinated debt, and the "Retained Assets" and "Retained Liabilities."  Included in the definition of "Retained Liabilities" were "the Case liabilities for postretirement health and life insurance obligations (to the extent that Case is obligated on the Reorganization Date [June 23, 1994]) of retirees of the Case Business in the United States and current employees of the Case Business in the United States who retire on or before July 1, 1994 and their dependents . . ."  Pursuant to the Reorganization Agreement, Tenneco agreed to assume the Retained Liabilities.

In exchange for the assets of the Case Business, Case Equipment issued its stock to Case.  (Pls.' Resp., Ex. 10 at 24-27.)  Case Equipment also assumed the existing labor agreements between Case and the UAW and other labor organizations.

On June 30, 1994, a week after the Reorganization, Tenneco began selling the stock of Case Equipment when it sold twenty-nine percent (29%) in an "initial public offering" ("IPO").  At 12:01 a.m. on the following day, July 1, 1994, Case (hereafter "Old Case") changed its name to Tenneco Equipment Corporation.  One minute later, Case Equipment changed its name to Case Corporation (hereafter "New Case").  Tenneco thereafter sold its remaining stock in New Case: selling twenty-four percent (24%) on November 22, 1994; three percent (3%) on December 8, 1994; twenty-three percent (23%) in August 1995; and the remaining twenty-one percent (21%) in March 1996.

Tenneco, the entity that assumed the liability for the costs of Plaintiffs' health insurance benefits in the Reorganization Agreement and Allocation Agreement, merged with El Paso Tennessee Pipeline Co. ("El Paso") in 1996. On October 27, 1997, El Paso sent a letter to Plaintiffs informing them that, as of April 1, 1998, they would be required to contribute $56 per month to continue participating in the El Paso Benefit Plan by which they received health insurance coverage. Prior to April 1, 1998, as part of their negotiations for a new CBA, the UAW asked New Case to pay the $56 per month contribution that El Paso sought from Plaintiffs. New Case agreed to pay this amount through the end of 1998.

During the 1998 labor negotiations between the UAW and New Case, the parties agreed to make deposits of specified amounts in a trust qualifying as a Voluntary Employee Benefit Association ("VEBA") ("VEBA Agreement"). (CNH's Mot., Ex. 37.) New Case and the UAW further agreed in the VEBA Agreement that the amounts held in the trust would be used to partially defray the costs of Plaintiffs' medical insurance coverage that exceeded cap levels set forth in a Letter of Understanding between Old Case and the UAW in 1993, which El Paso claimed limited its obligation to fund those costs. New Case agreed to contribute $24.7 million to the VEBA; the UAW agreed to contribute $2.8 million. In a Letter of Understanding attached to the VEBA Agreement, New Case and the UAW agreed to the following:

> The parties recognize that the VEBA is intended to complete
> Case's funding of the above cap cost and that Case will not be
> required to make any further contributions to the VEBA from

its own funds.

(*Id*. at UAW1464.)

In the Summer of 2002, when the funds that the UAW and New Case contributed to the VEBA were exhausted, the UAW asked New Case and El Paso to make additional contributions to fund the above-cap costs of Plaintiffs' health insurance coverage. Both companies refused. In August 2002, El Paso sent a letter to Plaintiffs informing them that they would need to contribute $290 per month in order to continue receiving retiree health care benefits. In December 2002, El Paso sent another letter to Plaintiffs, indicating that their premiums would increase to $501 per month as of January 2003. Subsequently, in October 2003, El Paso informed retirees that their monthly contribution would increase to $561 as of January 2004.

In the interim, New Case changed its name to Case LLC in September 2002, and eventually became CNH on January 1, 2004. Also in the interim, on December 23, 2002, Plaintiffs filed this lawsuit. Plaintiffs also filed a preliminary injunction motion, asking the Court to order Defendants to resume paying the full costs of their retiree health insurance benefits.

On December 31, 2003, this Court issued an opinion and order granting Plaintiffs' preliminary injunction motion. *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003). The Court concluded that, except for individuals retiring after October 3, 1993 and their surviving spouses, Plaintiffs likely would prevail in establishing their entitlement to vested retiree health insurance benefits. *Id*. at 471. The

Court excluded post-October 3, 1993 retirees and their surviving spouses from its preliminary injunction order because that was the effective date of the letter agreement between the UAW and Old Case that "arguably capped Case's retiree health insurance obligations." *Id*. at 473.

Although initially concluding that El Paso was the party liable for the above-cap costs of Plaintiffs' health insurance benefits based on the Reorganization Agreement and Allocation Agreement, the Court reconsidered this holding and found that New Case, by then CNH, is the party primarily liable for those costs. *Yolton v. El Paso Tennessee Pipeline Co.*, 2004 WL 3661450 (E.D. Mich. Mar. 9, 2004). The Court made this change because the Defendants' cross-claims, and therefore the issue of which defendant was liable for the cost of Plaintiffs' health insurance coverage based on the Reorganization Agreement and Allocation Agreement, were not yet before the Court when it decided Plaintiffs' preliminary injunction motion. Only Old Case was a signatory with the UAW to the Central Agreements and Group Insurance Plans that granted Plaintiffs the right to vested retiree health insurance benefits. The Court determined that CNH was the same entity as the company that signed those labor agreements.

CNH subsequently filed a motion seeking summary judgment in its favor on its and El Paso's cross-claims. On September 3, 2004, this Court granted summary judgment to CNH. The Court concluded that, pursuant to the Reorganization Agreement and Allocation Agreement, El Paso assumed the liability for the cost of Plaintiffs' retiree health insurance benefits and agreed to indemnify CNH for its failure to pay the costs of

those benefits.

Defendants appealed the Court's various rulings. On January 17, 2006, the Sixth Circuit affirmed. *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571.

### III.   Applicable Law and Analysis

#### A.   Whether CNH is Contractually Liable for the Costs of Plaintiffs' Health Insurance Benefits

The Supreme Court has held that a successor corporation generally is not liable for its predecessor's financial or contractual obligations. *See, e.g., NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 279, 268-88, 92 S. Ct. 1571, 1581-83 (1972). As the *Burns* Court indicated, however, there are exceptions to this rule and a collective bargaining agreement ("CBA") might remain in force "in a variety of circumstances involving a merger, stock acquisition, reorganization or assets purchase." *Id.* at 291, 92 S. Ct. at 1584. The Supreme Court also has held that when there is a "mere technical change in the structure or identity of the [old] employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management . . . the courts have had little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 210, 259 n.5, 94 S. Ct. 2236, 2242 n.5 (1974) (citing *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S. Ct. 452, 456 (1942)). Thus where a new employer continues the operations of an old employer and is "merely a disguised continuance of the old employer"– in other words is the "alter ego" of the old

9

employer– the new employer will be bound by the old employer's labor agreements.

*NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990)

(citing *Southport Petroleum Co.*, 315 U.S. at 106, 62 S. Ct. at 456).

As the Sixth Circuit previously confirmed in this case: the test to determine alter

ego status in this situation is "whether the two enterprises have substantially identical

management, business purpose, operation, equipment, customers, supervision and

ownership." *Yolton*, 435 F. 3d at 587 (quoting *Nelson Electric v. NLRB*, 638 F.2d 965,

968 (6th Cir. 1981). "... '[N]o one element should become a prerequisite to imposition

of alter ego status; rather, all the relevant factors must be considered together.'" *Id.*

(quoting *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 582 (6th Cir. 1986)). While an

intent to evade labor obligations is often found in alter ego cases, the Sixth Circuit has

made clear that such an intent is not essential or a prerequisite to finding alter ego status.

*Yolton*, 435 F.3d at 587 (citing *Wilson v. Int'l Bhd. of Teamsters, Warehousemen &*

*Helpers of Am., AFL-CIO*, 83 F.3d 747, 759 (6th Cir. 1996)); *see also Allcoast Transfer*,

780 F.2d at 581. As the court summarized in *Allcoast Transfer*:

> [T]he essential inquiry under an alter ego analysis is "whether
> there was a *bona fide* discontinuance and a true change of
> ownership . . . or merely a disguised continuance of the old
> employer." . . . This essential inquiry does not require [a]
> find[ing] that an employer intended to evade labor obligations
> . . . in order to impose alter ego status. Instead, in deciding
> whether a successor corporation is really the predecessor
> corporation by another name merely requires an examination
> of all the circumstances of the case, and a weighing of all the
> relevant factors.

780 F.2d at 581 (quoting *Southport Petroleum*, 315 U.S. at 106, 62 S. Ct. at 456).

Although "this is a 'more relaxed, less exacting' application of the alter ego doctrine '[i]n

order to effectuate federal labor policies,'" *Yolton*, 435 F.3d at 587 (quoting *Fullerton*

*Transfer*, 910 F.2d at 336), the Sixth Circuit has concluded that this is the appropriate

standard in this case. *Id.*

CNH does not dispute that it and Old Case share substantially identical business

purpose, employees, and customers. (CNH's Br. in Supp. of Mot. at 16 n.7.) As this

Court previously found, "the new Case Corporation not only operated under the same

name as the Old Case Corporation, but also in the same manufacturing facilities and with

the same employees." *Yolton*, 2004 WL 3661450, at *4. As the Court further found in its

previous decision, New Case also operated under the same collective bargaining

agreements ("CBAs") as Old Case, as the former "assumed all CBAs covering employees

of the farm and construction business of the old Case Corporation." *Id.* Although not

addressed by CNH, Richard M. Christman, the company's Senior Vice President in

charge of product management and support, acknowledged that all of the equipment that

Old Case owned or leased before the reorganization was owned or leased by New Case

after that date. (Pl.'s Resp., Ex. 10 at 43-44.) CNH contends, however, that there are

substantial differences between Old and New Case with respect to ownership,

management, and operation which demonstrate that CNH is not the alter ego of the entity

that employed Plaintiffs or their spouses.

With respect ownership, CNH contends that the 1994 reorganization led to a 100%

11

change in the ownership of the Case business.  (CNH's Br. in Supp. of Mot. at 11.)  As CNH explains, Tenneco owned all of the shares of Old Case, whereas CNH's shares are all publicly held.  While true as of March 1996, this was not the case immediately after the reorganization.

Before the reorganization, Tenneco, through subsidiaries, owned one hundred percent (100%) of Old Case's stock.  Pursuant to the Reorganization Agreement, Case Equipment (New Case) issued all of its stock to Old Case in exchange for the latter's assets.  As a result, Tenneco (through its subsidiary) owned one hundred percent (100%) of Case Equipment's stock.  (*See* Pls.' Resp., Ex. 12 at CASELLC 32433-34.)  *Tenneco* then sold the stock of Case Equipment (by then New Case) in a series of public offerings. (CNH Mot., Exs. 6-8.)

Before the reorganization, on April 26, 1994, Jean-Pierre Rosso, Old Case's President and CEO, sent a letter to the company's employees, informing them "[t]hat the leadership of Case and Tenneco" had announced an IPO of thirty-five percent (35%) of stock which "when completed, will make *Case* a publicly traded company."  (Pl.'s Resp., Ex. 16 (emphasis added).)  Mr. Rosso further informed Old Case's employees that "[e]ach [of the company's] 17,000 employees worldwide will be awarded options to buy 100 shares of Case Corporation stock at the Initial Public Offering price."  (*Id*.)  In closing his letter, Mr. Rosso stated:

> On behalf of our customers, <u>*our future shareholders*</u> and ourselves, I encourage you to seize the once in a lifetime opportunity this represents as we work together to shape a

12

bright, new future for Case Corporation.

(*Id.* (emphasis added).)

Based on the above undisputed facts, the Court does not find any difference in the ownership of Old and New Case immediately before and immediately after the reorganization. Through its subsidiaries, Tenneco was the sole owner of Old Case before the reorganization and it was the sole owner of New Case after the reorganization. Tenneco's subsequent sale of New Case's stock to the public simply continued a plan that had been initiated before the reorganization– that being, to "make Case a publicly traded company." *See, supra*.

Turning to management, CNH contends that there was a significant turnover of officers during the year following the reorganization which demonstrates that corporate supervision changed significantly from Old Case to New Case. In support of this contention, CNH identifies six individuals who joined New Case between August 1, 1994 and February 15, 1995. (CNH's Br. in Supp. of Mot. at 12-13.) CNH further identifies eight officers who resigned between June 24, 1994 and July 1, 1995. (*Id.* at 13.)

As Plaintiffs indicate, however, "'[c]hange is the one constant in corporate organization. Employees, plants, products, divisions, subsidiaries all come and go. . . . A corporate group is always changing and the change flows more swiftly than many rivers.'" (Pls.' Resp. Br. at 19 (quoting *Central States Pension Funds v. Sherwin-Williams Co.*, 71 F.3d 1338, 1341 (7th Cir. 1995).) Thus while New Case hired six individuals and lost eight individuals in the year following the reorganization, the Court does not find this

13

change indicative of whether it is a different entity from Old Case.  In fact as Plaintiffs point out, even greater change occurred in the management of Old Case before the reorganization.  Of the twenty-six executive officers of Old Case as of November 27, 1990, fifteen no longer were there on March 10, 1992; and on March 10, 1992, twelve of the existing executive officers had not been there on November 27, 1990. (Pls.' Resp., Ex. 7.)  Therefore, what the Court finds more telling as to whether New Case is an alter ego of Old Case, is whether there was a substantial similarity in the management of the two entities on the day before and the day after the reorganization.  Although there were some changes in Case's management after the reorganization, the Court finds that immediately before and after the reorganization date, the management of Old and New Case were almost identical.

For example, Mr. Rosso signed the Reorganization Agreement as Case Equipment's President and Chief Executive Officer.  *Yolton*, 2004 WL 3661450, at \*3.  At the time, Mr. Rosso also was President and CEO of Old Case.  *Id*.  Mr. Theodore R. French signed the Reorganization Agreement on behalf of Old Case as its Senior Vice President, Chief Financial Officer ("CFO"), and Treasurer.  *Id*.  Mr. French held the same positions with Case Equipment; in fact, he signed the Allocation Agreement as Senior Vice President, CFO, and Treasurer of Case Equipment *and* Old Case.  *Id*.  Twenty other individuals who were officers of Old Case on June 30, 1994, held the same title with Case Equipment on July 1, 1994.  (Pls.' Resp., Ex. 3.)  Eight persons who had the title of Assistant Secretary of Old Case before the reorganization, had the same title with New

14

Case as of May 12, 1995. (*Id.*, Ex. 39.) Of the thirty-seven officers listed in the minutes of New Case's Annual Meeting of the Board of Directors on May 12, 1995, at least thirty were officers of the Old Case. (Pls.' Resp., Ex. 3.)

CNH also asserts, however, that New Case operated differently than Old Case. According to Mr. Christman's declaration on behalf of CNH, New Case introduced several new products in late 1994 and 28 models of new equipment in 1995. (CNH's Mot., Ex. 5 ¶ 19; Ex. 23 at 62.) In his declaration, Mr. Christman identifies the following as new products of CNH in 1994: the 2100 series of Axial-Flow Combines, the 2155 series of Cotton Express pickers, the "L series of loader/backhoes, the 90B series of excavators, the 1150G model of crawler dozers, and the 921B model of wheel loaders. (*Id.*, Ex. 5 ¶ 19.) CNH does not cite to Mr. Christman's declaration or testimony (and in fact cites to no evidence) to support the statement in its brief that "[n]one of these products had been sold by the former Case Corporation." (CNH's Br. in Supp. of Mot. at 6.) This is not surprising, however, as Mr. Christman testified during his deposition that Old Case manufactured the same products before the reorganization. (Pls.' Resp., Ex. 10 at 48-50.) Further, the evidence shows that the "new" products that Mr. Christman identifies in his declaration were in fact the "Latest Models" of existing "Significant Products." (Pls.' Mot., Ex. 25 at CASELLC 01767.) As Mr. Christman testified, although these "Latest Models" of existing "Significant Products" were introduced by New Case in 1994, they had been developed by Old Case before the reorganization. (*Id.*, Ex. 10 at 62-63.) Some in fact had been introduced by Old Case before the

15

reorganization. (Pl.'s Resp. Br. at 25; Ex. 25 at CASELLC 01767.) Many other products sold by New Case had been introduced by Old Case before the reorganization. (*Id*.)

To support its claim that the companies operated differently, CNH also contends that unlike Old Case, which relied on Tenneco for funds to compensate for losses, New Case did not have the same luxury and had to rely on a "new business strategy." According to Mr. Christman, part of this strategy involved a new approach to the company's dealerships in that Old Case used a large number of company-owned dealerships, whereas New Case sold those dealerships to independent owners. (CNH's Mot., Ex. 6 ¶ 18.) Mr. Christman further declares that a different approach to pricing also was part of this "new business strategy." (*Id*. at ¶ 21.) As Mr. Christman explains, New Case introduced "value pricing." (*Id*.) Mr. Christman further explains that New Case used a "different approach to its supply chain" in that it "used a more streamlined approach to bring to market the products the company thought it could sell within a reasonable time [and] rationalized its European manufacturing strategy and closed facilities in Neuss, Germany, and Vierzon, France." (*Id*. at ¶ 22.) As Plaintiffs demonstrate, however, at least most of these elements of this "new business strategy" were part of a restructuring program that Old Case initiated several years before the reorganization.

Specifically, Old Case implemented a restructuring program in 1991 "principally aimed at reducing costs." (Pls.' Resp., Ex. 6 at EM 00983.) Pursuant to this restructuring program, Old Case closed two European plants and "started rationalizing its product

lines." (*Id*. at EM 00984.) Old Case announced a second restructuring program on March 22, 1993, referred to as the 1992 Restructuring Program. (*Id*.) "Central elements" of the 1992 Restructuring Program included "an increased focus on core product lines . . . rationalizing production of selected components; consolidating and resizing production capacity; addressing unprofitable, highly proliferated products; transferring our retail stores to private ownership; and restructuring our parts distribution systems." (*Id*.) When New Case closed facilities in Neuss, Germany and Vierzon, France, it issued bulletins and news releases indicating that the closures were made as part of this 1992 Restructuring Program. (Pls.' Resp., Exs. 11; 13.) With respect to New Case's sale of dealerships, Mr. Christman admitted during his deposition that this privatization had begun in the Fall of 1992 under the Restructuring Program and that most of the dealerships in fact had been sold before the reorganization. (*Id*., Ex. 10 at 31-32.)

As Plaintiffs demonstrate, the evidence (including Mr. Christman's testimony during his deposition) contradicts the representations in Mr. Christman's declaration on which CNH relies to show a difference in the operation of Old and New Case. The undisputed evidence instead shows that any changes in New Case's operations were initiated before the reorganization as part of restructuring programs that Old Case implemented. In most respects, the two companies operated the same way. They manufactured the same products (using the same brand and sub-brand names), at the same locations, and with the same equipment, supervision, and workforce (the latter working under the same collective bargaining agreements). *Yolton*, 435 F.3d at 588-89. Old and

New Case further used the same dealers. They also sent correspondences and issued releases on the same "J.I. Case" letterhead, signed by the same company representatives, working at the same location and in the same positions. *Id*. at 588.

Based on the above analysis of the factors relevant to the determination of alter ego status, the Court finds no genuine issue of material fact that CNH is merely a continuation or alter ego of the company that employed Plaintiffs or their spouses and that signed the labor agreements under which Plaintiffs assert a right to lifetime vested retiree health insurance benefits.

**B.** **Whether the 1998 VEBA Agreement is an Accord and Satisfaction, Relieving CNH of any Liability for the Above-Cap Costs of Plaintiffs' Health Insurance Benefits**

To demonstrate that there has been an accord and satisfaction, the party asserting this defense must establish the following: (1) that there was a disputed claim, (2) a substitute performance agreed upon and accomplished, and (2) valuable consideration. *Yard-Man*, 716 F.2d at 1487-88 (citations omitted). In looking at whether the substituted performance was agreed upon, the Court must keep in mind that a union may not bargain away the vested rights of retirees without the retirees' consent. *Id.* at 1482 n. 8; *see also Cleveland Electric Illuminating Co. v. Utility Workers Union of Am.*, 440 F.3d 809, 817 (6th Cir. 2006). "If benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees." *Maurer*, 212 F.3d at 918.

CNH contends that the 1998 VEBA Agreement between New Case and the UAW constituted an accord and satisfaction because there was a dispute regarding the above-cap costs of Plaintiffs' health insurance benefits, New Case and the UAW agreed that the company would contribute money to the VEBA in lieu of making any further contributions toward those costs, and the amount New Case paid was substantial. According to CNH, the undisputed material facts demonstrate that the UAW had actual authority to negotiate the VEBA Agreement on behalf of retirees. Specifically, CNH contends that in the Fall of 1997, New Case told the affected retirees that the company and the UAW intended to discuss a "longer term" solution to the above-cap costs. CNH

19

further contends that Class members admitted in their depositions that they wanted the

UAW to work with New Case to solve the problem and that they did not object to the

UAW bargaining on their behalf.

CNH relies on the following "Statement of Undisputed Material Facts" to

demonstrate that the retirees consented to the VEBA Agreement:

> ¶ 18.  On November 5, 1997, Case Corporation's Marc Castor
> told affected retirees:
>
>> As you know, El Paso had indicated that you would
>> become responsible for your contribution to your
>> medical coverage effective April 1, 1998.  Because
>> Case and the UAW are concerned about the timing of
>> this new required contribution, Case will pay the $56
>> per employee per month contribution as an interim
>> solution through the end of 1998.  *We expect to be
>> discussing the longer term issues involved in your El
>> Paso plan during our upcoming negotiations.*
>
> Nov. 5, 1997, Castor-Retiree Ltr. 1 (Ex. 31) (emphasis
> added); Hitt Dep. 84:10-16.
>
> ¶ 19.  On December 3, 1997, the Case Council received a
> report from the UAW's Jack Reese "on El Paso and the
> retiree benefits."  Dec. 3, 1997 Case Council Mins. 1 (Ex. 32).
> "Many fe[lt] a letter should be sent to the retirees from the
> UAW stating [thei]r position and support for [thei]r
> members."  *Id.*  The UAW declined, "but advised locals that
> they could sen[d] letter[s] themselves."  *Id.*  The UAW's
> Dean Prine felt that the Case Council "should reassure retirees
> and bargain in 1998 to eliminate [the] retiree cap letter."  *Id.*
> Accordingly, at least one local union sent out a leaflet to
> reassure retirees that the UAW "would represent them and
> bargain for them."  Prine Dep. 183:7-22 (Ex. 33).  The
> affected retirees did not object to the UAW's handling of this
> issue.  Hitt Dep. 85:11-19.

(CNH's Br. in Supp. of Mot. at 7-8.)  For at least two reasons, this Court finds that this evidence fails to demonstrate that Plaintiffs consented to the 1998 VEBA Agreement as an accord and satisfaction of Case's obligations for any further the costs of their health insurance benefits.

There is no evidence that any retiree was informed of– much less consented to– the actual accord and satisfaction.  At most, retirees were informed that Case "expect[ed] to be discussing the longer term issues in [their] El Paso plan during [Case's and the UAW's] upcoming negotiations."  (CNH's Mot., Ex. 31.)  According to the evidence CNH cites, the International UAW decided not to inform retirees of its position but left it to the local unions to decide whether to send something to retirees.  CNH only presents evidence to show that "at least *one*" local union sent a leaflet to retirees, but even then there is no evidence that this leaflet (which has not been submitted to the Court) informed the retirees that the Union intended to relieve Case of any future obligations for Plaintiffs' health insurance benefits in exchange for its contribution to the VEBA.

There is no evidence that Plaintiffs granted the UAW authority during its negotiations with Case to relieve Case of its contractual obligations to pay the costs of Plaintiffs' vested health care benefits.  Plaintiffs did not consent to such an agreement thereafter.  In fact, CNH offers no evidence to suggest that the contents of the VEBA Agreement were ever disclosed to retirees beyond perhaps the amounts Case and the UAW agreed to contribute to partially defray the above-cap costs of their health insurance benefits.  Unlike *Keppard v. International Harvester Co.*, 581 F.2d 764, 767 (9th Cir.

21

1978)– a case on which CNH relies– the surrounding circumstances do not indicate that Plaintiffs knew that Case's contribution to the VEBA was understood to be a full settlement of the company's liability for the costs of their vested health insurance benefits. As a result, this Court cannot find that the 1998 VEBA Agreement constitutes an accord and satisfaction.

**IV.    Conclusion**

Based on the foregoing analysis, the Court concludes that CNH is the same entity that employed Plaintiffs or Plaintiffs' spouses and therefore is contractually obligated for the costs of Plaintiffs' retiree health insurance benefits. The Court further concludes that CNH is not relieved of its contractual obligations as a result of the 1998 VEBA Agreement.

Accordingly,

**IT IS ORDERED**, that CNH's motion for summary judgment is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Roger J. McClow, Esq.
Norman C. Ankers, Esq.
Thomas G. Kienbaum, Esq.
Bobby R. Burchfield, Esq.