UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLADYS YOLTON, WILBUR
MONTGOMERY, ELSIE TEAS, ROBERT
BETKER, EDWARD MAYNARD, and
GARY HALSTEAD, on behalf of themselves
and a similarly situated class,

        Plaintiffs,                  Case No. 02-75164

v.                                    Honorable Patrick J. Duggan

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

        Defendants.

_____/

**OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AS TO LIABILITY; (2) DENYING EL PASO
TENNESSEE PIPELINE CO.'S MOTION FOR SUMMARY JUDGMENT ON
VESTING; AND (3) DENYING EL PASO TENNESSEE PIPELINE CO.'S
MOTION FOR SUMMARY JUDGMENT REGARDING LIABILITY FOR
ABOVE-THE-CAP COSTS FOR CLASS MEMBERS WHO RETIRED AFTER
THE CAP AGREEMENT**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 7, 2008.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

In this lawsuit, a Class of retirees of the Case Corporation ("Case") and surviving

spouses of those retirees seek fully funded, lifetime retiree health care benefits.[1]  Plaintiffs

_____

[1]The Class is defined as follows:

allege two counts against Defendants in their complaint. First, Plaintiffs claim that

Defendants breached labor agreements in violation of Section 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185. In their second count, brought

under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"),

29 U.S.C. § 1132(a)(1)(B), Plaintiffs seek to recover benefits due and to clarify their right

to benefits under an employee welfare benefit plan. El Paso Tennessee Pipeline Co. ("El

Paso") and CNH America LLC ("CNH") have filed cross-claims against each other,

contending that the other is liable for the disputed costs of Plaintiffs' health insurance

benefits and must defend and indemnify the non-liable party against Plaintiffs' lawsuit.

Presently before the Court are the following motions:

> (1) El Paso's Motion for Summary Judgment on Vesting, filed
> June 1, 2007;
>
> (2) El Paso's Motion for Summary Judgment Regarding
> Liability for Above-the-Cap Costs for Class Members Who
> Retired After the Cap Agreement ("Motion on After Cap
> Retirees"), filed on the same date; and
>
> (3) Plaintiffs' Motion for Summary Judgment as to Liability,
> filed June 4, 2007.

CNH filed a notice on June 4, 2007, indicating that it joins in El Paso's motions. All three

---

> All former bargaining unit employees who retired under the Case
> Corporation (formerly J.I. Case) Pension Plan for Hourly Paid
> Employees on or before July 1, 1994 (other than former employees
> eligible for or receiving retirement benefits under the deferred
> vested provisions of the Pension Plan) and all surviving spouses of
> those former bargaining unit employees.

Order Granting Pls.' Mot. for Class Certification. (E.D. Mich. Sept. 3, 2004).

motions are filed pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and are fully briefed. This Court held a motion hearing on November 20, 2007.

## I.    Factual and Procedural Background

J.I. Case was established in 1842 and became a wholly owned subsidiary of Tenneco, Inc. (now El Paso) in 1970. The company was renamed the Case Corporation in 1989. Plaintiffs are retirees or surviving spouses of the J.I. Case Company or the Case Corporation.[2]

The International Union, United Automobile, Aerospace and Agricultural Workers of America ("UAW") represented Case employees in collective bargaining over the years. Since 1967, the UAW and Case have negotiated a number of collective bargaining agreements, referred to as Central Agreements, including Central Agreements in 1971, 1974, 1980, 1983, 1987, and 1990. In 1993, the UAW and Case negotiated an Extension Agreement which extended the 1990 Central Agreement through February 5, 1995. The Central Agreements contain termination clauses, providing that the agreements will continue until a specified date which generally is three years from their effective date.

Beginning with the 1971 Central Agreement, collectively bargained group insurance benefits are contained in a separate document, the "Group Insurance Plan." With respect to the Group Insurance Plan, the Central Agreements between Case and the UAW from 1971 forward contain the following language: "The group insurance agreed to

---

[2]Although some Plaintiffs or their spouses retired while the company was named J.I. Case, the Court will refer to the company only as Case in this Opinion and Order.

between the parties will run concurrently with this Agreement and is hereby made a part

of this Agreement." *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 575 (6th

Cir. 2006). The language of the Group Insurance Plans from 1971 through 1998 remains

substantially unchanged.

The Group Insurance Plans provide the following with respect to eligibility for

retiree benefits: "Employees who retire under the Case Corporation Pension Plan for

Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension

under the provisions of that Plan, shall be eligible for the Group benefits described in the

following paragraphs." *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455,

460 (E.D. Mich. 2003). Beginning in 1974, Case agreed to pay the full cost of health care

benefits for retirees and eligible surviving spouses, regardless of age. Therefore, from

that year forward, under a section entitled "Contribution for Coverage," the Group

Insurance Plans provide that "the company shall pay the full premium cost of the above

coverages."

As mentioned previously, the UAW and Case negotiated an Extension Agreement

in 1993, extending the 1990 Central Agreement and Group Insurance Plan through

February 4, 1995. The Extension Agreement sets forth certain pension "improvements"

and provides the following with respect to wages, pension, and insurance: "Except for the

pension improvements set forth in Section 3, all wage schedules, pension benefit and

insurance levels now in effect will remain in effect at the current schedule rates or levels

for the term of the Extension Agreement." *Yolton*, 318 F. Supp. 2d at 461-62. In a

section entitled "FAS 106 Out-Year Cost Limiters,"[3] the Extension Agreement adopts an

attached "Letter of Agreement," effective October 3, 1993. *Id.* at 462. This Letter of

Agreement (hereafter "FAS 106 Letter"), which is addressed from Case to the UAW,

reads:

> This will confirm our understanding that the average per
> capita annual cost to the Company of providing medical and
> related benefits under the Case Group Benefit Plan to retired
> employees and surviving spouses of deceased employees shall
> not exceed $2,750 for Medicare eligible individuals and
> $8,500 for those individuals who are not eligible for
> Medicare. Notwithstanding the foregoing, no covered person
> shall be required to pay a portion of any excess amount prior
> to April 1, 1998.

*Id.*

Over the years, Summary Plan Descriptions ("SPDs") describing the insurance

benefits under the Group Insurance Plans were prepared. The SPDs between 1974 and

1980 include the following provision in which Case reserves the right to change the terms

of the Group Insurance Plan:

> It is hoped that the Group Policies will be continued
> indefinitely through the years, but your employer necessarily
> reserves the right, subject to the applicable provisions of the
> Labor Agreement between the Union and the Company, to

---

[3]"FAS 106" refers to an accounting standard promulgated by the Financial
Accounting Standards Board, which was effective on December 15, 1992. This rule
requires companies to report as costs on their financial statements, the present value of
their estimated future post-retirement health care obligations. *See Wise v. El paso
Natural Gas Co.*, 986 F.2d 929, 932 & n.3 (5th Cir. 1993). In other words, the
accounting standard requires companies to report their estimated future post-retirement
health care costs on an accrual basis, rather than on a "pay-as-you-go" basis.

terminate or change the Plan in the future.

*Yolton*, 435 F.3d at 575.  The SPDs between 1987 and 1993 state: "If there is any variance between the contents of this booklet and the above documents [the actual contracts, plan documents, and labor agreements on which the benefits are based], those documents will govern."  (El Paso's Mot. on Vesting, Ex. 3-G at 1; Ex. 3-H at 1.)

These latter SPDs contain "Cessation of Coverage" provisions indicating that coverage will cease upon the following events:

> 1.    All . . . coverage will cancel for you and your eligible dependents on your last day of work.
>
> 2.    Your coverage on account of any dependent shall automatically cease on the date such person ceases to be your dependent.
>
> 3.    If the Plan is canceled in whole or in part, coverage affected will immediately cease.

(*See, e.g., id.*, Ex. 3-G at CNH 0458, CNH 0559, CNH 05713-H.)  Although "Cessation of Coverage" provisions appear in the sections of the SPDs describing the various types of insurance coverage (e.g. medical, dental, long-term disability), no such provision appears in the section of the SPDs discussing retiree insurance benefits.  (*Id*. at CNH 0615-CNH 0618.)

With regard to retiree health insurance benefits, the SPDs repeat the eligibility criteria in the Group Insurance Plans and provide that benefits under those plans will continue after retirement for "[e]mployees who retired under the J.I. Case Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's

pension under the provisions of that plan." (*Id*., Ex. 3-g at CNH 0616; Ex. 3-H at EP

000216.)  The SPDs further inform retirees that "the benefits and maximums under these

continued coverages will be the same as those that were in effect on the day preceding

your retirement," and that "[t]he cost of this coverage is fully paid for by the employer."

(*Id*., Ex. 3-G at CNH 0616-CNH 0617; Ex. 3-H at EP 000216 & EP 000219.)

In 1994, Tenneco underwent a reorganization to spin off its own and Case's

agriculture and construction business assets.  To accomplish the reorganization, Tenneco

formed a new corporation, Case Equipment Corporation (now CNH America), and

pursuant to a Reorganization Agreement and Benefits and Compensation Allocation

Agreement ("Allocation Agreement"), transferred those assets to Case Equipment.

Included in the transferred assets was all of the "Case Business" (defined as the farm and

construction equipment business of Tenneco), except for Tenneco's Case stock, certain

demand notes and subordinated debt, and the "Retained Assets" and "Retained

Liabilities."  Included in the definition of "Retained Liabilities" were "the Case liabilities

for postretirement health and life insurance benefits (to the extent that Case is obligated

on the Reorganization Date [June 23, 1994]) of retirees of the Case Business in the United

States and current employees of the Case Business in the United States who retire on or

before July 1, 1994 and their dependents . . ." *Yolton*, 435 F. 3d at 575-76.  In the

Reorganization Agreement, Tenneco (now El Paso) agreed to indemnify Case Equipment

"from and against any and all Liabilities, and any claims, demands, and rights of the

[Case Equipment] Indemnitees arising out of or due to . . . the failure or alleged failure of

Tenneco or any Tenneco subsidiary to pay . . . any of the Retained

Liabilities . . ." *Id.* at 576.

Immediately after the reorganization, Case Equipment changed its name to the

Case Corporation. In September 2002, the company changed its name to Case LLC and

eventually became CNH.

Pursuant to the Reorganization Agreement and the Allocation Agreement, Tenneco

began paying the full cost of Plaintiffs' health insurance coverage in mid-1994. In

November 1996, Tenneco sent a letter to Plaintiffs, informing them of its impending

merger with El Paso and advising that El Paso would maintain their health care benefits

after the merger. In mid-1997, after the merger, the costs of Plaintiffs' health insurance

coverage exceeded the cap levels set forth in the 1993 FAS 106 Letter.

On October 27, 1997, El Paso sent a letter to Plaintiffs informing them that, as of

April 1, 1998, they would be required to contribute $56 per month to continue

participating in the El Paso Benefit Plan by which they received health insurance

coverage. (El Paso's Mot. on After Cap Retirees, Ex. F.) In this letter, El Paso states that

it is authorized to seek this contribution based upon the "cost-sharing provision" in the

1993 agreement between Case and the UAW. (*Id.*) El Paso further states that it reserves

"the right to make additional changes, including changes to the cost-sharing features of

the plan." (*Id.*)

Prior to April 1, 1998 (the date El Paso would begin seeking contributions from

Plaintiffs), as part of their negotiations for a new CBA, the UAW asked Case (CNH

America) to pay the $56 per month contribution that El Paso sought from Plaintiffs. Case agreed to pay this amount through the end of 1998, and informed Plaintiffs of this agreement in a letter dated November 5, 1997. (*Id*., Ex. G.) Case further informed Plaintiffs that it and the UAW intended to continue discussing "the longer term issues involved in your El Paso plan during upcoming contract negotiations." (*Id*.)

During those negotiations, Case and the UAW entered into an agreement ("VEBA Agreement") in which both parties agreed to make deposits of specified amounts in a trust qualifying as a Voluntary Employee Benefit Association ("VEBA"). Case and the UAW further agreed that the amounts in the VEBA would be applied to partially defray the cost of Plaintiffs' medical benefits in excess of the cap. Case agreed to contribute $24.7 million to the VEBA; the UAW agreed to contribute $2.8 million.

In the Summer of 2002, when the funds that the UAW and Case contributed to the VEBA were exhausted, the UAW asked Case and El Paso to make additional contributions to fund the above-cap costs of Plaintiffs' health insurance coverage. Both companies refused. In August 2002, El Paso sent a letter to Plaintiffs informing them that they would need to contribute $290 per month in order to continue receiving retiree health care benefits. In December 2002, El Paso sent another letter to Plaintiffs, indicating that their premiums would increase to $501 per month as of January 2003. Subsequently, in October 2003, El Paso informed retirees that their monthly contribution would increase to $561 as of January 2004. Case changed its name to CNH on January 1, 2004.

In the interim, on December 23, 2002, Plaintiffs filed this lawsuit. Plaintiffs also

filed a preliminary injunction motion, asking the Court to order Defendants to resume paying the full costs of their retiree health insurance benefits.

On December 31, 2003, this Court issued an opinion and order granting Plaintiffs' preliminary injunction motion. *Yolton*, 318 F. Supp. 2d 455. The Court concluded that, except for individuals retiring after October 3, 1993 and their surviving spouses, Plaintiffs likely would prevail in establishing their entitlement to vested retiree health insurance benefits. *Id*. at 471. The Court excluded post-October 3, 1993 retirees and their surviving spouses from its preliminary injunction order because that was the effective date of the FAS 106 Letter between the UAW and Case and the Court found that the letter "arguably capped Case's retiree health insurance obligations." *Id*. at 473.

Although initially concluding that El Paso was the party liable for the above-cap costs of Plaintiffs' benefits based on the Reorganization Agreement and Allocation Agreement, the Court reconsidered this holding and found that Case (CNH) is the party primarily liable for those costs. *Yolton v. El Paso Tennessee Pipeline Co.*, 2004 WL 3661450 (E.D. Mich. Mar. 9, 2004). The Court made this change because the Defendants' cross-claims, and therefore the issue of which defendant was liable for the cost of Plaintiffs' health insurance coverage based on the Reorganization Agreement and Allocation Agreement, were not yet before the Court when it decided Plaintiffs' preliminary injunction motion. Only Case (CNH)– which the Court determined was the same entity as the company that employed Plaintiffs or their surviving spouses– was a signatory with the UAW to the Central Agreements and Group Insurance Plans that

granted Plaintiffs the right to vested retiree health insurance benefits.

CNH subsequently filed a motion seeking summary judgment in its favor on its and El Paso's cross-claims. On September 3, 2004, this Court granted summary judgment to CNH. The Court concluded that, pursuant to the Reorganization Agreement and Allocation Agreement, El Paso assumed the liability for the cost of Plaintiffs' retiree health insurance benefits and agreed to indemnify CNH for its failure to pay the costs of those benefits.

Defendants appealed the Court's various rulings. On January 17, 2006, the Sixth Circuit affirmed. *Yolton*, 435 F.3d 571.

In the meantime, this Court was assigned a companion lawsuit brought by individuals who retired from Case after July 1, 1994, or their surviving spouses. *Reese v. CNH Global N.V. et al.*, Case No. 04-70592 (E.D. Mich. filed Feb. 18, 2004). The plaintiffs in *Reese*, who retired under Central Agreements and Group Benefit Plans substantially identical to those at issue in this case, sought a declaratory judgment that they have a vested right to lifetime retiree health insurance benefits. On August 29, 2007, this Court granted summary judgment to the *Reese* Plaintiffs, concluding that they are entitled to vested lifetime retiree health insurance benefits pursuant to the plain language of those agreements. In reaching this conclusion, the Court determined that the 1993 FAS 106 Letter and its 1995 replacement did not defeat the plaintiffs' claim to vested benefits, as the evidence demonstrated that the UAW and Case did not intend for the caps in those letter to ever have a substantive effect on retirees and their surviving spouses, but was

imposed for accounting purposes only.

In light of this Court's decision in *Reese*, the Plaintiffs in this action moved to extend the preliminary injunction entered on December 31, 2003, to include individuals in the certified Class who retired after the effective date of the FAS 106 Letter, or their surviving spouses. On October 17, 2007, this Court granted Plaintiffs' motion.

## II.     Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of

evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Governing Principles

Retiree health insurance benefit plans are welfare benefit plans under ERISA and, as such, unlike pension plans, are not subject to mandatory vesting requirements under the statute. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)). "If lifetime health benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan." *Yolton*, 435 F.3d at 578 (citing *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)). If the parties intended the benefits to vest for the lifetime of the retirees, the employer's unilateral modification or reduction of those benefits will constitute an LMRA violation. *Id.* (citing *Maurer*, 212 F.3d at 914). "If a welfare benefit has not vested, 'after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA.'" *Id.* (quoting *Bittinger v. Tecumseh Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D. Mich. 1998)).

The Sixth Circuit's decision in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (1983), sets forth the guiding principles for determining whether the parties to a collective bargaining agreement intended to vest retiree insurance benefits. Pursuant to these principles, courts

13

must apply basic rules of contract interpretation to discern the intent of the parties:

> [T]he court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The Court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id*. at 1479-80 (internal citations omitted). Where the above analysis fails to resolve any ambiguities, courts may look to extrinsic evidence to determine the parties' intent.

*Yolton*, 435 F.3d at 579 (citations omitted).

## IV. Application

Before interpreting the relevant Central Agreements and Group Benefit Plans, the Court will address an argument that El Paso raises for the first time in response to Plaintiffs' motion for summary judgment. El Paso argues that Plaintiffs fail to put forth a theory for holding it liable for the costs of their health insurance benefits as it was not a signatory to the labor agreements or Plaintiffs' employer and Plaintiffs were not third-

party beneficiaries of the Reorganization Agreement and Allocation Agreement. As El Paso correctly states, under Delaware law (which undisputedly controls), whether the parties intended to create a third-party beneficiary depends on the contract language and a provision in the parties' contract providing for no third-party beneficiaries demonstrates a specific intent not to confer third-party beneficiary status on anyone. *McKesson HBOC, Inc. v. New York State Common Retir. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003) (citing *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989)) (applying Delaware law).

El Paso, however, is liable to Plaintiffs as an assignee of Case's obligations under the relevant labor agreements. As set forth in Section I, in the Reorganization Agreement and Allocation Agreement, Tenneco (now El Paso) assumed Case's liability for the costs of Plaintiffs' retiree health insurance benefits.[4] Thus El Paso agreed to assume Case's obligations to on or before July 1, 1994 retirees and their dependents under the relevant labor agreements. "[A]n assignee of a contract [El Paso] who assumes the obligations which the contract imposes on his or her assignor [Case] becomes directly liable on the contract to the other contracting party." *Hursey Porter & Assoc. v. Bounds*, No. 93C-01-091, 1994 WL 762670, at *17 (Del. Super. Dec. 2, 1994) (unpublished opinion) (citing 6

---

[4] Although the costs of Plaintiffs' health insurance benefits were referred to as "*Retained* Liabilities," those liabilities previously belonged to Case, not Tenneco. Thus the liabilities actually were assigned to or assumed by Tenneco.

Am Jur. 2d Assignments § 109).[5]

Moreover, El Paso's argument only is relevant with respect to Plaintiffs' claim under the LMRA. There is no dispute that, since the reorganization, Plaintiffs' retiree health insurance benefits are provided pursuant to Tenneco's and now El Paso's Benefit Plan, which is a welfare benefit plan under ERISA. Pursuant to Sixth Circuit law, the proper defendant in an ERISA action under 29 U.S.C. § 1132(a)(1)(B) is the party that is shown to control administration of the plaintiff's plan. *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988). Thus regardless of whether El Paso was Plaintiffs' employer or a signatory to the labor agreements or whether Plaintiffs were third-party beneficiaries under the Reorganization Agreement and Allocation Agreement, as administrator of Plaintiffs' health insurance benefit plan, El Paso may be liable to Plaintiffs under Section 501(a)(1)(B) of ERISA.

Turning to the labor agreements, in granting Plaintiffs' motion for preliminary injunction, this Court concluded that the express language of those agreements evidenced Case's and the UAW's intent to vest Plaintiffs' health care benefits for life.[6] *Yolton*, 318

---

[5]Even if El Paso is not directly liable to Plaintiffs as an assignee of Case's duties to these retirees and their surviving spouses, this Court determined in granting summary judgment to CNH on its cross-claim against El Paso that El Paso is the party ultimately obligated to pay the costs of those benefits (whether it pays those costs directly or reimburses CNH for the latter's payment of the costs).

[6]El Paso now argues that the "clear and express statement" rule should be applied to determine whether Plaintiffs are entitled to vested retire health insurance benefits. (El Paso's Br. in Supp. of Mot. on Vesting at 1.) Pursuant to this rule, "retiree health insurance benefits are not vested unless the employer's commitment to vest those benefits

F. Supp. 2d at 465-68.  The Sixth Circuit affirmed, summarizing its reasoning as follows:

> Prior cases of [the Sixth Circuit] have highlighted factors indicating an intent to vest benefits that were present in this case.  Additionally, we believe that the district court correctly interpreted the plain language of the CBAs and Group Insurance Plans as well as the agreement as a whole.  The language tying health care benefits to pension benefits and the context of the bargaining demonstrate an intent to provide lifetime benefits.  Furthermore, we do not believe that the general durational language in the CBA limits the duration of the health care benefits themselves, but rather merely provides a limitation on the agreement itself. The use of identical language in the CBAs referring to pension benefits and health care benefits provides strong additional support that the benefits are tied together and that they are lifetime benefits.

435 F.3d 571. This Court came to the same conclusion when it reevaluated the identical language in the Central Agreements and Group Insurance Plans in deciding the summary judgment motions in *Reese*.

In reaching the above decisions, this Court and the Sixth Circuit rejected the same

---

is 'stated in clear and express language.'"  (*Id*. (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)).  In other words, El Paso maintains that the relevant agreements must contain specific vesting language.  El Paso's argument ignores at least twenty four years of Sixth Circuit precedent as to how courts should determine whether vested benefits are granted in collectively bargained agreements.  In cases involving collectively bargained plans, the Sixth Circuit does not require specific vesting language but has instructed courts to apply the principles of contract interpretation set forth in *Yard Man* and determine whether the parties intended for the retiree health insurance benefits to vest.  *See, e.g., Policy v. Powll Pressed Steel Co.*, 770 F.2d 609 (6th Cir. 1985) (citing *Yard-Man*); *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648 (6th Cir. 1996) (same).

arguments that El Paso raises now.[7]  For that reason, the Court finds it unnecessary to

address again El Paso's arguments with respect to the proper interpretation of the Central

Agreements and Group Insurance Plans and adopts here its prior reasoning in granting

Plaintiffs' motion for preliminary injunction and the Sixth Circuit's analysis in affirming

that decision and this Court's reasoning in granting the plaintiffs' motion for summary

judgment in *Reese*.  The language this Court and the Sixth Circuit analyzed in those

previous decisions has not changed and El Paso fails to convince the Court that its prior

interpretation of the relevant labor agreements was otherwise incorrect.

    El Paso also fails to convince the Court that it incorrectly interpreted in *Reese*

_____

[7]One argument that the Court perhaps has not addressed in writing is El Paso's
claim that the UAW's request for "lifetime" language in the 1993 FAS 106 Letter, in
contradiction to a union-wide directive warning against such requests, demonstrates that
the UAW did not believe that prior labor agreements conferred vested or lifetime health
insurance benefits upon retirees.  El Paso cites a union-wide directive issued by UAW
President Owen Bieber in the aftermath of *Yard-Man*, discouraging UAW negotiators
from attempting to clarify ambiguous contract language concerning the duration of retiree
health insurance benefits as such attempts could create "bad bargaining history" that
would defeat the *Yard-Man* presumption that retiree benefits vest.  (*See* El Paso's Mot. on
Vesting, Ex. 17.) El Paso argues that UAW negotiators only would have requested
lifetime language in the FAS 106 Letter and ignored President Bieber's warning if they
believed that earlier labor contracts did not confer vested benefits upon Case retirees.
The Court finds no merit in El Paso's argument for at least two reasons.
    First, President Bieber's memo is dated April 23, 1984– eight years before the
negotiations concerning the FAS 106 Letter.  There is no evidence that the UAW
representatives who negotiated the FAS 106 Letter were aware of President Bieber's
memo when it was circulated or that they recalled President Bieber's warning when they
requested the insertion of lifetime language.  Second, even if they believed that earlier
labor agreements conveyed vested health insurance benefits upon retires, the UAW
negotiators may have sought lifetime language in the FAS 106 Letter to leave no doubt
that the parties did not intend for the caps in the letter to have a substantive impact on
retirees' entitlement to lifetime health insurance coverage.

Case's and the UAW's intent with respect to the 1993 FAS 106 Letter and the 1995

extension of that letter. First, the Court found in *Reese* that the FAS 106 Letter did not

unambiguously cap Case's future costs for retiree health insurance benefits, particularly

when viewed in the context of the overall Extension Agreement. The letter is an

attachment, incorporated into the Extension Agreement. The Extension Agreement itself

fails to mention any future cap on retire health insurance costs, even though there is a

specific section in the agreement discussing insurance levels. The Extension Agreement

refers to the letter only in a section entitled "FAS 106 Out-Year Cost Limiters," providing

simply: "The Letter of Agreement appended as Attachment B is adopted effective

October 3, 1993." (italics omitted). The title of this section on its own strongly indicates

that Case and the UAW viewed the letter simply as an accommodation for Case to

address the recently enacted FAS 106 accounting standard, and not as a substantive cap

on the company's future liability for the costs of retiree health insurance.

While the language of the FAS 106 Letter appears to unambiguously impose a cap

on Case's future liability for those costs, the Court believes that the parties' selection of a

date beyond the negotiations for the subsequent Central Agreement for when any covered

person could be required to pay any amount above the stated caps creates an ambiguity as

to whether Case and the UAW actually intended for the cap to ever take effect. As this

Court explained in *Reese*:

> The Cap Letters do not provide that individuals *will* be
> required to pay anything as of a subsequent date. Instead,
> they only state that "no covered person shall be required to

> pay a portion of any excess amount prior to [a specified future date]." Because the future dates selected in the Cap Letters are beyond the negotiation period for the subsequent Central Agreement, it is not clear whether the UAW and Case intended and/or otherwise agreed to take actions during future negotiations to prevent the cap from taking effect.

*Reese v. CNH Global et al.*, No. 04-70592, 8/29/07 Op. and Order [Doc. 214] at 19.

As the Court found ambiguity with respect to Case's and the UAW's intent in executing the FAS 106 Letter, it looked to extrinsic evidence and found, based on that evidence, no genuine issue of material fact that the parties did not intend for the cap to ever have a substantive effect on retirees and their surviving spouses, but was imposed solely for accounting purposes. *Id.* at 19-21. Among the extrinsic evidence the Court relied upon was the fact that for almost a decade after the adoption of the FAS 106 Letter, employees within Case's Benefits Department neither understood nor informed employees retiring from Case that their future retiree medical benefits would be subject to a cap. To the contrary, the evidence shows that Case's representatives understood and informed retirees and spouses of retirees that they were entitled to health insurance coverage for their lifetimes and at no cost. *Reese*, 8/29/07 Op. and Order at 21-22. In its reply brief in support of its motion for summary judgment on after cap retirees, El Paso offers for the first time the declaration of George Matkov Jr., a labor lawyer who participated in the negotiations with the UAW on behalf of Case. (El Paso's Resp. [Doc. 304], Ex. 4.) In his declaration, Mr. Matkov states that it was not *his* understanding that retiree health insurance benefits were vested lifetime, free benefits. (*Id.*) However, self-

serving declarations and deposition testimony of individuals associated with Defendants, such as Mr. Matkov, are not persuasive and can not create a genuine issue of material fact where they are contradicted by documents prepared by and statements made by Case's benefit representatives well before this litigation began.

In addition to the extrinsic evidence discussed in *Reese*, the Court finds it significant that for four and a half years after the FAS 106 Letter went into effect, the cap never was included in any Group Insurance Plan or SPD distributed to Plaintiffs.  (Pls.' Resp. to El Paso's Mot. on After Cap Retirees [Doc. 296], Ex. 25 at 394-95.)  Also significant are the descriptions of the letter that were given *around the time* it was adopted.  During his deposition in this case, Harold Dean Prine, Chairman of one of the UAW Locals, recalled that UAW International Union Representative Phil Cabreros explained the FAS 106 Letter at a meeting in September 1993 as follows:

> The Company requested relief for accounting  as a result of
> the new FASB law. . . . We were told that the Company – this
> letter to them, that no one would ever have to pay anything as
> a result of it; that this was being done strictly for FASB
> reasons, that would help the Company a lot; and the dates
> would be moved out or the caps would be raised during the
> follow-up negotiations.  So no one would ever have to pay
> anything.

(Pls.' Reply [Doc. 324], Ex. 25 at 69-70.)  Mr. Prine subsequently relayed the same information to the UAW membership.  (*Id*. at 89-90.)  Further, when El Paso sent its October 27, 1997 letter to retirees, claiming that the FAS 106 Letter was a "cost-sharing provision" between Case and the UAW, the UAW immediately responded that El Paso's

claim was "shocking." (Pls.' Resp. to El Paso's Mot. on After Cap Retirees [Doc. 296], Exs. 37-39.) The UAW assured its members that it and Case never intended for the letter to have a substantive impact on the company's obligations for retiree health insurance costs, but rather that the letter was executed for accounting purposes only to help Case handle the recently enacted FAS 106 accounting rule. (*Id.*)

In support of its claim that the UAW's and Case's intent was otherwise, El Paso argues that the UAW would not have agreed to the FAS 106 Letter unless it believed that retiree health insurance benefits were not vested. However, if the UAW understood that the FAS 106 Letter was for accounting purposes only– and therefore that it would never actually have a substantive effect on the company's liability for retiree health insurance costs– the UAW's belief as to whether or not retirees were entitled to vested health insurance benefits would not have been relevant to its decision whether to agree to the letter. Moreover, a year and a half before the UAW agreed to the FAS 106 Letter, Case had expressed to UAW representatives that retiree health insurance benefits were vested. (Pls.' Reply [Doc. 324], Ex. 14 at 191-96 & Dep. Ex. 24.)

In May 1992, Case and UAW representatives met to discuss ways of addressing the company's upcoming FAS 106 accounting problem. At this meeting, Mr. Matkov made a Power Point presentation on behalf of Case. (*Id.*) On page 5 of that presentation there is a description of "Plan Provisions - UAW Represented Retirees." (*Id.* at Dep. Ex. 24.) Next to the phrase "Annual Contributions" is the word "None" and next to the phrase "Duration of Benefits" is the word "Lifetime." (*Id.*)

Based on Case's admission at this meeting, the Court also does not find a genuine issue of material fact regarding Case's and the UAW's understanding of whether the Central Agreements and Group Benefit Plans granted vested health insurance benefits to retirees based on the UAW's request and Case's refusal to add a "lifetime" term to the FAS 106 Letter. This admission also contradicts Mr. Matkov's claim in his recent declaration that he "rejected [the UAW's] demand [for a "lifetime" term], pointing out that retiree health care was not vested and would not be recognized as vested." (El Paso's Resp. [Doc. 304], Ex. 4 at ¶¶ 12 & 13.) In any event, there is no evidence of Mr. Matkov's purported statement. Instead, the evidence shows that a few days after the UAW made its request for the inclusion of a "lifetime" term, Mr. Matkov prepared a "Talk Sheet" which included an assurance to the UAW that the caps would have "No practical effect; Won't hurt anyone." (Pls.' Resp. to El Paso's Mot. on Above Cap Retirees [Doc. 296], Ex. 9.; Pls.' Reply [Doc. 324], Ex. 15 at 20.) This assurance is consistent with a description of the "cap" approach to the FAS 106 accounting problem that Mr. Matkov's firm provided in an October 21, 1992 memorandum to Case.[8] (El

_____

[8]As described in the memorandum:

> The dollar cap reduces the employer's obligation because it affects the current estimate of how much medical cost the employer will pay in the future based on the current terms of the plan, including the cap. If the cap is raised in the future, the plan will have an experience loss. The amount of additional liability attributable to the change in the dollar cap will be spread over future years like other experience gains or losses. The same thing is true of any benefit improvement.

Paso's 11/19/07 Supp. Br., Ex. 9 at UAW 3281.)

El Paso further argues that, if the FAS 106 Letter was for accounting purposes only, the UAW would not have focused on the level of the caps and the dates when the caps could be enforced during the negotiations concerning the terms of the letter. In this Court's opinion, however, these details were important specifically because the parties intended the letter to be for accounting purposes only, as they needed to make sure that the cap levels selected would not be reached before the negotiation period for the next Central Agreement. As Frank Musick, the UAW's internal actuary who advised the UAW's negotiators regarding the appropriate cap levels testified, the UAW negotiated the specific cap levels and effective date to provide a "cushion" or "comfort level" to guarantee that the levels were not reached before the next negotiation session. (Pls.' Resp. to El Paso's Mot. on After Cap Retirees [Doc. 296], Ex. 7 at 91-101 & 131.) Contrary to El Paso's assertion, Mr. Musick did not claim during his deposition that the UAW believed the caps were real. Rather, Mr. Musick explained repeatedly that the FAS 106 Letter was an accommodation to Case to deal with an accounting issue *only*. (*Id*.)

In support of its assertion that the UAW and Case intended the FAS 106 Letter to

---

> The cost attributable to that change will be taken into account when it is negotiated or adopted and will be spread over future years. *No individual is harmed by this arrangement* and costs are more realistically assigned to the particular period in which benefits are negotiated.

(El Paso's 11/19/07 Supp. Br., Ex. 9 at UAW 3281 (emphasis added).)

substantively cap Case's future liability for the cost of retiree health insurance, El Paso also refers to an SPD it prepared in 1997. At page 7, in a section entitled "Paying for Coverage," this SPD provides in part: "The retiree contribution for 1998 is $56 per month." (El Paso's Mot. on After Cap Retirees [Doc. 260], Ex. AA at EP 004656.) At page 57, in a section entitled "Maximum Annual El Paso Health Care Contribution," the SPD sets forth the cap levels contained in the FAS 106 Letter and states: "The Maximum Annual El Paso Health Care Contribution has been reached, which means all future benefit increases will be borne by the participant and not the Plan Sponsor." (*Id.* at EP 004708.) El Paso claims that the UAW did not dispute the statements in this SPD.

First, the Court does not believe that *El Paso's* statements in a 1997 SPD are evidence of *Case's* and the UAW's intent when they entered the FAS 106 Letter four years earlier. Second, the SPD specifically provides that if it conflicts with the official plan documents, the official documents prevail. (*Id.* at EP 004644.) Third, and contrary to El Paso's assertion, the UAW did object to this language. On a list of "SPD Discrepancies," the UAW responded to the "Paying for Coverage" section: "[T]his paragraph continues to speak to retiree fears!" (*Id.*, Ex. BB.) Additionally, on July 19, 1999, Jack Reese of the UAW provided the following in a list of "SPD Discrepancies" that he sent to Bernie McDearman, Principal of El Paso's Corporate Benefits Department:

> These Sections ("Paying for Coverage" and ["]Minimum Annual El Paso and Health Care Contribution") should be re-written to accurately describe El Paso's obligations, as well as Case's obligations for amounts over the caps. As written, they inaccurately describe the funding of the plan.

(Pls.' Resp. to El Paso's Mot. on After Cap Retirees [Doc. 296], Ex. 56 at UAW 0969.)

In any event, El Paso presents no evidence to suggest that any SPD discussing a cap on its

obligation for retiree health insurance costs was ever disseminated to retirees, and the

evidence Plaintiffs present indicates otherwise. (*Id*., Ex. 26 at 32; Ex. 25 at 394-95.)

El Paso further points to remarks that Richard Shoemaker made at a meeting of the

UAW's International Executive Board ("IEB") in December 1997. Reporting on the

status of the UAW's relationship with Case leading up to contract negotiations in 1998,

Mr. Shoemaker stated:

> We have a huge issue there over a program that was put in
> place last time to cap the cost of insurance to the company for
> retired workers, and once it goes beyond that cap the workers
> have to pay. It doesn't kick in until after the next round of
> negotiations.

(El Paso's 11/19/07 Supp. Br., Ex. 2.) El Paso argues that Mr. Shoemaker's statement

constitutes an "admission" by the UAW as to its intent with respect to the FAS 106

Letter. For several reasons, the Court does not believe that these statements create a

genuine issue of material fact with regard to Case's and the UAW's intent with respect to

the letter.

First, Mr. Shoemaker's statements were made several years after the letter was

executed and thus they do not reflect the UAW's intent at the time of the agreement.

Second, Mr. Shoemaker testified that he neither participated in the labor negotiations

leading to the adoption of the FAS 106 Letter nor in the negotiations resulting in the

extension of the letter. Third, it is not clear from the IEB meeting minutes what

specifically Mr. Shoemaker was conveying in his comments. When asked about his statement during his deposition, Mr. Shoemaker testified that he only was attempting to summarize El Paso's position in the letter it sent to retirees telling them they would need to contribute to their health insurance cost, not conveying the UAW's interpretation or intent with respect to the letter. (El Paso's 11/19/07 Supp. Br., Ex. 4 at 216.) He also testified that his understanding of the FAS 106 Letter always has been that the amounts would be moved in subsequent negotiations so "that the retirees wouldn't have to pay anything . . ." (CNH Mot., Ex. 36 at 154-55.)

In support of its claim that Case and the UAW intended the FAS 106 Letter to substantively cap the former's obligations for retiree health care costs, El Paso also relies on the fact that the UAW proposed and Case rejected the "Maytag" approach to FAS 106 and instead adopted "the 'dollar cap' approach" that is contained in the letter. Pursuant to the Maytag approach– also referred to as the "Delayed FAS 106 Start Option"– the employer would modify its eligibility rules so that its workers were deemed to accrue eligibility for retiree health benefits during the last 10 years of their employment, rather than over the course of their employment. In a memorandum entitled *The New Retiree Health Accounting Standard: Alternatives to Caps*, William Hoffman– then the head of the UAW's Social Security Department– indicated that the UAW's preferred response to FAS 106 should be the Maytag approach because it did not raise "the potential cost-sharing concerns of a 'cap' approach." (El Paso's 11/19/07 Supp. Br., Ex. 8 at 5.) According to El Paso, Mr. Hoffman's memo makes clear that Case's rejection of the

Maytag approach and the Case's and the UAW's adoption of the cap approach could only mean that the UAW agreed to the 1993 FAS 106 Letter fully aware that the caps, if reached, would substantively affect the amount retirees would have to contribute for their health care coverage.

The problem with El Paso's argument is that Mr. Hoffman's memo also makes clear that a cap approach does not necessarily entail a substantive cap on a company's obligations for retiree health care costs. As Mr. Hoffman describes in the memo:

> . . . [E]mployers have tried various ways to reduce the financial statement impact of the new accounting standard, . . . Some have sharply reduced or even eliminated health care benefits for current and/or future retirees. Some have "capped" current and/or future retiree benefits, thereby shifting a significant portion of potential liabilities off their financial statements and on to retirees; in some cases the "caps" are real, while in others they're more artificial in that they are subject to modifications through subsequent rounds of negotiations (the so-called AT&T approach).

(El Paso's 11/19/07 Supp. Br., Ex. 8 at 3.) Thus a "cap" approach could encompass a substantive cap on the company's liability *or* an artificial cap that would be moved in subsequent negotiations to prevent the cap from ever taking effect.[9] Evidence indicates that it was the latter approach that Case was pushing. (*See, e.g.,* El Paso 11/19/07 Supp. Br., Ex. 8.)

---

[9]The Court does not conclude that the caps were "real" because they would take effect unless moved during subsequent negotiations. Pursuant to Case's and the UAW's agreement when they executed the 1993 FAS 106 Letter, the caps would be moved before their effective date so that they never would have a substantive impact on any individual.

Finally, El Paso argues that interpreting the FAS 106 Letter as Plaintiffs suggest would "violate national labor policy, which prohibits an employer and union from secretly agreeing to disregard provisions of a collective bargaining agreement." (El Paso's Br. in Supp. of Mot. on After Cap Retirees at 2.) The Court does not have to believe that there was a "secret" or "side" agreement between the UAW and Case to disregard the terms of the FAS 106 Letter to conclude that the letter was intended for accounting purposes only. The plain language of the letter reads: "Notwithstanding the foregoing [i.e. the caps], no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998." This "trigger" date is after the negotiation period for Case's and the UAW's subsequent labor agreement. The letter does not address what Case and the UAW intended to do with the cap levels in those subsequent negotiations. The evidence, however, demonstrates that their intent was to increase the cap levels or further extend the trigger dates in those negotiations (and this in fact is exactly what happened in 1995, when the levels were increased and the date was extended to January 1, 1999).

## IV.    Conclusion

Based on the foregoing analysis, the Court finds no genuine issue of material fact with respect to whether Plaintiffs are entitled to vested retiree health insurance benefits. Applying the principles set forth by the Sixth Circuit in *Yard-Man*, the Court concludes that the plain language of the Central Agreements and Group Benefit Plans grants Plaintiffs health insurance benefits for their lifetimes and requires the company to pay the

full contribution costs for those benefits. Even if the intent of the parties was not clearly evidenced by the language of the labor agreements, the extrinsic evidence further supports this conclusion.[10]

Accordingly,

**IT IS ORDERED**, that Plaintiffs' Motion for Summary Judgment as to Liability is **GRANTED**;

**IT IS FURTHER ORDERED**, that El Paso's Motion for Summary Judgment on Vesting is **DENIED**;

**IT IS FURTHER ORDERED**, that El Paso's Motion for Summary Judgment Regarding Liability for Above-the-Cap Costs for Class Members Who Retired After the Cap Agreement is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Roger J. McClow, Esq.
Norman C. Ankers, Esq.
Thomas G. Kienbaum, Esq.
Bobby R. Burchfield, Esq.

---

[10]With respect to El Paso's argument that, even if deemed "lifetime" benefits, Plaintiffs' benefits are not unalterable in scope, the Court will resolve that issue when it decides El Paso's pending motion specifically addressing that issue.