UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLADYS YOLTON, WILBUR
MONTGOMERY, ELSIE TEAS, ROBERT
BETKER, EDWARD MAYNARD, and
GARY HALSTEAD, on behalf of themselves
and a similarly situated class,

        Plaintiffs,

v.

        Case No. 02-75164

        Honorable Patrick J. Duggan

EL PASO TENNESSEE PIPELINE CO. and
CNH AMERICA, LLC,

        Defendants
_____/

## OPINION AND ORDER DENYING EL PASO TENNESSEE PIPELINE CO.'S MOTION FOR APPROVAL OF ADMINISTRATIVE AND PLAN DESIGN CHANGES TO HEALTH INSURANCE PLAN

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 7, 2008.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

This matter currently is before the Court on a "Motion for Approval of Administrative and Plan Design Changes to Health Insurance Plan," filed by Defendant El Paso Tennessee Pipeline Company ("El Paso"). Because the Court concludes that the changes that El Paso seeks to make are contrary to the levels and types of health insurance benefits promised to Plaintiffs in the governing labor agreement, the Court denies El Paso's motion.

In the pending motion, El Paso asks the Court to modify the preliminary injunction issued on December 31, 2003, that requires Defendants to resume "the same insurance coverage" Plaintiffs enjoyed before Defendants required them to make substantial premium contributions. (Doc. 182 at 3, quoting 12/31/03 Op. and Order at 33.) Specifically, in its initial pleading in support of the motion, El Paso asks the Court for permission it to make certain proposed "administrative" and "material plan design" changes to the health insurance plan it provides Plaintiffs. El Paso has since indicated that it is no longer seeking the Court's review or approval of the proposed "design" changes. (Doc. 222 at 2 n.2.) Additionally, because summary judgment motions have been filed since El Paso filed its initial motion, El Paso now asks the Court to find that the proposed changes are permissible even if the Court concludes on summary judgment that Plaintiffs are entitled to vested retiree health insurance benefits. (Doc. 252 at 3-4.)

**Procedural Background**

Plaintiffs filed this class action lawsuit seeking fully funded, lifetime retiree health care benefits for certain retirees and surviving spouses of retirees of the Case Corporation ("Case"). Plaintiffs allege that Defendants breached labor agreements in violation of the Labor Management Relations Act and their fiduciary duties in violation of the Employee Retirement Income Security Act by requiring Plaintiffs to contribute substantial premiums to maintain their health care benefits. Plaintiffs subsequently filed a motion for preliminary injunction, asking the Court to order Defendants to pay the full costs of those benefits.

On December 31, 2003, having concluded that Plaintiffs likely will prevail in establishing their entitlement to vested retiree health insurance benefits, this Court issued an opinion and order granting Plaintiffs' motion for preliminary injunction. *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003). Although initially finding that El Paso was the party liable for the above-cap costs of Plaintiffs' benefits, the Court reconsidered this holding and found that Case– now CNH America, LLC ("CNH America")– is the party primarily liable for those costs. *Yolton v. El Paso Tennessee Pipeline Co.*, 2004 WL 3661450 (E.D. Mich. Mar. 9, 2004). The Court subsequently concluded, however, that El Paso is contractually obligated to indemnify CNH America for the above-cap costs of Plaintiffs' health insurance and ordered El Paso to step into CNH America's shoes and begin paying those costs. *Yolton v. El Paso Tennessee Pipeline Co.*, 2004 WL 3664179 (E.D. Mich. Sept. 3, 2004). These decisions were affirmed by the Sixth Circuit. *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006). Defendants then filed petitions for writs of certiorari, which the Supreme Court denied on November 6, 2006. *CNH America v. Yolton*, 127 S. Ct. 554 (2006); *El Paso Tennessee Pipeline Co. v. Yolton*, 127 S. Ct 555 (2006).

### El Paso's Motion and Plaintiffs' Response

El Paso describes the "administrative" changes that it proposes in its pending motion as follows:

> **1. Mandatory Mail Order Drugs.** This change would require that individuals who are utilizing maintenance medications (recurring prescriptions associated with chronic

conditions) receive their prescriptions only through mail order service, and not through retail pharmacies. . . .

**2. Mandatory Generic Drugs.** This would require that those individuals taking a brand name medication for which a generic drug is available be required to use the generic alternative. . . . Coverage of a generic drug would be the "median cost of the generics available." Individuals purchasing a brand name drug when a generic is available will be responsible for the generic drug co-pay plus the difference in cost between the brand name drug and the generic drug.[1]

**3. Formulary Drug List.** Prescription drugs are segregated into therapeutic categories based on what they treat and how they treat it. Allergy drugs, pain medications, etc. . . are simplified descriptions of therapeutic classes. A formulary drug list identifies the most effective drugs in each therapeutic class and defines a limited number of them (usually 2-3) as preferred drugs based on clinical assessment of their cost efficiency. Those drugs that are not determined to be preferred based on their efficiency and effectiveness are either not covered, or are covered at a lower benefit level than the preferred drugs.

**4. Preferred Provider Organization (PPO).** Establish a PPO and require Plaintiffs to participate in it. Those Plaintiffs who choose not to utilize a doctor within the PPO must pay 20% of the medical provider's charges.

**5. Utilization Review.** This type of program requires that individuals receiving specific types of care or undergoing specific procedures contact a utilization review clinician (nurse or physician) to have the proposed procedure reviewed prior to having the care delivered or procedure performed.[2]

---

[1] In its pleadings, El Paso does not specify what Plaintiffs' costs would be for brand name drugs for which generic drugs are not available.

[2] El Paso's benefits expert, Michael A. Barbour, indicates that benefits will be reduced by 20% for individuals who do not comply with utilization review requirements.

4

> **6. Care Management.** This program requires that individuals with significant ongoing healthcare treatment and/or chronic disease work with a clinical team focused on assuring that they receive the most appropriate care, in the most appropriate setting, based on established medical protocols for treatment.
>
> **7. Case Management.** This focuses on emergent conditions that involve intensive and expensive healthcare treatment. A case management team led by a clinician (usually a registered nurse) would monitor the treatment of major illnesses, injuries, and procedures.

(Doc. 182 at 5-6; Doc. 222 at 3, 11-20.)

According to El Paso, these changes will not impact Plaintiffs' benefit levels but will substantially decrease El Paso's costs of providing Plaintiffs' health care coverage. El Paso contends that, given the enormous costs of complying with the preliminary injunction, the Court should exercise its equitable powers and modify the injunction to permit El Paso to make the above changes and therefore reduce the harm of the injunction to it. Relying on *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir. 1996), and *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615 (7th Cir. 2006), El Paso argues that even if Plaintiffs possess a contractual right to lifetime health insurance coverage, they are not entitled for their lifetime to the identical types and levels of benefits in place when they retired.

---

(Doc. 182, Ex. B at 3 ¶ 8.) In subsequent pleadings, however, El Paso asserts that Plaintiffs failing to comply with the utilization review program only will be assessed a $100 charge. (Doc. 222 at 3.)

Plaintiffs raise several arguments in response to El Paso's motion.³ First, Plaintiffs argue that changes to their health insurance coverage should not be made this late in the proceedings absent an agreement between the parties. Plaintiffs further argue that the proposed changes are not cost neutral, but in fact would shift substantial costs to them. Finally, Plaintiffs contend that the changes are contrary to the benefit levels to which they are contractually entitled to receive for their lifetime.

**Analysis**

The specific levels and types of health care coverage provided to Plaintiffs were established through labor negotiations between the UAW and Case and are set forth expressly in the collectively bargained 1990 Group Benefit Plan (or "Plan"). As relevant to the "administrative" changes that El Paso seeks to make, those details are as follows:

- **Mail Order Prescription Drugs**: Section II, subsection J of the Plan provides for a mail order prescription drug "*option*." The Plan states that "[p]rescription drugs that are dispensed for an extended period *can be* purchased utilizing the mail order prescription drug option." (Doc. 237, Ex. 1 at 30, emphasis added.)

---

³In their initial response to El Paso's motion, Plaintiffs argued that the Court lacked jurisdiction to decide the motion as the matter, at that time, was on appeal. (Doc. 186 at 3-4.) At this juncture, this argument is moot. Plaintiffs further argued that El Paso lacks standing to seek a modification of the preliminary injunction, as the injunction only requires CNH America to pay the above-cap costs of the Plaintiffs' health insurance benefits. (*See id*. at 4-5.) To the extent Plaintiffs still make this argument, the Court finds that it has no merit. El Paso is not directly liable to pay the above-cap costs of Plaintiffs' health benefits pursuant to the injunction. This Court, however, has concluded that El Paso must indemnify CNH America for those costs pursuant to the Reorganization Agreement between El Paso's and CNH America's predecessors and has ordered El Paso to step into CNH America's shoes with regard to the preliminary injunction.

- **Prescription Drugs**: Section II, subsection I of the Plan provides the following, in part, with respect to benefits for generic and brand name drugs:

1) Benefits under the Plan will be paid as follows less the co-payment noted in (d) for each prescription and for each refill:

- a) 100% of the charge if dispensed by a Participating Pharmacy; or
- b) 75% of the reasonable and customary charge (or 75% of the actual charge, if lower) if dispensed by a Non-Participating Pharmacy within the local area; or
- c) 100% of the reasonable and customary charge (or 100% of the actual charge, if lower) if dispensed by a Non-Participating Pharmacy outside the local area. (35 mile radius of the plant where employed.)
- d) Co-payment amounts, effective May 12, 1987, to be:

    1. $5.00 for any prescription for which a non-generic (brand name) drug (a product protected by trademark registration) is specified by a physician and/or dispensed by the pharmacy and for which there is an acceptable generic substitute available; or

    2. $2.00 for any prescription for generic drugs (a product not protected by trademark registration and for the purposes of this provision only those prescription drugs listed by the Federal Food and Drug Administration for Drug Product Selection).

- e) The laws and regulations of the State in which the prescription is dispensed shall be followed in determining the availability of an acceptable generic substitute.

> f) Where satisfactory evidence is provided demonstrating a legitimate medical reason why in an individual case a generic substitute should not be used, the co-payment for the non-generic drug shall be $2.00.

(*Id.* at 27.) This section of the Plan further provides that "Legend Drugs" and specifically listed "Non-Legend Drugs" are covered. (*Id.*) "Legend Drugs" are defined as "[a]ny medical substance, the label of which under the Federal Food, Drug and Cosmetic Act is required to bear the legend: "Caution: Federal Law prohibits dispensing without prescription."[4] (*Id.*)

• **Preferred Provider Organization ("PPO")**: The Plan has no provision for a PPO; instead, the Plan is an "Indemnity Plan" pursuant to which a participant can go to any hospital or physician for treatment and the Plan will pay the "reasonable, necessary and customary" charge for covered services subject to certain deductibles, co-payments, and/or maximums for some services. (*Id.* at 15-23.)

The Plan does contain Letters of Understanding ("LOU") relating to *optional* Health Maintenance Organizations ("HMOs"). (*Id.* at 58, 59, 65.) One LOU states in part:

> The Company is prepared to investigate any group practice direct service prepayment plan as an alternative to the Company's group health insurance plan in the event that one or more are formed, and if it is found, *by mutual agreement between the undersigned and the Union* . . . that such a plan or plans is of high quality and provides at least the level of benefits specified in the Company's group health insurance plan, at a cost to the Company not to exceed its cost at that time to provide these benefits, then steps will be taken by the Company within a reasonable period of time following such

---

[4]While the Plan sets forth some limitations on benefits for Covered Drugs, the Court does not find those limitations relevant to El Paso's motion. (*See* Doc. 237, Ex. 1 at 28-29.)

> investigation but before the termination of the 1990
> Agreement, to *permit* employees and retirees, and their
> dependents, *an option*, annually, to enroll in such a plan. (*Id.*
> at 65, emphasis added.)
>
> • **Utilization Review**: The Plan contains a provision entitled
> "Pre-Certification – Active & Retirees" which applies to
> participants "who are not eligible for Medicare." (*Id.* at 51.)
> This provision provides that, for "non-emergency
> hospitalization," a participant is required to either "[c]omplete
> the Pre-Admission form and give it to his physician . . .;" or
> "[h]ave the physician call the toll-free Certification telephone
> number and pre-certify the admission." (*Id.*) For emergency
> admissions, "if admitted, the attending physician or hospital
> must notify the Certification Team within 48 hours." (*Id.*) If
> a non-emergency admission is not pre-certified, the
> participant "would pay a $200 deductible and 20% of the
> covered charges" up to a "maximum annual co-payment
> amount [of] $750 per employee or dependent and $1,500 per
> family." (*Id.* at 52.) No co-payment is required for failure to
> obtain certification where a) in an emergency confinement, a
> "patient's condition precludes informing the hospital that
> certification is necessary;" b) where the participant "presents
> the Medical Plan Identification Card . . . to [the] hospital but
> [the] hospital does not call to verify the confinement;" and c)
> where the participant "advises his physician that pre-
> certification is necessary and the physician does not call the
> Pre-Certification Center." (*Id.*)
>
> The Plan also requires a second surgical opinion for retirees
> not eligible for Medicare, paid for by the Plan, for listed
> surgical procedures. (*Id.* at 56-57.) Failure to obtain a second
> surgical opinion when required results in a 20% co-payment.
> (*Id.* at 57.)

The fact that the specific levels and types of health care coverage are specifically set forth in Case's and the UAW's labor agreement renders Plaintiffs' health insurance benefits distinguishable from the benefits provided to the plaintiffs in *Diehl* and *Zielinksi*– the

9

cases on which El Paso relies to support its motion.

In *Diehl* and *Zielinski*, the relevant labor agreements did not provide the details (i.e. the specific levels and types) of the plaintiffs' health insurance coverage. Instead, those details only were outlined in the insurance provider's plan brochure (in *Zielinski*) or the insurance section of the company's "Employer's Manual" (in *Diehl*). *Zielinski*, 463 F.3d at 619 ("the most compelling reason [to doubt the plaintiffs' interpretation that the benefit levels were fixed] is the sheer impossibility of determining Pabst's obligation if the only guide is the old Blue Cross-Blue Shield brochure– yet it *is* the only evidence of the plan's terms"); *Diehl*, 102 F.3d at 303 (providing that the retirees' health insurance benefits were determined in a given year by examining the applicable insurance "booklet"). Where specific levels and types of coverage have been negotiated and agreed to (i.e. contracted for), as was done by Case and the UAW, this Court does not believe that changes to those levels and/or types of benefits can be imposed unilaterally by El Paso or the courts. This holding is consistent with the Sixth Circuit's decision in *International Union, United Automobile, Aerospace & Agricultural Implement Workers of Am. v. Loral Corporation*, Nos. 95-3710, 95-3711, 1997 WL 49077 (6th Cir. Feb. 3, 1997) (unpublished opinion).

In *Loral*, the defendants unilaterally reduced the health benefits of the plaintiffs (employees who retired under collective bargaining agreements and pension plans) by instituting a co-payment plan for both treatment and prescription drugs, eliminating dental coverage, and capping Medicare reimbursements. 1997 WL 49077, at *1. The

defendants argued that the plaintiffs were not entitled to vested retirement healthcare benefits but, even if they were, that a court should presume that the parties to a retirement benefits agreement expect future changes and modifications to the vested benefits scheme. The Sixth Circuit concluded that the plaintiffs were entitled to vested benefits and rejected the defendants second argument, reasoning:

> [I]f the employer retained discretion to cut benefits somewhat, there is nothing to give us a standard by which to distinguish a 1% cut from a 99% cut that would be virtually equivalent to a complete revocation. It might well be sensible for parties to agree to allow the employer to retain some flexibility to deal with future vicissitudes, but such an arrangement must be agreed to in the contract. It cannot be imposed unilaterally by the employer or the courts.

*Id*. at *3.

Holding El Paso to the specific levels and types of benefits agreed to and set forth by Case and the UAW in their labor agreement also is consistent with basic rules of contract interpretation, which require a court to interpret the obligations of parties to a contract by looking to the express and unambiguous terms of their contract. *See* 20 Williston on Contracts, § 55:23 (4th ed.) (cases cited therein). This rule applies even when "in today's marketplace" those terms may provide one of the parties "an insanely generous [benefit]." *Cf. Zielinski*, 463 F.3d at 619. A party cannot be relieved of its contractual promises simply because the party later decides that it made a bad deal. Morever, the Court notes that the 1990 Summary Plan Description specifically promises retirees the same medical benefits, at the same levels, that they were receiving on the day

11

before they retired: "Except where noted, the benefits and maximums under these continued coverages *will be the same as those that were in effect on the day preceding your retirement*." (Doc. 252, Ex. 3-H at EP 000216-000218 (emphasis added).) El Paso's proposed administrative changes would not leave Plaintiffs with the same coverages they were receiving pursuant to the 1990 Group Benefit Plan on the day preceding their retirement.

First, use of a mail order prescription drug program was expressly an "option" in the 1990 Group Benefit Plan; it was not mandatory. Second, the Plan specifically provides that the co-payments for generic and non-generic drugs will be $5.00 and $2.00, respectively. Imposing El Paso's mandatory generic drug plan would drastically increase a retiree's responsibility for the costs of brand name drugs to the generic co-pay plus the difference in cost between the brand name drug and the generic drug, even if the retiree's physician recommends the brand name over the generic. It also appears that Plaintiffs' costs for generic drugs would increase beyond the $2.00 co-pay set forth in the 1990 Group Benefit Plan, as El Paso states that coverage of a generic only would be "the median cost of the generics available." Third, the Plan sets forth a broad definition for the prescription drugs covered by the Plan, while El Paso's proposed changes limit coverage to a formulary drug list.

Fourth, with respect to El Paso's proposal for a mandatory PPO, the 1990 Group Benefit Plan is an Indemnity Plan pursuant to which the Plan pays the "reasonable, necessary and customary" charge for covered services subject to specified deductibles,

12

co-payments, and/or maximums for certain services. Unlike the PPO that El Paso proposes, the level of coverage is not dependent upon whether the retiree uses a preferred provider. Moreover, although Case and the UAW contemplated the adoption of alternative types of insurance programs in their agreement, they specifically agreed that any alternative program had to be agreed upon by both parties and, even then, would only be an option offered to retirees.

Finally, the 1990 Group Benefit Plan sets forth a utilization review program and establishes specifically when review must be obtained and the penalty for failing to do so. El Paso's proposal for utilization review, care management, and case management unilaterally imposes a different utilization review program on Plaintiffs which requires additional review procedures than those set forth in the Plan and penalizes participants who fail to follow those procedures.[5]

## Conclusion

---

[5] In one of their briefs, Plaintiffs state that "El Paso has indicated that two of its seven areas of proposed change, Case Management and Care Management[,] are voluntary and therefore carry no penalty for noncompliance." (Doc. 221 at 4 n.3.) The Court does not believe that El Paso ever states in its pleadings whether there would be a penalty for noncompliance and, if so, what that penalty would be. However Michael A. Barbour, El Paso's expert, indicates that these administrative changes "would have no negative impact on participant out-of-pocket costs *assuming the participant complied with the provisions of the plan*." (Doc. 182, Ex. B ¶ 9 (emphasis added).) Thus the Court presumes that if the participant does not comply with the provisions of the plan, there would be a negative impact on the participant's out-of-pocket costs. This Court also was not able to find any indication in El Paso's pleadings that either program is voluntary. To the contrary, in its description of care management, El Paso provides: "This program *requires* that individuals with significant ongoing healthcare treatment and/or chronic disease . . ." (*See, e.g.*, Doc. 182 at 6; Ex. B ¶ 8.)

As indicated above, a party cannot unilaterally modify its contractual promises, nor can a court order the modifications, even if future events reveal the promises to be more costly than anticipated or otherwise unwise. The party must return to the bargaining table and negotiate for the change it seeks to make to the contract. El Paso's proposed "administrative" changes would modify the levels and types of health insurance coverage expressly promised to Plaintiffs in the labor agreement between Case and the UAW. Thus, the Court denies El Paso's request to make those changes.

Accordingly,

**IT IS ORDERED**, that El Paso Tennessee Pipeline Co.'s Motion for Approval of Administrative and Plan Design Changes to Health Insurance Plan is **DENIED**.

                                                             s/PATRICK J. DUGGAN
                                                             UNITED STATES DISTRICT JUDGE

Copies to:
Roger J. McClow, Esq.
Norman C. Ankers, Esq.
Thomas G. Kienbaum, Esq.
Bobby R. Burchfield, Esq.