UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLADYS YOLTON, WILBUR
MONTGOMERY, ELSIE TEAS, ROBERT
BETKER, EDWARD MAYNARD, and
GARY HALSTEAD, on behalf of themselves
and a similarly situated class,

        Plaintiffs,                    Case No. 02-75164

v.                                   Honorable Patrick J. Duggan

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

        Defendants.
_____/

## BENCH OPINION REGARDING CNH AMERICA, LLC'S ACCORD AND SATISFACTION DEFENSE

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 27, 2009.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Plaintiffs represent a Class consisting of certain retirees and surviving spouses of

retirees of the J.I. Case Company or the Case Corporation, and they seek fully funded,

lifetime retiree health care benefits from Defendants.[1]  In an opinion and order issued on

---

[1]The Class is defined as follows:

        All former bargaining unit employees who retired under the
        Case Corporation (formerly J.I. Case) Pension Plan for
        Hourly Paid Employees on or before July 1, 1994 (other than

(continued...)

March 7, 2008, this Court held that the governing collective bargaining agreements grant Plaintiffs health insurance benefits for their lifetimes and require Defendants to pay the full-contribution costs for those benefits.  (Doc. 380.)  Defendant CNH America, LLC ("CNH") nevertheless has asserted that Plaintiffs are barred from recovering the costs of their health care benefits from the company because the union of which they were members as active and retired workers entered into an "accord and satisfaction" with the company in 1998, on Plaintiffs' behalf.

CNH moved for summary judgment with respect to its "accord and satisfaction" defense, but the Court denied the motion on March 7, 2008.  (Doc. 379.)  Thus the issue of whether CNH can prevail with respect to this defense was the subject of a trial conducted before this Court on January 27-29, 2009.  Based on the evidence introduced at the trial and the applicable law, and for the reasons discussed below, this Court concludes that CNH's defense fails.

## I.     Findings of Fact[2]

Plaintiffs initiated this lawsuit against Defendants on December 23, 2002, alleging

_____

[1](...continued)
> former employees eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan) and all surviving spouses of those former bargaining unit employees.

(Doc. 145.)

[2]Unless noted otherwise, these factual findings are derived from prior decisions of this Court.

2

two counts in their Complaint.[3]  In Count I, Plaintiffs claim that Defendants breached labor agreements in violation of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by requiring Plaintiffs to contribute premiums to maintain their retiree or surviving spouse health care benefits.  In Count II, brought under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), Plaintiffs seek to recover benefits due and to clarify their rights to benefits under an employee welfare benefit plan.  In its Answer and Affirmative Defenses filed on June 19, 2003, CNH asserted the "accord and satisfaction" as an affirmative defense.  (Doc. 27.)

J.I. Case was established in 1842 and became a wholly owned subsidiary of Tenneco, Inc. (now Defendant El Paso Tennessee Pipeline Corporation ("El Paso")) in 1970.  J.I. Case was renamed the Case Corporation ("Case") in 1990.  The International Union, United Automobile, Aerospace and Agricultural Workers of America ("UAW") represented Case employees in collective bargaining over the years.

Case and the UAW negotiated a number of collective bargaining agreements, referred to as Central Agreements, including a Central Agreement in 1990.  In 1993, the UAW and Case negotiated an Extension Agreement that extended the 1990 Agreement through February 5, 1995.  In a section of the Extension Agreement entitled "FAS 106

---

[3]The defendants initially named in Plaintiffs' Complaint were El Paso Tennessee Pipeline Co. and Case Corporation.  In an opinion and order issued on April 22, 2005, this Court granted Defendants' request to substitute CNH for Case.  (Doc. 180.)

Out-Year Cost Limiters," the agreement adopted an attached "Letter of Agreement." This Letter of Agreement (hereafter "FAS 106 Letter") appeared to establish "caps" on Case's liability for the health insurance costs of retirees and surviving spouses of retirees as of April 1, 1998. While this Court has held that the parties intended the FAS 106 Letter for accounting purposes only and that the letter, therefore, did not effectively cap Case's liability for the costs of Plaintiffs' health insurance benefits, the above-cap costs of Plaintiffs' insurance benefits were a source of dispute between the UAW and Case (as well as between the UAW and El Paso) in subsequent years.

In the meantime, in 1994, Tenneco, Inc. (Case's parent company) underwent a reorganization to spin off its own and Case's agriculture and construction business assets. To accomplish this reorganization, Tenneco first formed a new corporation, Case Equipment Corporation. Then, pursuant to a Reorganization Agreement and Benefits and Compensation Allocation Agreement (collectively "Reorganization Agreements"), Tenneco transferred its and Case's agriculture and construction business assets to Case Equipment. Under the Reorganization Agreements, the assets transferred to Case Equipment did not include *inter alia* liability for health insurance benefits for those individuals who retired from Case on or before July 1, 1994 ("Pre-IPO retirees") and surviving spouses of those retirees. Tenneco "retained" this liability.

In exchange for the construction and business assets of Tenneco and Case, Case Equipment issued its stock to Case and assumed the existing labor agreements between Case and the UAW and other labor organizations.

4

On June 30, 1994, a week after the reorganization, Tenneco began selling the stock of Case Equipment in an "initial public offering."  At 12:01 a.m. the following day, July 1, 1994, Case changed its name to Tenneco Equipment Corporation.  One minute later, Case Equipment changed its name to Case Corporation.  Tenneco thereafter sold its remaining stock in this new Case Corporation (hereafter "Case").  In September 2002, Case changed its name to Case LLC and became CNH on January 1, 2004.[4]

In 1995, the UAW and CNH engaged in negotiations regarding the collective bargaining agreements CNH assumed as part of the reorganization.  During these negotiations, the parties agreed to a new FAS 106 Letter which extended the date when retirees and surviving spouses could be asked to pay the costs of their health insurance benefits that exceeded the cap from April 1, 1998 to January 1, 1999 ("1995 FAS 106 Letter").  (Def.'s Ex. 11 at UAWR081006.)

Thereafter, in 1996, Tenneco merged with El Paso.  As a result of the merger, El Paso assumed Tenneco's obligation for Plaintiffs' health care plan.  On November 14, 1996, Class member Elliott Anderson, as the Retiree Representative for UAW Local 807, wrote a letter on behalf of "[t]he Retirees of Case Company" to Richard Shoemaker, Vice-President of the UAW, expressing concern regarding the transfer of the Pre-IPO retirees' health insurance benefits to El Paso.  (Def.'s Ex. 15.)  Mr. Anderson indicated that the retirees were concerned about three issues: (1) responsibility for their benefits

---

[4]For simplification, the Court hereafter will refer to Case as CNH even where the activities pre-date the company's name change.

5

being transferred to "a company of which our union nor the retirees have a relationship with"; (2) El Paso's indication that it possesses the right to make changes to Plaintiffs' benefits; and (3) Plaintiffs' belief that "[CNH] has a collective bargaining obligation and a moral obligation to their retired workers." (*Id*.) Mr. Anderson asked Mr. Shoemaker to call a meeting with senior CNH officials "to address these concerns and get assurances that our hard won retirees' benefits will not be reduced or eliminated through this procedure of passing the responsibility of administration." (*Id*.) UAW representatives subsequently met with representatives of CNH and El Paso to convey the retirees' concerns. (Def.'s Ex. 16.)

On October 27, 1997, El Paso sent a letter to Plaintiffs informing them that, as of April 1, 1998, they would be required to contribute $56 per month to continue participating in the El Paso Benefit Plan by which they received health insurance coverage. (Def.'s Ex. 18.) El Paso cited the FAS 106 Letter as the authority permitting it to charge Plaintiffs this "above-cap" cost of their insurance benefits. (*Id*.) El Paso's letter "created concern amongst the retirees" and they contacted UAW officials about this issue. (1/28/09 Tr. at 17 (Shoemaker), 127-31 (Prine); Anderson Dep. at 75-77; Hitt Dep. at 83; Kale Dep. at 19-20.) Class member James Reynolds testified that he was upset about the information from El Paso. (1/29/09 at 77 (Reynolds).) When asked whether he wanted "this situation resolved as quickly as possible," Mr. Reynolds replied: "Well, let's put it this way, I had lifetime benefits when I retired, they were guaranteed and now all of a sudden they were trying to charge me, yes, I wanted it taken care of. I wanted it

6

resolved."  (*Id.*)

Mr. Reynolds further testified that he was unaware of how the cap on the costs of retiree health insurance benefits were put on and that he expected the UAW to resolve the issue so "we didn't have to pay."  (1/29/09 at 77-79 (Reynolds).)  Mr. Reynolds explained: "I thought [the] UAW should enforce the agreement that I already had, that I had lifetime benefits" and "[a]ll we told [the UAW] to do was we have a benefit, enforce it, that's your job."  (*Id.* at 92, 112.)  Union representatives assured retirees that they would not have to pay the $56 demanded from El Paso.  (Anderson Dep. at 76-77.)  It was the UAW's position that "[CNH] was responsible for providing the healthcare coverage that they agreed to to the retirees."  (1/28/09 at 19 (Shoemaker).)

Therefore, prior to April 1, 1998, the UAW asked CNH to pay the $56 per month that El Paso was demanding from Plaintiffs.  CNH responded that it was no longer liable for Plaintiffs' health insurance benefits and therefore the above-cap costs of those benefits.  (Def.'s Ex. 20; Crist Dep. at 83-84.)  CNH also took the position that the 1995 FAS 106 Letter that it negotiated with the UAW was not effective as to Plaintiffs because the agreement referred specifically to the "Case Group Benefit Plan" (which covered individuals who retired *after* the IPO) and the benefits of Plaintiffs (who retired before the IPO) were administered by an El Paso plan.  (1/27/09 at 69, 71-72 (Haas).)  The UAW disagreed with both positions.  (*Id.* at 73 (Haas) (explaining that the UAW's view was that the 1995 FAS 106 Letter was applicable to both groups of retirees); 1/28/09 at 19 (Shoemaker) (expressing the UAW's view that CNH continued to remain liable for

7

Plaintiffs' benefits).)

Eventually CNH agreed to pay the $56 that El Paso demanded from Plaintiffs through the end of 1998. On November 5, 1997, Marc Castor, CNH's Vice President for Human Resources, sent Plaintiffs a letter informing them: "[CNH] will pay the $56.00 per employee per month contribution as an interim solution through the end of 1998. We expect to be discussing the longer term issues involved in your El Paso plan during our upcoming contract negotiations." (Def.'s Ex. 21.) Dean Prine, Chairman and President of UAW Local 1304 and President of the "Case Council"[5] from 1993 to June 2002, informed members of his Local in the November 11, 1997 *Union Voice* that the "cap" issue "has been resolved at this point. Vice-President Shoemaker got involved and [CNH] now agrees that they will pick up any cost El Paso tries to pass on to the Pre-IPO retirees thru 1998" (Def.'s Ex. 22.) Mr. Prine explained that the cap was intended to "have absolutely no effect on retirees or their benefits. It was merely a bookkeeping procedure to get around the new Federal FASBY law and make [the company's] stock more attractive to investors." (*Id*.) Mr. Prine further wrote: "We have no intention of letting [CNH] or [El Paso] screw over our retirees. This issue will be one of our top priorities in the upcoming negotiations." (*Id*.)

On December 3, 1997, prior to the upcoming collective bargaining negotiations

---

[5]The Case Council was "an administrative arm of the International Union" formed "to formulate policies in dealing with" Case and later CNH. (Def.'s Ex. 14 art. 20, §§ 1, 5; 1/28/09 Tr. at 100 (Prine).)

between the UAW and CNH, the Case Council met.  (1/28/09 Tr. at 136 (Prine).)  At that

meeting, Mr. Prine expressed his belief "that [the] Council should reassure retirees and

bargain in 1998 to eliminate the retiree cap letter."  (*Id*. at 137.)  At a subsequent meeting

of his Local on January 10, 1998– responding to an active member's motion that funds be

contributed to hire a lawyer to represent the retirees and sue the company– Mr. Prine

advised that they should "give the negotiation a chance first . . . everything possible

should be done to get the caps taken off in negotiations." (*Id*. at 141-43.)  During his trial

testimony, Mr. Prine elaborated on his position back in 1998: "[T]he International Union

made a pledge that if [it] couldn't get Case to live up to [its] responsibility and this thing

ended up having to go to court, they would see that it got there." (1/29/09 Tr. at 12

(Prine).)

    In early February 1998, CNH and the UAW began negotiations for a new

collective bargaining agreement ("CBA").  (Def.'s Ex. 50.)  Before the negotiations

began, the UAW made clear to CNH that Plaintiffs' health care benefits were "an

important issue that [the UAW] believed [CNH] needed to take care of."  (1/29/09 Tr. at

152 (Atwood).)  James Atwood, Administrative Assistant to Mr. Shoemaker and a

participant in the 1998 negotiations, informed CNH's negotiators that "the issue of the

Pre-IPO retiree above-cap amounts" was "a key issue," "a show stopper" and that the

"[UAW] cannot more forward on anything else until we address this issue."  (1/27/09 Tr.

at 64, 85-87, 178-79 (Haas) (answering that "the resolution of the cap problem for the

Pre-IPO retirees" was the issue denominated as a show stopper by the UAW.)  When the

negotiations began, the UAW's initial demand was that the FAS 106 Letter be removed for all retirees.[6]  (1/27/09 Tr. at 143 (Haas).)

Eventually in the negotiations, on or about April 6, 1998, CNH proposed a Voluntary Employee Benefit Association ("VEBA") to address the above-cap costs of Plaintiffs' health insurance benefits.  Mr. Haas testified that this was "an all encompassing proposal to put this issue to bed once and for all" and that "[CNH] wanted a final settlement to address this issue."  (Id. at 106 (Haas).)  UAW representatives contend that the VEBA was not intended to finally resolve CNH's liability for Plaintiffs' health care benefits.  (1/28/09 Tr. at 30-32, 34 (Shoemaker); 1/29/09 Tr. at 193-95 (Atwood).)  On April 7, 1998, CNH proposed a "VEBA Letter of Understanding" ("VEBA Agreement") that stated in pertinent part: "The parties recognize that the VEBA is intended to complete [CNH's] funding of the above cap cost and that [CNH] will not be required to make any further contributions to the VEBA from its own funds."  (Def.'s Ex. 35.)

Negotiations thereafter ensued regarding the language of the VEBA Agreement. On April 20, 1998, the UAW provided CNH with a revised version of the agreement that stated: "The parties recognize that the VEBA is intended to complete [CNH's] funding of the Above-Cap Costs for the term of this Agreement and that Case will not be required to

_____

[6]During the 1998 negotiations, CNH did agree to eliminate the cap for individuals who retired after July 1, 1994 ("Post-IPO Retirees") and their surviving spouses. (1/27/09 Tr. at 144 (Haas).)

10

make any further contributions to the VEBA from its own funds during the term of this Agreement."  (Def.'s Ex. 40.)  Later the same day, CNH rejected the UAW's proposed modifications and restored the language from CNH's initial proposal.  (Def.'s Ex. 41.)  CNH continued to "hold[] firm" on its proposed language."  (Def.'s Ex. 50. at UAWR095425.)  On April 26, 1998, the UAW and CNH entered a tentative CBA incorporating the VEBA Agreement.  (Def.'s Ex. 1.)

With respect to Plaintiffs' health insurance benefits, the tentative agreement provided:

> PRE-IPO RETIREES
> Establish VEBA (outline attached) to help pay Medicare Part "B" (including 1998) and above cap medical premium costs after 1/1/99; contribution schedule, source of funds and understandings attached– Attachment "F"

(*Id.* at CASELLC 17166.)  The VEBA Agreement at Attachment F provided:

> During the 1998 negotiations, the Company and the Union had extensive discussions of the medical plan maintained by El Paso Natural Gas Company for pre IPO retirees.  Although these retirees retired prior to the formation of [CNH] and sales of its stock to the public, [CNH] has agreed with the UAW to create a VEBA and to fund it with $24,700,000 in order to pay a portion of the cost of benefits above the cost cap limit under the El Paso Plan . . .
>
> An additional 2.8M from the economic settlement will be contributed for total VEBA funding of approximately $27,800,000.
>
> The parties recognize that the VEBA is intended to complete [CNH's] funding of the above cap cost and that Case will not be required to make any further contributions to the VEBA from its own funds.

11

(Def.'s Ex. 1 at CASELLC 17253.)  The UAW's active members subsequently ratified the tentative CBA.  (1/27/09 Tr. at 123 (Haas).)

Retirees are not notified of ratification meetings and the union does not encourage them to attend.  (1/29/09 Tr. at 23 (Prine), 130 (Atwood).)  Retirees attending ratification meetings are not permitted to speak and they cannot vote on the tentative agreement. (1/28/09 Tr. at 87 (Shoemaker); 1/29/09 Tr. at 130-31 (Prine).)  Mr. Shoemaker, who was the UAW's lead negotiator in the 1998 negotiations, testified at trial that he was not aware of any efforts before ratification of the VEBA Agreement to inform Plaintiffs of the terms of the tentative agreement.  (1/28/09 Tr. at 87-88 (Shoemaker).)  Mr. Prine similarly testified that he did not speak to retirees about the agreement until after ratification.  (1/29/09 Tr. at 24-25 (Prine); *see also* Hitt Dep. at 86 (explaining that his retiree chapter was informed about the VEBA after it "was in place.")）  Mr. Prine further testified that neither he nor his office for the Case Council distributed copies of the VEBA Agreement to Plaintiffs before the tentative CBA was ratified by the active members.  (1/29/09 Tr. at 22 (Prine).)  While Mr. Prine indicated that there were copies of the "Highlighter"[7] for the proposed agreement left over from the ratification meeting at the union hall and that they subsequently were taken, he did not know who took them. (*Id*. at 25-26.)

---

[7]This document is the *UAW-Case Corporation Highlights of Proposed New Agreement 1998-2004*.  (Def.'s Ex. 51.)  "Highlighters" are documents in which the UAW summarizes key provisions of tentative CBAs.

12

The Highlighter for the 1998 tentative agreement between the UAW and CNH described the VEBA Agreement, in its entirety, as follows:

> Prior to the time of the Initial Public Offering (IPO), caps were established on the amount of medical coverage costs for the pre-IPO retirees and surviving spouses, that were later to become the obligation of the El Paso Natural Gas Company. During the course of the prior agreement, those caps were met and surpassed. In order to protect those retirees and surviving spouses from possible out-of-pocket costs for medical care, the company and the union agreed to establish a Voluntary Employee Beneficiary Association (VEBA) under Section 501(c)(9) of the Internal Revenue Code. The purpose of the VEBA is to create a fund which will be used to pay for any amounts over the cap. The VEBA will be used to pay the amounts of the Medicare Part B benefit that is not covered by [El Paso] up to amounts negotiated in the new agreement for pre-IPO retirees and surviving spouses.
>
> In order to fund the VEBA, the company has agreed to deposit a total of $27.8 million. These funds will consist of a total of $25 million from [CNH], and an additional $2.8 million from the economic settlement of the agreement. This fund will be developed and managed for the sole purpose of paying these benefits. Actuarial estimates show that the fund should meet the obligations through the term of the proposed agreement.

(Def.'s Ex. 51.)

Except for Class members James Reynolds and Thomas Kale, Plaintiffs did not become aware of the VEBA Agreement until after the 1998 tentative CBA was ratified. Some Plaintiffs did not learn about the VEBA Agreement until this litigation. For example, Plaintiff Elsie Teas testified during her deposition in this case that she was not aware of what the VEBA was until it came up in this lawsuit. (Teas Dep. at 108.)

Similarly, Plaintiffs Wilbur Montgomery, Robert Betker, Edward Maynard, Paula Castillo, L. Margaret Roberts, and Edward Johnson testified during their depositions that they had never heard of a VEBA before their depositions and/or did not know what a VEBA is. (Montgomery Dep. at 77; Betker Dep. at 82; Maynard Dep. at 99-100; Castillo Dep. at 52; Roberts Dep. at 71; Johnson Dep. at 64.)

Mr. Reynolds testified that he learned about the VEBA at the conclusion of the 1998 negotiations. (1/29/05 Tr. at 85 (Reynolds).) Mr. Reynolds further testified that when he then asked what a VEBA is, he was told "it would help address the over-cap payments that El Paso was making." (*Id*.) Mr. Reynolds attended the ratification meeting for the 1998 Tentative Agreement. (1/29/09 Tr. at 128 (Reynolds).) Mr. Reynolds was not able to speak or vote at the meeting. (*Id*. at 131.) When asked at trial whether Mr. Prine informed attendees of the ratification meeting "that the VEBA was intended to release Case from any further obligations to Pre-IPO retiree healthcare," Mr. Reynolds responded: "Absolutely not . . . he told me exactly the opposite." (*Id*. at 128.)

UAW representatives held meetings for retirees after ratification of the 1998 agreement, where they discussed the VEBA Agreement. (Hitt Dep. at 78-79; 1/29/09 Tr. at 23-25 (Prine); Anderson Dep. at 87, 89; Kale Dep. at 28-29.) According to Class member Ronald Hitt, retirees were informed at these meetings that the VEBA "was a fund set up to pay the excess of the premiums so the retirees would have what they were promised." (Hitt Dep. at 88.) UAW representatives did not inform Plaintiffs that the UAW released CNH from further liability for Plaintiffs' health care benefits in exchange

14

for CNH's contribution to the VEBA Trust.  (1/28/09 Tr. at 85 (Shoemaker); 1/29/09 Tr.

at 55 (Prine), 196 (Atwood).)

After ratification of the 1998 CBA, UAW and CNH representatives met to

negotiate the terms of the VEBA Plan and VEBA Trust Agreement.  Attorney Allan

Gunn of Matkov Salzman Madoff & Gunn was one of CNH's negotiators.  On July 31,

1998, during the negotiations, Mr. Gunn wrote a letter to UAW's counsel, Daniel W.

Sherrick, addressing the issue of who should administer the VEBA Trust for Plaintiffs

and taking the position that it should not be the UAW.  (Pl.'s Ex. 115.)  One reason Mr.

Gunn identified for why the UAW should not administer the trust was the union's conflict

of interest arising out of the fact that it does not owe retirees a duty of fair representation.

Mr. Gunn wrote, in part:

> Retirees are not employees within the meaning of the LMRA
> and therefore are not included in any bargaining unit
> represented by a union.  Allied Chemical & Alkali Workers,
> Local Union #1 v. Pittsburgh Plate Glass Co., 404 U.S. 157,
> 92 S. Ct. 383 (1971).  A union's duty of fair representation
> runs only to members of the bargaining unit.  Therefore, a
> union does not have a duty of fair representation with respect
> to retirees.  Schneider Moving & Storage Co. v. Robbins, 466
> U.S. 364, 376 n.2, 104 S. Ct. 1844, 1851 n.22 (1984)
>
> Courts have recognized that this arrangement results in an
> inherent conflict of interest on the part of a union as between
> active employees, on the one hand, who are in a collective
> bargaining unit and with respect to whom the union does have
> a duty of fair representation, and retirees on the other.  In
> Anderson v. Alpha Portland Industries, Inc., 727 F.2d 177
> (8th Cir. 1984), the Court explicitly described this conflict as
> follows (727 F.2d at 183):

"The difficulty for the union in representing both active employees and retirees is most apparent in the contract negotiation process.  In contract negotiation the conflict of interest between the active employees and the retirees is made clear as the total benefits available from the employer are divided between active employees and retirees. . . .

In addition to creating difficulties for the union, the conflict of interest between active employees and retirees also threatens the retirees' interests.  The threat is to the retirees' interest, not the active employees' interests, because of the politics of the situation.  The union leadership has a political interest in serving the interests of the active employees because the active employees vote in union certification elections and union leadership elections.  The union leadership has no political interest in serving the interests of retirees because retirees do not vote in union certification elections and generally do not vote in union leadership elections."

(*Id.*)  CNH and the UAW subsequently agreed to a VEBA Plan and VEBA Trust Agreement, which they executed on December 18, 1998.  (Def.'s Exs. 2, 3.)

The above-cap costs of Plaintiffs' health insurance benefits thereafter were paid from the VEBA Trust.  (1/27/09 Tr. at 149-50 (Haas).)  By September 2000, word had spread that the funds in the VEBA account were likely to be depleted before the 1998 CBA expired in 2004.  (Def.'s Ex. 66.)  In November 2000, UAW Vice President Richard Shoemaker requested that the UAW attempt to identify "opportunities to cut/contain cost[s]" that could be proposed to El Paso in order to address "the long term viability of the VEBA Fund."  (Def.'s Ex. 67.)  Mr. Shoemaker testified at trial that "[m]any times you can find administrative costs and ways that you can change costs without impacting benefits."  (1/28/09 Tr. at 66 (Shoemaker).)

16

By early 2002, it became apparent that the VEBA funds would be exhausted by August of that year. (Def.'s Ex. 70.) Representatives from the UAW, CNH, and El Paso met several times in the first half of 2002 to discuss "the insurance problem." (Def.'s Ex. 71; *see also* Def.'s Exs. 70, 79.) The UAW kept retirees apprised of its efforts to address this problem with the companies. (Def.'s Exs. 71, 75.) No solution was reached, however, and the funds in the VEBA Trust were depleted at the end of August 2002. (1/27/09 Tr. at 149-50 (Haas).) In August 2002, El Paso sent a letter to Plaintiffs, informing them that they now would be required to pay a monthly premium of $290 to remain covered in the El Paso health care plan. (Def.'s Ex. 80.)

In response to El Paso's letter, the UAW and five Pre-IPO retirees filed a class action lawsuit against El Paso and CNH on October 29, 2002. *Int'l Union, UAW v. El Paso Tenn. Pipeline Co.*, Case No. 02-74276 (E.D. Mich. Oct. 29, 2002). That lawsuit subsequently was dropped and the present lawsuit was filed on December 23, 2003.

## II.    Conclusions of Law

To demonstrate that there has been an accord and satisfaction, the party asserting this defense must establish the following: (1) that there was a disputed claim, (2) a substituted performance agreed upon and accomplished, and (3) valuable consideration. *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1487-88 (6th Cir. 1983) (citations omitted.)

As an initial matter, the parties dispute the intended meaning of the VEBA Agreement. CNH argues that the UAW and CNH intended for the agreement to relieve CNH of all further liability for the above-cap costs of Plaintiffs' health insurance benefits;

17

whereas Plaintiffs argue that the agreement only relieved CNH of the obligation to make further contributions to the VEBA Trust. It is not necessary to resolve this issue first (or at all), however. For, regardless of how the VEBA Agreement is interpreted, it is not binding on Plaintiffs if the UAW lacked the authority to enter the agreement on their behalf.

Two principles particularly are significant in determining whether the UAW possessed the authority to bind Plaintiffs to the VEBA Agreement. First, because retired workers are no longer employees included in the collective bargaining unit, "the bargaining agent is under no statutory duty to represent them." *Allied Chem. & Alkali Workers. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n.20, 92 S. Ct. 383, 398 n.20 (1971). A union, however, may bargain on behalf of retirees if the employer agrees and the retirees assent. *Id.*; *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540-41 (7th Cir. 1997). As the Seventh Circuit stated in *Rossetto*: "Although a union has no duty to represent retirees, and retirees need not submit to union representation, retirees are free to make a union their agent if they so choose." 128 F.3d at 540. Because "any claims for benefits . . . belong to the retirees individually and the retirees may deal with [their former employer] in pursuing such claims," the *Rossetto* court concluded that "[the union] does not have any right to represent the retirees . . . unless *each* of the retirees assents to its representation." *Id.* at 540-41 (emphasis added).

Second, "[i]f benefits have vested, then retirees must agree before the benefits can be modified, even by a subsequent CBA between the employer and active employees."

18

*Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 918 (6th Cir. 2000).  As the Supreme Court stated in *Pittsburgh Plate Glass*, "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent." 404 U.S. 181 n.20, 92 S. Ct. 398 n.20.  Because any claim to vested retiree rights belong to the retirees, individually (*see supra* and *United Steelworkers v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 283 (6th Cir. 2007)), this Court concludes that, to be binding on a member of the Class, that individual had to consent to the VEBA Agreement.

There is no evidence of any Plaintiff expressly consenting to the VEBA Agreement.  CNH contends, however, that the UAW, acting as Plaintiffs' agent, consented to the agreement and that this is sufficient to bind Plaintiffs.  CNH also contends that, regardless of whether Plaintiffs initially consented to the VEBA Agreement, they subsequently ratified it.

CNH relies on common law principles of agency in support of its claim that the UAW was acting as Plaintiffs' agent during the 1998 negotiations and therefore had the authority to enter into the VEBA Agreement on their behalf.  Plaintiffs respond that such principles are inapplicable to matters involving a union's representational status.  The Court is not persuaded by the authority Plaintiffs cite in support of their position.[8]

---

[8]The cases Plaintiffs cite hold that (1) Congress discarded common law doctrines of agency by requiring a union to represent the collective interests of all bargaining unit employees and (2) that making the union the bargaining agent of retirees and active employees creates the potential for severe internal conflicts. *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S. Ct. 176 (1952); *Pittsburgh Plate Glass*, 404 U.S. at 173, 92 S. Ct. at 394.
(continued...)

However, the Court recognizes that two of the essential elements of agency are absent in the relationship between a union and its retired employees– the principal's right to control the agent[9] and the agent's fiduciary duty to the principle.[10]  This suggests that agency

---

[8](...continued)
These cases, however, do not answer whether agency law principles can be applied to determine when a retiree has consented to a union's representation.

Plaintiffs also cite *Sparks v. UAW*, 980 F.2d 394 (6th Cir. 1992), where the Sixth Circuit held that the common law agency "doctrine of apparent authority has no place in the analysis of a hybrid section 301 action brought against employer and union."  *Id.* at 398.  The court specifically limited its holding, however to the hybrid section 301 context: "While there may be analogies in other contexts between the common law of agency and the relationship among employer, union, and employee defined by federal labor law, the doctrine of apparent authority has no place in the analysis of a hybrid section 301 action brought against employer *and* union."  *Id*. Most likely this is because, in hybrid § 301 actions, the employee is challenging unlawful conduct by the employer *and* asserting a breach of the union's duty of fair representation.  If the union breached its duty to "fairly and impartially" represent the employee, it is illogical to also find that the union acted as the employee's agent.

[9]"A principal's right to control the agent is a constant across relationships of agency, . . . ."  Restatement (Third) of Agency § 1.01 (2006).  While retirees may remain involved in UAW activities and may be able to "influence" the UAW, they lack the power to "control" the union.  As Mr. Gunn expressed in his July 31, 1998 letter, retirees are not included in the bargaining unit represented by the union and the union's duty of fair representation runs only to its active members.  (Pls.' Ex. at 115.)  Moreover, "'[t]he union leadership has a political interest in serving the interests of the active employees . . . The union leadership has no political interest in serving the interests of retirees . . .'"  (*Id.* (quoting *Anderson*, 727 F.2d at 183)); *see also Merk v. Jewel Co.*, 848 F.2d 761, 764-65 (7th Cir. 1988) (discussing the different pressures on a union to fairly represent active members fairly; pressures which do not apply to retirees).

Although the UAW Constitution grants retirees the right to vote for certain local union officers, they cannot vote for stewards or committee persons or for an office of a local union if that position automatically places that officer on a bargaining committee.  (Def.'s Ex. 14 at 172, 214; 1/27/09 Tr. at 193 (Shoemaker) (explaining that retirees "can vote for local union officers that aren't going to either participate in the day-to-day

(continued...)

20

principles perhaps should not be applied. Nevertheless, CNH has cited cases where the courts apparently found agency principles relevant in evaluating a retiree's assent to union representation.[11] *See Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1271 (5th Cir. 1990) ("[a]bsent some evidence that past members expressly or *impliedly* authorized the union to proceed in their behalf, there can be no presumption that the Union had authority to act in a representative capacity"); *Merk v. Jewel Co.*, 848 F.2d 761, 766 (7th Cir. 1988) ("Again, however, the parties have not discussed whether the former employees assented to representation by the Union– in the collective bargaining agreement itself *or by acquiescing* in the Union's pursuit of their rights through arbitration.") When previously faced with the issue, the Sixth Circuit Court of Appeals declined to identify the nature and

---

[9](...continued)
grievance procedures or negotiations"). Retirees also are prohibited from speaking and voting at ratification meetings. (Def.'s Ex. 14 at Art. 19 § 3; 1/28/09 Tr. at 87 (Shoemaker); 1/29/09 Tr. at 130-31 (Prine).)

[10]An agent has a "fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) of Agency § 8.01 (2006). As the Supreme Court recognized in *Pittsburgh Plate Glass*, active and retired employees "plainly do not share a community of interests . . ." 404 U.S. at 173, 92 S. Ct. at 394. A union, however, has a statutory duty to represent the interests of active employees "fairly and impartially." *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S. Ct. 363, 368 (1964). The inherent conflict between active and retired employees and a union's fiduciary duty only to the former, impairs its ability to function as a fiduciary of retirees. For this reason the Supreme Court concluded in *Pittsburgh Plate Glass* that retired employees cannot be included in the bargaining unit that the union represents. 404 U.S. at 172-73, 92 S. Ct. at 394.

[11]CNH also relies on §§ 301(b) and (e) of the LMRA, 29 U.S.C. §§ 185(b), (e). By its express language, however, § 301(b) and thus § 301(e) address only when *a labor organization* is bound by the acts of *its* agents. *Id.*

21

extent of the consent that must be obtained before a union can represent its retirees.

*Cleveland Elec. Illuminating Co. v. Utility Workers Union, Local 270*, 440 F.3d 809, 810 (6th Cir. 2006).  Absent guidance from the Sixth Circuit or other authority holding that common law agency principles are not applicable in this context– and because the Court finds no consent even applying common law agency principles– the Court will address CNH's arguments that the UAW had implied or apparent authority to enter the VEBA Agreement on Plaintiffs' behalf or that Plaintiffs subsequently ratified the agreement.

### A.  Implied Actual Authority

Implied actual authority "rest[s] upon acts and conduct of the alleged agent known to and acquiesced in by the alleged principal prior to the incident at bar." *Shanabarger v. Phillips*, 370 Mich. 135, 139, 121 N.W.2d 693, 695 (1963).  "An agent has implied authority from his principal to do business in the principal's behalf in accordance with the general custom, usage and procedures in that business . . . However, the principal must have notice that the customs, usages and procedures exist." *Meretta v. Peach*, 195 Mich. App. 695, 698, 491 N.W.2d 278, 280 (1992) (citations omitted). "Actual authority of an agent may be implied from the circumstances surrounding the transaction at issue. These circumstances must show that the principal actually intended the agent to possess the authority to enter into the transaction on behalf of the principal." *Hertz Corp. v. Volvo Truck Corp.*, 210 Mich. App. 243, 246, 533 N.W.2d 15, 17 (1995) (citations omitted). "Regardless of the detail in a principal's statements or other conduct, an agent's duty is to interpret them reasonably to further purposes of the principal that the agent knows or

22

should know, in light of facts that the agent knows or should know when the agent acts."

Restatement (Third) of Agency § 2.01 (2006).

The evidence presented by CNH to demonstrate the UAW's implied actual

authority establishes that:

1.    Retirees play an active role in the UAW;

2.    The UAW has a practice of negotiating on behalf of
      retirees; and,

3.    In those negotiations and in meetings with company
      officials, the UAW has raised the concerns of retirees
      (including with respect to their health insurance
      benefits and even emphasizing to CNH in the 1998
      negotiations that resolving the cap issue affecting the
      retirees' benefits was a "show stopper" and that the
      UAW will take whatever actions are necessary to
      protect the retirees' concerns).

From this evidence, the Court can find a pattern and practice of the UAW representing

retirees in connection with their health care benefits and negotiating agreements that

protect or improve those benefits.  However, the Court cannot find a pattern and practice

of the UAW negotiating to reduce vested retiree benefits or to relieve the company of its

obligation to provide those benefits.  Importantly, the Court finds no evidence to conclude

that such authority would have been a reasonable interpretation of the assent manifested

by Plaintiffs.

In other words, the evidence establishes that Plaintiffs, at most, manifested their

assent to the UAW negotiating or engaging in discussions with CNH (or El Paso) to

protect and improve their health insurance benefits and that the UAW understood that it

23

possessed such authority.  There are no facts manifesting Plaintiffs' assent to the UAW

negotiating reductions to their benefits or relieving CNH of its liability for those benefits

or to suggest that the UAW believed it had such authority.

Timothy Haas, CNH's Vice President of Compensation and Benefits who

participated in collective bargaining negotiations with the UAW over the years (including

the 1998 negotiations), testified that he concluded the UAW had the authority to bargain

on behalf of retirees "primarily because of [the] history of [the UAW] negotiating benefits

for retirees . . ."  (1/27/09 Tr. at 66 (Haas).)  Mr. Haas described that history as follows:

> Based upon my experiences, that there were always demands
> for changes to retiree benefits, specifically in terms of pension
> *improvements*, changes to Medicare Part "B" premium
> reimbursements.
>
> 1995, I recall specifically where there was demand for
> changes in those amount for Pre-IPO retirees and the
> company gave some benefit *improvements* to that group.
>
> . . . And subsequently in 1998 there were negotiations that
> ultimately led to the VEBA.

(1/27/09 Tr. at 134 (emphasis added).)  Thus, except for the VEBA Agreement, Mr. Haas

identified only instances where the UAW negotiated improvements to retiree benefits.

Neither Mr. Haas nor any other witness identified an instance where the UAW

agreed to a reduction in or elimination of vested retiree benefits.  CNH refers to Mr.

Shoemaker's request to the UAW in November 2000, to identify "opportunities to

cut/contain cost[s]" to address "the long term viability of the VEBA Fund."  (Def.'s Ex.

67.)  This evidence, however, does not demonstrate that Mr. Shoemaker or the UAW

considered changes that would materially impact Plaintiffs.  As Mr. Shoemaker testified:
"Many times you can find administrative costs and ways that you can change costs
without impacting benefits."  (1/28/09 Tr. at 66 (Shoemaker).)

CNH also refers to the UAW's handling of Plaintiffs' health care benefits in 1993,
when the UAW agreed to the FAS 106 Letter. As this Court has held, however, "[CNH]
and the UAW viewed the letter simply as an accommodation for [CNH] to address the
recently enacted FAS 106 accounting standard, and not as a substantive cap on the
company's future liability for the costs of retiree health insurance."  (Doc. 380 at 19.)
Thus CNH fails to demonstrate a "pattern and practice" of the UAW negotiating
reductions in or waivers of vested retiree benefits.

UAW negotiators may not have told the company that "they were present to
negotiate only enhancements to the benefits for the Pre-IPO retirees but that they weren't
authorized to negotiate reductions in benefits for Pre-IPO retirees."  (1/27/09 Tr. at 136
(Haas).)  Yet in light of the second, well-established principle discussed previously– that
each retiree must consent before his or her vested benefits are reduced– CNH's
negotiators were aware or should have been aware of the limitations on the UAW
negotiators' authority without the UAW's negotiators telling them so.  Based on the same
principle, it was not reasonable for CNH to assume that the UAW had the authority to
reduce Plaintiffs' benefits or relieve CNH of its liability for those benefits simply because
the UAW previously negotiated improvements to those benefits or changes to nonvested
benefits.  Even if retirees historically acquiesced in collectively-bargained-for

25

improvements to their benefits it does not follow that they acquiesced in negotiated reductions to their vested benefits. *See Kerns v. Caterpillar, Inc.*, 585 F. Supp. 2d 885, 898-99 (M.D. Tenn. 2008); *see also Sparks v. Ryerson & Haynes, Inc.*, 638 F. Supp. 56, 60 (E.D. Mich. 1986) (citing *Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 672 (6th Cir. 1985) ("A union may choose to bargain away nonvested retiree benefits in future negotiations . . . It cannot do so with vested benefits though.")

As CNH indicates, "implied authority is measured by 'the authority that an agent believes the agent possesses.'" (Doc. 427 at 50 (citing *Chires v. Cumulus Broad., LLC*, 543 F. Supp. 2d 712, 717 (E.D. Mich. 2008).) The UAW, however, did not believe that it possessed the authority to modify Plaintiffs' vested benefits. Mr. Shoemaker testified that he "understood that the UAW had authority to negotiate the VEBA on behalf of retirees." (1/28/09 Tr. at 74 (Shoemaker).) However, Mr Shoemaker also testified that he never understood the VEBA Agreement as modifying CNH's obligation to provide healthcare benefits to Plaintiffs. (*Id*. at 79.) Mr. Shoemaker explained: "my position has been for many years, the position of the Union, we don't have the right to reduce [retiree's] benefits." (*Id*. at 72.) Mr. Shoemaker later testified that "[w]e had been advised by legal counsel for many years we didn't have a right to reduce the healthcare benefits that had been provided for retiree members." (1/28/09 at 82 (Shoemaker).) When asked whether he ever told CNH that the UAW did not have authority to reduce retiree healthcare benefits, Mr. Atwood testified: "Yes, not only we didn't, they didn't, nobody did . . . I've said it several times over a period of years." (1/29/09 Tr. at 192 (Atwood).)

26

In short, the evidence fails to demonstrate that the UAW had the implied actual authority to negotiate reductions or releases of Plaintiffs' vested benefits. In its conduct prior to the 1998 negotiations, leading up to the negotiations, during the negotiations, and in subsequent years, the UAW expressed its intent to protect Plaintiffs' vested health insurance benefits. It negotiated and met with CNH to resolve the issue– specifically the cap issue– impacting those benefits. CNH has not presented a single instance– aside from the VEBA Agreement– where the UAW negotiated a material reduction of Plaintiffs' vested benefits– much less a pattern and practice of doing so. Case law that was well-established at the time of the 1998 negotiations informed CNH and the UAW of the latter's limited authority to bargain on behalf of its retired employees and that this authority did not include the right to bargain for restrictions on the retirees' vested benefits. Exhorting the union to address the cap issue with the company and to protect the benefits to which the retirees believed they were entitled under CBAs did not manifest the retirees' consent to a release of the company's liability for those benefits. As a result, it was not reasonable for the UAW or CNH to conclude that the UAW had actual implied authority to enter the VEBA Agreement on Plaintiffs' behalf.

**B.    Apparent Authority**

"[A]pparent authority arises in situations when the principal manifests to a third party that an agent is authorized to act upon the principal's behalf and the third party reasonably relies on that authority." *Anderson v. Int'l Union, United Plant Guard Workers*, 370 F.3d 542, 551 (6th Cir. 2004), *cert. denied*, 543 U.S. 1056, 125 S. Ct. 934

27

(2005).  "A third party may not, however, *reasonably* rely upon an agent's ostensible

authority if the third party knows that the agent is not authorized to act in a particular

manner."  *Id*. (emphasis in original) (citing *Dayton Bread Co. v. Montana Flour Mills

Co.*, 126 F.2d 257, 261 (6th Cir. 1942)).  The *Anderson* court relied on the following

explanation from *Dayton Bread*:

> The principal is often bound by the acts of his agent in excess
> of or in abuse of his actual authority, but this is only true
> between the principal and third persons who, *believing and
> having the right to believe that the agent was acting within
> and not exceeding his authority*, would sustain a loss if the act
> was not considered that of the principal . . . If . . . a third
> person dealing with an agent *knows he is acing under a
> circumscribed and limited authority and that his act is in
> excess of or an abuse of the authority conferred, then clearly
> the principal is not bound*.

*Id*. (emphasis added in *Anderson*).  "A principal's inaction creates apparent authority

when it provides a basis for a third party *reasonably* to believe the principal intentionally

acquiesces in the agent's representations or actions."  Restatement (Third) of Agency,

§ 3.03 (2006) (emphasis added).

CNH maintains that the UAW possessed the apparent authority to enter the VEBA

Agreement on Plaintiffs' behalf based on Plaintiffs' failure to respond to the November 5,

1997 letter that Mr. Castor (CNH's Vice President for Human Resources) sent to them.

(Def.'s Ex. 21.)  The letter informed Plaintiffs that CNH would pay the $56 monthly

contribution that El Paso was demanding from each retiree and surviving spouse "as an

interim solution through the end of 1998" and that it "expect[ed] to be discussing the

28

longer term issues involved in [their] El Paso plan during [the] upcoming contract negotiations" with the UAW. (*Id*.) Because Plaintiffs did not respond and inform CNH that the UAW lacked the authority to negotiate their health care benefits in the upcoming negotiations with the company, CNH contends that "[its] negotiators understood that the UAW had authority to represent Plaintiffs in the 1998 negotiations . . ." (Doc. 427 at ¶ 99.)

First, this Court does not believe that it was reasonable for CNH to conclude that Plaintiffs authorized the UAW to negotiate on their behalf in the 1998 negotiations based solely on their failure to respond to the statements in Mr. Castor's letter. But even assuming that it was reasonable for CNH to reach this conclusion, it was not reasonable for CNH to further conclude that the UAW's authority extended to the relinquishment of CNH's liability for the above-cap cost of Plaintiffs' health insurance benefits.

Nothing in Mr. Castor's letter suggested that CNH's future liability would be a subject of its negotiations with the UAW. Instead, the letter only informed Plaintiffs of the "interim solution" to the cap issue and stated that CNH "*expect[ed]* to be discussing *the longer term issues*" with the UAW. (Def.'s Ex. 21 (emphasis added).) CNH is correct that the retirees wanted the UAW "to solve the problem." (Hitt Dep. at 85.) The problem, however, was the FAS-106 Letter which El Paso was using to demand premium contributions from Plaintiffs when Plaintiffs and the UAW believed it was not intended to have a substantive impact on any retiree. This is evident from Mr. Reynolds' testimony:

> Q.    And were you, yourself, upset about this information

29

from El Paso [that Plaintiffs would be required to pay the above-cap cost to maintain their health insurance benefits]?

A.    Yes.

Q:    And did you want *this situation* resolved as quickly as possible?

A.    Well, let's put it this way, I had lifetime benefits when I retired, they were guaranteed and now all of a sudden they were trying to charge me, yes, I wanted *it* taken care of.  I wanted it resolved.

Q.    And to your knowledge, did the other Pre-IPO retirees that you spoke with about this issue, want it resolved as well?

A.    Most people were confused at how this happened, . . . . . .

Q.    . . . At any point in late 1997 after you received this letter from El Paso, did you come to learn that the UAW was going to attempt to address the healthcare cost issue with El Paso or [CNH]?

A.    I think that we probably - - we went to Dean Prine and Dean Prine contacted the International Union and I think they were saying that those artificial caps were not supposed to cost anybody any money. . . .

Q.    Did you object, at that time, to the UAW trying to address *this issue* for the Pre-IPO retirees?
. . .

A.    No, I didn't object.  I didn't even know how the caps were really put on because everything we were told, they were artificial caps that weren't going to cost anybody any money. So, we couldn't figure out how, all of a sudden, an artificial cap ended up costing people money.

(1/29/08 Tr. at 77-78 (emphasis added) (Reynolds).)

Mr. Reynolds was clear about the "issue" he understood the UAW Negotiating Committee was going to raise with CNH in the upcoming negotiations.  As he further testified:

> [M]y understanding was that the UAW Negotiating Committee, at that point, did not agree with the company's interpretation to charge us $56 a month. That the cap letter said artificial caps to be used for FASB and that it didn't – wasn't suppose[d] to have an affect [sic] on us paying anything . . .
> . . .
> It was my understanding that the International Union was going to go back to [CNH] and tell them that that wasn't the intent of the letter that they negotiated, . . .

(*Id*. at 84-85.)  Mr. Reynolds shared this view with other retirees in the October 28, 1997 edition of *Strictly Retired*, in which he wrote:

> It wasn't until last Friday that El Paso Tennessee Pipeline notified the International Union that they intended to charge retirees for excess health care costs after April 1, 1997.  The International Union went to Case and were astounded to hear the company's position that the Case-Tenneco Retirees [i.e. Pre-IPO retirees] were not covered by the discussions to change the "kick in" date on the FASBY letter in the 1995 negotiations.  The reason they were so astounded was because almost the entire discussion on the FASBY letter in 1995 was concerning the Case-Tenneco retirees. . . .
> I am told that upon hearing Case's position, UAW Vice President Dick Shoemaker notified Case that there would be no meetings prior to negotiations in [sic] Case until this issue is resolved. . . .

(Def.'s Ex. 20.)  The fact that Plaintiffs expressed to the UAW that they wanted the UAW to "enforce the agreement that [they] already had" did not create the apparent authority for the UAW to relieve CNH of its liability for the cost of Plaintiffs' benefits.  *See*

31

*Bialoszynski v. Milwaukee Forge*, 419 F. Supp. 2d 1045, 1056 (E.D. Wis. 2006).

In *Bialoszynski*, the plaintiffs claimed that they held vested retirement health insurance benefits based on collective bargaining agreements between their employer, Milwaukee Forge, and the union that represented them. Due to continuing financial problems, Milwaukee Forge sought to eliminate retiree insurance benefits and they presented a contract proposal to the union which did so during negotiations with the union for the 2003 CBA. 419 F. Supp. 2d at 1048.

During these negotiations, the union sent a "letter to retirees and their spouses, stating that it would 'fight to the end if necessary to protect the retirees and their families.'" *Id.* Eventually Milwaukee Forge and the Union reached an agreement that eliminated retiree health insurance benefits for individuals retiring after the CBA became effective, September 1, 2003. *Id.* at 1048. The union membership subsequently ratified the agreement. *Id*. at 1049. The day after the CBA took effect, the company sent a letter to retirees, informing them that it no longer would provide health care benefits to retirees and their dependents. *Id*. In response, individuals who retired prior to September 1, 2003, and their spouses and dependents, sued Milwaukee Forge, alleging that termination of their company-provided retirement health benefits constituted a violation of the LMRA and ERISA.

In defense of the lawsuit, Milwaukee Forge argued that the retirees were "bound by" the 2003 agreement that eliminated their benefits because they authorized and consented to have the union act in their behalf during the negotiations leading up to the

32

agreement.  The district court rejected this argument, having noted that "the Union was not authorized by the retirees in writing or by any vote of the retirees to represent them in negotiations."  *Id*.  The court found that the retirees did not consent to relinquish their vested benefits and did not authorize the union to relinquish their rights: "The fact that some retirees may have exhorted Milwaukee Forge to continue providing retiree health benefits, or had the Union exhort Milwaukee Forge on their behalf, does not mean that they forfeited their statutory claims or any vested benefits."  *Id*. at 1056.

Likewise, simply because Plaintiffs exhorted CNH and the UAW to take care of the problem that threatened what they believed were guaranteed lifetime, fully-funded benefits does not mean that they authorized the UAW to effectuate a waiver of the company's liability for or an alteration of those benefits.  The retirees may not have expressly described "the problem" that they expected the UAW to resolve during the 1998 negotiations.  Nevertheless, there was no manifestation by Plaintiffs suggesting that they authorized the UAW to relieve CNH of its liability for their vested benefits.

As discussed earlier, absent such an expression, well-established case law informed CNH that the UAW's authority to bargain on Plaintiffs' behalf was limited and that the consent of each retiree was necessary to effectuate a waiver of the company's liability for or an alteration of the retiree's vested benefits.  *See supra*.  The Court also finds it significant that, in other situations where the company and union negotiated agreements resulting in the waiver of employee benefits, it was customary to require each employee to sign an individual waiver and release.  (Pls.' Exs. 101, 102, 103, 104, 106,

33

110; *see also* 1/27/09 Tr. at 155 (Haas) (indicating that is was his understanding that, "[i]n the past, [CNH] had required employees to sign individual releases in order to get benefits under the negotiation agreement").)

As the Sixth Circuit emphasized in *Anderson*: "A third party may not . . . *reasonably* rely upon an agent's ostensible authority if the third party knows that the agent is not authorized to act in a particular manner." 370 F.3d at 551. "If . . . a third person dealing with an agent knows he is acting under a circumscribed and limited authority and that his act is in excess of or an abuse of the authority actually conferred, then clearly the principal is not bound." *Id.* (quoting *Dayton Bread Co.*, 126 F.2d at 261). As CNH knew or should have known that the UAW's purported waiver of the company's liability for the cost of Plaintiffs' health insurance benefits exceeded the scope of the authority created by Plaintiffs' manifestations, the Court concludes that the UAW lacked the apparent authority to enter the VEBA Agreement on Plaintiffs' behalf.

**C.    Ratification**

CNH contends that Plaintiffs ratified the UAW's actions in the 1998 negotiations because they were informed of the VEBA Agreement and accepted the benefits of the agreement.  The flaw in CNH's argument is that the evidence does not support its assertion that Plaintiffs had knowledge of the agreement's material facts.  In fact, the evidence reflects that Plaintiffs were not informed that the VEBA Agreement relieved CNH of any future liability for the above-cap costs of Plaintiffs' health insurance benefits

and that, except for Mr. Kale, no Plaintiff received a copy of the agreement.[12]

A principal may ratify or affirm the unauthorized act of his agent. "However, one essential prerequisite to a principal's ratification of an unauthorized act is that *at the time of the ratification* the principal have knowledge of all material facts." *Capital Dredge and Dock Corp. v. City of Detroit*, 800 F.2d 525, 530 (6th Cir. 1986) (emphasis added). "[A] person is not bound by a ratification made without knowledge of material facts . . ." Restatement (Third) of Agency, § 4.00. Plaintiffs therefore did not ratify the VEBA Agreement when they accepted the benefits of the agreement unaware that the agreement purportedly relieved CNH of any future liability for Plaintiffs' health insurance benefits.

## III.   Conclusion

To summarize, the UAW was not precluded from bargaining on Plaintiffs' behalf; however, the UAW did not have the right to negotiate a waiver of CNH's liability for the costs of Plaintiffs' vested health insurance benefits absent the consent of *each* retiree. This is because any claims to those benefits belong to Plaintiffs, individually. CNH has not shown (or even attempted to show) that each member of the Class expressly authorized the UAW to waive CNH's liability during negotiations for the 1998 CBA.

---

[12]CNH takes issue with Mr. Prine's assertion during his trial testimony that he provided retirees with copies of the "Highlighter" following ratification of the 1998 CBA, noting that this was a departure from his deposition testimony where he stated that he gave retirees copies of the 1998 tentative agreement. (1/29/09 Tr. at 25-28.) Mr. Prine explained during his trial testimony, however, that he previously meant the Highlighter and not the actual agreement. (*Id.* at 27-28.) As he explained, the tentative agreement was five or six inches thick and he "certainly didn't have bunch or 40 or 50 of those." (*Id.*)

CNH also has not shown that the UAW had actual implied or apparent authority to enter into the VEBA Agreement on Plaintiffs' behalf.  The UAW's and CNH's understandings as to the extent of the authority granted by Plaintiffs must have been reasonable.  In light of established principles governing the relationship between a union and its retirees and the facts known to the UAW and CNH at the time of the 1998 negotiations, it was not reasonable for either the UAW or the company to conclude that Plaintiffs consented to a release of CNH's liability.  Plaintiffs subsequently did not ratify the VEBA Agreement by accepting its benefits, because they were not informed by that time of the agreement's material facts.

Therefore, the Court holds that Plaintiffs are not bound by the VEBA Agreement and CNH remains contractually liable for the above-cap costs of their vested health insurance benefits.

**SO ORDERED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Roger J. McClow, Esq.
Norman C. Ankers, Esq.
Thomas G. Kienbaum, Esq.
Bobby R. Burchfield, Esq.

36