# EXHIBIT G
## to
## Settlement Agreement

## Notice of Preliminary Approval

**EXHIBIT G**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN

*Yolton, et al v. El Paso Tennessee Pipeline Co., et al* -- Case No. 02-CV-75164

### NOTICE OF PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT
### AND HEARING TO BE HELD TO APPROVE THE PROPOSED SETTLEMENT

To:   Certain retired bargaining unit employees of Case Corporation and certain of their eligible surviving spouses

This Notice is given pursuant to Rule 23 of the Federal Rules of Civil Procedure and pursuant to an Order of the United States District Court for the Eastern District of Michigan, entered on [insert date].  It is directed to certain bargaining unit employees who retired from Case Corporation (formerly J.I. Case Company) and to certain eligible surviving spouses who are Class Members in the Litigation.  This Notice is intended to provide Class Members with information about the proposed Settlement Agreement reached by the parties.

### THE CLASS

On September 3, 2004, the Court certified that this Litigation may proceed and be maintained as a class action pursuant to Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure.  For purposes of the Settlement Agreement, the Class consists of the following persons:

> All former bargaining unit employees who retired under the Case Corporation (formerly J.I. Case) Pension Plan for Hourly Paid Employees on or before July 1, 1994 (other than former employees eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan) and all surviving spouses who are (1) spouses of former bargaining unit employees who retired or died on or before July 1, 1994; and (2) eligible for or receiving surviving spouse benefits under the Case Corporation (formerly J.I. Case) Pension Plan for Hourly Paid Employees, other than a deferred vested pension.

## NATURE OF THE ACTION

This Litigation concerns Health Care Benefits for Retirees and Surviving Spouses described as Class Members in the above description of the Class.

On December 23, 2002, six Class Representatives, for themselves and on behalf of similarly situated Case Corporation Retirees and Surviving Spouses, sued El Paso Tennessee Pipeline Co. and Case Corporation (the "Defendants") in the United States District Court for the Eastern District of Michigan ("Court"). Class Representatives sought a declaratory judgment that El Paso Tennessee and Case Corp. were required to provide these Retirees and Surviving Spouses with lifetime Health Care Benefits. Class Representatives also sought monetary damages and injunctive relief. Class Representatives asserted that, when, beginning in August 2002, the Defendants required Class Members to pay premium contributions to maintain their Health Care Benefits, they had: (1) breached the applicable collective bargaining agreements between the Case Corporation and the UAW; and (2) violated the Employee Retirement Income Security Act ("ERISA"). El Paso Tennessee and Case Corp. denied that they had breached the collective bargaining agreements or ERISA and asserted certain affirmative defenses to the Litigation.

On December 31, 2003, the Court issued a Preliminary Injunction requiring El Paso Tennessee to pay the full cost of Health Care Benefits for Class Members. On March 9, 2004, the Court modified the Preliminary Injunction, ruling that Case Corp. was responsible for providing Health Care Benefits for Class Members.

On January 17, 2006, the United States Court of Appeals for the Sixth Circuit affirmed the Court's issuance of the Preliminary Injunction.

On March 8, 2008, the Court held that El Paso Tennessee and Case Corp. (now known as CNH America LLC) were both obligated to provide lifetime Health Care Benefits for Class Members and entered summary judgment as to liability in favor of the Class Representatives. Because this judgment was to liability only, and individual damages remained to be determined, the judgment was not final and, therefore, is not yet appealable.

During the process of the Litigation, counsel for El Paso Tennessee, Case Corp. and the Class Representatives conducted a very extensive investigation of the facts and the law. The Class Representatives and Class Counsel have concluded that, under the circumstances and given that further appeals will take time and that final success is not guaranteed, the proposed Settlement Agreement is fair to and in the best interests of the Class. The Class Representatives and Class Counsel fully support the proposed Settlement Agreement.

While El Paso Tennessee continues to deny liability, it desires to settle the action on the terms set forth in the Settlement Agreement in order to put to rest all further controversy and to avoid the expense of further, protracted litigation.

This Notice is not meant to imply that there has been any violation of law or that Class Members will be ultimately successful if this lawsuit were not settled.

### SUMMARY OF THE PROPOSED SETTLEMENT AGREEMENT

A copy of the Settlement Agreement, and certain of the pertinent Exhibits, is enclosed with this Notice. Because the Settlement Agreement describes your continuing Health Care Benefits from El Paso Tennessee and your right to damages, all Class Members should read the Settlement Agreement very carefully.

The Court gave preliminary approval to the Settlement Agreement in an Order dated [insert date]. The Settlement Agreement is subject to final approval by the Court after

considering any objections filed by Class Members. If approved, the Court will enter a Judgment requiring El Paso Tennessee to comply with the terms of the Settlement Agreement.

If a Judgment approving the Settlement Agreement is not entered by [insert date], El Paso Tennessee can implement the modified Health Care Benefits Plan summarized briefly below. If the Court does not give final approval to the Settlement Agreement, El Paso Tennessee will reinstate the 1990 Group Benefit Plan within 90 days of written notice of termination by Class Counsel or El Paso Tennessee, and the Litigation will continue.

### HEALTH CARE BENEFITS UNDER THE PROPOSED SETTLEMENT AGREEMENT

Under the Settlement Agreement, El Paso Tennessee will provide a comprehensive Managed Care Plan for Class Members who are not Medicare-eligible. The Managed Care Plan provides a full range of hospital, surgical and medical services through a network of health care providers. Blue Cross Blue Shield of Texas will administer the Managed Care Plan.

For in network services, the Managed Care Plan will pay 100% of the cost of health care services, with a $10.00 co-pay for such things as doctor's office visits. For network services, there is no deductible, no co-insurance and no lifetime maximum benefit.

For out-of-network services, the Managed Care Plan pays 90% of the reasonable and customary cost of services after an annual deductible of $100.00 per person. Once a covered individual has paid a total of $600.00 per year (including the deductible), non-network services are paid at 100% of the reasonable and customary charge.

If a Class Member lives outside the network, all services will be paid as if they were network services.

For Medicare-eligible Class Members, El Paso Tennessee will provide the Medicare Supplement Plan L. The Medicare Supplement Plan L will pay 75% of the annual Medicare Part

A deductible and 75% of the 20% co-payment that Medicare Part B does not pay for services like doctors' visits. The Medicare Supplement Plan L also provides an additional 365 lifetime days of hospital coverage beyond what Medicare provides. The Medicare Supplement Plan L does not pay any part of the Medicare Part B deductible ($162.00 in 2011), but there is an out-of-pocket maximum. For 2011, after a participant has paid $2,320 for the year in out-of-pocket expenses, the Medicare Supplement Plan L pays 100% of all covered expenses. El Paso Tennessee will initially provide the Medicare Supplement Plan L through AARP.

The current Indemnity Plan will be eliminated.

The Prescription Drug Plan will have co-pays of $5.00 for generic drugs; $10.00 for brand name formulary drugs; and $15.00 for non-formulary brand name drugs for a 30-day retail supply. For a 90-day supply of mail order drugs, the co-pays will be $10.00; $20.00; and $30.00. Class Members will be required to use generic drugs where available and purchase maintenance drugs through mail order (after three months of retail purchases).

El Paso Tennessee will continue to provide Dental, Vision and Hearing Aid Benefits. The levels of these benefits will be increased from current levels. For example, the annual maximum payment for certain types of dental expenses will be increased by $200.00, from $1,400.00 to $1,600.00 per person per year; certain vision expense benefits will be increased by 10%; and the maximum benefit for hearing aids will be increased from $303.20 to $350.00 per ear.

El Paso Tennessee will maintain Health Care Benefits, as modified by the Settlement Agreement, for the lifetime of all Retirees and Surviving Spouses.

El Paso Tennessee will maintain current Life Insurance Benefits for the lifetime of all Retirees.

El Paso Tennessee will pay the full premium cost of these Health Care Benefit and Life Insurance plans.

**This is only a very brief summary of the main provisions of the modified Health Care Benefit plans.** Full details of all of the Health Care Benefit plans are contained in the Summary Plan Description, a copy of which is Exhibit K to the Settlement Agreement. You should consult the Summary Plan Description for more information about the Health Care Benefit plans that will be implemented if the Settlement Agreement is approved by the Court.

### AUTHORIZED CLAIM PROCEDURE

The Settlement Agreement provides that El Paso Tennessee will reimburse eligible Class Members for a portion of the Premium Contributions and certain other expenses, including substitute insurance and out-of-pocket health care and prescription drug expenses, incurred as a result of El Paso Tennessee's requirement that, beginning September 1, 2002, Class Members pay Premium Contributions to maintain their Health Care Benefits. The amounts reimbursed under the Settlement Agreement are called the Authorized Claim Amounts.

For Pre-October 3, 1993 Class Members (those who were covered by the Preliminary Injunction when it first became effective on March 15, 2004) El Paso Tennessee will pay 70% of the Premium Contributions and 70% of other properly documented out-of-pocket health care expenses those Class Members incurred for the period September 1, 2002 through March 15, 2004.

For Post-October 3, 1993 Class Members (those who were not covered by the Preliminary Injunction until October 17, 2007) El Paso Tennessee will pay 75% of the Premium Contributions and 75% of other properly documented health care expenses those Class Members incurred for the period September 1, 2002 through October 17, 2007.

6

Authorized Claim Amounts will be determined pursuant to an Authorized Claims Procedure, which is Exhibit A to the Settlement Agreement. All Class Members will be provided a written Notice of Opportunity to File Damage Claim, and a Damage Claim Form that will show the Premium Contribution amount that each Class Member paid to El Paso Tennessee, according to records supplied by El Paso Tennessee. Class Members who terminated coverage with El Paso Tennessee before the Preliminary Injunction became effective as to them will be required to document any expenses they incurred for substitute insurance premiums and health care and prescription drug expenses that would have been paid by the 1990 Group Benefit Plan.

**Early Authorized Claim Amount Payment**: Under the Settlement Agreement, Class Members must wait until the conclusion of the Authorized Claim Procedure to receive payment of their Authorized Claim Amount. This process may take a year or longer to complete. But a Class Member who: (1) agrees that the Premium Contribution amount shown on the Damage Claim Form is correct; (2) does not seek additional damages for the cost of substitute insurance and for out-of-pocket health care expenses and prescription drug expenses; and (3) signs a Release and timely returns the Release to Class Counsel will be eligible for an early Authorized Claim Amount payment from El Paso Tennessee.

### EL PASO TENNESSEE'S OBLIGATION UNDER THE SETTLEMENT AGREEMENT

El Paso Tennessee will pay the Authorized Claim Amount and will continue to pay the entire premium cost for all Health Care Benefits. El Paso Tennessee will provide these programs for the lifetime of the Retirees and eligible Surviving Spouses. The Judgment will require that El Paso Tennessee comply with its obligations under the Settlement Agreement.

El Paso Corporation, the parent company of El Paso Tennessee, will sign a Guaranty that will require El Paso Corporation to guaranty all of El Paso Tennessee's obligations under the Settlement Agreement.

El Paso Tennessee has agreed to pay Class Counsel an amount of up to $4 million in attorney fees and costs for services rendered through the date the Authorized Claim Amount checks are distributed. Class Counsel has filed a motion for approval of these attorney fees and costs, a copy of which is attached. These costs and fees are subject to approval by the Court after a hearing on any objections filed by Class Members.

### SETTLEMENT OF ALL CLASS MEMBER CLAIMS AND DISMISSAL OF THE LITIGATION

This Settlement Agreement settles all claims of the Class Members and anyone claiming on behalf of or through a Class Member (including but not limited to any spouse, Surviving Spouse, beneficiary or dependent of a Class Member). If the Settlement Agreement is approved, Class Members will only have claims for Health Care Benefits that arise under the Settlement Agreement. All claims for Health Care Benefits that do not arise under the Settlement Agreement will be dismissed with prejudice in the Judgment.

### THIS NOTICE IS JUST A SUMMARY OF THE TERMS OF THE SETTLEMENT AGREEMENT

This Notice contain just a summary of the terms of the Settlement Agreement. The full terms of the settlement of the Litigation are contained in the text of the Settlement Agreement and the attached Exhibits. In the event of any inconsistency between this Notice and the Settlement Agreement, the Settlement Agreement is the controlling document.

### HEARING

Pursuant to an Order of the Court entered on [insert date], there will be a hearing before the Honorable Patrick J. Duggan in Courtroom 867, 231 W. Lafayette, Detroit, Michigan 48226

on [insert date and time] for the purpose of determining whether the proposed Settlement Agreement is fair, reasonable, and in the best interests of the class and whether it should be finally approved by the Court. The hearing may be adjourned from time to time by the Court without further notice.

You do not have to come to the hearing. Class Counsel will attend the hearing. Any Class Member may appear at the hearing and, if he or she has objected to the proposed Settlement Agreement, tell the Court why the proposed Settlement Agreement should not be approved. No Class Member will be heard at the hearing unless he or she files written objections with the Court at the above address on or before [insert date], and by the same date sends a copy of the objections to each of the following: (a) Class Counsel Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., 400 Galleria Officentre, Suite 117, Southfield, MI 48034; (b) El Paso Tennessee Counsel William B. Forrest III, Kienbaum Opperwall Hardy & Pelton, 280 N. Old Woodward, Suite 400, Birmingham, MI 48009.

Any member of the Class who does not make his or her objections in this manner will be deemed to have waived his or her objections and will be forever precluded from making any objections to the fairness or adequacy of the proposed Settlement Agreement. Objections should bear the following heading: *Yolton, et al. v. El Paso Tennessee*, Case No. 02-CV-75164, Objections to Proposed Settlement Agreement.

If, after the hearing, the Court determines that the proposed Settlement Agreement is fair, reasonable and in the best interests of the Class and enters a Final Judgment approving it, that judgment will be binding on all Class Members, regardless of whether objections have been filed.

9

Dated: [insert date]

_____

Clerk of the Court

# EXHIBIT H
## to
## Settlement Agreement

## Order of Preliminary Approval

**EXHIBIT H**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

GLADYS YOLTON, WILBUR MONTGOMERY,
ELSIE TEAS, ROBERT BETKER, EDWARD
MAYNARD, and GARY HALSTED, on
behalf of themselves and a class of persons
similarly situated,

      Plaintiffs,

v.

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

      Defendants.

Hon. Patrick J. Duggan

Case No. 02-CV-75164

**CLASS ACTION**

---

## ORDER OF PRELIMINARY APPROVAL
## OF SETTLEMENT AGREEMENT

The parties entered into a proposed Settlement Agreement on [insert date] and requested the Court to give its preliminary approval to that Settlement Agreement and approve the form and method of providing notice of the proposed settlement to the Class described in the Settlement Agreement.

The Court has reviewed the Settlement Agreement and the referenced Exhibits, including the proposed forms of Class Notice, and finds and concludes as follows:

1.    This Court certified the Litigation as a class action in an Order dated September 3, 2004. Based on the agreement of the parties, the Court now finds that the following described Class is appropriate for purposes of the Settlement Agreement:

> All former bargaining unit employees who retired under the Case Corporation (formerly J.I. Case) Pension Plan for Hourly Paid Employees on or before July 1, 1994 (other than former employees

> eligible for or receiving retirement benefits under the deferred
> vested provisions of the Pension Plan) and all surviving spouses
> who are (1) spouses of former bargaining unit employees who
> retired or died on or before July 1, 1994; and (2) eligible for or
> receiving surviving spouse benefits under the Case Corporation
> (formerly J.I. Case) Pension Plan for Hourly Paid Employees,
> other than a deferred vested pension.

3.     The Court is intimately familiar with the history of this protracted Litigation,

having presided over it since it was filed in December 2002.  The Court has now considered the

pleadings filed in support of the Settlement Agreement and the statements of Counsel on the

record.  Based on this Court's extensive knowledge of this Litigation and a review of the

proposed Settlement Agreement, the Court finds, on a preliminary basis, that the Settlement

Agreement is fair, reasonable, adequate and in the best interests of the Class.  The Court will

therefore direct that the notice of the Settlement Agreement be provided to the Class pursuant to

Fed. R. Civ. Pro. 23(e)(B).

4.     The Court has reviewed the attached forms of the Notice of Preliminary Approval

of the Proposed Settlement and the cover letter from Class Counsel to be sent with the Notice,

and finds that they comply with the requirements of Fed. R. Civ. Pro. 23(d) and (e) and fairly

present the terms of the Settlement Agreement and the Class Members' rights and

responsibilities in the settlement approval process.

5.     The parties propose that Class Counsel send the Notice of Preliminary Approval

to all identified Class Members by first class mail.  The Court finds that such notice is the best

notice practicable under the circumstances and is reasonably calculated to effectuate actual

notice of the settlement to the Class.

6.     The parties have compiled the names and addresses of all known Class Members.

The individual mailing of the Notice to those Class Members identified by the parties provides

due and sufficient notice of the proceedings, of the proposed settlement, and of the settlement approval procedure, thus satisfying the requirements of Fed. R. Civ. Pro. 23 and the requirements of due process.

Based upon the foregoing findings of fact and conclusions of law:

IT IS HEREBY ORDERED THAT the Settlement Agreement is preliminarily approved.

IT IS FURTHER ORDERED THAT all proceedings not related to the approval and implementation of the Settlement Agreement are stayed until further Order of the Court.

IT IS FURTHER ORDERED THAT the Notice of Preliminary Approval of Settlement Agreement and the cover letter from Class Counsel to accompany the Notice are approved by this Court and that the Notice and letter, together with a copy of the Settlement Agreement and any appropriate Exhibits, be mailed to each identified Class Member at his or her current last known address by Class Counsel on or before [insert date].

IT IS FURTHER ORDERED THAT Class Counsel will file an Affidavit of Mailing of the Notice with this Court and serve copies of that Affidavit on all counsel prior to the date set for hearing on the Settlement Agreement.

IT IS FURTHER ORDERED THAT on [insert date], at [insert time], in Courtroom 867, 231 W. Lafayette Blvd., Detroit, Michigan 48226, the Court will conduct a hearing to finally determine the fairness, reasonableness and adequacy of the terms and conditions of the settlement set forth in the Settlement Agreement and Exhibits thereto.

IT IS FURTHER ORDERED THAT any Class Member may appear personally or by counsel at the hearing and may object or express his or her view regarding the Settlement Agreement and present evidence, briefs, or other papers in support thereof.  However, a Class Member will not be heard, nor be entitled to contest the approval by this Court of the Settlement

Agreement, unless on or before the date set forth in the Notice of Preliminary Approval, he or she files with the Clerk of this Court written objections, together with all papers to be submitted to this Court at the Settlement Hearing, and on or before that date serves all such objections and other papers on each of the following:  (a) Class Counsel Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., 400 Galleria Officentre, Suite 117, Southfield, MI 48034; (b) El Paso Tennessee Counsel William B. Forrest III, Kienbaum Opperwall Hardy & Pelton, 280 N. Old Woodward, Suite 400, Birmingham, MI 48009.  Any Class Member who does not file and serve his or her objections in this manner will be deemed to have waived his or her objections and will be forever precluded from making any objections to the fairness or adequacy of the proposed Settlement Agreement.  Objections should bear the following heading: *Yolton, et al. v. El Paso Tennessee*, Case No. 02-CV-75164, Objections to Proposed Settlement Agreement.

IT IS FURTHER ORDERED THAT the hearing may be continued or adjourned by order of this Court, from time to time, and without further notice to the Class, except to any Class Member who has timely filed an objection.

Dated: [insert date]

_____
Hon. Patrick J. Duggan,
United States District Judge

155655

4

# EXHIBIT I
## to
## Settlement Agreement

## Case Pension Plan

EXHIBIT I

# JI Case Corporation

### And

# United Auto Workers

### Pension Plan

### For

### Hourly Paid Employees



UAW 2816

<u>CONTENTS</u>

|  |  | <u>Page</u> |
|---|---|---|
| <u>1</u>. | ELIGIBILITY | |
| | 1.1 Normal Retirement | <u>1</u>-1 |
| | 1.2 Regular Early Retirement | <u>1</u>-1 |
| | 1.3 Early Regular Early Retirement | <u>1</u>-1 |
| | 1.4 Special Early Retirement | <u>1</u>-2 |
| | 1.5 Special Early Retirement in the Event of Full or Partial Plant Closing | <u>1</u>-2 |
| | 1.6 Disability Retirement | <u>1</u>-3 |
| | 1.7 Deferred Vested Retirement | <u>1</u>-3 |
| <u>2</u>. | BENEFITS | |
| | 2.1 Normal Retirement Benefit | <u>2</u>-1 |
| | 2.2 Regular Early Retirement Benefit | <u>2</u>-1 |
| | 2.3 Early Regular Early Retirement | <u>2</u>-2 |
| | 2.4 Special Early Retirement Benefit or Disability Benefit | <u>2</u>-4 |
| | 2.5 Deferred Vested Retirement Benefit | <u>2</u>-4 |
| | 2.6 Normal Form of Pension Benefits for Married Employees | <u>2</u>-5 |
| | 2.7 Death Before Retirement or Commencement of Benefits | <u>2</u>-8 |
| | 2.8 Effect of Bridge and Transition Benefits | <u>2</u>-10 |
| | 2.9 Special Medicare Benefit | <u>2</u>-10 |
| | 2.10 Maximum Limitation on Pensions | <u>2</u>-11 |
| | 2.11 Election of Joint and Survivor Annuity by Former Employees | <u>2</u>-11 |
| | 2.12 Election of REA Pre-Retirement Survivor Annuity by Former Employee | <u>2</u>-12 |
| <u>3</u>. | SUPPLEMENTAL ALLOWANCE | |
| | 3.1 Eligibility | <u>3</u>-1 |
| | 3.2 Amount of Supplement Allowance | <u>3</u>-1 |
| | 3.3 Special Payment of Supplemental Allowance | <u>3</u>-1 |
| | 3.4 Rules for Computing Supplemental Allowance | <u>3</u>-2 |
| | 3.5 Maximum Limitation on Supplemental Allowance | <u>3</u>-2 |
| | 3.6 Restriction on Earnings | <u>3</u>-2 |
| | 3.7 Effect of Union Leave | <u>3</u>-3 |
| | 3.8 Effect of Discharge for Cause | <u>3</u>-3 |

-i-

UAW 2816

14.   PERIOD OF BENEFIT PAYMENTS

    4.1   Commencement of Pensions ..... 14-1
    4.2   Commencement of Deferred Vested
        Benefits ..... 14-1
    4.3   Last Benefit Check ..... 14-2
    4.4   Endorsement of Checks ..... 14-2
    4.5   Suspension of Benefits ..... 14-2
    4.6   Deduction of Workers' Compensation ..... 14-4
    4.7   Legal Distribution Rules ..... 14-4
    4.8   Payment of Small Amounts ..... 14-5

15.   CREDITED SERVICE

    5.1   Service Prior to January 1, 1967 ..... 15-1
    5.2   Service After January 1, 1967 ..... 15-1
    5.3   Discontinuance of Accrual of
        Credited Service ..... 15-3
    5.4   Reinstatement of Credited Service ..... 15-3
    5.5   Transfer of Employment ..... 15-3
    5.6   Additional Credited Service for
        Foundry Employees ..... 15-5
    5.7   Additional Credited Service for
        Certain Rock Island Employees ..... 15-6
    5.8   Credited Service for Wausau Employees ..... 15-7

16.   ADMINISTRATION

    6.1   The Administrative Committee ..... 16-1
    6.2   Powers ..... 16-1
    6.3   Duties ..... 16-2
    6.4   Delegation ..... 16-3
    6.5   Standard of Care ..... 16-3
    6.6   Discretionary Acts ..... 16-3
    6.7   Compensation and Expenses ..... 16-3
    6.8   Notification ..... 16-4
    6.9   Prohibited Transactions ..... 16-4
    6.10  Applications ..... 16-4
    6.11  Addresses ..... 16-4
    6.12  Payment to Others ..... 16-4
    6.13  Named Fiduciary ..... 16-4
    6.14  Location of Participant or
        Surviving Spouse Unknown ..... 16-4

17.   PENSION FUND

    7.1   Establishment of Pension Fund ..... 17-1
    7.2   Company Contributions ..... 17-1
    7.3   Benefits Payable Only From Fund ..... 17-1
    7.4   Company Contributions Irrevocable ..... 17-1
    7.5   Investments ..... 17-2

UAW 2817

<u>18</u>.    GUARANTEES AND LIABILITIES                                |

    8.1  No Guarantee of Employment              <u>18</u>-1       |
    8.2  No Vesting                               <u>18</u>-1       |
    8.3  Spendthrift Clause                      <u>18</u>-1       |
    8.4  Federal Income Tax Withholding          <u>18</u>-1       |

<u>19</u>.    PREVIOUSLY RETIRED PENSIONERS                              |

    9.1  Benefits                                <u>19</u>-1       |
    9.2  Optional Form of Pension Benefit        <u>19</u>-3       |

<u>110</u>.   AMENDMENT AND TERMINATION                                 |

    10.1 Right to Amend                          <u>110</u>-1      |
    10.2 Right to Terminate                      <u>110</u>-1      |
    10.3 Disposition of Pension Fund            <u>110</u>-1      |
    10.4 Forms of Distribution                  <u>110</u>-3      |

<u>111</u>.   CLAIMS AND APPEALS                                        |

    11.1 Claims for Benefits                     <u>111</u>-1      |
    11.2 Review Procedure                        <u>111</u>-1      |
    11.3 Referral to Joint Board of
         Administration                         <u>111</u>-1      |
    11.4 Provisions to Prevent Discrimination
         of Benefits                            <u>111</u>-1      |
    11.5 Merger of Plan or Transfer of
         Assets from this Plan to Another       <u>111</u>-4      |
    11.6 Forfeitures                            <u>111</u>-4      |
    11.7 Limitation on Benefits                 <u>111</u>-4      |

<u>112</u>.   DEFINITIONS                                               |

    12.1 Company                                <u>112</u>-1      |
    12.2 Plan                                   <u>112</u>-1      |
    12.3 Employee                               <u>112</u>-1      |
    12.4 Pensioner                              <u>112</u>-1      |
    12.5 Retire, Retirement                     <u>112</u>-1      |
    12.6 Total and Permanent Disability
         Totally and Permanently Disabled       <u>112</u>-1      |
    12.7 Eligible for an Unreduced Social
         Security Benefit                       <u>112</u>-1      |
    12.8 Related Employment                     <u>112</u>-2      |
    12.9 Plan Year                              <u>112</u>-2      |
    12.10 Pension Agreement                     <u>112</u>-2      |
    12.11 Hour of Service                       <u>112</u>-2      |
    12.12 Administrative Committee              <u>112</u>-2      |
    12.13 Actuarial Equivalent                  <u>112</u>-2      |
    12.14 One-Year Break in Service             <u>112</u>-2      |

-iii-

UAW 2818

12.15 Code                                           112-2      |
12.16 Qualified Joint and Survivor Annuity           112-2      |
12.17 Leased Employee                                112-13     |

113.    PLAN SUPPLEMENTS                                         |

13.1 Plan Available to Others                        113-1      |
13.2 Method of Adopting the Plan                     113-1      |
13.3 Changes in Plan Following
       Execution of Supplement                       113-1      |

114.    SPECIAL VOLUNTARY SUPPLEMENT PROGRAM                     |

14.1 Amendment of Plan                               114-1      |


Appendix A - Foundry Classifications                            |

Appendix B - Special Voluntary                                  |
                  Supplement Retirement                         |

UAW 2819

## ꟾCASE CORPORATION

PENSION PLAN FOR HOURLY-PAID EMPLOYEES

Case Corporationꟾ hereby amends the Case Corporationꟾ Pension Plan for Hourly-Paid Employees effective June 2, 1990ꟾ except for those provisions which explicitly state otherwise. Terms used in the Plan shall have the meaning set forth in Section ꟾ12.

### SECTION ꟾ1

ELIGIBILITY

1.1  Normal Retirement.  An Employee who completes at least one Hour of Service on or after January 1, 1989 and either (a) has ꟾfive or more years of credited service (10 or more years of credited service for an Employee who does not complete an Hour of Service on or after January 1, 1989) ꟾand has attained age 65 or (b) has attained age 66ꟾ shall have a nonforfeitable right to a normal retirement benefit and shall, upon retirement and proper application, receive a normal retirement benefit as provided in Section 2.1.  Notwithstanding ꟾthe foregoing, the normal retirement date under the Plan of a Participant who completes at least one Hour of Service on or after January 1, 1988 shall be not later than the fifthꟾ anniversary of the date on which the Employee's participation commenced, provided the Employee has attained age 65.

1.2  Regular Early Retirement.  An Employee whoꟾ on or after ꟾJune 2, 1990:

(a)  Has 10 or more years of credited service and has attained age 60, but not age 65;

(b)  Has attained age 55, but not age 60, and whose combined age (computed to the nearest 1/12 year) and years of credited service total 85 or more; or

(c)  Has 30 or more years of credited serviceꟾ

shall be eligible to retire at his option and, upon proper application, to receive a regular early retirement benefit as provided in Section 2.2, and, in addition, a supplemental allowance as provided in Section III.

1.3  Early Regular Early Retirement.  An Employee who on or after ꟾJune 2, 1990 is laid off as the result of a full

1-1

UAW 2820

or partial plant closing, as defined 1by the Company1, and who
is less than age 55 at the time of such layoff, but could
become eligible for regular early retirement benefits while on
layoff pursuant to Section 1.2 before expiration of his
seniority, shall be eligible to retire at his option and, upon
proper application, to receive an early regular early
retirement benefit as provided in Section 2.3, commencing on
the first day of any month after the Employee attains age 55,
in lieu of the benefits otherwise payable to the Employee from
the date he first would have been eligible for regular early
retirement benefits pursuant to Section 1.2, and in lieu of a
pension under any other section of this Section 11. An
Employee who is recalled from such layoff prior to the
commencement of early regular early retirement benefits shall
cease to be eligible for such benefits unless he is again laid
off as the result of the same or another full or partial plant
closing.

1.4   Special Early Retirement. An Employee who on or
after 1June 2, 1990, has 10 or more years of credited service
and has attained age 55, but not age 65,1 shall be eligible,
upon proper application, to receive a special early retirement
benefit as provided in Section 2.4, and, in addition, a
supplemental allowance as provided under Section 13, provided
that a discharge for cause on or after attainment of age 55,
but prior to age 65, shall not be deemed to be a retirement
under this Section 1.4.

1.5   Special Early Retirement in the Event of Full or
Partial Plant Closing. An Employee who on or after 1June 2,
1990, is laid off as the result of a full or partial plant
closing, as defined 1by the Company1, shall be eligible to
retire at his option and, upon proper application, to receive
the special1 early retirement benefits as described in
Section 1.4, in lieu of a pension under any other section of
this Section I, provided the Employee is age 55 and has 10 or
more years of credited service at the time of such layoff. An
Employee who is age 54 with 9.1 or more years of credited
service at the time of such layoff shall be eligible for the
special early retirement benefits upon attainment of age 55,
provided the Employee then has 10 or more years of credited
service. An Employee who is immediately eligible to receive
the special early retirement benefits upon being laid off as
the result of a full or partial plant closing must apply for
the benefits by no later than six months following the date of
layoff, and the benefits shall commence the first day of the
month following the date of application. An Employee who
becomes eligible after the date of layoff must apply for the
special early retirement benefits in the month he first becomes
eligible, and the benefits shall commence the first day of the

UAW 2821

month following the month in which the Employee becomes eligible. An Employee who is recalled from such layoff before the commencement of special early retirement benefits shall cease to be eligible for such benefits unless he is again laid off as the result of the same or another full or partial plant closing.

1.16 <u>Disability Retirement</u>. An Employee who (a) has been totally and permanently disabled (as defined in Section 12.7) for a period at least equal to the maximum period for which weekly sickness and accident benefits are payable under the Company's group insurance program, (b) is not engaged in active employment (except for purposes of rehabilitation), (c) has 10 or more years of credited service and has not attained age 65, and (d) retires on or after <u>|June 2, 1990</u> prior to age 65 by reason of such disability, shall be eligible, upon proper application, to receive a disability retirement benefit as provided in Section 2.4 1

1.17 <u>Deferred Vested Retirement</u>. An Employee who has 15 or more years of credited service and whose employment is terminated <u>after completing at least one Hour of Service on or after January 1, 1989</u> |prior to his becoming eligible for any other benefit under this Plan (<u>ten</u> or more years of credited service for an employee whose employment <u>terminates on or after March 1, 1987 and prior to January 1, 1989</u>) shall be eligible, upon proper application, to receive a deferred vested benefit as provided in Section 2.5. Such an Employee shall not be eligible for a pension under any other section of this Section 11.

UAW 2822

<u>SECTION 2</u>|

BENEFITS

2.1   <u>Normal Retirement Benefit</u>.   The Normal Retirement
Benefit (also referred to as "monthly basic benefit") payable
to an Employee eligible under Section 1.1 who retires on or
after <u>June 2, 1990</u>, shall be a monthly benefit for life based
upon an Employee's years of credited service at retirement
determined as follows:

(a)   For months beginning on and after |<u>June 2,</u>   |
<u>1990</u> and prior to |<u>April 1, 1991</u>, $<u>126.05</u> multiplied by the   |
Employee's years of credited service;

(b)   For months beginning on and after |<u>April 1,</u>   |
<u>1991</u> and prior to |<u>February 1, 1992</u>, $<u>127.45</u> multiplied by the   |
Employee's years of credited service;

(c)   For months beginning on and after
|<u>February 1, 1992</u>, $<u>28.85</u> multiplied by the Employee's years of |
credited service.

2.2   <u>Regular Early Retirement Benefit</u>.   The benefit
payable to an Employee eligible under Section 1.2, who retires
on or after |<u>June 2, 1990</u>, shall be a monthly benefit for life   |
determined in accordance with Section 2.1, subject to reduction
under Section 2.6, if applicable, but reduced according to the
following schedule:

| Age at Time of Commencement of Pension or Subsequent <u>Increase in Pension</u> | Percentage of <u>Benefit Payable</u>* |
|---|---|
| 47 | 30.4 |
| 48 | 32.8 |
| 49 | 35.4 |
| 50 | 38.3 |
| 51 | 41.5 |
| 52 | 45.0 |
| 53 | 48.9 |
| 54 | 53.2 |
| 55 | 57.9 |
| 56 | 63.5 |
| 57 | 69.4 |
| 58 | 75.2 |

UAW 2823

|    |       |
|----|-------|
| 59 | 80.8  |
| 60 | 86.7  |
| 61 | 93.3  |
| 62 | 100.0 |

* Prorated for intermediate ages computed on the basis of number of complete calendar months by which an Employee is under the age he will attain at his next birthday.

The actuarial reduction stated above will be eliminated at age 62 in the case of an Employee who retired with 30 or more years of credited service or who retired on or after July 1, 1980 at a time when his combined age (computed to the nearest 1/12 year) and years of credited service totaled 85 or more. At that age, such Employee will commence receiving an unreduced monthly basic benefit.

Employees may, by application, elect to defer commencement of any benefit payable under this Section 2.2 to a month not later than the age at which they would have been eligible for a normal retirement benefit.

2.3  Early Regular Early Retirement Benefit.  The monthly benefit payable to an Employee who retires on or after [June 2, 1990, and who is eligible for, and has elected, an early regular early retirement benefit under Section 1.3, shall be the monthly basic benefit provided under Section 2.1, reduced according to the schedule under Section 2.2 applied to the Employee's age at time of commencement of the early regular early retirement benefit, and subject to reduction under Section 2.6, if applicable.

An Employee electing the early regular early retirement benefit under Section 1.3 who attains 85 points pursuant to Section 1.2(b) within two years of date of layoff due to a full or partial plant closing shall receive a Supplemental Allowance, commencing with the month following the date on which he attains 85 points (otherwise the regular early retirement date) to age 62, in addition to the reduced monthly basic benefit provided by this Section 2.3.  The Supplemental Allowance payable as part of the early regular early retirement benefit shall be calculated according to Section 3.2, but on the basis of the monthly basic benefit which would have been payable to the Employee on his attainment of 85 points (the regular early retirement date).  When the Employee reaches age 62, his monthly basic benefit for his lifetime shall be the full monthly basic benefit under Section 2.1 reduced by a

2-2

percentage equal to the difference between the percentages under Section 2.2 at the regular early retirement date and at the early regular early retirement date.*

---

\* **Example:** Employee laid off 1June 2, 1990 due to full or partial plant closing at age 54 with 28.1 years of Icredited Iservice.  Employee elects early regular early retirement at age 55 with 29 years of Icredited Iservice. Employee attains 85 points at age 56, within two years of layoff.

1. **Basic benefit commencing at age 55** = $126.05 x 57.9% (reduction factor at 55 under Section 2.2)

$$= \$115.08$$
$$x \ 29 \ years$$
$$= \$1437.32/month$$

2. **Supplemental Allowance plus basic benefit payable at age 56 to age 62**

At age 56, monthly supplemental allowance = $11.545 + 30 = $151.50 x 52% (100% - 48%:  1% reduction for each month less than age 60 under Section 3.2(b))

$$= \$126.78$$

**Less** basic benefit
at age 56 ($126.05 x
63.5% - reduction
factor at age 56
under Section 2.2)                  (116.54)
**Supplemental**
**Allowance**                    = $110.24
Total benefit payable from age 56 to age 62 = $115.08 (basic benefit at age 55) + $110.24

$$= \$125.32$$
$$x \ 29 \ years$$
$$= \$1734.28/month$$

3. **At age 62 - Recalculation of Basic Benefit (Lifetime)**
Reduction factor at
age 56 under
Section 2.2 =                         63.5%
Reduction factor at
age 55 under

UAW 2825

```
Section 2.2 =                57.9%
Difference =                  5.6%
Recalculated Basic Benefit
                           = $126.05 x 94.4%          |
                             (100%-5.6%) x 29 years
                           =$1713.14/month            |
```

2.4  **Special Early Retirement Benefit or Disability Benefit**.  The monthly benefit payable to an Employee who retires on or after June 2, 1990 and is eligible for a special early retirement benefit under Sections 1.4 or 1.6, shall be the sum of:

(a)  A benefit for life determined under Section 2.1 (subject to reduction under Section 2.6, if applicable); plus

(b)  A temporary benefit payable monthly until he attains age 62, or, if earlier, the age at which he becomes or could have become Eligible for an Unreduced Social Security Benefit (as defined in Section 12.8) equal to the following:

(i)  For months beginning on and after June 2, 1990 and prior to February 1, 1991, $121.55 per month multiplied by the Employee's years of credited service (not to exceed a maximum of $1646.50 per month);

(ii)  For months beginning on and after April 1, 1991 and prior to February 1, 1992, $122.65 per month multiplied by the Employee's years of credited service (not to exceed a maximum of $1679.50 per month);

(iii)  For months beginning on and after February 1, 1992, $123.75 per month multiplied by the Employee's years of credited service (not to exceed a maximum of $1712.50 per month).

The temporary benefit shall be payable for one month beyond age 62 for retirees, or surviving spouses of retirees, whose Old Age Pension under the Federal Social Security Act is delayed by one month beyond age 62 pursuant to the provisions of said Act.

2.5  **Deferred Vested Retirement Benefit**.  The monthly benefit to an Employee whose Employment is terminated on or after June 2, 1990, and who is eligible for a deferred vested retirement benefit under Section 1.7, shall, if payment commences pursuant to Section 4.2, on or after age 65, be an amount determined under Section 2.1, subject to reduction under

2-4

UAW 2826

Section 2.6, if applicable, based upon his years of credited service and the benefit level in effect at the time he terminates employment, or if payment commences pursuant to Section 4.2, on or after age 55 and prior to age 65, the amount determined above, reduced according to the following schedule of percentages based on the Employee's age when his pension commences:

| Age at Time of Commencement of Pension | Percentage of Benefit Payable* |
|:---:|:---:|
| 55 | 42.8 |
| 56 | 47.9 |
| 57 | 53.1 |
| 58 | 58.4 |
| 59 | 63.8 |
| 60 | 69.4 |
| 61 | 75.2 |
| 62 | 80.8 |
| 63 | 86.7 |
| 64 | 93.3 |
| 65 | 100.0 |

* Prorated for intermediate ages computed on the basis of the number of complete calendar months by which an Employee is under the age he will attain at his next birthday.

2.6 Normal Form of Pension Benefits for Married Employees.

(a) A married Employee who retires or is retired on or after June 2, 1990, pursuant to the normal, regular early, early regular early, special early, or total and permanent disability retirement provisions of Sections 1.1, 1.2, 1.3, 1.4, 1.5 or 1.6 or whose employment is terminated on or after June 2, 1990, under conditions making him eligible for a deferred vested benefit under Section 1.7 shall receive a Qualified Joint and Survivor Annuity under Section 2.6(f) for his life with the provision that it be payable in a reduced amount determined under Section 2.6(g) upon his death to his spouse for life if she shall be living at his death.

(b) A Qualified Joint and Survivor Annuity shall become effective on the first day of the month for which the first monthly benefit is payable, except in the case of a married Employee who has been married less than one year, in which case the Qualified Joint and Survivor Annuity shall become effective on the first day the month next following the month in which the Employee and his spouse have been married one year.

2-5

UAW 2827

(c)  An Employee who is subject to Section 2.6(a) may elect to waive the Qualified Joint and Survivor Annuity during his applicable election period in favor of a monthly pension benefit calculated without regard to the reductions set forth in Section 2.6(f), provided that such Employee's spouse gives her written consent to such an election.  The election will be effective only if it designates the form of pension payable as a result of the election and only if the spouse's consent acknowledges the effect of the election to waive the qualified joint and survivor annuity and states the form of benefit payable as a result of the election.  The spouse's consent must be witnessed by a Plan representative or notary public.  The consent of an Employee's former spouse shall not be binding on a subsequent spouse.  The election must provide that the designation of the form of benefit cannot be changed without the consent of the spouse unless the consent expressly permits further change by the Employee without any requirement of further consent on the part of the spouse.  Any election made by the Employee and consented to by his spouse may be revoked by the Employee without the consent of his spouse at any time during the applicable election period.

(i)  For purposes of this Section 2.6(c), an Employee's applicable election period shall be the 90-day period ending on the first day of the first month for which a Plan benefit is received.

(ii)  Not less than 30 days and not more than 90 days prior to a married Employee's early retirement date, the Administrative Committee shall provide the Employee with information regarding the Qualified Joint and Survivor Annuity and the necessary forms upon which the Employee, with his spouse's written consent, can elect to waive the Qualified Joint and Survivor Annuity.  Such information shall include (1) the terms and conditions of the Qualified Joint and Survivor Annuity; (2) an explanation of the Employee's right to waive the Qualified Joint and Survivor Annuity; (3) the right of the Employee's spouse to consent to any waiver; and (4) the right of an Employee to revoke any such waiver, and the effect thereof.

(d)  In the event that a spouse predeceases a Pensioner who is receiving a Qualified Joint and Survivor Annuity, the Pensioner may then reject such Annuity and thereafter receive a monthly pension benefit computed without regard to the Qualified Joint and Survivor Annuity, effective the first day of the month following receipt by the Administrative Committee of satisfactory evidence of the spouse's death.  In the event of a divorce by court decree, the

2-6

UAW 2828

terms of which do not expressly prohibit cancellation of the Qualified Joint and Survivor Annuity, the Pensioner may then reject the Qualified Joint and Survivor Annuity, effective the first day of the third month following the month in which the Administrative Committee receives the Employee's written rejection on a form approved by the Administrative Committee, accompanied by evidence satisfactory to the Administrative Committee of a final decree of divorce.

(e)  A Pensioner who retired or retires may elect a Qualified Joint and Survivor Annuity in the event of remarriage following divorce (unless expressly prohibited by court decree) or the death of the Pensioner's spouse as provided in paragraph (d) above, or in the event of the marriage of a Pensioner who was not eligible to elect a Qualified Joint and Survivor Annuity at the time he retired. Any such Qualified Joint and Survivor Annuity elected pursuant to this paragraph (e) shall be provided under the terms of the Plan in effect when the Pensioner retired.  The election of the Qualified Joint and Survivor Option shall be effective on the first day of the month following the date of the election, but in no event before the Pensioner has been married or remarried at least one year.  Pensioners shall be entitled to make such election not later than 12 months following marriage or remarriage.

(f)  Except in the case of an Employee with less than 30 years of credited service who becomes eligible for a disability retirement benefit under Section 1.6 prior to age 55, the Qualified Joint and Survivor Annuity referred to in Section 2.6(a) above shall be determined by reducing the monthly pension benefit otherwise payable to the Employee (or, if less, the benefit which would be payable if he were Eligible for an Unreduced Social Security benefit for age or disability) by 1/2 of 1% for each full year in excess of 10 that the spouse's age is less than the Employee's age (the age of each for the purposes of this Section 2.6 being the age at his or her last birthday prior to the annuity starting date), except that, in the case of an Employee whose monthly pension benefit is subject to redetermination at age 62 in accordance with Section 2.2 or 2.3, the amount of reduction in his monthly pension benefit under the Qualified Joint and Survivor Annuity shall be based on the monthly basic benefit payable to the Employee after age 62.

(g)  Except in the case of an Employee with less than 30 years of credited service who becomes eligible for a disability retirement benefit under Section 1.6 prior to age 55, the survivor benefit payable to the surviving spouse of a

2-7

Pensioner who dies after a Qualified Joint and Survivor Annuity has become effective pursuant to this Section 2.6 shall be a monthly benefit for the further lifetime of such surviving spouse equal to 55% of such Pensioner's Qualified Joint and Survivor Annuity as determined in Section 2.6(f) above, except that the survivor benefit payable to the surviving spouse of a Pensioner whose monthly pension benefit is subject to redetermination at age 62 in accordance with Section 2.2 or 2.3 shall be based on the monthly pension benefit payable to the Pensioner after age 62.

(h)   In the case of an Employee with less than 30 years of credited service who becomes eligible for a disability retirement benefit under Section 1.6 prior to age 55, the Qualified Joint and Survivor Annuity shall be a reduced monthly benefit for the life of the Employee which is the Actuarial Equivalent of and in lieu of the monthly benefit otherwise payable with a monthly benefit continuing to the Employee's surviving spouse after the Employee's death equal to 50% of the amount which the Employee was receiving at the time of his death.

(i)   An Employee with less than 30 years of credited service who becomes eligible for a disability retirement benefit under Section 1.6 prior to age 55 may waive the Qualified Joint and Survivor Annuity as provided in Section 2.6(c) or the Employee may elect that the Qualified Joint and Survivor Annuity take effect at age 55.  If the Employee elects to have the Qualified Joint and Survivor Annuity take effect at age 55, the amount payable to the Employee and the amount payable to the surviving spouse in the event of the Employee's death after age 55 shall be determined in accordance with Sections 2.6(f) and 2.6(g).  If the Employee elects to have the Qualified Joint and Survivor Annuity take effect at age 55 and dies before attaining age 55, his spouse will not receive a survivor benefit.  Any election to waive the Qualified Joint and Survivor Annuity or to have the Qualified Joint and Survivor Annuity take effect at age 55 shall be in writing on a form provided by the Company and shall be effective only if the spouse consents to the election in the manner provided in Section 2.6(c).

2.7   <u>Death Before Retirement or Commencement of Benefits</u>.

(a)   <u>I</u>The surviving spouse of an Employee who (1) <u>on or after January 1, 1989</u> has <u>5</u> or more years of credited service <u>(10 or more years of credited service for an employee who does not complete an Hour of Service on or after January 1, 1989)</u>; and (2) dies before his annuity starting date, shall

2-8

UAW 2830

receive a death benefit payable in the form of a pre-retirement survivor annuity, provided that such spouse had been married to such Employee for at least one year prior to the date of the Employee's death. The amount of the pre-retirement survivor annuity payable to the surviving spouse of an Employee who dies after attaining the earliest age on which he could elect to receive retirement benefits under this Plan shall be the benefit set forth in Section 2.6(g) that would have been payable to the surviving spouse had the Employee retired on the date before he died with a qualified joint and survivor annuity in effect. The amount of the pre-retirement survivor annuity payable to the surviving spouse of an Employee who dies before attaining the earliest age at which he could elect to receive a retirement benefit under this Plan shall be the benefit set forth in Section 2.6(g) that would have been paid to the surviving spouse had the Employee (1) separated from service on the date of his death; (2) survived to the earliest age at which he could elect to receive a retirement benefit under this Plan; (3) retired on the date on which he attained the earliest age at which he could elect to receive a retirement benefit under this Plan; and (4) died the day after the date on which he attained the earliest age at which he could elect to receive a retirement benefit under this Plan.¹

(b)   IThe surviving spouse of a former Employee who is eligible for a deferred vested pension, and who dies before his annuity starting date, shall receive a death benefit in the form of a pre-retirement survivor annuity, provided that the spouse had been married to the former Employee for at least one year prior to the date of death. The amount of the pre-retirement survivor annuity payable to the surviving spouse of a former Employee who dies after attaining the earliest age at which he could elect to receive benefits under this Plan shall be the benefit the surviving spouse would have received had the former Employee's benefit commenced on the date before his death in the form of a Qualified Joint and Survivor Annuity. The amount of the Pre-Retirement Survivor Annuity payable to the surviving spouse of a former Employee who dies before attaining the earliest age on which he could elect to receive benefits under this Plan shall be a benefit equal to the benefit that would have been paid to the surviving spouse had the former Employee (1) survived to the earliest age at which he could elect to have his benefit commence under this Plan; (2) elected to have his benefit commence in the form of a qualified joint and survivor annuity on the day on which he attained the earliest age at which he could elect to have his benefit commence under this Plan; and (3) died on the day after the day on which he attained the earliest age at which he could elect to have his benefit commence under this Plan.¹

UAW 2831

1          (c)   Notwithstanding anything in subsection (a)
to the contrary, no pre-retirement survivor annuity will be
paid pursuant to this Section 2.7 to the surviving spouse of
any Employee or former Employee who does not have at least one
Hour of Service or one hour of paid leave on or after
August 23, 1984.  Section 2.7 of this Plan as constituted
immediately prior to March 1, 1987 shall continue to apply to
former Employees who do not have at least one Hour of Service
or one hour of paid leave on or after August 23, 1984.
However, Section 2.12 shall apply to any such former Employee
with at least 10 years of credited service who had at least one
Hour of Service on or after January 1, 1976 and who was alive
but was not receiving a benefit under this Plan on August 23,
1984.

          (d)   Payment of a pre-retirement survivor annuity
shall commence on the later of (i) the last day of the month
next following the month in which the Employee or former
Employee died or (ii) the last day of the month next following
the month in which the Employee or former Employee would have
attained the earliest age at which he could have elected to
receive a retirement benefit under this Plan.  In no event
shall payment of pre-retirement survivor annuity commence later
than the last day of the month next following the month in
which the Employee would have attained age 66.

          (e)   Effective with respect to benefits
commencing on or after June 2, 1990, the benefits of this
Section 2.7 shall be fully subsidized by the Plan, and no
reduction of the basic benefit shall be applied to provide for
the cost of pre-retirement survivor annuity benefits.  Benefits
commencing prior to June 2, 1990 shall not be recalculated to
take into account the elimination of the charge for the cost
of pre-retirement survivor annuity coverage.

1     2.8   Effect of Bridge and Transition Benefits.  No
survivor benefit shall be payable under this Section II for any
month in which a bridge or transition benefit is payable to a
surviving spouse under the Company's insurance program, except
that if such bridge or transition benefit for any month is less
than the survivor benefit which would otherwise be payable to
the spouse, an eligible surviving spouse shall receive a
reduced survivor benefit equal to the amount by which the
survivor benefit otherwise payable would exceed the bridge or
transition benefit for that month.

      2.9   Special Medicare Benefit.  A Special Medicare
Benefit shall be paid to a retired Employee or spouse or to the
surviving spouse of a deceased retired Employee, provided such

UAW 2832

Employee or spouse is (i) age 65 or older, or (ii) under age 65 and enrolled in the voluntary Medicare coverage available under the Federal Social Security Act, in the amount of the actual Medicare Part B Premium, or according to the following schedule, whichever is less:

| | Months Payable | Monthly Amount |
|---|---|---|
| (a) | For months beginning [with January 1990 through December] 1990 | $25.00 |
| (b) | For months from January] 1991 through December] 1992 | $33.40 |
| (c) | For months from January] 1993 through December] 1993 | $34.40 |

Notwithstanding the foregoing, no Special Medicare Benefit shall be payable to a spouse of a retired Employee or to the surviving spouse of a deceased retired Employee who is eligible to receive comparable reimbursement of the Medicare Part B Premium from another employer.

2.10   **Maximum Limitation on Pensions.**   Notwithstanding any provision in this Plan to the contrary, no Employee shall receive a pension in excess of that permitted under Section 415 of the [Code.   For purposes of applying the limitations of Code Section 415, the Plan shall consider as compensation an Employee's wages within the meaning of Code section 3401(a) for purposes of income tax withholding.

2.11   **Election of Joint and Survivor Annuity by Former Employees.**

(a)   A former Employee with at least 10 years of credited service who had at least one Hour of Service under the Plan on or after September 2, 1974 but did not have an Hour of Service under the Plan on or after January 1, 1976 and whose benefit had not commenced as of August 23, 1984 may elect during his lifetime to receive his benefit in the form of a 50% joint and survivor annuity (the "ERISA Joint and Survivor Annuity") under the terms of Section 205 of the Employee Retirement Income Security Act of 1974 ("ERISA") as constituted immediately prior to enactment of the Retirement Equity Act ("REA").   The ERISA Joint and Survivor Annuity shall provide a monthly benefit for the life of the Employee which is the

UAW 2833

Actuarial Equivalent of and in lieu of the benefit otherwise payable under this Plan, with a survivor benefit continuing after the death of the Employee to the Employee's surviving spouse equal to 50% of the monthly benefit payable to the Employee at the time of his death.  The surviving spouse shall be entitled to the survivor benefit only if the spouse was married to the Employee for at least one year at the time of the Employee's death.

(b)    The Administrative Committee shall furnish the former Employee with a written explanation of his right to elect that his benefit be paid in the form of an ERISA Joint and Survivor Annuity described in paragraph (a) above and with a description of the effect of the election.  The former Employee shall be permitted to make the election by any time prior to the date on which his benefit commences.  A former Employee may revoke the election at any time prior to the date on which the benefit commences by filing a written revocation with the Administrative Committee.  The consent of the Employee's spouse shall not be required in order to revoke the election.

2.12    Election of REA Pre-Retirement Survivor Annuity by Former Employee.

(a)    A former Employee with 10 or more years of credited service who had at least one Hour of Service on or after January 1, 1976 but did not have an Hour of Service on or after August 23, 1984, and who was alive but was not receiving a benefit under this Plan on August 23, 1984, may elect to be covered by the pre-retirement survivor annuity provisions of ERISA as amended by Sections 103 and 203 of REA (the "REA Pre-Retirement Survivor Annuity").

(b)    A REA Pre-Retirement Survivor Annuity shall be payable to the surviving spouse of a former Employee who has made the election provided in paragraph (a) above and who dies before his benefit commences, provided that the former Employee and the surviving spouse have been married for at least one year on the date that the former Employee dies.  The amount of the REA Pre-Retirement Survivor Annuity payable to the surviving spouse of a former Employee who dies after attaining the earliest age when he could elect to begin receiving a benefit under this Plan shall be the benefit which would have been payable to the surviving spouse in the form of an ERISA Joint and Survivor Annuity as described in Section 2.11 calculated as if the former Employee's benefit had commenced immediately prior to his death.  The amount of the REA Pre-Retirement Survivor Annuity payable to the surviving spouse

UAW 2834

of a former Employee who dies before the earliest age when he could elect to begin receiving a benefit under this Plan shall be calculated as if the former Employee had survived until the earliest date when he could elect to begin receiving a benefit under this Plan and had begun to receive the benefit immediately prior to his death.  The monthly REA Pre-Retirement Survivor Annuity payable to the surviving spouse shall be reduced in the manner provided in subsection (c) for the period that the election was in effect.

(c)  In order to provide for the cost of the REA Pre-Retirement Survivor Annuity described in subsections (a) and (b) the monthly benefit provided to any former Employee who at any time has had the REA Pre-Retirement Survivor Annuity coverage in effect shall be reduced by multiplying the monthly benefit by a percentage determined as follows:

| Age of Employee | Reduction of Benefit For Each Year That REA Pre-Retirement Survivor Annuity Is In Effect |
|---|---|
| Under 44 | .1% |
| 44-54 | .3% |
| 55 and Over | .8% |

The reduction described in this subsection (c) shall apply only to periods during which the Employee is married, unless a qualified domestic relations order requires that a Pre-Retirement Survivor Annuity be paid in the event of the Employee's death.

(d)  Payment of a REA Pre-Retirement Survivor Annuity shall commence on the later of (i) the last day of the month next following the month in which the former Employee dies or (ii) the last day of the month next following the month in which the former Employee would have attained the earliest age at which he could have elected to begin receiving a benefit under this Plan.

(e)  The Administrative Committee shall furnish a former Employee described in subsection (a) above with a written explanation of his right to elect REA Pre-Retirement Survivor Annuity coverage and with a description of the effect of the election.  The former Employee shall be permitted to make the election by filing an election form with the Administrative Committee at any time prior to the date on which his benefit commences.  The election ceases to be effective when the former Employee's benefit commences.

UAW 2835

       (f)   A former Employee who has elected REA Pre-Retirement Survivor Annuity coverage shall be permitted to revoke the election in writing at any time.  The revocation shall not be effective unless accompanied by his spouse's written consent, obtained and observed in the manner set forth in Section 2.6(c).

2-14

UAW 2836

<u>SECTION 13</u>

SUPPLEMENTAL ALLOWANCE

3.1  <u>Eligibility</u>.  An Employee who retires on or after <u>June 2, 1990</u>, and who is eligible for a regular early, special early, or total and permanent disability pension under Sections 1.2, 1.4, 1.5 or 1.6, shall receive a monthly supplemental allowance in additional to his monthly pension benefit.  An Employee who retires on or after <u>June 2, 1990</u>, and elects an early regular early pension pursuant to Section 1.3 may receive a monthly supplemental allowance in addition to his monthly pension benefit, if eligible, calculated pursuant to Sections 2.3 and 3.2.

3.2  <u>Amount of Supplement Allowance</u>.

(a)  The supplemental allowance payable until age 62 to an eligible Employee who retires on or after <u>June 2, 1990</u>, with 30 or more years of credited service, shall be an amount which, when added to the monthly basic benefit, shall be equal to the following monthly amounts:

(i)  For months beginning on and after <u>June 2, 1990</u> and prior to <u>April 1, 1991</u>, $1,<u>545</u> per month;

(ii)  For months beginning on and after <u>April 1, 1991</u> and prior to <u>February 1, 1992</u>, $1,<u>645</u> per month;

(iii)  For months beginning on and after <u>February 1, 1992</u>, $1,<u>745</u> per month.

(b)  The monthly supplemental allowance payable to an eligible Employee who retires on or after <u>June 2, 1990</u>, with less than 30 years of credited service, shall be determined by dividing the applicable amount in Section 3.2(a) by 30 and then multiplying by the Employee's years of credited service.  In the case of any such Employee who retires prior to age 60, the resulting amount shall be reduced by 1% for each full month by which retirement is prior to age 60.

3.3  <u>Special Payment of Supplemental Allowance</u>.  The supplemental allowance referred to in Sections 3.1 and 3.2 shall be payable for one month beyond age 62 for retirees, or surviving spouses of retirees, whose Old Age Pension under the Federal Social Security Act is delayed by one month beyond age 62 pursuant to the provisions of said Act.

3-1

UAW 2837

3.4  <u>Rules for Computing Supplemental Allowance</u>.  The supplemental allowance shall be determined on the basis of the following:

(a)  The monthly basic benefit for which the Employee would be eligible without regard to any reduction under Section 2.6;

(b)  In the case of an Employee eligible for regular early retirement, the amount of monthly pension benefit commencing immediately upon retirement; <u>and</u>

(c)  In the case of an Employee electing early regular early retirement and eligible for a supplemental allowance as part thereof, the amount of monthly basic benefit for which the employee would be eligible on the date when he attains 85 points.

3.5  <u>Maximum Limitation on Supplemental Allowance</u>.  In no event shall the ┃supplement allowance ┃payable in any month to an Employee who retires on or after <u>June 2, 1990</u>┃exceed 70% of the Employee's average monthly earnings.  For purposes of this Section 3.5, an Employee's average monthly earnings shall be considered to be 173-1/3 times his average hourly earnings as determined for the purpose of computing vacation pay under the collective bargaining agreement in effect at the time of his retirement, assuming for such purposes that his vacation commenced on the day he retired.

3.6  <u>Restriction on Earnings</u>.  In order to become eligible for a supplemental allowance, an Employee must agree to restrict his participation in the labor force within the earnings limits shown below.  If after retirement a Pensioner has earnings (such earnings being defined for this purpose as the type counted for the earnings test under the Federal Social Security Act) in any calendar year which exceed the amounts in the following schedule:

| Year | Permitted Earnings | |
|------|--------------------|--|
| 1990 | $12,000 | ┃ |
| 1991 | $13,000 | ┃ |
| 1992 | $13,500 | ┃ |
| 1993 | $14,000 | ┃ |

his supplemental allowance shall be reduced by twice the amount of such excess earnings.  The reduction shall be applied to succeeding monthly payments of the supplemental allowance until fully offset.  An Employee may be required to certify that his

UAW 2838

earnings have not been in excess of the permitted amount and to furnish verification of the amount of his earnings. Unless otherwise recovered, the full amount of any monthly supplemental allowances paid after the Pensioner ceased to be entitled to receive such allowances because of excess earnings may be deducted from future monthly pensions payable to him. Nothing contained in this Section 3.6 shall be construed to adversely affect an Employee's right to a future supplemental allowance if he becomes eligible therefor after being reemployed by the Company. This Section 3.6 shall not apply to any Pensioner who is forced to retire as a result of <u>la full plant</u> closing<u>l, as defined by the Company</u>.

3.7 <u>Effect of Union Leave</u>. Consistent with the other provisions of this Article, an Employee who retires while on an approved leave of absence requested by the International Union to permit him to engage in the business of or to work for the International Union shall be entitled to a Supplemental Allowance, provided he is otherwise eligible.

3.8 <u>Effect of Discharge for Cause</u>. An Employee eligible for regular early retirement under Section 1.2 who is discharged for cause shall not be eligible for a supplemental allowance, but such Employee may elect regular early retirement and may file a grievance seeking determination under the grievance procedure set forth in the collective bargaining agreement that the reason for his discharge should not result in his being ineligible for supplemental benefits.

UAW 2839

SECTION 14

PERIOD OF BENEFIT PAYMENTS

4.1 <u>Commencement of Pensions</u>.  A Pensioner shall be entitled to his first monthly basic pension benefit for the following months:

(a)  If retired for normal retirement or special early retirement - the month in which the retirement occurred, <u>provided that commencement of special early retirement benefits for Employees laid off as the result of a full or partial plant closing shall be governed by section 1.5</u>;

(b)  If retired for regular early retirement - the month in which retirement occurred or, if later, the month designated in the Pensioner's application;

(c)  If retired for early regular early retirement - as provided in Sections 1.3 and 2.3;

(d)  If retired for disability - the month in which he first meets the eligibility requirements of Section 1.6.

The first monthly supplemental allowance shall be payable for the month in which retirement occurred except that the first monthly supplemental allowance for an Employee electing special early retirement after layoff as the result of a full or partial plant closing shall be payable as provided in Section 1.5, for an Employee electing early regular early retirement shall be payable as provided in Section 1.3 and 2.3, and for an Employee retired for disability shall be payable for the month in which he first meets the eligibility requirements of Section 1.6.  No basic pension or supplemental allowance shall be paid for any month in which the Pensioner is receiving weekly sickness and accident benefits or layoff disability benefits under any group insurance program to which the Company has contributed, and for this purpose, if such weekly sickness and accident benefits or layoff disability benefits are payable for a period of less than 4-1/3 weeks, the sum of the monthly pension benefit and supplemental allowance payable for that month shall be reduced by the percentage which such period of benefits is of 4-1/3.

4.2  <u>Commencement of Deferred Vested Benefits</u>.  The first deferred vested benefit shall be paid for the month selected in the former Employee's application (but not later than the month in which the former Employee attains age 65),

14-1

which month must be subsequent to both (a) the month in which he attains the earliest retirement date under the Plan pursuant to Section 1.2 and (b) the month in which he applies. Application for a deferred vested benefit may be made not earlier than 60 days prior to the date the former Employee attains such age.

4.3  Last Benefit Check.  Except for surviving spouse's benefits, the last pension benefit shall be paid for the month in which the Pensioner dies, or in the case of recovery of a Pensioner retired for total and permanent disability the month in which such Pensioner ceases to be totally and permanently disabled.  The last monthly supplemental allowance shall be paid for the month in which the Pensioner attains age 62 (subject to Section 3.3), dies, is reemployed by the Company, or in case of recovery of a Pensioner retired for total and permanent disability, the month in which such Pensioner ceases to be totally and permanently disabled, whichever is the first to occur.

4.4  Endorsement of Checks.  No payment shall be made unless the check is endorsed personally by the Pensioner or by his duly appointed representative or by his legal guardian appointed by a court of competent jurisdiction, provided that, consistent with this Section 4.4, pension checks may be deposited directly in designated facilities in accordance with special arrangements made for such deposits.

4.5  Suspension of Benefits.  Any pension benefits payable under the Plan to a Pensioner who, after his attainment of age 65 (1) remains in active employment or (2) is reemployed by the Company, shall during any month in which he is credited with 40 or more hours of service with the Company in "section 203(a)(3)(B) service" be permanently withheld. "Section 203(a)(3)(B) service" and such withholding shall be as defined and implemented in a manner consistent with Department of Labor Regulations, 29 CFR section 2530.203-3 and other applicable regulations.  The following subsections also apply:

(a)  Resumption of Benefits.  If benefit payments are suspended, payments shall resume no later than the first day of the third calendar month after the calendar month in which the employee's "section 203(a)(3)(B) service" ceases. The initial payment upon resumption shall include the payment scheduled to occur in the calendar month in which payments resume and any amounts withheld during the period between the date "section 203(a)(3)(B) service" ceases and the resumption of payments.

UAW 2841

(b)   Notification.   Not later than the end of the first calendar month or payroll period in which the Plan first withholds benefits pursuant to this subsection, the Administrative Committee shall, by personal delivery or first class mail, provide the Employee with a notice containing a description of the specific reasons why benefit payments are being suspended, a general description of the Plan provision relating to the suspension of benefits, a statement that the Department of Labor regulations may be found in section 2530.203-3 of the Code of Federal Regulations, the claims procedure set forth in Article 12 and other information required by law.

1          (c)   Offset Rules.   The Plan may deduct from benefit payments to be made by the Plan any payments previously made by the Plan during those calendar months or pay periods in which the employee was employed in "section 203(a)(3)(B) service;" provided, however, that such deduction or offset does not exceed in any one month 25% of that month's total benefit payment which would have been due but for the offset (excluding the initial payment described in subsection (a) above which may be subject to offset without limitation).

(d)   Nonsuspendable Benefits.   For any month in which a Pensioner is reemployed by the Company but is credited with less than 40 hours of section 203(a)(3)(B) service, benefits shall be calculated and paid in accordance with applicable Plan provisions as if the Employee were retired.

(e)   Benefits Upon Subsequent Retirement.   Upon subsequent retirement, the Pensioner shall be entitled to a monthly pension benefit payable under this Plan based on his credited service during his prior period of employment plus his credited service accrued subsequent to reemployment and his age at his subsequent retirement.

(f)   Suspension of Special Early Retirement or Early Regular Early Retirement Benefits.   In the event an Employee receiving special early retirement or early regular early retirement benefits as the result of a full or partial plant closing is recalled or exercises preferential hiring rights pursuant to the Basic Labor Agreement and the Plant Closing Agreement, said benefits shall be suspended for the duration of the Employee's reemployment in accordance with section (a) above.   Upon termination of the reemployment period, the suspended benefits shall resume, subject to recalculation to take into account the age and credited service accumulated by the Employee during the reemployment period.   In the event the Employee qualifies for a pension greater than the

14-3

UAW 2842

<u>recalculated special early retirement or early regular early retirement benefit at the time of termination of his reemployment, the Employee shall be eligible to receive such greater benefit, in lieu of the recalculated benefit.</u>

4.6  <u>Deduction of Workers' Compensation</u>.  In determining the monthly benefits payable under this Plan to an Employee, a deduction shall be made, unless prohibited by law, equivalent to all or any part of Workers' Compensation (including compromise or redemption settlements) payable to such Employee by reason of any law of the United States, or any political subdivision thereof, which has been or shall be enacted, provided that such deductions shall be to the extent that such Workers' Compensation has been provided by premiums, taxes, or other payments paid by or at the expense of the Company, except that no deduction shall be made for the following:

(a)  Workers' Compensation payments specially allocated for hospitalization or medical expense, fixed statutory payments for the loss of any bodily member, or 100% loss of use of any bodily member, payments for loss of industrial vision or silicosis causing permanent incapacity;

(b)  Compromise or redemption settlements payable prior to the date monthly pension benefits first become payable;<u> and</u>

(c)  Workers' Compensation payments paid under a claim filed not later than two years after the breaking of seniority.

4.7  <u>Legal Distribution Rules</u>.  Notwithstanding anything to the contrary in this Article <u>14</u>, and subject to the remaining paragraphs of this section 4.7, payment of a pension under this Plan shall not commence later than the 60th day following the close of the Plan Year in which the latest of the following dates occurs:  (a) The date on which the Employee attains age 65; (b) the tenth anniversary of the years in which the Employee commenced participation in the Plan; or (c) the date on which the Employee terminated his service with the Company.

If an Employee has a "Required Beginning Date" which precedes the latest of the three dates specified in the first paragraph of this section 4.7, distribution shall commence no later than such Required Beginning Date.  In this regard, Required Beginning Date shall be the April 1 of the calendar year in which the Employee attains age 70-1/2; <u>except,</u>

4-4

UAW 2843

however, that the Required Beginning Date of a Participant who
attained age 70-1/2 prior to January 1, 1988 shall be the later
of the calendar year in which the Participant attains
age 70-1/2 or the calendar year in which the Participant
retires.

In the case of an Employee whose pension
commences prior to retirement, the amount of the pension shall
be calculated on the basis of the Employee's credited service
at the time his pension commences.  The pension payable to the
Employee subsequent to retirement shall be recalculated based
upon the Employee's credited service at retirement and shall be
reduced to reflect the Actuarial Equivalent value of benefits
paid prior to retirement.  Benefits may not be distributed to
any Participant under a method of payment which as of the
Participant's Required Beginning Date does not satisfy the
minimum distribution requirements of Code section 401(a)(9) and
applicable Treasury regulations, including the minimum
distribution incidental benefit requirements of proposed
Treasury regulation section 1.401(a)(9)-2, which the Plan
hereby incorporates by reference.

4.8   Payment of Small Amounts.

(a)   For Employees who retire pursuant to
Section 1.7 (Deferred Vested Retirement), if the present value
of their pension benefit payable under this Plan is $3,500 or
less prior to any distributions, the Administrative Committee,
shall direct the Trustee to distribute the benefit immediately
in one lump sum.  No distribution of a qualified joint and
survivor annuity or pre-retirement survivor annuity [shall] be
made in a lump sum under the preceding sentence after
commencement of benefit payments unless the Employee, with the
consent of his spouse, or the surviving spouse, as the case may
be, consents in writing to such distribution.  For purposes of
this section, if the present value of an employee's vested
accrued benefit is zero, the employee shall be deemed to have
received a distribution of such vested accrued benefit.

(b)   The interest rate used in determining the
present value of a pension benefit for purposes of this
Section 4.8 shall not be greater than the interest rate which
would be used by the Pension Benefit Guaranty Corporation (the
"PBGC") in determining the present value of a lump sum
distribution upon a plan termination.  This determination shall
be based upon the PBGC interest rate for immediate or deferred
annuities, as applicable, in effect on the first day of the
Plan Year in which the distribution is made.

4-5

UAW 2844

(c)  Whenever a lump sum distribution is made under this Section 4.8, the Administrative Committee shall notify the Employee or surviving spouse to whom payment is made in writing as to the rules governing federal income tax treatment of the distribution.  The notice shall be in the form and manner directed by the Secretary of the Treasury.

(d)  In the event that a former Employee who received a lump sum payment under paragraph (a) above is reemployed and becomes entitled to a future pension benefit under the Plan, the benefit payable upon his subsequent reemployment, termination of employment, or death shall be reduced by the Actuarial Equivalent of the lump sum payment previously made to him; provided, however, that this reduction shall not apply if the former Employee repays to the Plan, within a reasonable period of time after his reemployment, the lump sum amount previously distributed to him, with interest as reasonably determined by the Administrative Committee.

4-6

UAW 2845

SECTION 15

CREDITED SERVICE

5.1  Service Prior to January 1, 1967.  Credited service prior to January 1, 1967, shall be computed as an Employee's seniority as of January 1, 1967, since his date of last hire as determined by the appropriate collective bargaining agreements.

5.2  Service After January 1, 1967.

(a)  Credited service after January 1, 1967, shall be computed on the basis of one year of credited service for each calendar year in which the Employee receives pay of 1,700 or more hours.  When total hours for which pay is received in a calendar year are less than 1,700, credited service for vesting and benefit accrual purposes shall be computed on the basis of 1/10 of a year of credited service for each 170 hours for which pay is received during the year, computed to the nearest 1/10 year.  For vesting purposes only, an Employee will be credited with a year of credited service if he has 1,000 or more Hours of Service; however, in no event will an Employee be credited with more than one year of credited service for any calendar year.

(b)  Credited service after January 1, 1967, for both benefit accrual and vesting purposes, shall include:

(i)  Hours which are not worked but for which pay is received, such as holiday pay, call-in pay, report-in pay, and back pay resulting from reinstatement subsequent to improper disciplinary suspension;

(ii)  Periods of leave of absence, approved by the Company, due to occupational injury or disease incurred in the course of employment with the Company for which Workmen's Compensation is received; such service shall be credited on the basis of the number of hours which would have been scheduled for the Employee during such absence, up to a maximum of eight hours in any day or 40 hours in any week, provided that no Employee shall accrue credited service after retirement;

(iii)  Periods of leave of absence, approved by the Company, for service in the armed forces of the United States or the Peace Corps, provided that the Employee returns to active employment in accordance with the terms of such leave of absence; such service shall be credited on the basis of 40

5-1

hours for each full week of such absence, up to a maximum credit for such absence of four years or, if greater, the number of years during which the Employee has reemployment rights under any federal law;

(iv)   An Employee who is absent from work during any calendar year after 1971 because of layoff or while on an approved sick leave shall be credited with 40 hours for each complete calendar week and eight hours for each full day in any partial week of such absence during such year in addition to any other hours credited, provided that such Employee shall have received pay from the Company during that year for at least 170 hours but for less than 1,700 hours, and provided further, that if such layoff or sick leave continues after that year he shall be credited with 40 hours for each full day in any partial week of absence after that year, not to exceed 1,530 hours of credit for all such absence related to receipt of such pay from the Company in the first year.   An Employee who returns to work on or after July 1, 1980 and received pay for a period of less than 170 hours and who thereafter returns to such layoff or sick leave, shall not be disqualified, solely because of the receipt of such pay, from receiving any such credit for which he would otherwise be eligible hereunder.   A part-time Employee shall be credited for any week of such absence in the same percentage relationship as such Employee's regular part-time schedule is to 40 hours.

(c)   For vesting purposes only, credited service shall also include each hour during which an Employee is on an authorized absence from work due to the Employee's pregnancy, birth of the Employee's child, or placement of a child in connection with the Employee's adoption of the child, or each hour the Employee is on an authorized absence for the purpose of caring for his or her child immediately following such birth or adoption.   The Employee shall be credited only with the number of Hours of Service which the Employee otherwise could have been expected to have during the authorized absence, based on the Employee's regular schedule of employment, up to a maximum of 501 Hours of Service for any one pregnancy, birth or placement for adoption.   The Hours of Service earned during an authorized maternity or paternity absence shall be credited in the Plan Year in which the leave commences to the extent required to avoid a discontinuance of accrual of credited service, as provided in Section 5.3 hereof, in that Plan Year. The balance of such Hours of Service shall be credited in the following Plan Year.   Nothing in this Section 5.2(c) shall be construed as requiring the Company to grant maternity or paternity leaves on occasions when such leaves would not be ordinarily granted under the terms of the applicable collective bargaining agreement.

5-2

UAW 2847

(d)  Hours shall be counted in the period in which pay for them is received, and hours for which pay is received at a premium rate shall be counted as straight time hours without regard to any premium.

5.3  <u>Discontinuance of Accrual of Credited Service</u>. For purposes of this Plan, accrual of credited service, as defined in Section 15, Credited Service, shall cease when an Employee ceases to accrue Hours of Service as defined in Section 12.12 or ceases to be credited with hours described in Section 5.2(b).

5.4  <u>Reinstatement of Credited Service</u>.

(a)  Any former Employee who is reemployed by the Company <u>on or after June 2, 1990</u> shall have his prior credited service reinstated if (i) he had 51 or more years of credited service <u>(10 or more years of credited service in the case of former Employees who terminated employment before January 1, 1989)</u>, (ii) he had less than five consecutive One-Year Breaks in Service, or (iii) his prior years of credited service are equal to or greater than his consecutive One-Year Breaks in Service.

(b)  For Employees with seniority <u>as of June 2, 1990, or rehired and attaining seniority after June 2, 1990,</u> periods of absence for compulsory military service in the armed forces of the United States, including the period covered by an initial enlistment, which have not been restored as credited service for pension purposes shall be restored, provided that the Employee went on an approved leave of absence from active employment with the Company upon entering such military service and returned to active employment upon leaving military service within the period of time provided by the Veterans Reemployment Act then in effect or, if no such Act was then in effect, within 90 days after leaving military service.

5.5  <u>Transfer of Employment</u>.

(a)  In the case of an Employee who is covered by this Plan on <u>June 2, 1990 and who</u> retires or terminates employment on or after <u>June 2, 1990</u> and is then eligible for a benefit under Section 11 of this Plan, any prior related employment as defined in Section 12.9 shall be considered as credited service under this Plan for purposes of determining both eligibility for and the amount of the benefit to which he is entitled under this Plan; provided, however, that the benefit payable under this Plan will be reduced by the amount of any other pension paid under another retirement plan of the

5-3

Company or of any employer to which Section 12.9 applies, to the extent that such pension is for a period of credited service which has also been considered under this Plan.

(b)   In the case of an Employee who is not covered by this Plan on June 2, 1990¹ but who transfers into a position covered by this Plan after June 2, 1990¹ and thereafter retires or terminates employment, prior related employment as defined in Section 12.9 shall be considered as credited service only for the purpose of determining eligibility for benefits under this Plan.  The amount of benefit payable to the Employee shall be calculated only on the basis of credited service earned while the Employee was in a position covered by this Plan or, in case of employment prior to January 1, 1967, in a position of the type which would have been covered by this Plan if it had then been in effect.  In the event that a benefit is payable under this Plan and another plan of the Company or of any employer to which Section 12.9 applies by virtue of the same period of employment, the benefit payable under this Plan shall be reduced by such other benefit.  This subparagraph (b) shall not apply to Employees at the Bettendorf, Iowa or Rock Island plants of the Company who transfer after March 1, 1987 into positions at those plants which are covered by this Plan.

(c)   An Employee who does not retire under Section I of this Plan, but who transfers to related employment as defined in Section 12.9 at a time when he meets the age and credited service requirements under Section 1.1 or 1.2 shall continue to be eligible for a benefit under Section 2.1 or Section 2.2, as the case may be.  Upon his subsequent retirement or termination of related employment, the amount of such benefit payable under Section 2.1 or Section 2.2 of this Plan shall be calculated according to the terms of this Plan as constituted at the time of his subsequent retirement or termination of related employment and his age at such time, but such benefit shall be based only on the total of all periods of credited service under this Plan accumulated prior to the date of the most recent transfer to related employment, provided such periods otherwise satisfy the requirements of this Plan for crediting prior service.  An Employee who continues to be eligible for a Regular Early Retirement Benefit by virtue of this Section 5.5(a) shall be entitled to a Supplemental Allowance under Section 13 of this Plan as constituted when he terminates related employment.  The Supplemental Allowance shall be calculated only on the basis of the total of all periods of his credited service under this Plan accumulated prior to his most recent transfer to related employment, provided such periods otherwise satisfy the requirements of this Plan for crediting prior service.

5-4

(d)   In the case of an Employee who transfers to related employment as defined in Section 12.9 and is not eligible for a benefit under Section 1.1 or 1.2 of this Plan or under any other plan with respect to his period of employment covered by this Plan, related employment shall be considered as if it were credited service for the purpose of determining whether the Employee is eligible for a deferred vested benefit in accordance with Section 1.7 at the time he terminates related employment and in determining the amount of such benefit.  The amount of any benefit payable under Section 2.5 of this Plan by virtue of this Section 5.5(c) shall be calculated according to the terms of this Plan as constituted when the Employee terminates related employment, but shall be based only on the total of all periods of his credited service under this Plan accumulated prior to the most recent date of transfer to related employment, provided such periods otherwise satisfy the requirements of this Plan for crediting prior service.  Such benefit shall be paid at the time and in the manner provided in Section 2.5.

5.6   Additional Credited Service for Foundry Employees.

(a)   Effective June 2, 1990, each Employee who is covered by the Plan on October 3, 1993 shall be credited with additional pension credited service with respect to employment prior to October 3, 1993 in the foundry job classifications designated in Exhibit A.  Commencing October 3, 1993, Employees in foundry job classifications designated in Exhibit A shall be credited with additional pension credited service for employment prior to October 3, 1993.  Such additional foundry credited service shall be considered for all purposes of the Plan, except that it shall be disregarded in determining whether an Employee is eligible for a deferred vested benefit under the Plan.  Additional foundry credited service shall consist of one year of credited service for every five full years of foundry service (as defined in paragraph (b) below,) provided that such years of foundry service have not previously been used to establish additional credited service with respect to employment in foundry classifications in accordance with the provisions of the Plan as amended prior to June 2, 1990.

(b)   For purposes of this Section 5.6, foundry service shall be accumulated at the rate of one full year for each calendar year in which the Employee was in foundry job classifications described in Exhibit A during each of 25 or more weeks.  An Employee will not be credited with a year of foundry service in any calendar year in which he was in foundry job classification for fewer than 25 weeks.  For purposes of

5-5

UAW 2860

this Section 5.6, an Employee shall be treated as being in such foundry classifications in any week in which he worked in a foundry classification or was absent from such classification and such absence constituted credited service under Article 11, Section 2 of the Pension Agreement or Section 15 of the Pension Plan. No more than one year of foundry service will be credited in any one calendar year.

(c)  Additional credited service through February 28, 1987 pursuant to this Section 5.6 shall be determined as of March 1, 1987. An application is not required in order for an Employee to be credited with such additional credited service.  Additional credited service after June 2, 1990 and prior to October 4, 1993 shall be credited as earned.

(d)  Additional foundry service shall be credited to any Employee who is covered by the Plan on March 1, 1987 with respect to employment in foundry classifications in accordance with the terms of the Plan as in effect on March 1, 1987.  If any Employee retired on or after July 1, 1983 and prior to March 1, 1987 and was employed in one or more foundry classifications during that period, the Employee shall be credited with additional foundry service for the period of employment in foundry classifications prior to retirement.  If the additional foundry service results in additional credited service, the Pensioner's pension benefit will be recalculated on the basis of the Employee's adjusted years of credited service.  The recalculated pension shall be effective March 1, 1987 and shall be the basis for determining increases to Pensioners on and after March 1, 1987.  If a Pensioner retired on or after July 1, 1983 and died prior to March 1, 1987, any adjustment with respect to additional credited service attributable to the Pensioner's employment in foundry classifications shall be made in the joint and survivor annuity, if any, payable to the Pensioner's surviving spouse. If an Employee died on or after July 1, 1983 but prior to March 1, 1987, any preretirement survivor annuity payable to the Employee's surviving spouse shall be adjusted for any additional credited service attributable to the Employee's employment in foundry classifications prior to his death.

5.7  Additional Credited Service for Certain Rock Island Employees.  Notwithstanding the provisions of Section 5.1 relating to computation of credited service prior to January 1, 1967, the credited service of the following Rock Island employees shall include, on a non-precedential basis, credited service for the periods of time prior to January 1, 1967 indicated below:

UAW 2851

| | |
|---|---|
| Arthur H. Chambers: | October 20, 1961 through October 20, 1965 |
| Daniel L. Tipton: | May 3, 1961 through January 5, 1965 |
| Richard F. Tipton: | May 15, 1961 through January 4, 1965 |
| Donald J. Hanson: | June 30, 1961 through October 11, 1964 |
| Ronald G. Nimrick: | May 24, 1961 through December 16, 1964 |
| Frank C. Rennison, Jr. | January 23, 1961 through August 23, 1965 |
| James C. Ludwig: | May 27, 1960 through February 14, 1965 |
| Mark J. Parr: | October 21, 1953 through March 21, 1955 & April 25, 1956 through July 13, 1956 |

5.8  Credited Service for Wausau Employees.  Prior to January 1, 1992, the credited service of Wausau employees shall include only years of credited service earned subsequent to October 1, 1990.  Effective as of January 1, 1992, the credited service of Wausau employees shall include all years of credited service of employment with the Company.

UAW 2862

<u>SECTION 16</u>

ADMINISTRATION

6.1 <u>The Administrative Committee</u>. The Joint Board of Administration provided for in the Pension Agreement shall have the powers and duties with respect to the Plan as set forth in the Pension Agreement. Except where such powers and duties are applicable, the Plan shall be administered by the Administrative Committee.

(a) Any person appointed as a member of the Committee shall signify his acceptance or his recognition by delivering such written acceptance or resignation to the Secretary of the Committee.

(b) The Company shall appoint a Secretary and one or more Assistant Secretaries to the Committee, who may be, but need not be, members of the Committee. The Secretary and Assistant Secretaries of the Committee shall have such powers and duties, as provided in the Supplemental Pension Agreement, in addition to such powers and duties as the Committee shall determine. An Assistant Secretary shall serve only in the absence or disability of the Secretary of the Committee.

(c) The Committee shall hold meetings at such places and such times as it may determine, but not less than annually. The Committee shall maintain written minutes of its meetings and shall record in these minutes any delegation of duty or powers as permitted by Section 6.4. The Committee shall maintain a written record of such acts or decisions in its sole discretion as it may determine.

(d) The Committee shall establish rules for the administration of the Plan and the transaction of its business subject to the other provisions of this Plan and any requirements of law. The determination of the Committee as to any disputed questions shall be conclusive.

6.2 <u>Powers</u>. The Secretary of the Committee, acting on behalf of the Committee, is authorized and empowered:

(a) To employ such attorneys, accountants, clerks, agents or counsel as it deems necessary in order to carry out the provisions of the Plan.

(b) To establish and enforce such rules, regulation, and procedures as it shall deem necessary or proper for the efficient administration of the Plan and Trust.

UAW 2863

(c)  To interpret in good faith the Plan and Trust.

(d)  To decide all questions concerning the Plan and the eligibility of any Employee to participate in the Plan.

(e)  To compute the amount of benefits which shall be payable to any Employee or Beneficiary in accordance with the provisions of the Plan and to determine the person or persons to whom such benefits shall be paid.

(f)  To authorize the payment of benefits.

(g)  In addition to the powers enumerated herein to do all other acts in its judgment necessary or desirable for the administration of the Plan and Trust.

The decision of the Committee, or the Secretary of the Committee, acting on behalf of the Committee, shall be binding upon all persons dealing with the Plan or claiming any benefit thereunder, except to the extent that such decision may be determined to be arbitrary and capricious by a court having jurisdiction over such matters.

6.3  Duties.  The Secretary of the Committee, acting on behalf of the Committee, shall have the duty;

(a)  To furnish to each Employee a written summary of the Plan and any amendment thereto, and any additional reports or schedules required by the Employee Retirement Income Security Act of 1974 and any regulations thereunder.

(b)  To ascertain that such returns or reports as are required by the Employee Retirement Income Security Act of 1974 and the regulations thereunder have been filed with the appropriate governmental agency.

(c)  To maintain in convenient form such data as may be necessary for actuarial valuations of the Plan, and to prepare annually a report showing in reasonable detail the assets and liabilities of the Plan.

(d)  To maintain records in sufficient detail to determine eligibility for participation and termination of participation, eligibility for benefits, and the amount of such pension benefit.

(e)  All records and reports shall be maintained for such period of time as is necessary to provide Employees

UAW 2854

and their beneficiaries with their benefits under the Plan. However, all records including vouchers, worksheets, receipts, and applicable resolutions which are necessary to verify any reports filed as required by subsection (b) shall be kept for a period of not less than six years after the filing date of the documents or six years after the date on which documents would have been filed, but for an exemption or simplified reporting procedure provided by regulation under Section 104(a)(2) and (3) of the Employee Retirement Income Security Act of 1974.

(f)  To provide the Employee with a notice explaining the right of the Employee to elect another form of benefit payment at least nine months prior to his early retirement date.  A written explanation of the effect of the qualified joint and survivor annuity and the effect of the Employee rejecting such benefit under Section 2.6(c) shall be given to the Employee within 30 days following the Employee's request for such information.

6.4  <u>Delegation</u>.  The Committee or the Secretary of the Committee may delegate to any person or persons, or administrative body of another employee benefit plan, any of its powers or duties so long as it exercises the standard of care prescribed in Section 6.5.  Such delegation shall be made in writing an shall be reflected in its minutes.  Acceptance of such delegation shall be in writing and delivered to the Secretary of the Committee.

6.5  <u>Standard of Care</u>.  The Committee and the Secretary of the Committee shall exercise their powers and carry out their duties solely in the interest of the Employees and their beneficiaries with the care, skill, prudence, and diligence that the prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character.

6.6  <u>Discretionary Acts</u>.  Any discretionary acts to be taken under these provisions by the Company or by the Committee or by the Secretary of the Committee, with respect to classification of Employees, contributions, or benefits, shall be uniform in their nature and applicable to all those persons similarly situated, and no discretionary act shall be taken which shall be discriminatory under the provisions of the <u>ICode</u> applicable to pension plans and trusts.

6.7  <u>Compensation and Expenses.  The expenses incurred by the Administrator in the proper administration of the Plan shall be paid from the Trust Fund or the Company may pay such expenses.</u>  No member of the Committee or the Secretary of the Committee shall receive any compensation for his service as such.

UAW 2855

6.8  <u>Notification</u>.  The Company shall furnish to the Trustee the names of the Secretary and any Assistant Secretary to the Committee.  The trustee may presume until notified in writing to the contrary that the Secretary of the Committee is duly authorized to act on behalf of the Committee.

6.9  <u>Prohibited Transactions</u>.  The Administrative Committee shall not cause the Plan to engage in a "prohibited transaction," as described in the Employee Retirement Income Security Act of 1974, as amended from time to time.

6.10  <u>Applications</u>.  Employees will furnish to the Committee such benefit applications, documents, evidence, and information as the Committee reasonably considers necessary or desirable for the purpose of administering the Plan.

6.11  <u>Addresses</u>.  Each person entitled to payments hereunder shall at all times be responsible for furnishing the Committee with the address to which his benefit checks and other communications are to be mailed.  If any check mailed by regular United States mail to the last such address appearing on the records of the Committee is returned unclaimed, further checks need not be sent to such person at any address unless and until he or some other person validly in his behalf shall contact the Committee.

6.12  <u>Payment to Others</u>.  In the event any benefit payments hereunder become payable to any person under legal disability or unable properly to administer such payments, such payments may be paid for the benefit of such person to his legally appointed guardian or conservator1.

6.13  <u>Named Fiduciary</u>.  The Administrative Committee shall be the named fiduciary under the Plan.

6.14  <u>Location of Participant or Surviving Spouse Unknown</u>.  If the Administrative Committee is unable to pay benefits from the Plan to any Participant or beneficiary due to the Administrative Committee's inability to locate such Participant or Participant's surviving spouse after forwarding a registered letter, return receipt requested, to the last known address of such Participant or surviving spouse and after further diligent effort, the amount to be distributed shall be treated as forfeited.  If the Participant or surviving spouse is later located, the benefit shall be reinstated.  In the event a Participant or surviving spouse cannot be located upon termination of the Plan, any amount payable to such Participant or surviving spouse shall be transferred at the earliest possible date to the state of the Participant's or surviving

UAW 2856

spouse's last known address pursuant to the terms of that state's abandoned property law. Upon such transfer, the Company, administrative Committee and Trustee shall have no further liability for the amount so transferred.

16-5

UAW 2867

<u>SECTION 17</u>

PENSION FUND

7.1  <u>Establishment of Pension Fund</u>.  The Company shall establish a pension fund for the purpose of providing benefits called for by this Plan.  This fund shall be in the form of a Trust Fund to be administered by a trustee or trustees appointed by or at the direction of the Company and shall have such rights, powers, and duties as are set forth in the trust agreement establishing the trust, as amended from time to time.

7.2  <u>Company Contributions</u>.  The Company shall contribute to the Trust Fund such amounts from time to time as shall be necessary to maintain the Plan on a sound actuarial basis and meet the funding requirements of the Employee Retirement Income Security Act of 1974.  The amount of such contribution shall be computed by annual actuarial valuation. Following each actuarial valuation, the actuary shall certify the amount or rate of contributions to be used until the next actuarial valuation.

7.3  <u>Benefits Payable Only From Fund</u>.  All benefits provided by this Plan shall be paid solely out of the pension fund.

7.4  <u>Company Contributions Irrevocable</u>.  All contributions made by the Company to the pension fund established pursuant to this Plan shall be held by the trustee pursuant to the terms of the trust agreement for the exclusive benefit of the Employees of the Company (including Pensioners) who are covered by this Plan and their beneficiaries, and shall be irrevocably available to provide benefits under this Plan and to pay the expenses of administration of this Plan and of the pension fund established hereunder to the extent that such expenses are not otherwise paid, provided that <u>Company contributions made to the Plan in the following circumstances shall be returned to the Company by the Trustee:</u>

<u>(a)</u>  Any assets remaining in the pension fund due to variations between actuarial estimates and actual experience, after the satisfaction of all liability under the Plan<u>.</u>

<u>(b)  The Company of the Plan hereby condition all Company contributions to the Plan upon the Company obtaining a deduction pursuant to Code section 404(a) in an equal amount for the Company's taxable year ending with or within the Plan Year for which the contribution is made.  If all or any portion</u>

UAW 2868

of the Company's contribution is not deductible for such year, the Trustee shall return the nondeductible amount to the Company, without earnings but reduced by any losses attributable thereto, within one year of the disallowance of the deduction by the Internal Revenue Service.

(b)  The Trustee, at the direction of the Company, shall return to the Company, without earnings, but reduced by any losses attributable thereto, any contributions made due to a mistake of fact provided the Administrator determines that such mistake existed at the time of the contribution.  The Trustee may only return a contribution pursuant to this section within 12 months of the date the contribution was made.

7.5  _Investments_.  The Company may appoint a committee, or designate a committee or a related company, to be responsible for the investment of trust funds.  Such committee will be responsible for the appointment of investment managers.  In the absence of written directions concerning investment decisions of the Trust Fund by such committee, the Trustee shall make investments of the Trust Fund, provided that (i) the Trustee shall not be directed to invest in "qualified employer securities" as defined by the Employee Retirement Income Security Act of 1974 in excess of 10% of the Plan assets, and (ii) the Trustee may invest in deposits in a bank which is a fiduciary under the Plan, so long as the bank is supervised by the United States or a state and the deposits bear a reasonable rate of interest.

UAW 2859

## SECTION 18

### GUARANTEES AND LIABILITIES

8.1   No Guarantee of Employment.  Nothing contained in this Plan shall be construed as a contract of employment between the Company and any Employee, or as a right of any Employee to be continued in the employment of the Company, or as a limitation of the right of the Company to discharge any Employee.

8.2   No Vesting.  No person shall have any vested right to, or interest in, any part of the pension fund upon termination of employment or otherwise, except as provided from time to time under this Plan and then only to the extent of the benefits payable to such person out of the assets of the pension fund.

8.3   Spendthrift Clause.  No assignment of any benefit payment provided by this Plan will be recognized or permitted, nor shall any such benefit or payment on account of any such benefit be subject to attachment or other legal process for or against the Pensioner; provided, however, that any Pensioner or his surviving spouse, if applicable, who elects hospital, surgical, or medical coverage for himself and/or his dependents, if such coverage is made available under the Company's group insurance plan applicable to him, may, insofar as is consistent with the terms of the policy or policies providing such benefits, authorize in writing that the required contribution be deducted from the monthly pension of such Pensioner, or his surviving spouse, if applicable, and provided, further, that a Pensioner may authorize the deduction and remittance of union dues from the monthly pension of such Pensioner, provided that such deductions in the aggregate shall not be greater than 10% of the Pensioner's monthly pension. Upon request of a Pensioner or surviving spouse, amounts shall be withheld from pension checks for purposes of paying Wisconsin state income tax and shall be transmitted to taxing authorities in accordance with applicable law.

This Section 8.3 shall not, however, prohibit the Administrative Committee from directing the Trustee to comply with a "Qualified Domestic Relations Order" as that term is defined in Section 414(p) of the Code.

8.4   Federal Income Tax Withholding.  A Pensioner may request to have federal income tax withheld from his pension benefits upon completion and submission of Form W-4P, Withholding Certificate for Pension or Annuity Payments.

8-1

UAW 2860

SECTION 19

PREVIOUSLY RETIRED PENSIONERS

9.1   Benefits.

(a)   A Pensioner who retired under the Plan prior to June 2, 1990†, shall continue to receive the benefits to which he was entitled under the Plan immediately prior to June 2, 1990†, in accordance with the following tables:

Basic Benefits

| Date of Retirement | For Months From 5/1/89 to 6/1/90 | For Months From 6/1/90 and Thereafter |
|---|---|---|
| 1/1/67 to 1/1/71 | $16.50 | $17.50 |
| 1/1/71 to 1/1/75 | $16.50 | $17.50 |
| 1/1/75 to 7/1/77 | $17.75 (first 30 years) | $18.75 (first 30 years) |
|  | $16.50 (years over 30) | $17.50 (years over 30) |
| 7/1/77 to 7/1/80 | $19.50 | $20.50 |
| 7/1/80 to 7/1/83 | $20.00 | $21.00 |
| 7/1/83 to 3/1/87 | $20.00 | $21.00 |
| 3/1/87 to 6/2/90 | $23.00 | $24.00 |

Early Retirement Supplements** (until age 62)***

| Date of Retirement | For Months From 5/1/89 to 6/1/90 | For Months From 6/1/90 and Thereafter |
|---|---|---|
| 7/1/72 to 1/1/75 | $ 770 | $ 800 |
| 1/1/75 to 7/1/77 | $ 895 | $ 905 |
| 7/1/77 to 7/1/78 | $ 920 | $ 950 |
| 7/1/78 to 7/1/79 | $ 920 | $ 950 |
| 7/1/79 to 7/1/80 | $ 945 | $ 975 |
| 7/1/80 to 7/1/83 | $ 995 | $1,025 |
| 7/1/83 to 3/1/87 | $ 995 | $1,025 |
| 3/1/87 to 6/2/90 | $1,350 | $1,380 |

**   Proportionately reduced for Pensioners with less than 30 years of credited service by multiplying the applicable supplement by a fraction, the numerator of which is the Pensioner's years of credited service and the denominator

19-1

UAW 2861

of which is 30.  For Pensioners with less than 30 years of  |
credited service who retired prior to age 60, the
supplement shall be reduced by 1% for each month that they
were under age 60 at retirement.

*** Early retirement supplements payable to retired employees
between age 62 and 65 will be in accordance with the level
of benefits in effect immediately prior to June 2, 1990†.  |

### Temporary Benefit (until age 62)

| Date of Retirement | For Months From 5/1/89 to 6/1/90 | For Months From 6/1/90 and Thereafter |
|---|---|---|
| Prior to 7/1/83 | Increase of $.50 per month (maximum of $12.50 per month) | Increase of $1.00 per month per year of credited service (maximum of $25.00 per month) |
| on or after 7/1/83 | Increase of $.50 per month (maximum of $15.00 per month) | Increase of $1.00 per month per year of credited service (maximum of $30.00 per month) |

(b)  Pensioners who retired prior to June 2,  |
1990† will receive lump sum payments in April 1991† and
February 1992†, provided that they are living in the month of
payment.  For Pensioners with 30 or more years of credited
service each lump sum payment will be $420.  Other Pensioners
will receive a proportionate lump sum payment determined by
multiplying $420 by a fraction, the numerator of which is the
Pensioner's years of credited service and the denominator of
which is 30.  Surviving spouses of Pensioners who retired prior
to June 2, 1990† and surviving spouses of deceased Employees
who died prior to June 2, 1990† will receive lump sum payments
in April 1991† and February 1992†, provided that they are
living in the month of payment and are entitled to receive
benefits under this Plan for that month.  For surviving spouses
of Pensioners who had 30 or more years of credited service,  |

UAW 2862

each lump sum payment will be $231. Other surviving spouses will receive a proportionate lump sum payment <u>determined by multiplying $231 by a fraction, the numerator of which is the Pensioner's years of credited service and the denominator of which is 30.</u>

9.2 <u>Optional Form of Pension Benefit</u>. A Pensioner who is receiving a reduced pension by virtue of not having waived the form of benefit payable pursuant to Section 2.6, and whose spouse is no longer living or whose spouse dies on or after <u>June 2, 1990</u>1, shall have his monthly pension benefit increased to the amount which would have been payable had he waived such form of benefit. Such increase shall be effective for the month following the month in which the Company is notified of the spouse's death and is furnished evidence, satisfactory to it, of such death. In the event of divorce by court decree, the terms of which do not expressly prohibit cancellation of the Qualified Joint and Survivor Annuity, a Pensioner may have his monthly pension benefit increased to the amount which would have been payable had he waived the form of benefit set forth in Section 2.6, effective the first day of the third month following the month in which the Company is furnished evidence, satisfactory to it, of such divorce.

9-3

UAW 2863

## SECTION 110

### AMENDMENT AND TERMINATION

10.1 <u>Right to Amend</u>.  This Plan may be amended by the Company, retroactively or otherwise, at any time, by a written instrument declaring itself to be an amendment, executed in the name of the Company by any [officer] thereof, provided that no amendment of this Plan shall <u>(a)</u> cause any part of the pension fund to be used for or diverted to any purpose other than for the exclusive benefit of the Employees of the Company (including Pensioners) and their beneficiaries, [(b)] be inconsistent with the terms of any collective bargaining agreement covering Employees covered by this Plan, <u>(c) cause any reduction in the vested portion of any Participant's interest in the Trust Fund determined as of the date immediately preceding the effective date of amendment or restatement.</u>

10.2 <u>Right to Terminate</u>.  This Plan is intended to be permanent, but the Company, at any time, subject to any provision to the contrary set forth in a collective bargaining agreement covering Employees covered by this Plan, may terminate this Plan and cause the pension fund to be liquidated as provided herein.  In the event the Company, for any reason, shall cease to exist, the Plan, unless continued by another, shall terminate and the pension fund be liquidated as provided herein.

10.3 <u>Disposition of Pension Fund</u>.  In the event that the Plan is terminated in whole or in part, the rights of all affected Employees to their retirement benefits, to the extent then funded, shall be nonforfeitable.  In the event of such termination, an Employee will have recourse for payment of his nonforfeitable benefits from assets of the Plan or the Pension Benefit Guaranty Corporation, but will not have any recourse against the Company for payment of any benefits under the Plan.  The assets of the Plan shall be allocated for the benefit of Employees and their surviving spouses in the following order:

(a)  First, to provide pensions for life, on the basis of the Plan in effect during the five-year period ending on the date of termination, under which such benefit would be the least, to Employees and surviving spouses, included in Group A, and if any assets remain thereafter, to Employees and surviving spouses in Group B.  The allocation of the amounts for this purpose shall be based on the actuarial value of the benefit payable under the Plan at age 65 as a single life annuity, without death benefit, not in excess of the lesser of

UAW 2864

(i) $750 a month, or (ii) 100% of the Employee's monthly compensation (averaged for the five consecutive years in which his compensation was the highest). Any benefit payments determined in accordance with the preceding sentence, which must be reduced because of insufficiency of assets, at or after the date of termination of the Plan shall be apportioned first among the persons in Group A and then among the persons in Group B in proportion to the full benefit, not in excess of the maximum benefit stated herein, to which they would have been entitled if no reduction were required.

Group A shall include Employees and surviving spouses who have been receiving benefits for three years prior to the date of termination and Employees who met the requirements for a normal, early, special early or disability retirement benefit at least three years prior to the date of Plan termination (including Employees who have a vested benefit and who had reached their early retirement date at least three years prior to the date of Plan termination).

Group B shall include all other Employees with 5% years of credited service at the date of Plan termination (including terminated Employees and retired Employees) who are not included in Group A.

(b)   Second, if any assets remain after allocation for the purposes of subsection (a), they shall be allocated to provide any benefit, in excess of the amount allocated in subsection (a), resulting from amendments made within the five-year period ending on the date of termination, each such amendment to be taken separately and in the order of effective dates starting with the earliest. Such additional benefits shall be limited to the greater of (i) or (ii) below for each year that the amendment was in effect prior to the date of termination.

(i)   20% of the additional benefit as a result of the amendment; or

(ii) $20 a month.

The allocations of the amounts for this purpose shall be determined in the same manner and allocated in the same order as in subsection (a). Any allocations under this subsection when added to the allocations under subsection (a) shall not increase any benefit beyond the actuarial equivalent of the maximum annual benefit stated in Section 10.3(a).

UAW 2865

(c)   Third, if any assets remain after allocations under subsections (a) and (b), they shall be allocated to Employees with 10 years of credited service (including terminated Employees and retired Employees) to provide the balance of the full actuarial equivalent of the Normal Retirement Benefit, at the date of Plan termination, if any, in excess of the benefit provided by the allocations under subsections (a) and (b), such benefits are to be determined in the same manner as in subsection (a) without regard to the maximum benefit state therein.

(d)   Fourth, if any assets remain after allocation for the purposes of subsections (a), (b) and (c), they shall be allocated to provide to all other Employees under the Plan on the date of termination the actuarial equivalent of their Normal Retirement Benefit at the date of Plan termination, such benefits to be determined in the same manner as in subsection (a) without regard to the maximum benefit stated therein.

(e)   Fifth, if any assets remain after the complete allocation for the foregoing purposes of this Article, they shall be returned to the Company.

(f)   The maximum amount of $750 in subsection (a) shall be subject to adjustment each year to reflect changes in the Social Security contribution and benefit base, any such adjustment to be in accordance with regulations issued by the Pension Benefit Guaranty Corporation.

(g)   No allocations will be made under the foregoing sections, with respect to any benefits accrued under the Plan after the Secretary of the Treasury has issued notice that the Plan does not meet the requirements of Section 404(a)(2) of the Code, or that the Plan and Trust do not meet the requirements of sections 401(a) and 501(a) of the Code.

10.4   Forms of Distribution.  The allocations for which provisions are made in Section 10.3 may be accomplished at the discretion of the Administrative Committee, through:

(a)   The continuance of the Trust Fund or Trust Funds; or

(b)   Group contracts or individual annuity contracts; or

(c)   Cash; or

(d)   Any combination of the foregoing.

10-3

## SECTION 111

## CLAIMS AND APPEALS

11.1  Claims for Benefits.  Any Employee who is entitled to benefits under this Plan must apply in writing on a form furnished by the Administrative Committee.  The form must be signed by the applicant and accurately state such information as is necessary to establish the applicant's eligibility for benefits.

If the Employee has applied for benefits, as described above, and the claim for benefits was wholly or partially denied, the Secretary of the Administrative Committee, within a reasonable time, will provide the applicant with written notice stating the reasons for denial, the reference to plan provisions on which the denial was based, a description of any additional information or material necessary to complete the application for benefits, and an explanation of the review procedure described n this section.

11.2  Review Procedure.  Within 90 days after the date of written notice denying any benefits, the Employee, or authorized representative, may request a review of that decision by writing to the Administrative Committee, ICase Corporation, 700 State Street, Racine, Wisconsin 53404, requesting a review of that decision.

The applicant will have a reasonable time to submit in writing the reasons and facts supporting the claim for benefits.

11.3  Referral to Joint Board of Administration.  Claims or appeals which come under the jurisdiction of the Joint Board of Administration shall be promptly referred to it by the Administrative Committee.  On all other claims or appeals, the Administrative Committee shall consider the claim or appeal as promptly as possible and make its decision in writing, in the usual case, within 60 days after receipt of the request for review and no later than 120 days after that date, if unusual circumstances exist.  An applicant or authorized representative of the applicant may review pertinent documents at a Company office during regular business hours.

11.4  Provisions to Prevent Discrimination of Benefits.  With a view to preventing any discrimination in favor of highly compensated Employees, the allocation of the annual contributions of the Company is subject to the following limitations:

UAW 2867

(a)   <u>Application of Restriction for Plan Year Beginning Before January 1, 1993</u>.   Notwithstanding any other provisions in the Plan to the contrary, <u>for Plan Years beginning before January 1, 1993</u>, during the first 10 years after the effective date of the Plan, the benefits for an Employee who is among the 25 highest paid Employees of the Company as of the effective date, but excluding any Employee whose annual retirement benefit under the Plan will not exceed $1,500, will be subject to the conditions set forth below.

(i)   If the Plan is terminated or the full current costs hereof have not been met at any time within 10 years after the Effective Date, the total benefits (hereinafter called the "unrestricted benefit") which any individual Employee, as described above, may receive without restrictions shall not have a value in excess of the benefits which can be provided by the largest of the following amounts resulting from the Company contributions:

[a]   $20,000; or

[b]   20% of the first $50,000 of the Employee's average annual salary multiplied by the number of years for which the current costs of the Plan have been met after the effective date.

(ii)   If the full current costs of the Plan for the 10-year period following its effective date have not been met, the limitations on benefits for its Employees, imposed by the foregoing provisions of this section 11.4 shall remain in effect until such full current costs have been met for the first time.

<u>(iii)   If the Plan is amended to substantially increase the benefit payable in the event of a subsequent termination of the Plan (or the subsequent discontinuance of contributions), then the provisions of subsection (2) above shall be applied to the Plan as amended as if it were a new plan established on the date of the amendment.   The original group of 25 employees shall continue to have the limitations described above apply, and the restrictions above shall also apply to the benefits of the 25 highest paid employees on the effective date of the amendment, except that such restrictions shall not apply with respect to any employee in this group for whom the normal annual pension benefit provided by Company contributions prior to that date and during the ten ensuing years, based on his rate of compensation to that date, could not exceed $1,500.   Company contributions for the new group of 25 employees shall be limited to the greater of:</u>

11-2

UAW 2868

[a]   The Company contributions which would have been applied to provide the benefits for the employee if the Plan had been continued without amendment;

[b]   $20,000; or

[c]   The sum of (i) the Company contributions which would have been applied to provide benefits for the employee under the Plan if it had been terminated the day before the effective date of amendment and (ii) an amount computed by multiplying the number of years for which the current costs of the Plan after that date are met by 20% of his annual compensation, or if less, $10,000.

(b)   Application of Restriction For Plan Years Beginning On or After January 1, 1992.   For Plan Years beginning or after January 1, 1992, the benefit of any highly compensated employee (and any highly compensated former employee) is limited to a benefit that is nondiscriminatory under Code section 401(a)(4).   In addition, benefits distributable to any of the 25 most highly compensated active and former employees are restricted such that the annual payments are no greater than an amount equal to the payment that would be made on behalf of the employee under a single life annuity that is the Actuarial Equivalent of the sum of the employee's accrued benefit plus the amount of the payments that the employee is entitled to receive under a social security supplement.   The preceding sentence shall not apply if, after payment of the benefit to an employee described in the preceding sentence, (1) the value of the Plan assets equals or exceeds 110% of the value of current liabilities, as defined in Code section 412(1)(7), (2) the value of the benefits for an employee described above is less than 1% of the value of current liabilities, or (3) the value of the benefits payable to the employee does not exceed the amount described in Code section 411(a)(11)(A) regarding restrictions on certain mandatory distributions.   The terms "highly compensated employee" and "highly compensated former employee" shall be as defined in Code section 414(g).

(c)   Repayment Guarantee.   To the extent permitted by applicable law, these conditions shall not restrict the full payment of any death benefits payable under the Plan or the current payment of full retirement benefits called for by the Plan for any retired Participant while the Plan is in effect, provided an agreement, adequately secured, guarantees the repayment of any part of the distribution that is or may become restricted.

UAW 2869

11.5   <u>Merger of Plan or Transfer of Assets from this</u>
<u>Plan to Another</u>.   The Company reserves the right to merge or
consolidate this Plan with any other pension plan maintained by
the Company or an affiliated Company, and to transfer the
assets of this Plan to the other Plan.   In the event of a
merger, consolidation, or transfer of assets, no Employee of
this Plan shall receive a benefit subsequent to the merger,
consolidation, or transfer less than what he would have been
entitled to receive if his Plan had otherwise been terminated
immediately prior to the merger, consolidated or transfer.

11.6   <u>Forfeitures</u>.   Any forfeitures which may arise
under the Plan shall be used to reduce the Company's concurrent
or next subsequent contribution to the Plan.

<u>11.7   Limitation on Benefits.   Notwithstanding any</u>
<u>other provision of the Plan, benefits payable ǀunder the Plan</u>
<u>shall be limited to the amounts permitted by Section 415 of the</u>
<u>Internal Revenue Code as provided in Appendix B.</u>

11-4

## SECTION 112

### DEFINITIONS

The following definitions shall apply to the terms indicated wherever such terms are used in this Plan, unless otherwise specifically provided in the context:

12.1 <u>Company</u>. ICase Corporation, a Delaware corporation, or any substitute employer of all or substantially all of the Employees of said corporation who are covered by this Plan immediately prior to such substitution of employer, provided that the substitute employer adopts this Plan with the consent of ICase Corporation.

12.2 <u>Plan</u>. ICase Corporation Pension Plan for Hourly-Paid Employees, as stated herein and as hereafter amended from time to time.

12.3 <u>Employee</u>. Any hourly-paid employee of the Company, <u>excluding a Leased Employee and</u> any person who is a participant in or eligible for coverage under any other pension plan or system designed to provide benefits upon retirement to which the Company or any of its subsidiaries makes contributions, other than United States Social Security or its equivalent in other countries. An Employee shall be covered by the Plan immediately upon employment <u>as an hourly Employee.</u>

12.4 <u>Pensioner</u>. A Person who has retired from employment with the Company and is receiving or is entitled to receive benefits under the terms of this Plan.

12.5 <u>Retire, Retirement</u>. Termination of employment of an Employee who has met the eligibility requirements of Section I, other than the requirement of application.

12.6 <u>Total and Permanent Disability, Totally and Permanently Disabled</u>. Inability by reason of bodily injury or disease to engage in any regular employment or occupation with the Company which, on the basis of medical evidence, is determined to be permanent and will continue during the remainder of the Employee's life.

12.7 <u>Eligible for an Unreduced Social Security Benefit</u>. The first to occur of (a) attainment of the qualifying age for unreduced benefits by reason of age or (b) satisfaction of the eligibility requirements for disability insurance benefits under the Federal Social Security Act, even though the retired Employee does not apply for such benefits,

UAW 2871

or loses part or all of such benefits through delay in applying, by entering into covered employment, or other act or failure to act on his part.

12.8  Related Employment.  Any employment with the Company in a position which is not covered by this Plan and any employment with a subsidiary or the Company, with a corporation which owns 50% or more of the stock of this Company, or with any subsidiary of such corporation, shall be considered related employment.

12.9  Plan Year.  Plan Year shall mean the calendar year.

12.10  Pension Agreement.  The pension agreement between the Company and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, effective June 2, 1990].

12.11  Hour of Service.  Each hour for which an Employee is paid or is entitled to payment for the performance of duties for the Company; each hour for which an Employee is paid or is entitled to payment by the Company on account of a period of time during which no duties are performed due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence; each hour for which back pay, irrespective of mitigation of damages is either awarded or agreed to by the Company.  Hours shall be credited to appropriate periods of time in accordance with Department of Labor Regulations, Section 2530.200(b)-2(b) and (c).

12.12  Administrative Committee.  The Case Corporation Administrative Committee appointed by the Company.

12.13  Actuarial Equivalent.  A benefit of the same value as the benefit which it replaces, based on the UP-1984 Mortality Table and a 7% interest assumption.

12.14  One-Year Break in Service.  A Plan Year in which an Employee has 500 or fewer Hours of Service.

12.15  Code.  The Internal Revenue Code of 1986, as amended from time to time, and as interpreted by applicable regulations and rulings.

12.16  Qualified Joint and Survivor Annuity.  An immediate monthly annuity for the life of the Participant with payments continuing upon the death of the Participant for the life of his surviving spouse in an amount equal to 50% of the amount payable while the Participant was living.

12-2

12.17   Leased Employee.   Any person (other than an Employee) who, pursuant to an agreement between the Company and any other person (the "leasing organization"), has performed services for the Company (or for the Company and related persons determined in accordance with Code section 414(n)(6)) on a substantially full-time basis for a period of at least one year, if such services are of the type historically performed by Employees in the business field of the Company. Contributions or benefits provided a leased employee by the leasing organization which are attributable to services performed for the Company shall be treated as provided by the Company.

In no event shall a Leased Employee be considered an Employee if (a) the Leased Employee is covered by a money purchase pension plan providing a nonintegrated employer contribution rate of at least 10% of compensation, immediate participation and full and immediate vesting; and (b) Leased Employees equal no more than 20% of the Company's nonhighly compensated employees.

UAW 2873

## SECTION 13

### PLAN SUPPLEMENTS

13.1 <u>Plan Available to Others</u>.  With the consent of
the Company, the Plan, or portions thereof, may be adopted by,
or extended to, any appropriate group of Employees upon such
terms, and with such amendments as are agreed to by the Company.

13.2 <u>Method of Adopting the Plan</u>.  A separate
Supplement shall be executed for each group of Employees,
incorporating the Plan by reference and stating each and every
amendment, deletion, addition or change in benefit level from
the Plan, as applicable to a particular group of Employees.

13.3 <u>Changes in Plan Following Execution of
Supplement</u>.  The Plan provisions adopted by a Supplement are
those in effect on the date of execution of the Supplement.  No
amendment to any Plan provision adopted subsequent to a
Supplement (regardless of effective date of the Plan amendment
or the Supplement) shall amend or affect the provisions adopted
by the Supplement unless specifically incorporated by
subsequent instrument.

13-1

UAW 2874

## SECTION 114

### SPECIAL VOLUNTARY SUPPLEMENT PROGRAMS

14.1   Amendment of Plan.   The Company may amend the Plan to provide for special voluntary supplements for eligible Employees in a targeted group.   The terms of such supplements, including the identification of the targeted group, identification of Employees eligible within a targeted group, and the amount and duration of the payment of any supplement, shall be set forth in Appendix B, which is incorporated herein by this reference.   The Company may establish limits on the maximum number of Employees in a targeted group who can accept an offer of a special voluntary supplement.   The Company shall establish time periods for acceptance of an offer.   An Employee shall accept an offer by signing and returning an acceptance form provided by the Company and by retiring within the period specified in the offer.   For purposes of this Article 114, the Chief Financial Officer, President or Senior Vice President-Human Relations may act on behalf of the Company for purposes of special voluntary supplements.

UAW 2875

APPENDIX A

FOUNDRY CLASSIFICATIONS

| | |
|---|---|
| 081-109 | Core Carry |
| 099-006 | Cupola, Tend and Repair |
| | 099-006   Cupola and Furnace Repair |
| | 099-007   Cupola Charge |
| | 099-016   Cupola and Furnace Tend |
| 198-007 | Inspect Cores and Castings |
| 222-108 | Ladle, Mix Material, Line, Patch |
| 264-007 | Material Coordinator |
| | 096-027   Crib, Keep A. Maintenance |
| 265-108 | Material Handler |
| | 027-108   Blast, Cast, Inspect, Rough |
| | 265-108   Material Handler |
| 276-107 | Mechanical Maintenance, Oil |
| 285-005 | Mold and Core Make Experimental |
| 285-006 | Mold and Core Make Experimental |
| 365-007 | Foundry Molding Relief |
| 381-005 | Salvage-Castings, Weld |
| 384-107 | Sand Mill |
| 405-006 | Set Up, Repair, Store Core Boxes |
| 486-007 | Test Foundry Sand |
| 510-007 | Transport, Monorail |
| 521-008 | Utility Man - Cores |
| 347-109 | Production General B |
| | 219-109   Labor General |
| 063-007 | Chip, Grind, Inspect, Repair |
| 081-008 | Core, Make, Dip |
| 081-009 | Core, Make |
| 081-108 | Core, Make, Fit |
| 081-119 | Core, Make Blow |
| 285-007 | Mold, Machine Operate |
| 285-108 | Mold, Core Set |
| 336-008 | Pour Molds |
| 411-018 | Action Handler |
| 411-108 | Shakeout |
| 009-004 | Automotive, Maintenance |
| 048-004 | Carpenter, Maintenance |
| 135-003 | Electrical, Maintenance |
| 261-003 | Machinist (All Around) |
| 276-004 | Mechanical Maintenance Millwright |
| 321-003 | Pipe and Steamfit |
| 510-016 | Crane (Outside)* |
| 537-004 | Weld, Acetylene and Arc, Maintenance |

UAW 2876

\* Employees in classification 510-016 on or before June 1, 1990 will be grandfathered for foundry service pension credit; employees posting into this classification after June 1, 1990 are excluded.

Work in job classifications which are no longer in effect will be considered for the purpose of determining foundry service if the type of work in the discontinued classification is substantially the same as that performed in

## APPENDIX B

### Special Voluntary Supplement Retirement

**B1.1   Definitions.**

(a)   **Target Group.** An Employee employed by the Company during an Election Period applicable to such Employee who (1) is in a group designated by the Company for the purpose of receiving offers of special voluntary supplements and (2) satisfies the eligibility requirements determined by the Company.

(b)   **Election Period.** The dates designated by the Company within which an eligible Employee may submit an application for special voluntary supplement retirement.

**B1.2   Target Groups.**

(a)   **Group 1.** An Employee employed during the Election Period applicable to his location who (1) has 30 or more years of credited service; (2) has attained an age (computed to the nearest 1/12 of a year) that, when combined with his years of credited service totals 85 or more; or (3) has ten or more years of credited service and has attained at least age 50 (age 60 for Employees at the Company's Racine, Wisconsin location).

(b)   **Group 2.** An Employee age 50 with ten or more years of credited service under the Plan employed by the Company at its Wausau, Wisconsin facility during the Election Period applicable to his employment location.

(c)   **Group 3.**

(d)   **Group 4.**   [Clerical only at East Moline]

**B1.3   Election Periods.**

(a)   **Group 1.**

| Location | Election Period |
|---|---|
| Burlington, Iowa | 6/21/91 - 7/31/91 |
| Racine, Wisconsin | 8/12/91 - 8/23/91 |
| Racine, Wisconsin | 9/12/91 - 9/27/91 |
| Wausau, Wisconsin | 9/1/91 - 12/31/91 |
| East Moline, Wisconsin | 11/5/91 - 11/28/91 |

UAW 2877

(b)  Group 2.

| Location | Election Period |
|---|---|
| Hinsdale, Illinois | 7/1/91 - 7/31/91 |
| Wausau, Wisconsin | 12/16/92 - 1/31/92 |
| Racine, Wisconsin | 2/6/92 - 2/28/92 |
| Burlington, Iowa | 1/2/92 - 1/31/92 |
| Hinsdale, Illinois | 12/11/91 - 1/24/92 |
| Memphis, Tennessee | 2/6/92 - 2/28/92 |

(c)  Group 3.

| Location | Election Period |
|---|---|
| Hinsdale, Illinois | 3/23/92 - 4/24/92 |

(d)  Group 4.

| Location | Election Period |
|---|---|
| East Moline, Illinois | 12/16/91 - 1/31/92 |

B1.4  Amount of Special Voluntary Supplement Benefit.

(a)  Group 1.

(b)  Group 2.

(1)  Prior to Eligibility for Unreduced Social Security Benefit.  An Employee making an election for special voluntary supplement retirement shall receive a monthly benefit commencing on the first month in which retirement occurs and payable through the month in which the Employee becomes eligible for an Unreduced Social Security Benefit equal to the sum of:

[a]  The basic monthly benefit for life determined in accordance with Section 2.1 as of the Employee's date of retirement -- and recalculated for subsequent benefit increases only during the term of the collective bargaining agreement in effect on such Employee's date of retirement (June 2, 1990 - October 3, 1993) -- but not reduced for early payment;

[b]  The supplemental allowance determined in accordance with Sections 3.2(a) and (b) -- as pro

UAW 2878

(b) **Amount of Benefit.** If an Employee eligible for grow-in to special voluntary supplement benefits submits proper application to the Company upon attaining age 50 and completing at least ten years of credited service, such Employee shall receive the benefit described in Section B1.4 above, except that the $350 per month benefit otherwise payable shall be reduced by $175 in each month until the total amount of weekly SUB payments made on behalf of such Employee during his voluntary grow-in period of layoff has been recovered. Such SUB amounts shall be deemed to be recovered upon the earlier of (1) the date $175 times the number of months benefits are paid from the Plan equals the SUB payments made to the Employee during his grow-in period, (2) the Employee's attainment of age 62, or (3) the death of the Employee.

UAW 2879

459DLP:LRB   06/30/92

rated for less than 30 years of credited service -- disregarding any reduction for payments commencing prior to age 60; and

[c]   A special voluntary supplement benefit equal to $350 per month.

(2)   After Eligibility for Unreduced Social Security Benefit.   The monthly benefit payable after the month in which an Employee electing special voluntary supplement retirement becomes eligible for an Unreduced Social Security Benefit shall be equal to such Employee's basic monthly benefit for life determined in accordance with Section 2.1 -- based on years of credited service as of the Employee's retirement date -- but not reduced for early payment.

An Employee's special voluntary supplement benefit shall not be subject to the provisions of Section 3.6 regarding restrictions on earnings.

B1.5   Last Benefit Check.   Except for surviving spouse benefits, the last monthly special voluntary supplement benefit shall be paid for the month in which the Pensioner dies or is reemployed by the Company, whichever is the first to occur.   If a Pensioner is reemployed by the Company, the provisions of Section 4.5 shall apply.

B1.6   Normal Form of Payment of Special Voluntary Supplement Benefit for Married Employees.   The provisions of Section 2.7 shall apply in determining the surviving spouse benefits payable with respect to a married Employee electing special voluntary supplement retirement.   Beginning with the month in which a deceased Employee would have become eligible for an Unreduced Social Security Benefit had he not died, the surviving spouse's benefit shall be recalculated to reflect the reduced special voluntary supplement benefit that would have then become payable to the Employee but for his death.

B1.7   Grow-In to Special Voluntary Supplement Retirement.

(a)   Eligibility.   An Employee who (1) has attained age 48 and completed at least eight years of credited service as of January 1, 1992, and (2) is employed by the Company during the Election Period applicable to his employment location may elect, in writing, to be placed on layoff status and shall be entitled to special voluntary supplement benefits upon the earlier of attaining age 50 and completing at least ten years of credited service or completing 30 years of credited service.   An employee's election must be filed with and approved by the Administrator.

UAW 2880

# JI Case Corporation

### And

# United Auto Workers

### Supplemental Pension Agreement and Plan

### Effective June 2, 1990



UAW 2881

SUPPLEMENTAL
PENSION AGREEMENT

THIS AGREEMENT is entered into as of this ___ day of _____, 19__, between CASE CORPORATION (herein called the "Company") and INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) and its Local Unions Nos. 152, 180, 689, 763 807, 808, 858, 1004, 1304, 1306, 1356 and 1489 (herein called the "Union");

W I T N E S S E T H:

WHEREAS, the Company and the Union have negotiated with respect to a program of pension and disability benefits applicable as of June 2, 1990, to employees in collective bargaining units represented by the Union;

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

ARTICLE I

Definitions

Section 1. Definition of Terms. When used herein, the following terms shall have the following meanings, unless the context clearly indicates otherwise:

    (a)   "Plan" means the Case Corporation Pension Plan for Hourly-Paid Employees, as amended effective June 2, 1990, as set forth in Appendix A attached hereto and made a part hereof, including any amendments thereto.

    (b)   "Employee" means (i) any person represented by Local Union Nos. 152, 180, 689, 763, 807, 808, 858, 1004, 1304, 1306 and 1356 (as agreed upon between

UAW 2882

the Company and the Union) who is or shall be employed by the Company on or after June 2, 1990; and (ii) any person represented by Local Union No. 1489 who is or shall be employed by the Company on or after October 1, 1990.

(c) "Pensioner" means any person who has retired from employment with the Company and who is receiving or is eligible to receive benefits under the Plan.

(d) "Collective Bargaining Unit" means any unit represented by the Union and appropriately certified for collective bargaining purposes by the National Labor Relations Board, and collectively means all such units.

Section 2.   Credited Service for Union Leaves.   In computing the number of years of credited service under the Plan of a duly elected or appointed Union representative for periods after June 2, 1990, there shall be included credit for hours which would have been worked, except for absence from work due solely to (a) attendance at labor contract negotiation meetings with the Company, (b) attendance at official meetings of the Local Union at the plant or establishment at which he is employed, (c) performance (pursuant to written leave of absence granted by the Company upon request by the Union) of other duties either as a Union representative at such plant or establishment, or while holding a position on the staff of the International Union (pursuant to written leave of absence granted by the Company upon request by the Union), provided that the provisions of this Section 2 shall not apply to any absence (other than pursuant to written leave of absence) with respect to which the Employee fails to advise the Company

-1-

UAW 2883

promptly, in writing, of hours of credit claimed for such absence. For absences pursuant to any such written leave of absence, no more than 40 hours shall be credited during any single week and no more than one year of credited service shall be credited for any single calendar year.

Section 3. <u>Statements of Credited Service</u>. Employees will be provided with annual statements of their credited service beginning with the 1990 annual statement. Such statements will be distributed within six months after the end of the year to which they relate.

<u>ARTICLE II</u>

<u>Corporate and Tax Approval</u>

Section 1. <u>Approvals</u>. This Agreement is subject to the following conditions:

    (a)   Approval of this Agreement by the Board of Directors of the Company;

    (b)   Issuance of a determination letter by the appropriate District Director of Internal Revenue to the effect that the Plan meets the requirements of Section 401 of the Internal Revenue Code of 1986, or any successor provisions, and that any trust forming a part of the Plan is exempt from income taxation under Section 501(a) of the Internal Revenue Code of 1986, or any successor provisions; (the Company shall exert its best efforts with due diligence to obtain such determination letter); and

    (c)   Deductibility of the Company's payments or contributions pursuant to the Plan under Section 404 of the Internal Revenue Code of 1986, or any successor provisions.

Section 2. <u>Amendments</u>. In the event that any amendments of the Plan are necessary in order to obtain or maintain the

-2-

UAW 2884

determination letter described in Section 1 of this Article II, the Company may make such revisions, with the consent of the Union insofar as Employees in the collective bargaining unit are affected, which consent shall not be unreasonably withheld, adhering as closely as possible to the intent of the parties as expressed in this Agreement (including Appendix A). Any such amendments may be made retroactively to the extent necessary for the purposes set forth in Section 1 of this Article II.

Section 3. <u>Coverage of Others</u>. The Company, in its discretion, may extend the Plan to persons now or hereafter in its employ outside the collective bargaining unit, and may include any such persons within the coverage of any trust established pursuant to said Plan for the benefit of Employees within the collective bargaining unit, with such modifications as it may see fit, provided such modifications do not apply to Employees in the collective bargaining unit.

<u>ARTICLE III</u>

<u>Joint Administration</u>

Section 1. <u>Joint Board of Administration</u>. There shall be a Joint Board of Administration (herein called the "Board"), consisting of six members, three appointed by the Company, and three by the Union, which shall administer the Plan as herein provided. Each member of the Board may have an alternate. The expenses of the Board shall be paid by the Company, except that the compensation and expenses of each member or alternate

-3-

UAW 2886

(other than the Chairman) shall be paid by the party appointing him, and the compensation and expenses of the Chairman shall be shared equally by the Company and the Union. In the event a member is absent from a meeting of the Board, an alternate may attend, and, when in attendance, shall exercise the powers and perform the duties of such member. Either the Company or the Union may, at any time, remove a member or alternate appointed by it and may appoint a member or alternate to fill any vacancy among members or alternates appointed by it. The Company and the Union shall notify the other, in writing, of any appointment made by it.

Section 2. Meetings. The Board shall meet at such times and places as the Board shall determine. At least two Union members and two Company members must be present at any meeting in order to constitute a quorum necessary for the transaction of business. The Company members present at any meeting shall have a total of three votes and the Union members present shall have a total of three votes, the vote of any absent member being divided equally between the members present appointed by the same party.

Section 3. Chairman. In the event that a majority of the Board is unable to agree with respect to any matter referred to it and with respect to which the Board has power to decide hereunder, the members of the Board shall appoint an impartial person to act as Chairman, who shall serve until requested in

-4-

UAW 2886

writing to resign by any three members of the Board.  The
Chairman shall not be counted for the purpose of a quorum and
will be present and will vote only in case of failure of the
Company and the Union by vote through their representatives on
the Board to agree upon a matter which is properly before the
Board and within the Board's authority to determine.  In the
event of the inability of the members of the Board to agree
upon a Chairman within 30 days after it is determined that a
Chairman should be appointed, or to agree upon the appointment
of any successor Chairman within 30 days, the Board shall
obtain from the American Arbitration Association a list of
names of five persons from which the Board shall select one
person to serve as Chairman.  Such selection shall be by
agreement, if possible; otherwise by the Union members, as a
group, and the Company members, as a group, alternately
eliminating names from said list.  After each such group has
eliminated the names of two persons from said list, the
remaining one shall be appointed by the Board as Chairman.

   Section 4.  Secretary.  The Company shall furnish a
Secretary to the Board who shall not be a Board member and
shall have no right to vote.  The Secretary shall have the
following duties:

   (a) To receive, on behalf of the Board, applications for
       retirement and benefits under the Plan and requests
       for hearing from Employees, former Employees, and
       Pensioners, and surviving spouses and to present the
       same to the Board at such time and in such manner as

-5-

UAW 2887

the Board may direct, together with such additional information relating thereto as may be directed by the Board;

(b)   To authorize the making of payments as directed by the Board; and

(c)   To perform such other duties as the Board may prescribe.

Section 5.   Liability of Board Members, Chairman, and Secretary.   The Board, its Chairman, and each member of the Board shall be entitled to rely upon the correctness of any information furnished by the Union, the Company, or any Employee, former Employee, Pensioner, or person claiming through any of the foregoing.   Except as otherwise provided by law, neither the Board, its Chairman, Secretary, nor any of its members, nor the Union nor any officer or other representative of the Union, nor the Company nor any officer or other representatives of the Company, shall be liable or responsible for any act, or failure to act, on the part of the Board, its Chairman, Secretary, or any of its members, except that nothing herein shall be deemed to relieve any such individual from liability from his own fraud or bad faith.

Section 6.   Powers and Duties of Board.   The Board shall have the following powers and duties:

(a)   To establish the administrative procedures necessary to carry out its duties;

(b)   To furnish forms for application for benefits, for designation of beneficiary, and for the furnishing of such information as the Board may deem appropriate;

-6-

UAW 2888

(c)  To approve or reject applications for benefits and to make final determinations with respect to the rights under the Plan of any persons applying for or receiving benefits thereunder;

(d)  To make the determinations regarding payees in accordance with Section 6.12 of the Plan, and to determine whether, for purposes of Section 1.6 of the Plan, any employment is for purposes of rehabilitation;

(e)  To direct the Secretary to authorize payments to Pensioners and Beneficiaries under the Plan;

(f)  To obtain such information as may be necessary for the proper administration of the Plan;

(g)  To obtain the annual report of the receipts and disbursements of the trustee or trustees of the pension fund under the Plan, the annual report of the actuary selected by the Company on the state of the pension fund under the Plan (including the actuarial assumptions used in making his valuations), and a copy of the trust agreement under the Plan; a copy of each such report shall be furnished to the Social Security Department of the International Union; and

(h)  To provide for a local pension committee at each plant location to consist of one Company Pension Representative and one Union Pension Representative, and to delegate to such committee responsibility to review and to make recommendations regarding any questions which may arise in connection with pension applications and determination of benefit rights under the Plan, subject to final determination by the Board.

The Board shall have no power to add to, subtract from, change, or modify any of the terms of the Plan, to change or add to any benefit or payment provided under said Plan, nor to waive or fail to apply any requirement of eligibility for a benefit under said Plan.

–7–

UAW 2889

Section 7.   Redetermination by Board.   Each applicant and Pensioner with respect to whom the Board makes any determination shall be promptly notified of the determination and shall be entitled, upon his request within a reasonable time after receipt of such notification, to present to the Board any reasons for believing that the determination is incorrect, and the Board shall make a determination after the hearing at which such reasons are presented.   The Board shall establish such additional procedures as are required to maintain a fair and complete appeals procedure.

Section 8.   Determination of Disability.   When an Employee applies for a pension for total and permanent disability, and whenever (but not exceeding twice a year) the Board determines that a Pensioner receiving a pension for total and permanent disability should be reexamined, the Board shall appoint a qualified physician or clinic to examine such Employee or Pensioner and to render a medical opinion as to whether the Employee or Pensioner is totally and permanently disabled, unless the Board unanimously determines on the basis of competent alternative medical evidence that such examination is not necessary.   Such medical opinion shall be binding upon the Board.   The fees and expenses of the physician or clinic making the examination shall be paid by the Company.

-8-

UAW 2890

Section 9. <u>Decisions of Board Final</u>. No matter or dispute respecting, or arising under the Plan or this Agreement shall be subject to any grievance procedure established in any collective bargaining agreement between the Company and the Union. Each determination of the Board at which no hearing is requested as provided in Section 7 of this Article III, each determination made after any such hearing, and any other ruling by the Board which is within its authority, shall be final and binding on all persons, including the applicant, the Union, and the Company, and shall not be subject to further appeal, except to the extent provided by law. No determination or ruling by the Board in any case shall create a basis for retroactive adjustment in any other case. The Union shall discourage and shall not cooperate in any appeal from a determination or ruling of the Board to any court or administrative board or agency.

Section 10. <u>Applicability</u>. The provisions of this Article III shall apply only to Employees in collective bargaining units represented by the Union (including any survivors thereof) and shall not apply to any other person in the employ of the Company.

### ARTICLE IV

#### Funding

Section 1. <u>Contributions by Company</u>. The Company shall establish a pension fund for the purpose of paying the benefits

-9-

UAW 2891

provided by the Plan.  The Company shall contribute to that fund from time to time during the term of this Agreement amounts which shall be sufficient in the aggregate, based upon estimates prepared from time to time by an independent actuary selected by the Company, to provide the following on an annual basis:

(a) The normal cost of the Plan (except the cost of supplemental allowances under the Plan) which accrue during the term of this Agreement;

(b) The portion of the amount required to fund in full on a uniform basis the past service liability under the Plan as constituted as of January 1, 1967, over a 40-year period commencing January 1, 1967;

(c) The portion of the amount required to fund in full on a uniform basis the past service liability (except that attributable to supplemental allowances) attributable to changes in basic benefits set forth in the Plan as amended effective August 2, 1971, over respective 40-year periods commencing on the following dates:

　(i) August 2, 1971 as to the change in basic benefits effective August 2, 1971;

　(ii) January 1, 1972 as to the change in basic benefits effective January 1, 1972;

　(iii) January 1, 1973 as to the change in basic benefits effective January 1, 1973;

(d) The portion of the amount required to fund in full on a uniform basis the past service liability (except that attributable to supplemental allowances) attributable to changes in basic benefits set forth in the Plan as amended effective July 1, 1974, over a 40-year period commencing January 1, 1975.

(e) The portion of the amount required to fund in full on a uniform basis the past service liability attributable to changes in the Plan as amended effective July 1, 1977, over respective 30-year periods commencing on the following dates:

-10-

UAW 2892

    (i)    July 1, 1977 as to the changes effective on such date;

    (ii)   July 1, 1978 as to the changes effective on such date;

    (iii)  July 1, 1979 as to the changes effective on such date;

(f)    The portion of the amount required to fund in full on a uniform basis the past service liability attributable to changes in the Plan as amended effective July 1, 1980, over respective 30-year periods commencing on the following dates:

    (i)    July 1, 1980 as to the changes effective on such date;

    (ii)   July 1, 1981 as to the changes effective on such date;

    (iii)  July 1, 1982 as to the changes effective on such date;

(g)    The portion of the amount required to fund in full on a uniform basis the past service liability, if any, attributable to changes in the Plan as amended effective July 1, 1983 over a 30-year period commencing July 1, 1983;

(h)    The portion of the amount required to fund in full on a uniform basis the past service liability attributable to changes in the Plan as amended effective March 1, 1987, over respective 30-year periods commencing on the following dates:

    (i)    March 1, 1987 as to the changes effective on such date;

    (ii)   December 1, 1987 as to the changes effective on such date;

    (iii)  October 1, 1988 as to the changes effective on such date;

    (iv)  May 1, 1989 as to the changes effective on such date;

-11-

UAW 2893

(v)   January 1, 1990 as to the changes effective on such date;

(i)   The portion of the amount required to fund in full on a uniform basis the past service liability, if any, attributable to changes in the Plan as amended effective June 2, 1990, over respective 30-year periods commencing on the following dates:

(i)   June 2, 1990 as to changes effective on such date;

(ii)   April 1, 1991 as to changes effective on such date;

(iii)   March 1, 1992 as to changes effective on such date.

Section 2.   Actuarial Estimates.   The actuarial estimates to be made for the purpose of determining the sufficiency of the Company's contributions shall use assumptions and factors generally acceptable to the Internal Revenue Service for income tax purposes.

Section 3.   Liability of Company.   By making contributions to the pension fund in the amounts so determined by an independent actuary employed by the Company, the Company shall be relieved of all further liability under this Agreement, and no Employee or Pensioner shall have any claim for benefits other than those which can be provided by the pension fund, except as otherwise provided by law.

ARTICLE V

Special Voluntary Supplement Program.   The Company, at its option, may offer special voluntary supplements in order to encourage voluntary early retirement of eligible Employees

-12-

UAW 2894

covered by this Agreement.  To the extent provided by law, special voluntary supplements shall be payable from the pension fund established in connection with the Plan.  When special voluntary supplements are offered to Employees in any targeted group, the Chief Executive Officer, President or Senior Vice President-Human Relations, on behalf of the Company, shall have the power to amend the Plan to provide for payment of special voluntary supplements under the Plan.

## ARTICLE VI

## Duration of Pension Agreement

Section 1.  Duration.  This Agreement shall become effective as of June 2, 1990, (October 1, 1990 for Local Union No. 1489) and shall remain in full force and effect until October 2, 1993, and thereafter from year to year unless at least 60 days prior to October 2, 1993, or at least 60 days prior to October 2 of any succeeding year, either party gives written notice to the other that it desires a modification or termination.  In the event such notification is given, the parties shall meet within 30 days for the purpose of negotiating with respect to the matters covered hereby.  In the event that such negotiations do not result in an agreement for renewal, with or without modification, prior to October 2, 1993, or prior to the next succeeding October 2, as the case may be, this Agreement shall terminate on such October 2, unless extended by mutual agreement.

-13-

UAW 2896

Section 2.  No Strike During Term of Agreement.  During the
term of this Agreement neither the Union nor any of its
officers, agents, or representatives, nor any of the Employees
or their agents or representatives, shall engage or continue to
engage in or in any manner sanction or encourage any strike,
work stoppage, slowdown, or other interruption or impeding of
work, or engage or continue to engage in any other use of
economic force, for the purpose of securing any modification,
change, or termination of this Agreement or of the Plan, or for
the purpose of securing the establishment of any new,
different, or additional plans for retirement, pensions, or
disability pensions.  During the term of this Agreement, the
Company shall have no obligation to negotiate or bargain with
the Union, with the Employees, or with any other representative
of the Employees with respect to any of the subject matters of
this Agreement (except as otherwise expressly provided herein).

Section 3.  Determination Letter.  If at any time the
determination letter from the Internal Revenue Service
described in Section 1 of Article II ceases to be in effect,
the Company (unless revisions made pursuant to Section 2 of
Article II result in the complete reinstatement of such ruling)
may terminate this Agreement by giving at least 60 (but not
more than 90) days written notice thereof to the Union (which
notice shall specify the effective date of the termination).

-14-

UAW 2896

In the event any such notice of termination is given, the
parties shall meet within 30 days for the purpose of
negotiating with respect to the matters covered hereby.

Agreed and subscribed to as of the day and year first above
written.

INTERNATIONAL UNION, UNITED                    CASE CORPORATION
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW)

By _____        _____

LOCAL UNION NO. 152

By_____

LOCAL UNION NO. 180

By_____

LOCAL UNION NO. 689

By_____

LOCAL UNION NO. 763

By_____

LOCAL UNION NO. 807

By_____

LOCAL UNION NO. 808

By_____

LOCAL UNION NO. 858

By_____

LOCAL UNION NO. 1004

By_____

-15-

UAW 2897

LOCAL UNION NO. 1304

By_____

LOCAL UNION NO. 1306

By_____

LOCAL UNION NO. 1356

By_____

LOCAL UNION NO. 1489

By_____

-16-

UAW 2898

# EXHIBIT J
## to
## Settlement Agreement

## List of Post-10/3/93 Class Members

**EXHIBIT J**          **POST-OCTOBER 3, 1993 CLASS MEMBERS**          8/4/2011

| Last 4 SSN | Last | First | MI | Status | Spouse | Last 4 SSN | Dec'd Retiree | Last 4 SSN |
|---|---|---|---|---|---|---|---|---|
| 4920 | Adamek | Josef | | RNS | | | | |
| 9164 | Arvigo | James | S. | R | Linda | 6981 | | |
| 0827 | Becker | David | J. | R | Marlene | 0257 | | |
| 4144 | Becker | Lawrence | J. | R | Emilie | 5941 | | |
| 6924 | Bester | Kizzie | | SS | | | Henry J. | 6861 |
| 2558 | Betchkal | Thomas | J. | R | Ann M. | 4868 | | |
| 3574 | Birr | Ervin | H. | R | Joann | 6184 | | |
| 1893 | Blythe | Edward | R. | R | Susan A. | 8049 | | |
| 8338 | Born, Jr. | Earl | H. | R | Judy | 2698 | | |
| 1415 | Claybrook | Ronald | L. | R | Bessie I. | 1698 | | |
| 3199 | Clifford | James | M. | R | Gail | 4328 | | |
| 7299 | Conley | James | E. | R | Annie | 7816 | | |
| 8171 | Cox | Billy | R. | RNS | DC | 4129 | | |
| 7950 | Curry, Sr. | Leonard | | DRNS | DC | | | |
| 7283 | Davis | Dale | D. | R | Janet | 2545 | | |
| 2317 | Davis | Janice | L. | SS | | | Jeffrey B. | 4276 |
| 5549 | DeBack | James | M. | R | Mary | 7403 | | |
| 4018 | Duff | Leland | | RNS | DV | | | |
| 0611 | Esser (Dexter) | Julie | A. | R | Eberhard | 4762 | | |
| 3628 | Everson | Walter | B. | R | Gloria | 7712 | | |
| 9562 | Eyman | Jack | L. | R | Barbara A. | 9353 | | |
| 7301 | Faulkner | Adolph | | RNS | DC | 6737 | | |
| 1934 | Galloway | Dennis | | R | Sharon L. | 9689 | | |
| 5052 | Gerardo | Richard | C. | R | Rose M. | 7625 | | |
| 0864 | Goldhammer | Edwin | L. | R | Edwina J. | 8375 | | |
| 6292 | Green | Albert | H. | DRNS | DC | 6857 | | |
| 8574 | Griffin | James | H. | RNS | DC | 9324 | | |
| 4712 | Grigsby | Larry | W. | R | Jean | 1808 | | |
| 0678 | Hanson | Ralph | B. | R | Ginny | 3997 | | |
| 2529 | Harris | Nannie Mae | | SS | | | George | 9920 |
| 6886 | Heil | Dennis | E. | R | Theresa Carol | 2905 | | |
| 2498 | Hill | Constance | M. | SS | | | Ira J. | 7656 |
| 5879 | Hitt | Ronald | M. | R | Gloria | 7362 | | |
| 6380 | Hoskins-Scott | Melvinnie | | R | Sylvester L. Scott | 2446 | | |
| 0136 | Hoyt | Craig | W. | R | Benita A. | 3495 | | |
| 5217 | Jaskulske | Marie | | SS | | | Howard | 0263 |
| 3329 | Johnson | Gerald | L. | R | Carol | 8367 | | |
| 9021 | Johnson, Jr. | Johnny | | R | Elaine | 5207 | | |
| 6279 | Keenum | Beulah | M. | SS | | | Henderson W. | 4314 |
| 1918 | Kentcy | Calvin | L. | R | Ethel | 7472 | | |
| 4157 | Kocol | Robert | S. | DRNS | DC | 2639 | | |
| 7413 | Kroening | Clifford | L. | RNS | | | | |
| 2728 | Kroll | Stanley | R. | R | Sharol | 5776 | | |
| 2722 | Lewis | Richard | J. | R | Julia Rosemary | 9365 | | |
| 6946 | Lisnich | George | | R | Mildred | 5772 | | |
| 5928 | Locke | Alice | M. | R | Thethel N. Jr. | 4268 | | |
| 9103 | Lutz, Jr. | Barbara | J. | SS | | | Christ, Jr. | 0344 |
| 0524 | Luxem | James | T. | R | Susan | 0018 | | |
| 4705 | Machado | Oscar | | R | Minerva | 1868 | | |
| 0977 | Magrecke | Neil | L. | R | Patricia A. | 9450 | | |
| 3535 | Marshall | James | D. | R | Rebecca | 2314 | | |

**EXHIBIT J**          POST-OCTOBER 3, 1993 CLASS MEMBERS          8/4/2011

| Last 4 SSN | Last | First | MI | Status | Spouse | Last 4 SSN | Dec'd Retiree | Last 4 SSN |
|---|---|---|---|---|---|---|---|---|
| 1157 | Mendez | Samuel | | R | Rosa A. | 1149 | | |
| 3603 | Milsap | Memphis | | R | Curley B. | 9406 | | |
| 2347 | Modrow | Judith | A. | SS | | | Richard B. | 0737 |
| 1237 | Momon | Rebecca | D. | R | John D. | 5719 | | |
| 2757 | Montgomery | Wilbur | G. | R | Patsy Y. | 5537 | | |
| 9977 | Moore | Rosie | L. | R | William | 0589 | | |
| 4106 | Mosley | Patricia | A. | SS | | | Charles E. | 5592 |
| 7876 | Nagler | Steve | J. | R | Joan | 3139 | | |
| 0663 | Nerada | Sidney | | R | Helen | 0672 | | |
| 6975 | Nyberg | Eugenia | D. | SS | | | Kenneth W. | 6340 |
| 9851 | Panis | Melichar | | R | Gladys | 7638 | | |
| 3516 | Parker | Larry | F. | R | Geraldine S. | 9672 | | |
| 9611 | Patton | Merlean | | SS | | | Eula C. | 2878 |
| 7078 | Pelatzke | Robert | A. | R | JoAnne | 0612 | | |
| 8635 | Pietrowski | James | J. | R | Sharon | 7159 | | |
| 7030 | Pike | Lawrence | M. | R | Janice S. | 3399 | | |
| 9115 | Rosenow | Duane | E. | R | Karen | 9783 | | |
| 1601 | Rotkis | John | C. | DRNS | DV | | | |
| 7971 | Santovi | George | A. | R | Margaret A. | 1368 | | |
| 6617 | Schilling | Thomas | R. | R | Elizabeth Ann | 4000 | | |
| 3540 | Schrader | Charles | R. | R | Cheryl L. | 7315 | | |
| 6315 | Schram | William | J. | R | Harriet A. | 0782 | | |
| 6095 | Schroeder | Jack | H. | R | Teresa | 3739 | | |
| 6213 | Schroeder | James | R. | R | Rosemary E. | 4376 | | |
| 6889 | Shannon | Melvyn | R. | RNS | | | | |
| 5776 | Sommers | Gary | A. | R | Janet D. | 0678 | | |
| 0304 | Spencer | Clifford | M. | RNS | | | | |
| 7264 | Stasiak | Egon | | R | Suzanne | 5604 | | |
| 5989 | Stuebe | Edward | L. | R | Adeline E. | 0655 | | |
| 0972 | Terrio | Charles | R. | R | Charlotte R. | 4488 | | |
| 2028 | Thigpen | Oral Lee | | DSS | | | Julius | 4379 |
| 4777 | Thomas | Burnell | | RNS | DC | 0104 | | |
| 6596 | Thompson | Lorice | W. | SS | | | Samuel | 6846 |
| 8672 | Tucker | Larry | T. | DRNS | DV | | | |
| 3900 | Turecek | James | L. | RNS | | | | |
| 3858 | Vanderleest, Jr. | Richard | | R | Barbara J. | | | |
| 1400 | Vincent | Freddie | E. | R | Geneva M. | 3124 | | |
| 8583 | Voigt | Dennis | L. | R | Pearl D. | 5293 | | |
| 6715 | Wagner | Gary | A. | R | Ellen | 7481 | | |
| 9865 | Walker | Joseph | L. | DRNS | SN | | | |
| 7714 | Walkowski | Mary | J. | SS | | | Clarence F. | 5670 |
| 3766 | Wember | Carleton | A. | RNS | DV | | | |
| 3219 | West | Leroy | J. | R | Kathleen A. | 6224 | | |
| 7044 | West | Ramon | M. | R | Dorothy P. | 0764 | | |
| 4944 | Wheatley | John | R. | R | Bernadette M. | 5596 | | |
| 5408 | Wiesman | Donald | C. | R | Shirley Jean | 8962 | | |
| 6743 | Wonsil | Ronald | L. | RNS | DV | | | |
| 4487 | York | Ronald | D. | RNS | DV | | | |
| 2186 | Young | Darold | G. | R | Violet | 6385 | | |
| 5725 | Zastrow | Carol | | SS | | | Willard | 6823 |
| 8819 | Zobrak | Ronald | J. | R | Carol Jean | 5637 | | |

# EXHIBIT K
## to
## Settlement Agreement

## Summary Plan Description

Exhibit K

# Case Hourly Retiree Summary Plan Description

For the Settlement Plan Provided Pursuant to Settlement Agreement of Class Action Litigation between El Paso Tennessee and Certain Case Retirees (*Yolton v. El Paso*)

El Paso Corporation

# [January 1, 2012]

# TABLE OF CONTENTS

**About This Summary Plan Description** ................................................................ **6**
**Accessing Your Benefits** .................................................................................... **7**
**Frequently Used Telephone Numbers and Addresses** ........................................ **8**
**Eligibility and Participation** ............................................................................... **9**
  Class Members ...................................................................................................... 9
  Eligible Dependents .............................................................................................. 9
  Medicare Supplement Plan Enrollment .............................................................. 10
    Initial Enrollment ............................................................................................ 10
    Alternate Medicare Supplement Plan Coverage .............................................. 10
    Moving to Medicare Supplement Plan upon Medicare Eligibility .................... 11
  Reenrollment in the Settlement Plans ................................................................. 11
    Optional Coverage Made Available by El Paso ............................................... 11
    Alternative Medicare Supplement Plan Not Provided by El Paso ..................... 11
  Qualified Medical Child Support Order (QMCSO) ............................................. 12
  Paying for Coverage ........................................................................................... 12
**Settlement Plans – Participants Not Eligible for Medicare** .............................. **13**
  Claims Administrators ......................................................................................... 13
  Network v. Non-Network ..................................................................................... 13
  Benefit Levels ..................................................................................................... 14
  Reasonable and Customary (R&C) Charges ........................................................ 15
**Managed Care Plan** ........................................................................................... **16**
  Medical Benefits ................................................................................................. 16
  Additional Medical Provisions ............................................................................ 18
    Annual Deductible—Non-Network Only ......................................................... 18
    Annual Out-of-Pocket Maximum—Non-Network Only .................................... 18
    Blue Care Connection ..................................................................................... 18
    Disease Management Services .......................................................................... 19
    Emergency Care .............................................................................................. 19
    Home Health Care ........................................................................................... 19
    Hospice Care ................................................................................................... 19
    Maternity Stays ............................................................................................... 19
    Precertification of Inpatient Hospital Services ................................................. 20
    Penalty for Not Precertifying Expenses ........................................................... 20
    Treatment of Temporomandibular Joint (TMJ) Dysfunction ............................ 20
    Covered Medical Expenses .............................................................................. 20
    Medical Expenses Not Covered ....................................................................... 22
  Mental Health and Substance Abuse Benefits ..................................................... 25
    Inpatient Mental Health ................................................................................... 25
    Inpatient Substance Abuse ............................................................................... 25
    Outpatient Mental Health and Substance Abuse ............................................... 25
    Steps to Take – Inpatient and Outpatient Mental Health and Substance Abuse Treatment ........ 26
    Payment of Mental Health and Substance Abuse Benefits ................................ 26
**Settlement Plans – Medicare-Eligible Participants** ......................................... **26**
  Claims Administrators and Insurers .................................................................... 26
  Medicare Supplement Plan .................................................................................. 27
  Optional Medicare Advantage and Part D Prescription Drug Plans ..................... 29
**Prescription Drug Plan – All Participants** ...................................................... **29**
  Retail Prescriptions ............................................................................................ 30

Mail-Order Prescriptions...................................................................................30
Annual Prescription Drug Cap on Out-of-Pocket Expenses...............................30
Prescription Drugs Requiring Authorization for Benefits....................................30
Prior Authorization............................................................................................31
Prescription Expenses Covered...........................................................................31
Prescription Expenses Not Covered....................................................................31
Medicare Part D Prescription Drug Coverage .....................................................32
**Other Benefit Plans – All Participants................................................................. 32**
Dental Benefits.......................................................................................................32
Network v. Non-Network Dentists...................................................................32
Type A Dental Benefits......................................................................................33
Type B Dental Benefits......................................................................................33
Type C Dental Benefits......................................................................................34
Type D Dental Benefits......................................................................................34
Dental Expenses Not Covered ..........................................................................34
Alternate Dental Benefits..................................................................................35
Dental Pretreatment Review .............................................................................36
Payment of Dental Benefits...............................................................................36
Hearing Aid Benefits...............................................................................................36
Hearing Aid Expenses Not Covered .................................................................37
Vision Care Benefits................................................................................................38
Vision Examination...........................................................................................38
Limitations .........................................................................................................38
Vision Care Expenses Not Covered ..................................................................38
**Medically Necessary............................................................................................... 40**
**Claims Procedures ................................................................................................. 41**
Claims Procedures...................................................................................................41
Eligibility Claims Procedures.................................................................................41
Benefits Claims Procedures for Medical, Dental, Hearing Aid and Vision Benefit Claims............41
General Information............................................................................................41
Making a Health Benefit Claim ........................................................................41
Non-Network Medical Benefit Claims .............................................................41
Health Benefit Denials.......................................................................................42
Notice of Denial ................................................................................................43
Appealing a Denied Health Benefit Claim........................................................44
Review of Appeal...............................................................................................44
Notice of Appeal Denial....................................................................................45
Benefits Claims Procedures for Mental Health and Substance Abuse Benefit Claims .................46
General Information............................................................................................46
Making a Mental Health or Substance Abuse Benefit Claim ...........................46
Non-Network Mental Health or Substance Abuse Benefit Claims....................46
Mental Health, Substance Abuse Benefit Denials ............................................46
Notification of Denial ........................................................................................48
Appealing Denied Claims..................................................................................49
Review of Appeal...............................................................................................49
Notification of Appeal Denial............................................................................50
Prescription Drug Plan Claims Procedures ...........................................................50
Making a Prescription Drug Benefit Claim ......................................................50
Prescription Drug Benefit Denials ....................................................................51
Notice of Denial ................................................................................................52
Appealing Denied Prescription Drug Claims....................................................53

    Review of Appeal ........................................................................................................ 53
    Notice of Appeal Denial ............................................................................................. 54

**Coordination of Benefits (COB) ................................................................................ 56**
  How Coordination of Benefits Works ............................................................................ 56
  COB Rules ...................................................................................................................... 56
    Retiree ......................................................................................................................... 56
    Spouse ........................................................................................................................ 56
    Children ...................................................................................................................... 56

**Continuation of Coverage (COBRA) .......................................................................... 57**
  Extension of Benefits ..................................................................................................... 57
  COBRA ........................................................................................................................... 57
    Highlights ................................................................................................................... 57
    What is COBRA Continuation Coverage? .................................................................. 57
    Who's Eligible for COBRA? ...................................................................................... 57
    When is COBRA Continuation Coverage Available? ................................................ 58
    For What Types of Qualifying Events Must you Give Notice? ................................. 58
    How is COBRA Continuation Coverage Provided? ................................................... 58
    How Long Will COBRA Continuation Coverage Last? ............................................ 58
    Termination of COBRA Coverage ............................................................................. 58
    New Eligible Dependent Children ............................................................................. 59
    Cost of Coverage ....................................................................................................... 59
    Changes in the Plans .................................................................................................. 60
    Trade Act 2002 .......................................................................................................... 60
    Questions About COBRA Continuation Coverage .................................................... 60

**Life Insurance Benefits – Retiree Participants Only ................................................ 62**
  Highlights ....................................................................................................................... 62
  Costs ............................................................................................................................... 62
  Life Insurance Coverage ................................................................................................ 62
  Naming a Beneficiary(ies) ............................................................................................. 63
    Naming and Changing Your Beneficiary(ies) ........................................................... 63
    If You Do Not Name a Beneficiary(ies) ................................................................... 63
  Filing a Claim ................................................................................................................ 63
    Overview .................................................................................................................... 63
    Attachment of Benefits .............................................................................................. 63
  Life Insurance Claims Procedures ................................................................................. 63
    Making Life Insurance Benefit Claim ....................................................................... 64
    Life Insurance Benefit Denials and Notice of Denial ............................................... 64
    Appealing a Denied Life Insurance Claim ................................................................ 64
    Review of Appeal ...................................................................................................... 65
    Notice of Appeal Denial ............................................................................................ 65

**When Coverage Ends .................................................................................................... 66**
  Retiree and Surviving Spouse Participants .................................................................... 66
  Eligible Dependents ....................................................................................................... 66

**Administrative Information .......................................................................................... 67**
  Benefits Committee ....................................................................................................... 67
  Plan Expenses ................................................................................................................ 67
  Claims and Appeals ....................................................................................................... 67
  Right of Recovery and Third-Party Liability ................................................................ 68
  Assignment Prohibited .................................................................................................. 68
  Plan Amendment ............................................................................................................ 68
  SPD and Settlement Agreement ..................................................................................... 69

Continuing Jurisdiction of the Court ..................................................................................69
Retiree Committee ...........................................................................................................69
Privacy ...........................................................................................................................70
**General Information** ....................................................................................................**71**
Information about the Plan ...............................................................................................71
Service of Process ...........................................................................................................71
Type of Plan ...................................................................................................................71
Sources of Plan Funding .................................................................................................71
Names and Addresses of Claims Administrators ..............................................................72
Statement of ERISA Rights ............................................................................................72
    Receive Information About Your Plan's Benefits ......................................................72
    Continue Group Plan Coverage ...............................................................................73
    Prudent Actions by Plan Fiduciaries .......................................................................73
    Enforce Your Rights ...............................................................................................73
    Assistance with Your Questions ..............................................................................73
**Appendix A** ................................................................................................................**74**

# About This Summary Plan Description

This Summary Plan Description or "SPD" provides information on health and life insurance benefits provided under the Settlement Plans established  pursuant to the court-approved class settlement agreement in <u>Yolton v. El Paso Tennessee Pipeline Co. et al.</u> that are available to certain former bargaining unit employees who retired under the Case Corporation (formerly J I Case Company) Pension Plan for Hourly Paid Employees on or before July 1, 1994, and Surviving Spouses.  The Settlement Plans are a component of the El Paso Corporation Retiree Benefits Plan (formerly known as the El Paso Tennessee Pipeline Co. Retiree Benefits Plan).

This SPD uses certain defined terms that have the meanings set forth in Appendix A.

The Settlement Plans are sponsored by El Paso Corporation, and provide a Managed Care Plan for Participants who are not Medicare-eligible, a Medicare Supplement Plan for Participants who are Medicare-eligible, as well as prescription drug, dental, vision, and hearing aid benefits for all Participants.  The Settlement Plans also provide Life Insurance Benefits for Retiree Participants.

This SPD is effective as of **[insert effective date of Settlement Plans]**.

# Accessing Your Benefits

The Settlement Plans are administered by Mercer HR Services ("Mercer") through the El Paso Benefits Service Center. You can access benefits information by calling the El Paso Benefits Service Center toll-free at 1-866-301-2359 and speaking to a Participant Services Representative. Representatives are available between 8:30 a.m. and 5:00 p.m. Central time, Monday through Friday.

You can also get benefit information and conduct transactions 24 hours a day through Mercer's website—Mercer OneView. Just log on to www.MercerOneView.com/ElPaso.

Mercer OneView is your primary resource for information about your Plan benefits, as well as conducting benefit transactions at any time that's convenient for you. Through Mercer OneView you can:

- Review your current benefits
- Verify your personal information, such as address or Eligible Dependent information
- Visit the Resources menu for a variety of information

All you need to access Mercer OneView is your User ID (your social security number) and your passcode (six digit number).

You may also contact Mercer HR Services by mail at the following address:

El Paso Benefits Service Center
P. O. Box 971
Deerfield, IL 60015

When you first access Mercer OneView, you should create a "security profile" by providing answers to a set of personal questions. Then, if you ever lose your passcode you will be able to get a new one immediately as long as you have a security profile in place. If you don't have a security profile, you will have to wait to receive a new passcode in the mail or via email if you have an email address on record with the El Paso Benefits Service Center.

# Frequently Used Telephone Numbers and Addresses

| Source | Telephone Number | Address |
|---|---|---|
| **El Paso Benefits Service Center**<br>*For general information and enrollment* | 1-866-301-2359 | P. O. Box 971<br>Deerfield, IL  60015 |
| **BlueCross BlueShield of Texas**<br>*Managed Care Plan (Medical), Dental, Hearing Aid and Vision Benefits Claims Administrator*<br><br>*For benefits information, local network providers and claims information* | 1-800-521-2227 | Claims Address:<br>P.O. Box 660044<br>Dallas, TX 75266-0044 |
| **United Behavioral Health**<br>*Managed Care Plan - Mental Health and Substance Abuse Benefits Claims Administrator* | 1-866-781-6395 | P.O. Box 30755<br>Salt Lake City, UT 84130-0755 |
| **UnitedHealthcare**<br>*Medicare Supplement Plan Insurer* | 1-800-620-9037 | United Healthcare Insurance Company, Horsham, PA 19044 |
| **Medco Health Solutions, Inc.**<br>*Prescription Drug Plan (retail prescriptions) Claims Administrator*<br><br>*Mail-order prescriptions* | 1-800-903-4710<br><br>1-800-903-4710 | Retail Claims:<br>P.O. Box 14711<br>Lexington, KY 40512<br><br>Mail Order:<br>P.O. Box 30493<br>Tampa, FL 33630-3493 |
| **Benefit Concepts**<br>*COBRA Administrator* | 1-866-629-1480 | P.O. Box 9222<br>Chelsea, MA 02150-9222 |
| **ReliaStar Life Insurance Company (ING)**<br>*Life Insurer* | 1-800-955-7736 | P.O. Box 1548<br>Minneapolis, MN  55440 |

# Eligibility and Participation

This Section of the SPD explains eligibility for and participation in the Settlement Plans.

## Class Members

Class Members are all former bargaining unit employees who retired under the Pension Plan on or before July 1, 1994 (other than former employees eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan) and Surviving Spouses.

If you are a Class Member, or an Eligible Dependent as defined below, you are a Participant in the Settlement Plans and eligible for medical benefits (either the Managed Care Plan or Medicare Supplement Plan), as well as the Prescription Drug Plan and Other Benefit Plans described in this SPD.

Class Members and Eligible Dependents who are not eligible for Medicare are Participants in the Managed Care Plan.   A Participant is not Medicare-eligible if the Participant is under age 65 and is not receiving Medicare benefits.

Class Members and Eligible Dependents who are Medicare-eligible are Participants in the Medicare Supplement Plan once they complete and submit enrollment forms to UnitedHealthcare as described on page 10 of this SPD.  A Participant is Medicare-eligible if the Participant is age 65 or older or, if under age 65, is receiving Medicare benefits.

All Class Members and Eligible Dependents are Participants in the Prescription Drug Plan and the Other Benefit Plans.

Only Retiree Participants participate in Life Insurance Benefits.

## Eligible Dependents

Eligible Dependents are (1) a Retiree's spouse; (2) a Class Member's unmarried child under 19 years of age, excluding in any case: (a) any person who is eligible for insurance as a Class Member; and (b) any person residing outside the United States or Canada.

The term "child" also includes any legally adopted child, any stepchild who resides in the Class Member's household, and any child supported solely by the Class Member and permanently residing in the Class Member's household.  This definition excludes children acquired by a Surviving Spouse Participant, through marriage, after the Retiree Participant's date of death.

Eligible Dependents also include children age 19, but less than age 25, provided such children are:

- unmarried;
- not in the military or similar forces of any country or subdivision thereof;
- not employed on a full-time basis;
- not residing outside the United States and Canada; and
- principally dependent on the Class Member for maintenance and support.

Eligible Dependents also include children who are Permanently and Totally Disabled upon attainment of age 25 provided:

- The child was covered as an Eligible Dependent when the disability commenced; and
- Medical certification is submitted as proof of the individual's permanently and totally disabling condition.

Residence in a home other than the home of a Class Member shall not exclude an otherwise Eligible Dependent child from coverage provided the Class Member is legally responsible for the medical expenses incurred by the child.

Children of Class Members who become employed on a full-time, permanent basis by an employer which provides medical benefits shall continue to be covered as Participants under the Settlement Plans for up to four (4) months or until they are covered for medical benefits as an employee, if earlier, as long as they otherwise qualify as Eligible Dependents.

If you have an Eligible Dependent or if you are an Eligible Dependent who is eligible to become a Participant after the **[effective date of Settlement Plans]**, please call the El Paso Benefits Service Center at 1-866-301-2359 to initiate the enrollment process.  Any individual who becomes an Eligible Dependent after the **[effective date of Settlement Plans]** must complete and submit all necessary enrollment forms in order to become a Participant in the Settlement Plans.  Once the enrollment forms have been accepted and processed, the Eligible Dependent will be a Participant in the Settlement Plans, retroactive to the date the forms are received by the Benefits Service Center.

If you have any questions about whether you are eligible for coverage under the Settlement Plans, please call the El Paso Benefits Service Center. Final determinations regarding who is a Class Member and an Eligible Dependent, including Eligible Dependent status from and after the date of the Settlement Agreement, shall be determined in accordance with the Settlement Agreement.

For information about filing an eligibility claim, see "Claims Procedures" beginning on page 41 of this SPD.

## Medicare Supplement Plan Enrollment
The Medicare Supplement Plan for Medicare-eligible participants is provided by UnitedHealthcare ("UHC") and is described beginning on page 27.

### Initial Enrollment
In order to become a Participant in the Medicare Supplement Plan, you must complete and submit a Medicare Supplement Plan enrollment form and submit it to UnitedHealthcare.  You will be provided with an enrollment kit, containing your enrollment form.  You will then need to complete the enrollment form and return it to UnitedHealthcare in the envelope provided.  Approximately 2 weeks after processing your enrollment form, UnitedHealthcare will send a Medicare Supplement Plan welcome kit and ID card to you.

### Alternate Medicare Supplement Plan Coverage
El Paso will offer Medicare-eligible Class Members more comprehensive Medicare Supplement Plans in lieu of the Settlement Plan, provided: i) this is approved by the provider of the benefits for Medicare-eligible Class Members under the Settlement Plan; ii) the Class Member pays premiums equal to the monthly cost of such Medicare Supplement Plan which exceeds the cost of the

Settlement Plan; and iii) this does not significantly increase El Paso's cost or administrative burden. If any such plans are offered, enrollment information will be provided to you.

**Moving to Medicare Supplement Plan upon Medicare Eligibility**

If you are covered under the Managed Care Plan and later become eligible for Medicare, you will have to complete a Medicare Supplement Plan enrollment form and submit it to UnitedHealthcare. If you become eligible for Medicare based on your age, the El Paso Benefits Service Center will notify UnitedHealthcare that you have attained or will soon attain the age of 65. UnitedHealthcare will then send an enrollment kit to you, containing your enrollment form. You will then need to complete the enrollment form and return it to UnitedHealthcare in the envelope provided. Approximately 2 weeks after processing your enrollment form, UnitedHealthcare will send a Medicare Supplement Plan welcome kit and ID card to you.

If you become eligible for Medicare for a reason other than your age, such as a disability or End Stage Renal Disease, you must contact the El Paso Benefits Service Center at 1-866-301-2539 and inform them of your Medicare-eligibility. The El Paso Benefits Service Center will then notify UnitedHealthcare, and UnitedHealthcare will send an enrollment kit to you, containing your enrollment form. You will then need to complete the enrollment form and return it to UnitedHealthcare in the envelope provided. Approximately 2 weeks after processing your enrollment form, UnitedHealthcare will send a Medicare Supplement Plan welcome kit and ID card to you.

## Reenrollment in the Settlement Plans
**Optional Coverage Made Available by El Paso**

After the **[effective date of the Settlement Plans]** El Paso may offer Medicare Advantage (Part C) medical plans (PFFS, HMO and PPO Plans) and/or Medicare Part D prescription drug plans and other authorized Medicare alternative plans, but only as voluntary options in lieu of the Settlement Plans (as described below). If a Participant chooses an optional coverage offered by El Paso and later wishes to reenroll in a Settlement Plan, the Participant may do so as long as he or she:

- is then a Class Member or Eligible Dependent; and
- submits a completed Settlement Plan enrollment form.

Please contact the El Paso Benefits Service Center at 1-866-301-2539 if you wish to reenroll, and the El Paso Benefits Service Center will provide you with the Settlement Plan enrollment forms and materials.

**Alternative Medicare Supplement Plan Not Provided by El Paso**

If, following enrollment in the Medicare Supplement Plan, a Participant chooses to become covered under a Medicare supplement plan option not offered by El Paso, the Participant may reenroll in the Medicare Supplement Plan as long as he or she:

- is then a Class Member or Eligible Dependent; and
- submits a completed Medicare Supplement Plan enrollment form.

Please contact the El Paso Benefits Service Center at 1-866-301-2539 if you wish to reenroll, and the El Paso Benefits Service Center will provide you with the Medicare Supplement Plan enrollment forms and materials.

## Qualified Medical Child Support Order (QMCSO)

In divorce and other domestic relations proceedings, certain orders may require health care coverage for your child. This is known as a Qualified Medical Child Support Order (QMCSO) and it could affect your benefits. For a court order to qualify under the Plan, the Plan's procedures must be followed. As soon as you become aware of any court proceedings that involve or affect your health care coverage, contact the El Paso Benefits Service Center at the following address and phone number for a free copy of the administrative policy and the Plan requirements.

El Paso Benefits Service Center
P. O. Box 971
Deerfield, IL  60015
Phone: 866-301-2359

## Paying for Coverage

El Paso pays the full cost of coverage under the Settlement Plans, except as set forth in this SPD. Participants pay for certain costs such as deductibles, copayments and coinsurance.  If changes in the law require an extension of coverage to individuals who are not Class Members or Eligible Dependents, to the extent allowed by law, the newly covered Participant shall pay the full cost of such coverage and El Paso shall not be responsible for the cost of any such extension of coverage.

# Settlement Plans – Participants Not Eligible for Medicare

The benefits provided under the Settlement Plans to Participants who are not Medicare-eligible include the Managed Care Plan as well as the Prescription Drug Plan and the Other Benefit Plans.

## Claims Administrators

The Plan Administrator has delegated benefit administration to third-party administrators, referred to in this SPD as "Claims Administrators." The chart below shows which claims administrator is responsible for administering each benefit.

| Benefit | Claims Administrator |
|---|---|
| Managed Care Plan<br>• Medical<br><br>• Mental Health and Substance Abuse<br>   o Inpatient hospital<br>   o Outpatient mental health and substance abuse | BlueCross BlueShield of Texas (BCBS)<br>United Behavioral Health (UBH) |
| Prescription Drug Plan | Medco Health Solutions, Inc. |
| Other Benefit Plans<br>• Dental<br>• Hearing Aid<br>• Vision | BCBS<br>BCBS<br>BCBS |

## Network v. Non-Network

You may participate in the network option regardless of whether you live in or outside of a network area. However, if you live in a network area, but choose to receive your care from a non-network provider, you will receive coverage under the non-network option.

If you live in a network area, you have a choice each time you receive health care. You can decide to choose "in-network" providers and receive a higher in-network benefit level—generally 100% with no deductible. Or, you may choose to receive your care from a "non-network" provider and receive a lower level of benefits—generally 90% after the deductible (subject to reasonable and customary limits). The network option has a network of physicians, hospitals, and other medical care providers who provide services at negotiated rates to Participants. The Plan uses the following networks:

- **BCBS Network** for the medical benefits (except inpatient hospital mental health and substance abuse); and

- **UBH Network** for mental health and substance abuse benefits.

With the network option, you need to coordinate your medical care through network providers. Your primary care physician will not do this on your behalf. Each time you receive medical care, the level of benefits you receive will depend on whether you receive care from an in- or non-network provider.

- **In-Network Care.** When you receive care from a network provider, you'll receive the highest level of benefits available and you won't need to submit any claim forms for payment.

- **Non-Network Care.** If you or your doctor use a provider that does not belong to the network ("non-network provider"), you will be reimbursed at a lower level and claim forms may be necessary.

## Benefit Levels

- **Network – If You Live In a Network Area**
  If you live in a network area and receive your care from a network provider, you'll generally receive the highest level of benefits available. If you choose a network provider, the Managed Care Plan pays 100% of doctor's office visits after a $10 copayment and 100% of covered expenses, subject to certain Plan limits.  For mental health and substance abuse benefits, the Managed Care Plan pays 100%, subject to certain Plan limits.

- **Non-Network – If You Live In a Network Area and Choose a Non-Network Provider**
  If you live in a network area, but choose to receive your care from a non-network provider, you will receive non-network level benefits. After you meet the annual deductible, the Managed Care Plan pays 90% of covered expenses, subject to reasonable and customary and Plan limits.

- **If You Live Outside a Network Area**
  If you live outside a network area you will receive network level benefits determined as if you received your care from a network provider. For medical benefits, the Managed Care Plan pays 100% of doctor's office visits after a $10 copayment and 100% of covered expenses, subject to certain Plan limits.  For mental health and substance abuse benefits, the Managed Care Plan pays 100%, subject to certain Plan limits.

*Network Services and Specialists*
If you or your Eligible Dependents receive medical care or hospital services from a provider, including a radiologist, anesthesiologist, pathologist, or from a lab that is not in the **BCBS Network** or **UBH Network**, benefits will be paid at the non-network level.  However, if you require the care of a specialist and a network specialist is not available in your network area (as determined by BCBS or UBH), the non-network specialists will be covered at the in-network coverage level.

If you use a specialist (e.g., physician, anesthesiologist, radiologist or pathologist) who is not in the network but this service resulted from your admission to a network hospital or treatment at a network outpatient facility, the Managed Care Plan will cover the medically necessary expenses of the non-network providers at the network level of coverage.

It is your responsibility to confirm that you receive all services from a network provider—even if you are admitted to a network hospital or receive care from a network outpatient facility or network physician's office.

*Using a Non-Network Provider*
While you always have the choice of receiving care from providers outside the network, benefits are lower if you use a doctor, hospital, or laboratory that is not part of the network. Before the Managed Care Plan pays benefits for care from a Non-Network Provider, each individual will pay an annual deductible. Once you meet the deductible, the Managed Care Plan pays 90% of most covered expenses subject to reasonable and customary limits and until the out-of-pocket maximum is met. See the "Network Services and Specialists" section above for more information.

*Finding and Using Network Providers*

- For medical benefits (except mental health and substance abuse benefits), you can locate **BCBS Network** providers through the following methods:

  - You can do so online at Mercer's website www.MercerOneView.com/ElPaso. After logging in, select "My Health & Group," then go to "Provider Lookup."

  - You can call BCBS at 1-800-521-2227 or visit their website (www.bcbstx.com/elpaso) to find if a doctor, hospital or other healthcare provider is in the **BCBS Network**.

  - You can request a provider listing free of charge by calling the El Paso Benefits Service Center at 1-866-301-2359 Monday through Friday between 8:30 a.m. and 5:00 p.m. Central time and speaking to a Participant Services Representative.

  While an online provider directory is a convenient tool, changes can occur which may not be immediately reflected on the directory of providers. **Therefore, to be sure your doctor or facility is a member of BCBS Network, you should call the provider directly to verify that they are still part of the network.**

- For mental health and substance abuse benefits, **you must call UBH at 1-866-781-6395 and request and be preauthorized for these benefits prior to accessing treatment.**

## Reasonable and Customary (R&C) Charges

If you chose to go to a non-network provider, only charges which are "reasonable and customary" ("R&C") are eligible for reimbursement under the Managed Care Plan. A charge is "reasonable" when the fee for a specific service or supply falls within the range of usual charges in the same geographical area, and "customary" when the fee is that which is most frequently charged for a similar medical service, procedure, or supply. The Managed Care Plan will take into consideration any complication or unusual aspect of a particular claim when determining the reasonable and customary charge. Charges for non-network care provided to a Participant who lives in the network area will not be paid to the extent they exceed reasonable and customary limits.

When a physician charges more than the R&C rate, you are responsible for any amounts over those rates if you live in a network area and receive care from a non-network provider. For example, consider a service for which the reasonable and customary charge is $120 in your area. If you live in a network area and receive non-network care, assuming you met your deductible:

- If your physician charges $120, the Managed Care Plan, if primary, will pay $108 (90% x $120).
- If your physician charges $150, the Managed Care Plan, if primary, will still pay $108 (90% x $120) and you will pay $42, which is your 10% coinsurance amount plus the amount that exceeds the R&C rate.

The Explanation of Benefits (EOB) form you receive from the Claims Administrator shows when your provider's charges exceed the R&C rate. Since you're responsible for any amounts above the R&C rates, you may want to discuss the matter with your physician before you receive care.

# Managed Care Plan

## Medical Benefits

The following information highlights the medical in-network and non-network options for Participants who are not eligible for Medicare.

| Medical (Except Mental Health and Substance Abuse) | BCBS Network | BCBS Non-Network |
|---|---|---|
| **Eligibility** | Participants who live in a BCBS Network area and select network providers<br><br>Participants who live outside a BCBS Network area* | Participants who live in a BCBS Network area and select non-network providers |
| **Annual Medical Deductible** | None | $100 / individual<br><br>$200 / family |
| **Annual Out-of-Pocket Maximum** (including annual medical deductible) | None | $600 / individual ($100 deductible plus $500 coinsurance)<br><br>$1,200 / family ($200 deductible plus $1,000 coinsurance) |
| **Lifetime Maximum** | None | None |
| **Physician Office Visits** | $10 copayment/office visit | 90% after deductible** |
| **Outpatient Specialty Physician Services** | $10 copayment/office visit | 90% after deductible** |
| **Hospital Services**<br><br>**(inpatient)**<br><br>• **Semiprivate room and board**<br>• **Ancillary hospital charges**<br>• **Drugs and medications** | 100% | 90% after deductible**<br><br>Non-emergency admissions must be precertified. If they are not precertified, a Participant will pay the first $200 of covered expenses plus 20% of any additional expenses (limited to $750 per individual or $1,500 per family in a calendar year)<br><br>The penalty for services that are not precertified does not apply to the out-of-pocket maximum |
| **Inpatient Professional Services** | 100% | 90% after deductible** |

| Medical (Except Mental Health and Substance Abuse) | BCBS Network | BCBS Non-Network |
|---|---|---|
| **Emergency Care**<br>(life or limb threatening)<br>• Hospital Emergency Room<br>• Outpatient facility<br>• Urgent Care<br>Note: You must call BCBS at 1-800-521-2227 within 48 hours of emergency treatment | 100% | 90% after deductible**<br>(unless a qualifying emergency) |
| **Allergy Tests and Treatment** | Allergy Injections: 100% without office visit<br>$10 copayment each visit | 90% after deductible** |
| **Chiropractic** | $10 copayment per visit<br>(Limit - 30 visits per year) | 90% after deductible**<br>(Limit - 30 visits per year) |
| **Durable Medical** | No copayment<br>($5,000 limit) | 90% after deductible**<br>($5,000 limit) |
| **Home Health Care** | 100% | 90% after deductible** |
| **Hospice Care:** | 100% | 90% after deductible** |
| **Lab/X-ray/MRI/CT Scans and Other Medically Necessary Diagnostic Procedures**<br>(Outpatient) | 100% | 90% after deductible** |
| **Preventive Care**<br><br>• Mammograms<br><br><br>• PAP Smears<br><br><br>• Colonoscopy | 100%<br><br>Age 40-49 – every 2 years<br>Age 50 and older – once a year<br><br>Under age 40 – every two years<br>40 and older – once a year<br><br>40 and older – every two years | 90% after deductible**<br><br>Age 40-49 – every 2 years<br>Age 50 and older – once a year<br><br>Under age 40 – every two years<br>40 and older – once a year<br><br>40 and older – every two years |
| **Skilled Nursing Facility** | 100%<br>(60 days per calendar year) | 90% after deductible**<br>(60 days per calendar year) |
| **Other Outpatient Services (ambulatory surgery, chemotherapy, radiation treatment, dialysis)** | 100% | 90% after deductible** |
| **Therapy (Speech and hearing, physical, occupational and respiratory therapy)** | 100% | 90% after deductible** |

*Participants who live outside a BCBS Network area are also eligible for this level of coverage, even though care is received from a non-network provider. Such services are subject to reasonable and customary limits.*
*\*\*Subject to reasonable and customary limits*

## Additional Medical Provisions
### Annual Deductible—Non-Network Only
Participants who live in a network area and receive non-network services, must meet a separate deductible each year. The deductible starts over each January 1. There is no carryover from year to year. An expense must be covered by the Plan to be credited to your deductible.

### Annual Out-of-Pocket Maximum—Non-Network Only
For Participants who live in a network area and receive non-network services, the annual out-of-pocket maximum is the amount you pay for your share of covered expenses, including deductibles. After you reach the out-of-pocket maximum the Managed Care Plan will pay the remaining covered expenses for that year.

Each Participant must meet a separate out-of-pocket maximum each year. The out-of-pocket maximum starts over each January 1. There is no carryover from year to year.

The following expenses do not apply to the out-of-pocket maximum:

- Expenses not covered by the Managed Care Plan;
- Expenses you pay for mental health and substance abuse treatment; and
- Non-network expenses that exceed the reasonable and customary charges.

### Blue Care Connection
Blue Care Connection is an umbrella of programs administered by BCBS that is designed to help achieve a higher level of wellness for you.

Blue Care Connection advisors center their efforts on prevention, education and closing any gaps in your care. The goal of the program is to ensure you receive the most appropriate and cost-effective services available. A Blue Care Connection advisor is notified when you or your provider calls the toll-free number on your ID card regarding an upcoming treatment or service.

Blue Care Connection provides a variety of different services to help you receive appropriate medical care. Program components and notification requirements are subject to change without notice. As of the publication date of this SPD, the Blue Care Connection program includes:

- **Condition Management** – This program helps with certain conditions by working with your physician to make sure that you are getting the care you need and that your physician's treatment plan is being carried out effectively.

- **Care Management** – Designed for Participants with certain at-risk conditions, this program addresses such health care needs as access to medical specialists, medication information and coordination of equipment and supplies. Participants may receive a phone call from a Blue Care Connection advisor to discuss and share important health care information related to the Participant's specific condition.

- **Case Management** – Designed for Participants with certain higher-risk conditions, this program addresses such health care needs as access to medical specialists, medication information and coordination of equipment and supplies. Participants may receive a phone call from a Blue Care Connection advisor to discuss and share important health care information related to the Participant's specific condition.

- **24/7 Nurseline** – This program provides around the clock access to experienced registered nurses who understand and can help with your health care concerns.

If you do not receive a call from a Blue Care Connection advisor but feel you could benefit from any of these programs, please call BCBS at 1-800-521-2227.

**Disease Management Services**
If you have been diagnosed with or are at risk for developing certain chronic medical conditions, you may receive free educational information through the mail, and may even be called by a registered nurse who is a specialist in your specific medical condition. Some of the chronic medical condition programs include coronary artery disease, chronic obstructive pulmonary disease, diabetes and asthma programs.

Participation is without extra charge. If you think you may be eligible or would like additional information regarding the program, please contact 1-800-521-2227.

**Emergency Care**
If you need emergency treatment, you should go to the nearest emergency facility.

**You must contact BCBS at 1-800-521-2227 within 48 hours of emergency treatment if you are admitted to a non-network facility.** Keep in mind that the emergency room should be used only for true emergencies (life or limb threatening). If you become ill or injured and the condition does not require immediate hospital attention, your first step should be to call your doctor.

**Home Health Care**
You may be eligible to receive benefits for part-time or intermittent nursing care in your home through the home health care program. This program is for continued care and treatment of an individual, normally within seven days following hospitalization for the same or related conditions for which the individual was hospitalized. The necessity of the program must be certified by the attending physician and approved in advance by the Claims Administrator. Services rendered under the program are skilled nursing care, home health services, paraprofessional nursing care, therapeutic services (physical or speech therapy), medical supplies, drugs, and laboratory and X-ray services. The care must be provided by a registered nurse or a state-certified home health care aide under a registered nurse's supervision. The care will not be covered if it is:

- Not included in the Claims Administrator-approved home health care program;
- Provided by a person who ordinarily resides in your home or by an immediate family member;
- Provided by a social worker;
- Considered transportation services; or
- Custodial.

**Hospice Care**
Hospice care is a centrally administered program of palliative and supportive services that provides physical, psychological, social, and spiritual care for dying persons and their families. Services are provided by a physician-supervised interdisciplinary team of professionals and volunteers. Hospice services are available both in health care facilities and in the home. Home care is available on a part-time, intermittent, regularly scheduled, and around-the-clock, on-call basis. Benefit approval for a hospice program is based on patient and family need.

**Maternity Stays**
Group health plans and health insurance issuers offering group insurance coverage generally may not, under Federal law, restrict benefits for any hospital length of stay in connection with childbirth

(for the mother or newborn child) to less than 48 hours following a normal vaginal delivery, or less than 96 hours following a cesarean section. They also may not require that a provider obtain authorization from the Plan or the insurance issuer for prescribing a length of stay not in excess of the above periods.

**Precertification of Inpatient Hospital Services**
**If you use a non-network provider,** for you to receive the maximum benefit available, the Claims Administrator must precertify your inpatient hospital stay.  You should call the Claims Administrator before any inpatient admission to a hospital (for nonemergency admissions you must call the Claims Administrator at least two working days prior to your admission). In an emergency, you must call the Claims Administrator within 48 hours after the admission.

**Penalty for Not Precertifying Expenses**
If you use a non-network provider, and if your provider does not call the Claims Administrator for precertification of hospital expenses, you will pay the first $200 of covered expenses plus 20% of any additional expenses (limited to $750 per individual or $1,500 per family in a calendar year).  The penalty for services that are not precertified does not apply to the out-of-pocket maximum.

**Treatment of Temporomandibular Joint (TMJ) Dysfunction**
The Managed Care Plan covers conservative or palliative treatment of pain (including injections of muscle relaxants, cortisone, or other necessary therapeutic drugs or agents) and oral surgical treatment, provided the treatment is determined to be medically necessary and functional in nature. Benefits are not payable for application of appliances (splints, etc.), orthodontics, equilibration, repositioning, altering, implanting, or replacement of teeth.

# Covered Medical Expenses
Following are examples of expenses the Managed Care Plan will cover if medically necessary:

- Hospital daily room and board, general nursing care, and intensive care.

- Miscellaneous services and supplies furnished by a hospital during covered inpatient hospital confinement, but not for private-duty nursing care.

- Pre-admission testing prior to a scheduled inpatient hospital confinement.

- Outpatient hospital charges for medical care and supplies used on the premises of a hospital.

- Services and supplies furnished in a licensed ambulatory surgical center.

- Services and supplies furnished in a lawfully operating birthing center.

- Treatment for dental care that results from accidental injury.

- Skilled nursing facility charges (60 days per calendar year) for:

  - Daily room and board;

  - A confinement that begins from an inpatient hospital confinement; or

- A confinement that begins within three days of a prior skilled nursing facility confinement. The confinement must be for the same illness or injury that caused the prior confinement.

- Professional service charges by a doctor (other than psychiatric/psychological service charges).

- Professional service charges by a doctor for surgery.

- Professional service charges by a doctor for the giving of anesthesia.

- Professional service charges made by a doctor, or by a laboratory for laboratory, X-ray, MRI/CT scans and other medically necessary diagnostic outpatient procedures.

- Chiropractic care up to 30 visits per Participant per year.

- Physiotherapy services by a physiotherapist.

- Charges for services of a qualified speech therapist to correct speech loss or damage which:

  - Follows surgery to correct a birth defect;

  - Follows surgery due to illness; or

  - Is due to illness, except a functional nervous disorder, congenital defect, delayed speech, or other learning development conditions.

- Charges for anesthesia as given by a doctor.

- Durable medical equipment ($5,000 limit) that is ordered or provided by a physician for outpatient use, used for medical purposes, not consumable or disposable, not of use to a person in the absence of a sickness, injury or disability, durable enough to withstand repeated use and is appropriate for use in the home.

- Travel:

  - By commercial airline in the continental U.S. and Canada to, but not from, a hospital for needed special care.

  - By professional ambulance used locally to and from a hospital.

- Expenses for pregnancy will be payable on the same basis as any illness.

- Sterilization, including tubal ligation and vasectomy.

- Elective abortions.

- Colonoscopy every two years for persons age 40 and older.

- Pap smear tests for women under age 40 every two (2) years, for women age 40 and older once every year.

- Mammograms for women between age 40 and 49 once every two (2) years, and for women age 50 and older once every year.

- Second surgical opinion.

- Allergy tests and treatment.

- Home health care.

- Hospice care.

- Reconstructive procedures to address a physical impairment where the expected outcome is restored and improved function.

- Organ transplants.

If any of the preceding covered expenses are incurred during a covered inpatient hospital confinement or as a covered outpatient hospital charge, and, for non-network services, are reasonable and customary, they will be paid as covered hospital charges or outpatient hospital charges and not as a separate benefit.

## Medical Expenses Not Covered

Examples of expenses that will not be covered as medical care benefits are:

- Charges not included as covered expenses.

- Blood or plasma when a refund or credit is made for those items.

- Cosmetic or plastic surgery and related charges, unless medically necessary due to:

  - An accidental injury;

  - A birth defect; or

  - And which interferes with a normal function of the body or causes physical pain.

- Eyeglasses or contact lenses and the fitting of such (except the first pair after cataract surgery, which is performed while covered).

- Eye refractions.

- Expenses for care or supplies which are furnished by a facility operated for or by the U.S. Government (or its agency) or by a doctor employed by that place unless:

  - For emergency treatment when you or your Eligible Dependent must pay for those services;

- For non-service connected disabilities in a Veterans Administration hospital; or

- Incurred by a U.S. military retiree (covered by this Plan) and his or her covered Eligible Dependents, while confined in a military medical facility.

- Expenses for care and services to the extent furnished or payable under:

  - A plan or program operated by a National Government or one of its agencies; or

  - A state cash sickness or similar law.

- Care and supplies for which:

  - No charge is made; or

  - You or your Eligible Dependent would not have to pay if you did not have this coverage.

- Expenses for injury or illness resulting from taking part in the commission of an assault or felony.

- Care or supplies for injury or illness resulting from drug use or abuse (by whatever name called) or use of:

  - Narcotics;

  - Hallucinogens;

  - Barbiturates;

  - Marijuana;

  - Amphetamines; or

  - Or similar drugs or substances, unless prescribed by a physician.

- Expenses for injury or illness arising out of employment, whether or not you or your Eligible Dependent is covered by Workers' Compensation or similar laws.

- Exercise for the eyes (orthoptics).

- Psychological testing, counseling, or group therapy (counseling or group therapy may be covered under the outpatient mental health and substance abuse benefit, described beginning on page 25).

- Services or supplies for obesity, weight reduction, or dietary control, except when provided for treatment of morbid obesity.

- Custodial care.

- Charges incurred by other than the diagnosed patient except for organ transplants, except as provided in the organ transplant benefit.

- Orthodontic treatment, or other non-surgical procedure, care, or supply to correct a malocclusion of the teeth.

- Treatment of teeth or nerves connected to teeth except:

    - Treatment of an accidental injury (sustained while covered) to natural teeth; or

    - Covered hospital charges (as defined) when needed for dental care.

- Any service rendered by a close relative or someone having the same legal residence as the patient.

- Infertility diagnosis and treatment.

- Reversal of an elective sterilization procedure.

- Surgical correction of eye refraction which can be corrected by eyeglasses or lenses (radial keratotomy, keratectomy, keroplasty).

- Purchase or rental of luxury medical equipment when standard equipment is appropriate for the patient's condition (e.g., motorized wheelchairs or other vehicles, bionic or computerized artificial limbs).

- Acupuncture.

- Experimental, investigational, or unproven procedures or treatment.

- Education or training of any type for the treatment of learning disabilities and attention deficit disorders; I.Q. testing.

- Thermograms or temperature gradient studies.

- Any care or supplies received prior to the effective date or after the termination date of this coverage (unless coverage is continued according to some Plan provision).

- Any service rendered by a person who is not legally qualified to perform that service.

- Sex transformations and hormones related to such.

- Charges for services not rendered.

## Mental Health and Substance Abuse Benefits

| Mental Health and Substance Abuse | UBH Network | UBH Non-Network |
|---|---|---|
| **Annual Deductible** | None | $100/Individual<br>$200/Family |
| **Inpatient Hospital**<br><br>• **Semi-private room and board**<br>• **Ancillary hospital charges**<br>• **Drugs and medications** | All care must be requested and preauthorized prior to accessing treatment. If care is not preauthorized, no benefits are payable.<br><br>Inpatient mental health:**<br>100% up to 60 days of coverage per confinement per year.<br><br>Inpatient substance abuse:**<br>100% up to 31 days per calendar year.* | All care must be requested and preauthorized prior to accessing treatment. If care is not preauthorized, no benefits are payable.<br><br>Inpatient mental health:**<br>90% after deductible, up to 60 days per confinement per calendar year.<br><br>Inpatient substance abuse:**<br>90% up to 31 days per calendar year.* |
| **Outpatient** | All care must be requested and preauthorized prior to accessing treatment. If care is not preauthorized, no benefits are payable.<br><br>100%, up to 30 visits per calendar year, subject to a $2,000 calendar year maximum.** | All care must be requested and preauthorized prior to accessing treatment. If care is not preauthorized, no benefits are payable.<br><br>90%, up to 30 visits per calendar year, subject to a $2,000 calendar year maximum.** |

*\* In-network and non-network visits/days per year are combined.*
*\*\*Subject to reasonable and customary limits and subject to the restrictions below.*

UBH administers the Plan's mental health and substance abuse benefits. You must request and be approved for mental health or substance abuse treatment through UBH prior to accessing treatment (please see "Steps to Take – Mental Health and Substance Abuse Treatment" below).

**Inpatient Mental Health**
In the case of confinement in a hospital, sanitarium or similar institution for care and treatment of a mental or nervous condition, the Plan will provide for 60 days of coverage per confinement year. Successive periods of confinement due to the same or related cause(s) will count as a continuous confinement unless separated by at least 90 days in which the Participant has continuously engaged in normal activities. However, in no event will the Plan provide benefits for more than 120 days of such confinement per Participant per calendar year.

**Inpatient Substance Abuse**
You must request and be approved for mental health or substance abuse treatment through UBH prior to accessing treatment. Inpatient treatment for substance abuse (drugs/alcohol) is covered for a maximum of 31 days of confinement in a calendar year.

**Outpatient Mental Health and Substance Abuse**
Outpatient treatment for mental health or substance abuse will be eligible for reimbursement if provided as an outpatient in a physician's office or in a Community Health Center.

A physician, for purposes of this benefit, means a psychiatrist, psychoanalyst, psychologist, or other physician specializing in the treatment of mental health and substance abuse disorders.

**Steps to Take – Inpatient and Outpatient Mental Health and Substance Abuse Treatment**
*Use UBH to arrange your care.* Contact UBH at **1-866-781-6395**. This line is available 24 hours a day. You will receive in-network benefits if you obtain approval from UBH and use a network provider.  You will also receive in-network benefits if you live outside a network area and you obtain approval from UBH.  You must contact UBH within 48 hours after receiving emergency care to receive in-network benefits.

*If you choose to receive mental health or substance abuse treatment without advance UBH approval, you will receive no benefits.* All mental health and substance abuse care, whether in-network or non-network, must be medically necessary.  Also, all mental health and substance abuse care must be rendered by a practitioner who is independently licensed at the highest level for the state in which he or she practices. There are no benefits available for practitioners who do not meet these minimum requirements.

**Payment of Mental Health and Substance Abuse Benefits**

- **UBH Network Providers**. When a Participant receives covered services from a facility or practitioner that is a UBH network provider, any payment due under this Plan will be made directly to the UBH network provider.

- **Non-UBH Network Providers**. When a Participant receives covered services from a facility or practitioner that is not a UBH network provider, payment due under this Plan will be made directly to the covered Participant for the covered services unless one parent or custodian has custody of a minor child Eligible Dependent. If so, the Plan will make payment directly to the custodial parent or the custodian.

*Expenses you have for mental health and substance abuse outpatient treatment, whether in-network or non-network, do not count toward any medical benefit deductibles or annual out-of-pocket maximums.*

For information about filing a medical claim under the Managed Care Plan, see "Benefits Claims Procedures" beginning on page 41 of this SPD.  For information about filing a mental health or substance abuse benefit claim under the Managed Care Plan, see "Benefit Claims Procedure" beginning on page 46 of this SPD.

# Settlement Plans – Medicare-Eligible Participants

The benefits provided under the Settlement Plans to participants who are Medicare-eligible include the Medicare Supplement Plan as well as the Prescription Drug Plan and the Other Benefit Plans.

## Claims Administrators and Insurers

The Plan Administrator has delegated benefit administration to third-party administrators, referred to in this SPD as "Claims Administrators," and has insured Medicare Supplement Plan benefits  The chart below shows which claims administrator is responsible for administering each benefit.

| Benefit | Claims Administrator or Insurer |
|---|---|
| Medicare Supplement Plan | UnitedHealthcare (insurer) |
| Prescription Drug Plan | Medco Health Solutions, Inc. |
| Other Benefit Plans<br>• Dental<br>• Hearing Aid<br>• Vision | BCBS<br>BCBS<br>BCBS |

## Medicare Supplement Plan

If you are eligible for Medicare, El Paso will pay for the cost of the Medicare Supplement Plan.

### 2011 PLAN L
### MEDICARE (PART A)—HOSPITAL SERVICES—PER BENEFIT PERIOD

| SERVICES | MEDICARE PAYS | PLAN PAYS | YOU PAY* |
|---|---|---|---|
| **HOSPITALIZATION**<br>Semiprivate room and board, general nursing and miscellaneous services and supplies<br>First 60 days | All but $1,132 | $849 (75% of Part A deductible) | $283 (25% of Part A deductible)♦ |
| 61st thru 90th day | All but $283 a day | $283 a day | $0 |
| 91st day and after:<br>—While using 60 lifetime reserve days | All but $566 a day | $566 a day | $0 |
| —Once lifetime reserve days are used:<br>—Additional 365 days | $0 | 100% of Medicare eligible expenses | $0*** |
| —Beyond the additional 365 days | $0 | $0 | All costs |
| **SKILLED NURSING FACILITY CARE**<br>You must meet Medicare's requirements, including having been in a hospital for at least 3 days and entered a Medicare-approved facility Within 30 days after leaving the hospital<br>First 20 days<br>21st thru 100th day | All approved amounts<br>All but $141.50 a day | $0<br>Up to $106.13 a day | $0<br>Up to $35.37 a day♦ |
| 101st day and after | $0 | $0 | All costs |
| **BLOOD**<br>First 3 pints<br>Additional amounts | $0<br>100% | 75%<br>$0 | 25%♦<br>$0 |
| **HOSPICE CARE**<br>Available as long as your doctor certifies you are terminally ill and you elect to receive these services | Generally, most Medicare eligible expenses for out-patient drugs and inpatient respite care | 75% of coinsurance or copayments | 25% of coinsurance or copayments ♦ |

## MEDICARE (PART B)—MEDICAL SERVICES—PER CALENDAR YEAR

| SERVICES | MEDICARE PAYS | PLAN PAYS | YOU PAY* |
|---|---|---|---|
| **MEDICAL EXPENSES—** IN OR OUT OF THE HOSPITAL AND OUTPATIENT HOSPITAL TREATMENT, such as Physician's services, inpatient and outpatient medical and surgical services and supplies, physical and speech therapy, diagnostic tests, durable medical equipment, First $162 of Medicare Approved Amounts**** | $0 | $0 | $162 (Part B deductible)**** ♦ |
| Preventive Benefits for Medicare covered services | Generally 75% or more of Medicare approved amounts | Remainder of Medicare approved amounts | All costs above Medicare approved amounts |
| Remainder of Medicare Approved Amounts | Generally 80% | Generally 15% | Generally 5% ♦ |
| **Part B Excess Charges** (Above Medicare Approved Amounts) | $0 | $0 | All costs (and they do not count toward annual out-of-pocket limit of $2,320)* |
| **BLOOD** First 3 pints | $0 | 75% | 25%♦ |
| Next $162 of Medicare Approved Amounts**** | $0 | $0 | $162 (Part B deductible) ♦ |
| Remainder of Medicare Approved Amounts | Generally 80% | Generally 15% | Generally 5%♦ |
| **CLINICAL LABORATORY SERVICES—**TESTS FOR DIAGNOSTIC SERVICES | 100% | $0 | $0 |

## MEDICARE (PARTS A & B) *****

| SERVICES | MEDICARE PAYS | PLAN PAYS | YOU PAY* |
|---|---|---|---|
| **HOME HEALTH CARE** MEDICARE APPROVED SERVICES —Medically necessary skilled care services and medical supplies | 100% | $0 | $0 |
| —Durable medical equipment First $162 of Medicare Approved Amounts**** | $0 | $0 | $162 (Part B deductible) ♦ |
| Remainder of Medicare Approved Amounts | 80% | 15% | 5% ♦ |

*This plan limits your annual out-of-pocket payments for Medicare-approved amounts to $2,320 per year. However, this limit does NOT include charges from your provider that exceed Medicare-approved amounts (these are called "Excess Charges") and you will be responsible for paying this difference in the amount charged by your provider and the amount paid by Medicare for the item or service.*

*\* A benefit period begins on the first day you receive service as an inpatient in a hospital and ends after you have been out of the hospital and have not received skilled care in any other facility for 60 days in a row.*

*\*\*\* NOTICE: When your Medicare Part A hospital benefits are exhausted, the insurer stands in the place of Medicare and will pay whatever amount Medicare would have paid for up to an additional 365 days as provided in the policy's "Core Benefits." During this time the hospital is prohibited from billing you for the balance based on any difference between its billed charges and the amount Medicare would have paid.*

*You will pay one-fourth of the cost-sharing of some covered services until you reach the annual out-of-pocket limit of $2,320 each calendar year. The amounts that count toward your annual limit are noted with diamonds (♦) in the chart above. Once you reach the annual limit, the plan pays 100% of the Medicare co-payment and coinsurance for the rest of the calendar year. However, this limit does NOT include charges from your provider that exceed Medicare-approved amounts(these are called "Excess Charges") and you will be responsible for paying this difference in the amount charged by your provider and the amount paid by Medicare for the item or service.*

*\*\*\*\* Once you have been billed $162 of Medicare-approved amounts for covered services (which are noted with an asterisk), your Part B deductible will have been met for the calendar year.*

*\*\*\*\*\*Medicare benefits are subject to change.*

## Optional Medicare Advantage and Part D Prescription Drug Plans

El Paso does not currently offer optional Medicare Advantage (Part C) medical plans (PFFS, HMO and PPO Plans), Medicare Part D prescription drug plans or other authorized Medicare alternative plans. If El Paso decides to offer these optional plans in the future and if you are Medicare-eligible and elect to enroll in them, El Paso will pay for the premium cost of the optional plans in an amount equal to the premium cost of the Settlement Plan. You will be responsible to pay any amount that exceeds the Settlement Plan cost.

## Prescription Drug Plan – All Participants

The following information describes the prescription drug benefits for all Settlement Plan Participants (both Medicare-eligible and non-Medicare eligible).

Medco Health Solutions, Inc. (Medco) administers the Prescription Drug Plan, including coordination of its mail-order service, the Medco Pharmacy™. The Prescription Drug Plan participates in Medco's Preferred Prescriptions® Formulary ("Formulary"). The Formulary is administered by Medco, and lists FDA approved drugs that have been evaluated for inclusion in the Formulary. The prescription drugs included in the Formulary will be modified from time to time as a result of factors, including but not limited to, medical appropriateness, manufacturer rebate arrangements, and patent expirations.

You will receive a separate prescription drug ID card from Medco to present when filling your prescription drug at retail pharmacies.

| Prescription Drug Program Overview | |
| --- | --- |
| Prescription Drugs Available through the Medco Pharmacy™<br><br>No benefit is available if you use a non-participating pharmacy. | **Retail (30-day supply or less):**<br>• $5.00 per generic prescription medication<br>• $10.00 per Formulary brand prescription medication<br>• $15.00 per non-Formulary brand prescription medication<br><br>**Mail Order (31-day to 90-day supply):**<br>• $10.00 per generic prescription medication<br>• $20.00 per Formulary brand prescription medication<br>• $30.00 per non-Formulary brand prescription medication |

## Retail Prescriptions

When you need a prescription for up to a 30-day supply of medication, take your prescription and present your prescription drug ID card to a participating retail pharmacy in Medco's network. **Prescription drug benefits are not available if you use a non-participating pharmacy**. You can locate pharmacies in the Medco network through Medco's website (www.medco.com) and clicking "Find a local pharmacy." Otherwise, call Medco Member Services at 1-800-903-4710. The mail-order prescription drug program described below is mandatory for maintenance prescription drugs after three prescriptions have been filled at retail pharmacies for a particular drug.

If you choose to get a brand-name prescription drug when a generic prescription drug is available, you will pay the difference in actual cost between the generic and brand name drug, plus the Formulary brand or non-Formulary brand retail prescription drug copayment, which ever applies. If your physician prescribes a brand-name drug when a generic prescription drug is available, it must be medically necessary.

## Mail-Order Prescriptions

To obtain prescriptions for greater than a 30-day but up to a 90-day supply, you must use the Medco Pharmacy™ mail-order service. The mail-order prescription drug program is mandatory for maintenance prescription drugs after three retail prescriptions have been filled at retail pharmacies for a particular drug. You will save money on medication for periodic maintenance or long-term treatments by ordering prescriptions through the mail. Generic drugs and the Medco Pharmacy™ mail order service must be used for maintenance prescription drugs. However, if you choose to get a brand-name prescription drug when a generic prescription drug is available, you will pay the difference in actual cost between the generic and brand name drug, plus the Formulary brand or non-Formulary brand mail order prescription drug copayment, which ever applies. If your physician prescribes a brand-name drug when a generic prescription drug is available, it must be medically necessary.

## Annual Prescription Drug Cap on Out-of-Pocket Expenses

There will be an annual cap on out-of-pocket prescription drug expenses. This annual cap limits the amount you pay for prescription drug expenses in a calendar year. Once you pay $1,000 in prescription drug copayments, for the remainder of the calendar year, any further copayments will be $5.00 for any retail prescription drug and $10.00 for any mail order prescription drug regardless if the prescription drug is generic, Formulary brand or non-Formulary brand.

Each Participant must meet a separate annual cap on out-of-pocket prescription drug expenses each year. The annual cap on out-of-pocket expenses starts over each January 1. There is no carryover from year to year.

## Prescription Drugs Requiring Authorization for Benefits

Some prescriptions may require prior authorization before they can be paid by the Prescription Drug Plan. Prior authorization is required by the Plan to determine whether the products will be approved for coverage for medically necessary treatment of a covered health condition. Some examples of drugs that require prior authorization include:

- Brand-name prescription drugs that are prescribed when a generic equivalent is available;
- Fertility agents;

- Growth hormones; or
- Interferons.

## Prior Authorization

If the medication prescribed for you requires this approval, your participating retail pharmacist or the Medco Pharmacy™ will initiate the process on your behalf. Medco will contact your physician to review the therapy and determine whether the drug can be covered by the Plan.

Typically, this process will take two business days, although in some cases it can be completed the same day. You and your physician will be notified when the process is complete. If your medication is not approved under the Plan and you elect to fill your prescription, you will be responsible for paying the full cost of the medication.

## Prescription Expenses Covered

The following are covered expenses (unless listed in the "Prescription Expenses Not Covered" section below):

- Federal legend drugs;
- State restricted drugs;
- Compounded medications of which at least one ingredient is a legend drug;
- Insulin;
- Insulin needles and syringes;
- Over-the-counter diabetic supplies; and
- Oral or injectable antineoplastic agents.

## Prescription Expenses Not Covered

- Drugs not classified as Federal legend drugs;
- Emergency contraceptives;
- Smoking deterrents;
- Topical fluoride preparations;
- Therapeutic devices or appliances;
- Drugs whose sole purpose is to promote or stimulate hair growth (e.g., Rogaine®) or are for cosmetic purposes only (e.g., Renova®);
- Allergy sera;
- Immunization agents and vaccines;
- Biologicals and blood or blood plasma products;
- Drugs labeled "Caution—limited by Federal law to investigational use," or experimental drugs, even though a charge is made to the individual;
- Medication for which the cost is recoverable under any Worker's Compensation or occupational disease law or any state or governmental agency, or medication furnished by any other drug or medical service for which no charge is made to the member;

- Medication which is dispensed and to be taken or administered to an individual, in whole or in part, while he or she is a patient in a licensed hospital, rest home, sanitarium, extended care facility, skilled nursing facility, convalescent hospital, nursing home, or similar institution which operates on its premises or allows to be operated on its premises, a facility for dispensing pharmaceuticals which is supplying the medications (Medication dispensed while an individual is a patient in a hospital or other licensed facility is covered under the Plan's medical benefit);

- Any prescription refilled in excess of the number of refills specified by the physician, or any refill dispensed after one year from the physician's original order; and

- Charges for the administration or injection of any drug.

For information about filing a prescription drug claim, see "Claims Procedures" beginning on page 50 of this SPD.

## Medicare Part D Prescription Drug Coverage

You have probably heard about Medicare's prescription drug coverage called Medicare Part D – which began on January 1, 2006. If you are eligible for Medicare, because you have prescription drug coverage available to you through the Plan, you'll want to compare the Plan's prescription drug coverage with the Plan offered under Medicare Part D.

El Paso has determined that the prescription drug coverage, on average for all Plan participants, is expected to pay out as much as the standard Medicare prescription drug coverage will pay. This is called "creditable coverage." You can keep this prescription drug coverage under the Plan and not pay a late enrollment fee if you later decide to enroll in a Medicare prescription drug program.

# Other Benefit Plans – All Participants

## Dental Benefits

The following information describes the dental benefits for all Settlement Plan Participants (both Medicare-eligible and non-Medicare-eligible). Dental benefit services must be performed or prescribed by a dentist and must be necessary in terms of generally accepted dental standards.

### Network v. Non-Network Dentists

Each time you need dental care, you can choose to see a network dentist, or a non-network dentist. Network dentists are either **BlueCare Dentists** or **DeltaBlue Dentists**. If you receive your care from a BlueCare Dentist, your out-of-pocket costs will generally be less and it will take longer to reach your annual benefit maximum because BlueCare Dentists have agreed to accept a lower amount as payment in full for all eligible dental services. This lower amount is referred to as an "allowable charge." If you choose to receive your care from a DeltaBlue Dentist, your out-of-pocket costs will generally be higher and your annual benefit maximums will be reached sooner than if you receive your care from a BlueCare Dentist, but not as high as they would be if you received your care from a non-network dentist. DeltaBlue Dentists have also agreed to accept an allowable charge, but it is higher than the BlueCare Dentists' allowable charge. In addition, for network dentists you are not required to file claim forms and you will not be balance billed for costs exceeding the allowable charge.

If you receive your care from a non-BlueCare or non-DeltaBlue Dentist, your out-of-pocket costs will probably be the greater than if you receive your care from a BlueCare or DeltaBlue Dentist. Non-network dentists have not entered into an agreement to accept allowable charges as payment in

full for eligible dental expenses. You will be required to file claims forms, and you will be balance billed for costs exceeding allowable charges.

Below is a coverage summary schedule of the dental benefits and how typical services are covered. The following pages show the complete list of covered dental benefits.

| Plan Feature | Coverage |
|---|---|
| Annual Deductible | None (see "Pretreatment Review" section on page 36) |
| Type A Dental Benefits | Plan pays 100% of allowable charges (does not count toward annual maximum benefit) |
| Type B Dental Benefits | Plan pays 100% of allowable charges (counts toward annual maximum benefit) |
| Type C Dental Benefits | Plan pays 50% of allowable charges (counts toward annual maximum benefit) |
| Type D Services: Orthodontics | Plan pays 50% of allowable charges (lifetime maximum benefit is $1,525) |
| Annual Maximum Benefit | $1,600 per Participant for Type B and Type C services |

**Type A Dental Benefits**

Expenses for the following will be covered at 100% of the allowable charge and are not included in the annual maximum benefit.

- Excision of partially or completely unerupted or impacted teeth.
- Excision of the tooth root (apicoectomy) without the extraction of the entire tooth.
- Other incision or excision procedures on the gums and tissues of the mouth when not performed in connection with the extraction of or repair of teeth (but not including treatment of periodontal and other diseases of the gums and tissues of the mouth).
- Multiple extractions while a Participant is staying in a hospital on an inpatient/outpatient basis when a concurrent hazardous medical condition exists.
- Gingivectomy procedures, if performed in connection with the treatment of diseased gums.
- Topical application of fluoride.
- Space maintainers that replace prematurely lost teeth for Participants under age 19.
- Emergency palliative treatment.
- X-rays and anesthesia done as part of an orthodontic procedure.

**Type B Dental Benefits**

Expenses for the following will be covered at 100% of the allowable charge and are included in the annual maximum benefit.

- Two oral examinations, including cleaning and scaling of teeth, within each calendar year.
- Dental X-rays, but not more than one full mouth X-ray in any period of 36 consecutive months; supplementary bitewing X-rays, but not more than twice in any period of 12 consecutive months; and such other dental X-rays as are required in connection with the diagnosis of a specified condition requiring treatment.
- Routine fillings, amalgams and gold resin.
- Oral surgery.
- Simple surgical tooth extractions.

- Repair or recementing of crowns, inlays, bridgework or dentures, or relining of dentures.
- Inlays, gold fillings, onlays, and crowns (including precision attachments for dentures).
- General anesthetics administered in connection with oral surgery or other covered dental services.
- Treatment of periodontal and other diseases of the gums and tissues of the mouth, including scaling and root planing two times per calendar year, but not surgical procedures.
- Endodontic treatment, including root canal therapy and direct pulp caps.
- Injection of antibiotic drugs by the attending dentist.

## Type C Dental Benefits

Expenses for the following will be covered at 50% of the allowable charge and are included in the annual maximum benefit.

- Initial installation of fixed bridgework (including inlays and crowns to form abutments).
- Initial installation (including adjustments) of partial or full removable dentures. Adjustments are limited to a six-month period following installation.
- Replacement of, or the addition of teeth to, existing full or partially removable dentures or fixed bridgework if:
  — Required to replace one or more teeth extracted after the existing denture or bridgework was installed; or
  — The existing denture or bridgework was installed at least five years prior to its replacement and cannot be made serviceable (this five-year rule applies only to dentures or bridgework for which benefits were payable under this Plan or any other group plan); or
  — The existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within 12 months.

## Type D Dental Benefits

Orthodontic treatment consisting of surgical therapy, appliance therapy, and functional/myofunctional therapy will be covered at 50% of the allowable charge and is limited to the lifetime orthodontic maximum specified.

## Dental Expenses Not Covered

The following dental services are not covered by the Plan:

- Services or supplies received prior to the date the Participant's dental benefits became effective.
- Services not performed by a dentist, except for those services of a licensed dental hygienist that are supervised and billed by a dentist and that are for:
  — Cleaning and scaling of teeth; or
  — Fluoride treatments.
- Cosmetic surgery, treatment or supplies, including charges for personalization or characterization of dentures (such as the capping of healthy natural teeth).
- Replacement of lost, missing or stolen crowns, bridges or dentures.
- Repair or replacement of an orthodontic appliance.
- Services or supplies that are covered by Worker's Compensation or Occupational Disease Laws.
- Dentures, bridges, crowns, inlays, onlays and their fittings, delivered or installed more than 60 days after the Participant's coverage ends.



- Adjustment of a denture or bridgework that is made within 6 months after it is installed by the same dentist who installed it.
- Services or supplies that are unnecessary, according to accepted standards of dental practice, that do not meet these standards, or that are experimental in nature.
- Any duplicate appliance or prosthetic device.
- Use of materials other than fluorides (such as sealants), used to prevent decay.
- Instruction for oral care such as hygiene or diet.
- Periodontal splinting.
- Myofunctional therapy or correction of harmful habits, other than for orthodontia.
- Non-surgical treatment for temporomandibular joint syndrome (TMJ).
- Implantology.
- Services or supplies received by a Participant for which no charge would have been made in the absence of dental expense benefits for that Participant.
- Services or supplies for which a covered person is not required to pay.
- Services or supplies received as a result of dental disease, defect or injury due to an act of war, or a warlike act in time of peace, which occurs while the dental expense benefits for the covered person are in effect.
- Services or supplies to the extent that benefits are otherwise provided under this Plan or under any other plan which the employer (or an affiliate) contributes to or sponsors.
- Charges for missed appointments.
- Charges by the dentist for completing dental forms.
- Dental expenses in connection with any treatment, care, confinement, or services which are or may be obtained without cost in accordance with the laws or regulations of any government. If a charge is made that a person is legally required to pay, any benefits under this Plan will be computed in accordance with the Plan's provisions, taking into account only such charge. "Any government" includes the Federal, state, provincial, local government, or any political subdivision of the United States or Canada.

**Alternate Dental Benefits**
As shown in the following examples, the dental benefits are limited to payment of expenses based on the materials and method of treatment that comprise the least costly method, yet meet generally acceptable dental standards.

- Fillings, inlays, onlays and crowns.
  — If a tooth can be repaired by a less costly method than an inlay, onlay or crown, dental expense benefits will be based on the adequate method of repair which costs the least.
- Crowns, pontics and abutments.
  — Veneer materials may be used for front teeth or bicuspids. However, dental benefits will be based on the adequate veneer materials which cost the least.
- Bridgework and dentures.
  — Dental benefits will be based on the adequate method of treating the dental arch which costs the least. In some cases, removable dentures may serve as well as fixed bridgework. If dentures are replaced by fixed bridgework, the dental expense benefits will be based on the cost of a replacement denture unless adequate results can be achieved only with fixed bridgework.

## Dental Pretreatment Review

If a dental charge is expected to be $125 or more, you should obtain a pretreatment review before treatment begins.  To do this, send a claim form to the Claims Administrator on which the dentist provides the following:

- The work to be done; and
- The cost.

The Claims Administrator will then tell you what dental expense benefits will be paid.  If you use this procedure, you will find out in advance what benefits will be payable before you receive care.

The pretreatment review procedure should not be used for:

- Emergency treatment;
- Routine oral exams;
- X-rays, cleaning and scaling, and fluoride treatments; or
- Dental services that cost less than $125.

## Payment of Dental Benefits

Dental benefits will be paid to your provider.  Should you have coverage under more than one group plan, benefits will be coordinated.

For information about filing a dental claim, see "Claims Procedures," beginning on page 41 of this SPD.

## Hearing Aid Benefits

Hearing aid benefits are provided according to the following schedule, and under the terms stated.

Payment is made for the actual charges to the extent that such charges are reasonable and customary, and do not exceed the maximum amount for such services specified below:

| Covered Hearing Aid Services | Maximum Amount Payable |
| --- | --- |
| Audiometric Examination | $45.00 |
| Hearing Aid Evaluation Test | $45.00 |
| Hearing Aids | $350.00 per ear |

The following describes the hearing aid benefits in detail:

- Audiometric examination, when performed by a doctor or audiologist, but only when performed following or in conjunction with a doctor's most recent medical examination of the ear.  The maximum amount payable for such exams is $45.00.
- Hearing aid evaluation tests performed by a doctor or audiologist, which may include the trial and testing of various makes and models of hearing aids to determine which make and model will best compensate for the loss of hearing acuity, but only when indicated by the recent audiometric examination.  The maximum payment for such tests is $45.00.
- Hearing aids of the following functional design: in-the-ear, behind-the-ear (including air conduction and bone conduction types) and on-the-body, but only if:
  - The hearing aid is prescribed based upon the most recent audiometric examination and most recent hearing aid evaluation examination; and

- – The hearing aid provided by the dealer is the make and model prescribed by the doctor or audiologist and is certified as such by the doctor or audiologist. The maximum payment for a hearing aid is $350.00 per ear.
- If a Participant has received an audiometric examination and a hearing aid evaluation test for a hearing aid for which benefits were payable under the Plan, benefits will be payable for any such subsequent hearing aid, audiometric examination and hearing aid evaluation test only if received more than 36 months after receipt of the most recent previous audiometric examination, hearing aid evaluation test or hearing aid, respectively, for which benefits were payable under the Plan.
- Replacement of a hearing aid will not require a physician's examination prior to the replacement.

## Hearing Aid Expenses Not Covered

The following services and supplies are not covered hearing aid benefits:

- Charges for which benefits are otherwise provided under the Plan.
- Charges for audiometric examinations by an audiologist that are not ordered by a doctor.
- Charges for medical treatment, including medical examination of the ear.
- Charges for the replacement of hearing aids that are lost, missing or stolen if such replacement takes place within 36 months following the date of the receipt of such device.
- Charges for failure to keep a scheduled visit with the doctor.
- Charges for services or supplies in connection with repairs or servicing of hearing aids or for replacement parts.
- Charges for audiometric examinations and hearing aid evaluation tests performed and hearing aids ordered:
  — Before the covered person became eligible for coverage; or
  — After the termination of coverage of the covered person.
- Charges for hearing aids ordered while covered, but delivered more than 60 days after termination of coverage.
- Charges for audiometric examinations, hearing aid evaluation tests and hearing aids that are not necessary according to professionally accepted standards of practice, or which are not recommended or approved by a doctor.
- Charges for audiometric examinations, hearing aid evaluation tests and hearing aids that do not meet professionally accepted standards of practice, including charges for any such services or supplies that are experimental in nature; and tinnitus maskers or instruments or any other devices which do not amplify sound or assist the physiological process of hearing.
- Charges for the completion of any insurance forms.
- Charges for eyeglass-type hearing aids, to the extent the charges for such hearing aids exceed the covered hearing aid expense for one hearing aid.
- Charges in connection with any treatment or services that are or may be obtained without cost in accordance with the laws or regulations of any government. If a charge is made that a person is legally required to pay, any benefits under this Plan will be computed in accordance with the Plan's provisions taking into account only such charge. "Any government" includes the Federal, state, provincial, local government, or any political subdivision of the United States or Canada.
- Expenses incurred while not a covered Participant.

For information about filing a hearing aid claim, see "Claims Procedures," beginning on page 41 of this SPD.

## Vision Care Benefits

The following is a summary of your vision benefits:

| Services | Benefit Coverages |
|---|---|
| Routine Exam* (once every 24 months) | Optometrist: Plan pays up to $38.50 *or* Ophthalmologist: Plan pays up to $48.00 |
| Eyeglasses* (once every 24 months) | **Frames:** Plan pays up to $27.30 **Lenses:** *Single*: Plan pays up to $38.50 per pair *Bifocal*: Plan pays up to $57.75 per pair *Progressive*: Plan pays up to $57.75 per pair *Trifocal*: Plan pays up to $77.00 per pair *Lenticular*: Plan pays up to $96.10 per pair |
| Contact Lenses (once every 24 months) | Plan pays up to $28.90 for each lens and up to $57.75 for a pair of lenses |

*See the "Limitations" section below for more information.*

### Vision Examination

A vision examination is an examination of your visual ability and acuity. It includes an external examination of the eye, refraction, binocular measure, ophthalmoscopic examination, tonometry when necessary, and recommendations including prescription for lenses when necessary. This examination must be performed by an ophthalmologist or optometrist. If during an examination by an optometrist you are referred to an ophthalmologist for an additional examination, the Plan will pay for the examination according to the schedule if the second examination is within 60 days of the first examination.

### Limitations

Benefits will be paid for a vision testing examination, lenses or frames, only if 24 months have elapsed since the date of the most recent examination provided by the Plan. Benefits for lenses and examination for children 16 years of age or younger will be provided every 12 months, if medically necessary, from the date of the most recent examination.

### Vision Care Expenses Not Covered

No benefits will be paid under the Plan for the following:

- Services or supplies received prior to the date the Participant's vision benefits become effective.
- Services not prescribed by an ophthalmologist, optometrist or optician.
- Services or supplies that are deemed to be experimental in nature.
- Services or supplies that are covered by Worker's Compensation or Occupational Disease Laws.
- Sunglasses and lenses, whether or not prescribed.
- Services in connection with medical or surgical treatment.
- Drugs or medications.
- Special services and procedures such as orthoptics, vision training, subnormal vision aids, aniseikonic lenses and tonography.
- Services to replace lost, stolen or broken lenses or frames, unless at the time of replacement the covered person is eligible for new lenses or frames.
- Eye exams required by an employer in order for the covered person to be allowed to work.



- Services or supplies to the extent that benefits are otherwise provided under this Plan or under any other plan that the employer (or an affiliate) contributes to or sponsors.
- Services or supplies for which a covered person is not required to pay.
- Services that do not meet accepted standards of ophthalmic practice.
- Lenses not requiring a prescription.
- Eyeglass cases.
- Frames supplied for non-prescription lenses.
- Safety glasses for use in connection with any job.
- Charges for failure to keep appointments.
- Services rendered or materials ordered after the date you or your Eligible Dependent ceases to be eligible for coverage, except for lenses and frames prescribed prior to cessation of coverage and delivered within 31 days of the date prescribed.
- Expenses in connection with any services that are or may be obtained without-cost in accordance with the laws or regulations of any government.  If a charge is made that a person is legally required to pay, any benefits under this Plan will be computed in accordance with the Plan's provisions taking into account only such charge.  "Any government" includes the Federal, state, provincial, local government, or any political subdivision of the United States or Canada.

For vision care benefits claims procedures, see "Claims Procedures," beginning on page 41 of this SPD.

# Medically Necessary

The Settlement Plans cover expenses "medically necessary" for the diagnosis or treatment of an illness or injury that are commonly recognized as appropriate treatment by the medical profession. Also, to be covered, medical care must be recommended or approved by your physician. Treatment that is educational, experimental, investigational or done primarily for research is not considered medically necessary.

# Claims Procedures

## Claims Procedures

For those benefits administered by an insurance company or a third party administrator, such third party has been delegated the responsibility for administering and determining claims and appeals and is referred to as the "Claims Administrator."

If your claim is for Plan eligibility, please follow the claims procedures provided below under "Eligibility Claims and Appeals." If your claim is for a benefit, please see the applicable claims procedures below. For example, if your claim is for prescription drug benefit, please see the section below entitled "Prescription Drug Benefit Claims Procedures."

## Eligibility Claims Procedures

Any person who believes he or she is entitled to be covered under the Plan must request enrollment under the procedures outlined in the Settlement Agreement. If you have questions about these procedures, please contact the El Paso Benefits Service Center.

## Benefits Claims Procedures for Medical, Dental, Hearing Aid and Vision Benefit Claims

### General Information

Medical, dental, hearing aid and vision benefits are all referred to in this section as "health benefits." (Note that this section does not apply to claims for mental health and substance abuse benefits. Those claims procedures begin on page 46.)

For any claim for benefits, you may be asked to submit additional information so that the Claims Administrator can determine whether the claim is covered and the amount of the claim.

An authorized representative may pursue the claim on your behalf. For example, this can be a doctor, lawyer or a friend or relative. You may be asked to notify the Claims Administrator in writing and give the Claims Administrator the name, address, and telephone number where your authorized representative can be reached.

### Making a Health Benefit Claim

Claims for health benefits fall into four categories: claims for urgent care, claims requiring advance approval, claims following approval of an on-going course of treatment, and claims for the payment of health services after they have been received (referred to as "Post-Service Claims"). The time frame within which you are notified of a claim decision depends on what kind of a claim has been made.

If you have a claim for in-network medical benefits, your claim is submitted for you by the provider. If you have a claim for non-network medical benefits, you must file a claim with BlueCross BlueShield of Texas (the "Claims Administrator"). In many cases, a non-network provider will file a claim on your behalf, but it is your responsibility to ensure that the claim has been filed with the Claims Administrator.

### Non-Network Medical Benefit Claims

If you have a claim for non-network medical benefits, you must file a claim form. You may obtain claim forms by calling BCBS at 1-800-521-2227 or downloading the form from their website—

www.bcbs.com/elpaso for claim forms. You must complete all sections of the claim form (including the section about coverage under another insurance plan). Send the completed form to:

> BlueCross BlueShield of Texas
> P.O. Box 660044
> Dallas, TX 75266-0044

Your claim must be submitted within 12 months from the date on which you incur the expense that gives rise to the claim. If the medical benefits are to be paid on a secondary basis, you must first submit your claim to the primary plan.

## Health Benefit Denials

As described above, claims for health benefits fall into four categories: claims for urgent care, claims requiring advance approval, claims following approval of an ongoing course of treatment, and Post-Service Claims. If you make a request for benefits, the time frame within which you receive notice of a benefit denial depends on what kind of claim has been made.

### Urgent Care Claims

If a claim is urgent, you will be notified of BCBS's decision, adverse or not, as soon as possible, taking into account the medical circumstances. Notice will not be later than 72 hours after BCBS received the claim, unless the claim does not contain sufficient information on which to base a decision.

If the claim is incomplete and additional information is required, you will be notified as soon as possible, but not later than 24 hours after BCBS received the claim. You will be advised of the information required and will be given at least 48 hours to provide it.

You will then be notified of BCBS's decision as soon as possible, but not later than 48 hours after the earlier of:

- BCBS's receipt of the specified information, or
- The end of the 48 hours given to you to provide additional information.

A claim is "urgent" in the following cases:

- Where application of the 30-day time period for non-urgent care claims could reasonably be expected to seriously jeopardize your life or health or ability to regain maximum function;
- Where application of the 30-day time period for non-urgent care claims would subject you to severe pain that could not be adequately managed without the care that is the subject of the claim; or
- If a physician with knowledge of your medical condition determines that a claim is urgent, such determination shall be accepted.

### Claim Requiring Advance Approval or Precertification

If a claim is for a benefit requiring advance approval by BCBS, for example, precertification of a hospital stay (see "Precertification" under "Additional Medical Provisions"), you will be notified of BCBS's decision, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after BCBS received the claim. This

time period may be extended for an additional 15 days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond BCBS's control.

If an extension is required, you will be notified before the end of the original 15-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, BCBS will specifically describe it in the notice and give you a period of at least 45 days to provide it.

### Approval of an Ongoing Course of Treatment

If BCBS has approved an ongoing course of treatment to be provided to you over a period of time or has approved a number of treatments, the following will apply:

- Any reduction or termination in the course of treatment will be treated as a claim denial or "Adverse Benefit Determination," which is defined below.
- BCBS will notify you sufficiently in advance to allow you to appeal and obtain a decision on appeal before the reduction or termination in the course of treatment.

### Post-Service Claim

If your claim is for the payment of medical services after they have been received, BCBS will decide the claim within a reasonable time, but not longer than 30 days after BCBS received the claim. This time period may be extended for an additional 15 days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond BCBS's control.

If an extension is required, you will be notified before the end of the original 30-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, BCBS will specifically describe it in the notice and give you a period of at least 45 days to provide it.

BCBS may secure independent medical or other advice and require such other evidence as it deems necessary to decide your claim.

### Notice of Denial

If BCBS issues an Adverse Benefit Determination, you will be notified of the Adverse Benefit Determination in writing. An "Adverse Benefit Determination" includes:

- Coverage denial;
- The Plan's failure to provide or make payment for a benefit, including a denial, reduction, termination or failure to provide or make payment based on an eligibility determination;
- Denial because the service is determined to be experimental, investigational, not medically necessary; or
- Reduction or termination in an ongoing course of treatment.

Written notice of the Adverse Benefit Determination, or denial, will include:

- The specific reason(s) for the denial;
- A reference to the Plan provision on which the denial is based;

- A description of any additional material or information necessary for you to complete your claim and an explanation of why such material or information is necessary;
- If BCBS relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;
- If the Adverse Benefit Determination is based on a medical necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request; and
- An explanation of the claim review procedures and the time limits applicable to those procedures, and a statement of your right to bring a civil action under ERISA section 502(a) following review of a denied claim for benefits.

**Appealing a Denied Health Benefit Claim**
You or your authorized representative may appeal an Adverse Benefit Determination.  Your appeal must be made in writing within 180 days of BCBS's initial notice of an Adverse Benefit Determination, or else you will lose the right to appeal your denial. If you do not appeal on time, you will also lose your right to file suit in court, as you will have failed to exhaust your internal administrative appeal rights, which is generally a prerequisite to bringing suit.

Your written appeal should be sent to:

> BlueCross BlueShield of Texas
> P.O. Box 660044
> Dallas, TX  75266-0044

Your written appeal should include the following:

- The reasons you feel your claim should not have been denied.
- Any additional facts and/or documentation that you feel support your claim.

You will have the opportunity to submit written comments, documents, records, and other information in support of your appeal.  You will be provided, upon request and free of charge, reasonable access to, and copies of, all relevant documents as defined by applicable U.S. Department of Labor regulations.

All written comments and documents you submit with your appeal, whether or not considered in the initial claim determination, will be reviewed and considered on appeal.

**Review of Appeal**
BCBS will review and render a decision on your appeal within the time frames outlined below and will notify you of its decision in writing. The individual who reviews and renders a decision on your appeal will not be someone who participated in or decided your original claim, nor will he or she be subordinate to the original decision maker. No deference shall be given to the initial decision. BCBS may consult with a physician or other licensed health care professional with appropriate training and experience to receive advice or other such evidence as it deems necessary to decide your claim,

except that any medical expert consulted in connection with your appeal will be different from any expert consulted in your initial claim and will not be a subordinate of that expert. (The identity of a medical expert consulted in connection with your appeal will be provided upon request.)

The time frame for review of your appeal, like your initial claim for medical or dental benefits, depends on whether it is an urgent care claim, a claim requiring advance approval, a claim following approval of an ongoing course of treatment or a Post-Service Claim.

### Urgent Care Claims
If your appeal is in connection with a complete urgent care claim, BCBS will notify you of its decision on appeal as soon as possible, taking into account medical circumstances, but not later than 72 hours after BCBS received the appeal.

### Claim Requiring Advance Approval or Precertification
If your appeal is in connection with a claim for benefits requiring advance approval by BCBS, you will be notified of its decision on appeal, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after BCBS received your appeal.

### Approval of an Ongoing Course of Treatment
If your appeal is in connection with a claim for an ongoing course of treatment, BCBS will notify you of its decision on appeal as soon as possible, but not later than the date your treatment ends or is reduced.

### Post-Service Claim
If your appeal is in connection with a claim for payment of medical services after they have been received, BCBS will notify you of its decision on appeal, adverse or not, but not later than 60 days after BCBS received the appeal.

### Notice of Appeal Denial
If the decision on appeal affirms the initial denial of your claim, you will be notified of the Adverse Benefit Determination in writing.  This notice of denial will include:

- The specific reason(s) for the denial;
- The Plan provisions on which the decision is based;
- A statement of your right to review (on request and at no charge) relevant documents and other information;
- If BCBS relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, scientific or clinical judgment, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;
- If the Adverse Benefit Determination is based on a medical  necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request;
- A statement of your right to bring suit under ERISA section 502(a).

## Benefits Claims Procedures for Mental Health and Substance Abuse Benefit Claims

### General Information

For any claim for benefits, you may be asked to submit additional information so that the Claims Administrator can determine whether the claim is covered and the amount of the claim.

An authorized representative may pursue the claim on your behalf. For example, this can be a doctor, lawyer or a friend or relative. You may be asked to notify the Claims Administrator in writing and give the Claims Administrator the name, address, and telephone number where your authorized representative can be reached.

### Making a Mental Health or Substance Abuse Benefit Claim

Claims for mental health and substance abuse services fall into four categories: claims for urgent care, claims requiring advance approval, claims following approval of an ongoing course of treatment, and claims for the payment of services after they have been received (referred to as "Post-Service Claims"). The time frame within which you are notified of a claim decision depends on what kind of a claim has been made.

If you have a claim for in-network mental health or substance abuse treatment, your claim is submitted for you by the provider. If you have a claim for non-network mental health or substance abuse treatment, you must file a claim with UBH (the "Claims Administrator"). In many cases, a non-network provider will file a claim on your behalf, but it is your responsibility to ensure that the claim has been filed with the Claims Administrator.

Your claim must be submitted within 12 months from the date on which you incur the expense that gives rise to the claim. If the Plan is secondary, you must first submit your claim to the primary plan.

For any claim for benefits, you may be asked to submit additional information so that UBH can determine whether the claim is covered and the amount of the claim.

### Non-Network Mental Health or Substance Abuse Benefit Claims

If you have a claim for non-network mental health, substance abuse benefits, you must file a claim form. You may obtain claim forms by calling UBH at 1-866-781-6395. You must complete all sections of the claim form (including the section about coverage under another insurance plan). Send the completed form to:

> United Behavioral Health
> P.O. Box 30755
> Salt Lake City, UT  84130-0755

Your claim must be submitted within 12 months from the date on which you incur the expense that gives rise to the claim. If the Plan is secondary, you must first submit your claim to the primary plan.

For any claim for benefits, you may be asked to submit additional information so that UBH can determine whether the claim is covered and the amount of the claim.

### Mental Health, Substance Abuse Benefit Denials

As described above, claims for benefits fall into four categories: Claims for urgent care, claims requiring advance approval, claims following approval of an ongoing course of treatment, and Post-

Service Claims,  If you make a request for benefits, the time frame within which you receive notice of a benefit denial depends on what kind of claim has been made.

### Urgent Care Claims

If a claim is urgent, you will be notified of UBH's decision, adverse or not, as soon as possible, taking into account the medical circumstances.  Notification will not be later than 72 hours after UBH received the claim, unless the claim does not contain sufficient information on which to base a decision.

If the claim is incomplete and additional information is required, you will be notified as soon as possible, but not later than 24 hours after UBH received the claim. You will be advised of the information required and will be given at least 48 hours to provide it.

You will then be notified of UBH's decision as soon as possible, but not later than 48 hours after the earlier of:

- UBH's receipt of any additional information, or
- The end of the 48 hours given to you to provide additional information.

A claim is "urgent" in the following cases:

- Where application of the 30-day time period for non-urgent care claims could reasonably be expected to seriously jeopardize your life or health or ability to regain maximum function;
- Where application of the 30-day time period for non-urgent care claims would subject you to severe pain that could not be adequately managed without the care that is the subject of the claim; or
- If a physician with knowledge of your medical condition determines that a claim is urgent, such determination shall be accepted.

### Claim Requiring Advance Approval or Pre-Authorization

If a claim is for a benefit requiring advance approval by UBH (all mental health and substance abuse treatment requires advance approval—see the "Steps to Take" section under "Mental Health and Substance Abuse Program"), you will be notified of UBH's decision, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after UBH received the claim. This time period may be extended for an additional 15 days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond UBH's control.

If an extension is required, you will be notified before the end of the original 15-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, UBH will specifically describe it in the notice and give you a period of at least 60 days to provide it.

### Approval of an Ongoing Course of Treatment

If UBH has approved an ongoing course of treatment to be provided over a period of time or approved a number of treatments, the following will apply:

- Unless the Plan is amended or terminated, any reduction or termination in the course of treatment will be treated as a claim denial or "Adverse Benefit Determination," which is defined below.

- UBH will notify you sufficiently in advance to allow you to appeal and obtain a decision on appeal before the reduction or termination in the course of treatment.

**Post-Service Claim**

If your claim is for the payment of medical services after they have been received, UBH will decide the claim within a reasonable time, but not longer than 30 days after it received the claim. This time period may be extended for an additional 15 days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond UBH's control.

If an extension is required, you will be notified before the end of the original 30-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, UBH will specifically describe it in the notice and give you a period of at least 60 days to provide it.

UBH may secure independent medical or other advice and require such other evidence as it deems necessary to decide your claim.

**Notification of Denial**

If UBH issues an Adverse Benefit Determination, you will be notified of the Adverse Benefit Determination in writing. An "Adverse Benefit Determination" includes:

- Coverage denial,

- The Plan's failure to provide or make payment for a benefit, including a denial, reduction, termination or failure to provide or make payment based on an eligibility determination;

- Denial because the service is determined to be experimental, investigational or not medically necessary, or

- Reduction or termination in an ongoing course of treatment.

Written notice of the Adverse Benefit Determination, or denial, will include:

- The specific reason(s) for the denial,

- A reference to the Plan provision on which the denial is based,

- A description of any additional material or information necessary for you to complete your claim and an explanation of why such material or information is necessary,

- If UBH relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline or protocol, or other criterion will be provided free of charge to you upon request,

- If the Adverse Benefit Determination is based on a medical necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request, and

- An explanation of the claim review procedures and the time limits applicable to those procedures, and a statement of your right to bring a civil action under ERISA section 502(a) following review of a denied claim for benefits.

**Appealing Denied Claims**

You or your authorized representative may appeal an Adverse Benefit Determination. Your appeal must be made in writing within 180 days of UBH's initial notice of an Adverse Benefit Determination, or else you will lose the right to appeal your denial. If you do not appeal on time, you will also lose your right to file suit in court, as you will have failed to exhaust your internal administrative appeal rights, which is generally a prerequisite to bringing suit.

Your written appeal should be sent to:

> United Behavioral Health
> Appeals and Complaints
> 4212 San Felipe Road
> PMB 448
> Houston, TX 77027-2902

Your written appeal should include the following:

- The reasons you feel your claim should not have been denied.
- Any additional facts and/or documentation that you feel support your claim.

You will have the opportunity to submit written comments, documents, records, and other information in support of your appeal. You will be provided, upon request and free of charge, reasonable access to, and copies of, all relevant documents as defined by applicable U.S. Department of Labor regulations.

All written comments and documents you submit with your appeal, whether or not considered in the initial claim determination, will be reviewed and considered on appeal.

**Review of Appeal**

UBH will review and render a decision on your appeal within the time frames outlined below and will notify you of its decision in writing. The individual who reviews and renders the decision on your appeal will not be an individual who participated in or decided your original claim, nor will it be a subordinate to the original decision maker. No deference shall be given to the initial decision. UBH may consult with a physician or other licensed health care professional with appropriate training and experience to receive advice or other such evidence as it deems necessary to decide your claim, except that any medical expert consulted in connection with your appeal will be different from any expert consulted in your initial claim and will not be a subordinate of that expert. (The identity of a medical expert consulted in connection with your appeal will be provided upon request.)

The time frame for review of your appeal, like your initial claim for mental health or substance abuse benefits, depends on whether it is an urgent care claim, a claim requiring advance approval, a claim following approval of an ongoing course of treatment or a Post-Service Claim.

**Urgent Care Claims**

If your appeal is in connection with an urgent care claim, the independent fiduciary will notify you of its decision on appeal as soon as possible, taking into account medical circumstances, but not later than 72 hours after UBH received the appeal.

**Claim Requiring Advance Approval or Precertification**

If your appeal is in connection with a claim for benefits requiring advance approval by UBH, you will be notified of its decision on appeal, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after UBH received your appeal.

**Approval of an Ongoing Course of Treatment**

If your appeal is in connection with a claim for an ongoing course of treatment, UBH will notify you of its decision on appeal as soon as possible, but not later than the date your treatment ends or is reduced.

**Post-Service Claim**

If your appeal is in connection with a claim for payment of mental health or substance abuse services after they have been received, UBH will notify you of its decision on appeal, adverse or not, but not later than 60 days after UBH received the appeal.

## Notification of Appeal Denial

If the decision on appeal affirms the denial of your claim, you will be notified of the Adverse Benefit Determination in writing. This notice of denial will include:

- The specific reason(s) for the denial;

- The Plan provisions on which the decision is based;

- A statement of your right to review (on request and at no charge) relevant documents and other information;

- If UBH relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, scientific or clinical judgment, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;

- If the Adverse Benefit Determination is based on a medical necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request; and

- A statement of your right to bring suit under ERISA section 502(a).

## Prescription Drug Plan Claims Procedures

For any claims for Prescription Drug Plan benefits, you may be asked to submit additional information so that Medco can determine whether the claim is covered and the amount of the claim.

An authorized representative may pursue the claim on your behalf. For example, this can be a doctor, lawyer, friend or relative. You may be asked to notify Medco in writing and give Medco the name, address and telephone number where your authorized representative can be reached.

## Making a Prescription Drug Benefit Claim

Claims for prescription drug benefits fall into four categories: claims for urgent care, claims requiring advance approval, claims following approval of an on-going course of treatment, and claims for the payment of medical services after they have been received (referred to as "Post-

Service Claims"). The time frame within which you are notified of a claim decision depends on what kind of claim has been made.

Claims for prescription drugs purchased at retail can be mailed to the following address:

Medco Health Solutions
P. O. Box 14711
Lexington, KY 40512

Your claim for prescription drug benefits must be submitted within 12 months from the date on which you incur the expense that gives rise to the claim. If the Plan is secondary, you must first submit your claim to the primary plan.

**Prescription Drug Benefit Denials**
As described above, claims for benefits fall into four categories: claims for urgent care, claims requiring advance approval, claims following approval of an ongoing course of treatment, and Post-Service Claims. If you make a request for benefits, the time frame within which you receive notice of a benefit denial depends on what kind of claim has been made.

**Urgent Care Claims**
If a claim is urgent, you will be notified of Medco's decision, adverse or not, as soon as possible, taking into account the medical circumstances. Notice will not be later than 72 hours after Medco received the claim, unless the claim does not contain sufficient information on which to base a decision.

If the claim is incomplete and additional information is required, you will be notified as soon as possible, but not later than 24 hours after Medco received the claim. You will be advised of the information required and will be given at least 48 hours to provide it.

You will then be notified of Medco's decision as soon as possible, but not later than 48 hours after the earlier of:

- Medco's receipt of the specified information, or
- The end of the 48 hours given to you to provide additional information.

A claim is "urgent" in the following cases:

- Where application of the 30-day time period for non-urgent care claims could reasonably be expected to seriously jeopardize your life or health or ability to regain maximum function;
- Where application of the 30-day time period for non-urgent care claims would subject you to severe pain that could not be adequately managed without the care that is the subject of the claim; or
- If a physician with knowledge of your medical condition determines that a claim is urgent, such determination shall be accepted.

**Claim Requiring Advance Approval or Preauthorization**
If a claim is for a benefit requiring advance approval by Medco, for example, preauthorization for growth hormones (see "Prescription Drugs Requiring Prior Authorization for Benefits"), you will be notified of Medco's decision, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after Medco received the claim. This time period may be extended for an additional 15

days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond Medco's control.

If an extension is required, you will be notified before the end of the original 15-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, Medco will specifically describe it in the notice and give you a period of at least 45 days to provide it.

### Approval of an Ongoing Course of Treatment

If Medco has approved an ongoing course of treatment to be provided to you over a period of time or has approved a number of treatments, the following will apply:

- Unless the Plan is amended or terminated, any reduction or termination in the course of treatment will be treated as a claim denial or "Adverse Benefit Determination," which is defined below.
- Medco will notify you sufficiently in advance to allow you to appeal and obtain a decision on appeal before the reduction or termination in the course of treatment.

### Post-Service Claim

If your claim is for the payment of prescription drug benefits after they have been received, Medco will decide the claim within a reasonable time, but not longer than 30 days after Medco received the claim. This time period may be extended for an additional 15 days if the claim does not contain sufficient information on which to base a decision, or an extension is required for other reasons beyond Medco's control.

If an extension is required, you will be notified before the end of the original 30-day period of the circumstances necessitating the extension and the date by which a decision is expected. If additional information is required, Medco will specifically describe it in the notice and give you a period of at least 45 days to provide it.

Medco may secure independent medical or other advice and require such other evidence as it deems necessary to decide your claim.

### Notice of Denial

If Medco issues an Adverse Benefit Determination, you will be notified of the Adverse Benefit Determination in writing. An "Adverse Benefit Determination" includes:

- Coverage denial;
- The Plan's failure to provide or make payment for a benefit, including a denial, reduction, termination or failure to provide or make payment based on an eligibility determination;
- Denial because the service is determined to be experimental, investigational, not medically necessary; or
- Reduction or termination in an ongoing course of treatment.

Written notice of the Adverse Benefit Determination, or denial, will include:

- The specific reason(s) for the denial;
- A reference to the Plan provision on which the denial is based;
- A description of any additional material or information necessary for you to complete your claim and an explanation of why such material or information is necessary;
- If Medco relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, or other similar criterion or

a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;

- If the Adverse Benefit Determination is based on a medical necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request; and
- An explanation of the prescription drug claim review procedures and the time limits applicable to those procedures, and a statement of your right to bring a civil action under ERISA section 502(a) following review of a denied claim for prescription drug benefits.

## Appealing Denied Prescription Drug Claims

You or your authorized representative may appeal an Adverse Benefit Determination.  Your appeal must be made in writing within 180 days of Medco's initial notice of an Adverse Benefit Determination, or else you will lose the right to appeal your denial. If you do not appeal on time, you will also lose your right to file suit in court, as you will have failed to exhaust your internal administrative appeal rights, which is generally a prerequisite to bringing suit.

Your written appeal should be sent to:

> Medco Health Solutions of Irving
> 8111 Royal Ridge Parkway
> Irving, TX  75063

You may send an urgent care claims appeal to Medco by fax to 1-888-235-8551.

Your written appeal should include the following:

- The reasons you feel your claim should not have been denied.
- Any additional facts and/or documentation that you feel support your claim.

You will have the opportunity to submit written comments, documents, records, and other information in support of your appeal.  You will be provided, upon request and free of charge, reasonable access to, and copies of, all relevant documents as defined by applicable U.S. Department of Labor regulations.

All written comments and documents you submit with your appeal, whether or not considered in the initial claim determination, will be reviewed and considered on appeal.

## Review of Appeal

Medco will review and render a decision on your appeal within the time frames outlined below and will notify you of its decision in writing. The individual who reviews and renders a decision on your appeal will not be an individual who participated in or decided your original claim, nor will he/she be a subordinate to the original decision maker. No deference shall be given to the initial decision. Medco may consult with a physician or other licensed health care professional with appropriate training and experience to receive advice or other such evidence as it deems necessary to decide your claim, except that any medical expert consulted in connection with your appeal will be different from any expert consulted in your initial claim and will not be a subordinate of that expert. (The identity of a medical expert consulted in connection with your appeal will be provided upon request.)

The time frame for review of your appeal, like your initial claim for prescription drug benefits, depends on whether it is an urgent care claim, a claim requiring advance approval, a claim following approval of an ongoing course of treatment or a Post-Service Claim.

### Urgent Care Claims

If your appeal is in connection with an urgent care claim, Medco will notify you of its decision on appeal as soon as possible, taking into account medical circumstances, but not later than 72 hours after Medco received the appeal.

### Claim Requiring Advance Approval or Preauthorization

If your appeal is in connection with a claim for benefits requiring advance approval by Medco, you will be notified of its decision on appeal, adverse or not, within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after Medco received your appeal.

### Approval of an Ongoing Course of Treatment

If your appeal is in connection with a claim for an ongoing course of treatment, Medco will notify you of its decision on appeal as soon as possible, but not later than the date your treatment ends or is reduced.

### Post-Service Claim – Level 1 Appeal

If your appeal is in connection with a claim for payment of prescription drug benefits after they have been received, Medco will notify you of its decision on appeal, adverse or not, but not later than 30 days after Medco received the appeal. There are two levels of appeal for Post-Service Claims.

## Notice of Appeal Denial

If the decision on appeal affirms the initial denial of your claim, you will be notified of the Adverse Benefit Determination in writing. This notice of denial will include:

- The specific reason(s) for the denial;
- The Plan provisions on which the decision is based;
- A statement of your right to review (on request and at no charge) relevant documents and other information;
- If Medco relied on an internal rule, guideline, protocol, or other similar criterion in making its decision, a description of the specific rule, guideline, protocol, scientific or clinical judgment, or other similar criterion or a statement that such a rule, guideline, protocol, or other similar criterion was relied on and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to you upon request;
- If the Adverse Benefit Determination is based on a medical necessity or experimental or investigational limitation, provide either an explanation of the scientific or clinical judgment for the determination or a statement that such explanation will be provided free of charge to you upon request;
- If the notice of denial is a Post-Service Claim Level 1 appeal denial, an explanation of Level 2 Appeal procedures; and
- A statement of your right to bring suit under ERISA section 502(a), unless the notice of denial is a Post-Service Claim Level 1 appeal denial. In which case, this statement will be included in the notice of a Level 2 appeal denial, if any.

**Post-Service Claim – Level 2 Appeal**
You or your authorized representative may request a review of the Level 1 appeal denial. If you choose a Level 2 review, you must submit your appeal in writing within 180 days of Medco's notice of Level 1 appeal denial, or else you will lose the right to a Level 2 review. If you do not request a Level 2 review on time, you will also lose your right to file suit in federal court as you will have failed to exhaust your internal administrative appeal rights, which is generally a prerequisite to bringing suit.

Your Level 2 appeal should be sent to:

> Medco Health Solutions of Irving
> 8111 Royal Ridge Parkway
> Irving, TX  75063

Your written Level 2 appeal should include the reasons you feel your claim should not have been denied and any additional facts or documentation that you feel supports your claim.

**Notice of Level 2 Post-Service Claim Appeal Denial**
If the decision on the Level 2 review upholds the Level 1 appeal denial, you will be furnished with a Notice of Adverse Benefit Determination on Review, setting forth all of the items included in the Notice of the Post-Service Claim Level 1 Appeal Denial described above, as well as a statement of your right to bring suit under ERISA Section 502(a).

# Coordination of Benefits (COB)

## How Coordination of Benefits Works

If you are covered by more than one group health plan, the benefits you receive from this Plan are subject to COB rules. COB rules prevent a duplication or double payment of a provider's charges for services.

One plan is considered primary and pays first. The other is considered secondary and pays second.

## COB Rules

Under the Plan COB rules, your total benefit from your group plans may be up to, but not more than, the benefits this Plan would pay if it were the primary plan.

*This approach to coordination of benefits does not provide for 100% reimbursement of health care expenses. Instead, it provides for two programs to pay together what this Plan would otherwise pay.*

These rules do not apply to any non-group insurance you purchased yourself.

### Retiree

An employer's plan covering a person (or his or her Eligible Dependents) as an active employee pays benefits before this Plan. If you have retiree medical benefits from two or more employers, the plan of the employer for whom you worked the longest is primary.

### Spouse

If your spouse is covered by this Plan and another group plan (such as your spouse's employer's plan), the other group plan is primary for your spouse and this Plan is secondary.

### Children

If your children are covered by this Plan and another plan (such as your spouse's employer's plan), the "birthday rule" applies. Under birthday rule, the plan of the parent whose birthday is earlier in the calendar year is primary for the children, regardless of which parent is older.

If you are separated or divorced with a court decree, the plan of the parent with custody of, and financial responsibility for, the child is considered primary, unless the divorce decree states otherwise. If you have joint custody, the plan of the parent with physical custody of the child at the time treatment begins is considered primary.

If you do not have a court decree, the plan of the parent with custody is considered primary, unless that parent has remarried. If so, the plan of the stepparent is primary. Otherwise, the plan that has covered the child longer is primary.

# Continuation of Coverage (COBRA)

If group health plan coverage (including medical, mental health and substance abuse, hearing aid and vision, prescription drug, and dental) ends, your covered Eligible Dependents may be eligible for extended benefits or COBRA continuation coverage.

## Extension of Benefits

If a Retiree Participant dies, their Surviving Spouse will be a Participant in the Settlement Plans as long as they live. Similarly, Eligible Dependents of a Surviving Spouse will be Participants in the Settlement Plans as long as they remain Eligible Dependents and the Surviving Spouse is living. Please see Eligibility and Participation, beginning on page 9 for Eligible Dependent definitions.

## COBRA
### Highlights

The right to COBRA continuation coverage was created by a federal law, the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). COBRA continuation coverage can become available to your family members who would otherwise lose coverage under the Plan. This section is intended to inform you of your rights and obligations under the COBRA law. For additional information about your rights and obligations under the Plan and under COBRA, you should contact the El Paso Benefits Service Center at 866-301-2359. After you have elected COBRA coverage, you should contact the COBRA administrator, Benefit Concepts, at 1-866-629-1480, for questions or information.

### What is COBRA Continuation Coverage?

COBRA continuation coverage is a continuation of group health plan coverage (including medical, mental health and substance abuse, hearing aid and vision, prescription drug, and dental) when coverage would otherwise end because of a life event known as a "qualifying event." After a qualifying event, COBRA continuation coverage must be offered to each person who is a "qualified beneficiary." Your spouse and your Eligible Dependent children could become qualified beneficiaries if coverage is lost because of the qualifying event. Under the Plan, qualified beneficiaries who elect COBRA continuation coverage must pay for COBRA continuation coverage (see "Cost of COBRA Coverage" further in this section).

### Who's Eligible for COBRA?
### Spouse Continuation Coverage

Your spouse will become a qualified beneficiary if any of the following qualifying events happen:

- The spouse loses coverage under the Plan because you and your spouse become divorced; or

- A Retiree dies and the spouse is not a Surviving Spouse entitled to coverage under the Settlement Plans, as defined in this SPD.

### Eligible Dependent Child Continuation Coverage

Your Eligible Dependent children will become qualified beneficiaries if they lose coverage under the Plan because any of the following qualifying events happen:

- The child is a child of a Surviving Spouse or Retiree Participant and the Surviving Spouse or Retiree Participant dies; or
- The child is no longer an Eligible Dependent.

## When is COBRA Continuation Coverage Available?

The Plan will offer COBRA continuation coverage to qualified beneficiaries only after the El Paso Benefits Service Center has been notified that a qualifying event has occurred. When the qualifying event is commencement of a proceeding in bankruptcy with respect to the employer, El Paso will notify the El Paso Benefits Service Center of the qualifying event.

## For What Types of Qualifying Events Must you Give Notice?

For divorce or legal separation of the retiree and spouse, or an Eligible Dependent child's losing eligibility for coverage as an Eligible Dependent child, you or your Eligible Dependents must notify the El Paso Benefits Service Center within 31 days after the later of the date the qualifying event occurs or the date of the loss of coverage due to the qualifying event.

## How is COBRA Continuation Coverage Provided?

Once the El Paso Benefits Service Center receives notice that a qualifying event has occurred, COBRA continuation coverage will be offered to each of the qualified beneficiaries. Each qualified beneficiary will have an independent right to elect COBRA continuation coverage. COBRA continuation coverage may be elected for only one, several, or for all Eligible Dependent children who are qualified beneficiaries. A parent may elect to continue coverage on behalf of any Eligible Dependent children. The retiree or the retiree's spouse can elect COBRA continuation coverage on behalf of all of the qualified beneficiaries.

Continued coverage is not automatic. You must enroll by completing an application and returning it to the COBRA administrator within 60 days after the later of:

- the date you cease to be eligible under the group plan; or
- the date the COBRA election notice is provided to you. (This is the date your COBRA election notice is post-marked, if mailed.)

## How Long Will COBRA Continuation Coverage Last?

COBRA continuation coverage is a temporary continuation of health coverage. The COBRA continuation coverage periods described below are the maximum coverage periods. COBRA continuation coverage can end before the end of the maximum coverage period for several reasons, which are described in the section below entitled "Termination of COBRA Continuation Coverage."

| COBRA Qualifying Event | How Long COBRA Coverage May Continue | |
|---|---|---|
| | You | Eligible Dependents |
| You and your spouse divorce or a Retiree Participant dies and the spouse is not a Surviving Spouse as defined in this SPD | Does not apply | 36 months |
| Your child is no longer an Eligible Dependent (including losing eligibility due to a Retiree Participant or Surviving Spouse's death) | Does not apply | 36 months |

## Termination of COBRA Coverage

COBRA continuation coverage will be terminated before the end of the maximum period if:

- any required premium is not paid in full on time,

- a qualified beneficiary becomes covered, after electing continuation coverage, under another group health plan that does not impose any pre-existing condition exclusion for a pre-existing condition of the qualified beneficiary, or
- a qualified beneficiary becomes entitled to Medicare benefits (under Part A, Part B, or both) after electing continuation coverage.

Continuation coverage may also be terminated for any reason the Plan would terminate coverage of a Participant or beneficiary not receiving continuation coverage (such as fraud).

Upon termination of COBRA continuation coverage, you will be provided a certificate of creditable coverage required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

**New Eligible Dependent Children**
A child who is born to or placed for adoption with a qualified beneficiary during a period of COBRA continuation coverage will be eligible for coverage for the duration of the qualified beneficiary's COBRA continuation coverage period. Benefit Concepts must be advised within 31 days of the child's birth or placement for adoption.

**Cost of Coverage**
**Your Premium Costs**
Each qualified beneficiary may be required to pay the entire cost of COBRA continuation coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent of the cost to the Plan for coverage of a similarly situated plan Participant or beneficiary who is not receiving COBRA continuation coverage.

Premium rates are subject to change each January 1.

**First Payment for COBRA Continuation Coverage**
If an Eligible Dependent elects COBRA continuation coverage, he or she does not have to send any payment when the election is submitted. However, he or she must make the first payment for COBRA continuation coverage not later than 45 days after the date of the election. (This is the date the COBRA election notice is post-marked, if mailed.) If the first payment for COBRA continuation coverage is not paid in full within 45 days after the date of the election, the qualified beneficiary will lose all COBRA continuation coverage rights under the Plan. The individual electing COBRA is responsible for making sure that the amount of the first payment is correct. A payment book detailing the amount and due dates of the initial and subsequent monthly payments will be provided. Benefit Concepts may also be contacted to confirm the correct amount of your first payment.

**Periodic Payments for COBRA Continuation Coverage**
After the first payment for COBRA continuation coverage is made, the individual electing COBRA will be required to make periodic payments for each subsequent month of coverage (known as the coverage period). Under the Plan, each of these periodic payments for COBRA continuation coverage is due on the first day of the month for that coverage period. If a periodic payment is made on or before the first day of the coverage period to which it applies, coverage under the Plan will continue for that coverage period without any break. The Plan will not send periodic notices of payments due for these coverage periods, but monthly premium coupons will be provided.

**Grace Periods for Periodic Payments**
Although periodic payments are due as explained above, the individual electing COBRA will be given a grace period of 30 days after the first day of the coverage period to make each periodic payment. COBRA continuation coverage will be provided for each coverage period as long as payment for that coverage period is made before the end of the grace period for that payment.

However, if a periodic payment is made later than the first day of the coverage period to which it applies, but before the end of the grace period for the coverage period, coverage under the Plan will be suspended as of the first day of the coverage period and then retroactively reinstated (going back to the first day of the coverage period) when the periodic payment is received. This means that any claim submitted for benefits while coverage is suspended may be denied and may have to be resubmitted once coverage is reinstated.

If a periodic payment is not made before the end of the grace period for that coverage period, all rights to COBRA continuation coverage under the Plan will be lost. Late payment will result in a permanent loss of coverage.

**Changes in the Plans**
If there are changes or modifications to the Settlement Plans affecting covered Class Members and Eligible Dependents, those changes also apply to individuals receiving COBRA continuation coverage, whether in improvements or reductions in benefits.

**Trade Act 2002**
The Trade Act of 2002 created a new tax credit for certain individuals who become eligible for trade adjustment assistance and for certain retired employees who are receiving pension payments from the Pension Benefit Guaranty Corporation (PBGC) (eligible individuals). Under the new tax provisions, eligible individuals can take a tax credit for qualified health insurance, including continuation coverage. If you have questions about these new tax provisions, you may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1-866-628-4282. TTD/TTY callers may call toll-free at 1-866-626-4282. More information about the Trade Act is also available at www.doleta.gov/tradeact/2002act_index.asp.

Certain individuals who, under limited circumstances, become eligible to take advantage of trade adjustment assistance pursuant to the Trade Act may receive a second 60-day COBRA election period. If you are receiving trade adjustment assistance or if you are eligible for trade adjustment assistance, please contact the **El Paso Benefits Service Center at 866-301-2359** for more information.

**Questions About COBRA Continuation Coverage**
The right to COBRA continuation coverage is protected by law. If the law changes, your rights will change accordingly. If you have any questions about COBRA continuation coverage, please contact the El Paso Benefits Service Center at 866-301-2359 or write to them at the following address:

El Paso Benefits Service Center
P. O. Box 971
Deerfield, IL   60015

After you are on COBRA coverage, if you have questions about your COBRA continuation coverage you should contact the COBRA administrator, Benefits Concepts, at 1-866-629-1480 or write to them at the following address:

Benefit Concepts
P. O. Box 246
Barrington, Rhode Island  02806-0246

For more information about your rights under the Employee Retirement Income Security Act of 1974 (ERISA), including COBRA, HIPAA, and other laws affecting group health plans, contact the nearest Regional or District Office of the U.S. Department of Labor's Employee Benefits Security

Administration (EBSA) in your area or visit the EBSA website at http://www.dol.gov/ebsa.
(Addresses and telephone numbers of regional and district EBSA offices are available through
EBSA's website.)

# Life Insurance Benefits – Retiree Participants Only

## Highlights

Life insurance offers financial protection to your beneficiary(ies) should you die. You may name the beneficiary for this benefit. Evidence of insurability is not required for this coverage.

The insurer of the life insurance benefits is ReliaStar Life Insurance Company (ING) ("ReliaStar Life Insurance (ING)").

## Costs

El Paso pays the full cost of this coverage. El Paso will pay the level of Life Insurance Benefits described below if the Life Insurance Benefits cease to be fully insured by ING or a successor insurance carrier.

## Life Insurance Coverage

Life insurance benefits are provided as follows:

1. If you retired prior to July 1, 1977, and had ten or more years of service when you retired, the life insurance benefit will be $4,500.

2. If you retired on or after July 1, 1977, but prior to May 12, 1987, the life insurance benefit will be $8,000 until age 65 and $4,500 thereafter.

3. If you retired on or after May 12, 1987 but prior to May 1, 1988, and had ten or more years of service when you retired, the amount of your life insurance benefit will be $8,500. When you reach age 65, the amount of your life insurance benefit will be reduced to $5,000.

4. If you retired on or after May 1, 1988 but prior to May 1, 1989, and had ten or more years of service when you retired, the amount of your life insurance benefit will be $9,000. When you reach age 65, the amount of your life insurance benefit will be reduced to $5,500.

5. If you retired on or after May 1, 1989 but prior to June 2, 1990, and had ten or more years of service when you retired, the amount of your life insurance benefit will be $9,500. When you reach age 65, the amount of your life insurance benefit will be reduced to $6,000.

6. If you retired on or after June 2, 1990 but prior to April 1, 1991, and had ten or more years of service when you retired, the life insurance benefit will be $9,750 until age 65, and $6,250 thereafter.

7. If you retired on or after April 1, 1991 but prior to February 1, 1992, and had ten or more years of service when you retired, the life insurance benefit will be $10,000 until age 65, and $6,500 thereafter.

8. If you retired on or after February 1, 1992 but prior to December 1, 1992, and had ten or more years of service when you retired, the life insurance benefit will be $10,250 until age 65, and $6,750 thereafter.

9. If you retired on or after December 1, 1992 but on or prior to July 1, 1994, and had ten or more years of service when you retired, the life insurance benefit will be $10,500 until age 65 and $7,000 thereafter.

10. If you retired on after July 1, 1980 and on or before July 1, 1994, and had five but less than ten years of service, the amount of your life insurance benefit will be $2,500.

## Naming a Beneficiary(ies)

You should name a beneficiary(ies) for your life insurance coverage. You may name more than one beneficiary, but you will have to indicate how benefits should be divided among them. Otherwise, the benefit will be divided equally among the beneficiaries.

You may also name a secondary beneficiary to receive your benefit in the event your primary beneficiary dies before you.

### Naming and Changing Your Beneficiary(ies)

You may name and change your beneficiary(ies) at any time through the El Paso Benefits Service Center by logging on to Mercer OneView at www.MercerOneView.com/ElPaso. Select "My Health and Group" then "My Beneficiary Data." Because family situations change, you should review your beneficiary designations from time to time.

### If You Do Not Name a Beneficiary(ies)

If you do not name a beneficiary(ies), or, if your beneficiary dies, ReliaStar Life Insurance (ING) will pay benefits to one or more of the following based on the laws in your state:

- The full benefit to your surviving spouse;
- Divided equally among your surviving children;
- Divided equally between your surviving mother or father; or
- Executors or administrators of your estate as established by a court order.

Your beneficiary(ies) must be living on the 10th day following your death to receive a benefit.

## Filing a Claim
### Overview

If your beneficiary is filing a claim, he or she should contact the El Paso Benefits Service Center at 866-301-2359. A letter with a claim form will be sent to your beneficiary. Your beneficiary should complete and return the form, along with a copy of the death certificate, to ReliaStar Life Insurance (ING). Once the claim has been processed, a checking account will be set up in your beneficiary's name for the amount of the benefit as soon as administratively possible.

### Attachment of Benefits

To the extent permitted by law, all rights and benefits under this Plan are exempt from execution, attachment, garnishment, or other legal process for you or your beneficiary's debts or liabilities.

## Life Insurance Claims Procedures

For any claim for benefits, your beneficiaries may be asked to submit additional information so that ReliaStar Life Insurance (ING) can determine whether the claim is covered and the amount of the claim.

An authorized representative may pursue the claim on your beneficiary's behalf. For example, this can be a doctor, lawyer, friend or relative. Your beneficiary may be asked to notify ReliaStar Life Insurance (ING) in writing and give ReliaStar Life Insurance (ING) the name, address, and telephone number where your beneficiary's authorized representative can be reached.

**Making Life Insurance Benefit Claim**

If your beneficiary has a claim for life insurance benefits, your beneficiary must file a claim with ReliaStar Life Insurance (ING). Your beneficiary may obtain a claim form by calling the El Paso Benefits Service Center at 866-301-2359. Your beneficiary should send the completed form to:

> ReliaStar Life Insurance Company (ING)
> P.O. Box 1548
> Minneapolis, MN 55440

Your beneficiary's claims must be submitted within 12 months from the date of your death.

**Life Insurance Benefit Denials and Notice of Denial**

If your beneficiary makes a request for life insurance benefits and ReliaStar Life Insurance (ING) issues an Adverse Benefit Determination (or claim denial), your beneficiary will be notified of the Adverse Benefit Determination in writing. This notice of denial will include:

- The specific reason(s) for the denial;

- A reference to the Plan provision on which the denial is based;

- A description of any additional material or information necessary for your beneficiary to complete your claim and an explanation of why such material or information is necessary; and

- An explanation of the Plan's claim review procedures and the time limits applicable to those procedures, and a statement of your beneficiary's right to bring a civil action under ERISA section 502(a) following an Adverse Benefit Determination on review.

ReliaStar Life Insurance (ING) will give your beneficiary notice of the decision no later than 90 days after it received the claim. If, because of special circumstances, the review process cannot be completed within 90 days, your beneficiary will be notified of the delay within the 90-day period, and the special circumstances requiring an extension of time and the date by which ReliaStar Life Insurance (ING) expects to render the decision upon review. In this situation, ReliaStar Life Insurance (ING) will provide a final written decision within 180 days of the date it received your beneficiary's request for review.

**Appealing a Denied Life Insurance Claim**

Your beneficiary or his or her authorized agent may appeal an Adverse Benefit Determination. Your beneficiary's appeal must be made in writing within 60 days of ReliaStar Life Insurance's (ING) initial notice of an Adverse Benefit Determination (or claim denial), or else your beneficiary will lose the right to appeal your denial. If your beneficiary does not appeal on time, your beneficiary will also lose his or her right to file suit in court, as he or she will have failed to exhaust his or her internal administrative appeal rights, which is generally a prerequisite to bringing suit.

Your beneficiary's written appeal should be sent to:

> ReliaStar Life Insurance Company (ING)
> P.O. Box 1548
> Minneapolis, MN  55440

Your beneficiary's written appeal should include the following:

- The reasons your beneficiary feels his or her claim should not have been denied.

- Any additional facts and/or documentation that your beneficiary feels supports his or her claim.

Your beneficiary will have the opportunity to submit written comments, documents, records, and other information in support of your beneficiary's appeal. Your beneficiary will be provided, upon request and free of charge, reasonable access to, and copies of, all relevant documents as defined by applicable U.S. Department of Labor regulations. The review of the adverse determination will take into account all comments, documents, records and other information submitted by your beneficiary relating to the claims, regardless of whether such information was submitted and considered in the initial benefit determination.

### Review of Appeal

ReliaStar Life Insurance (ING) will review and render a written decision on your beneficiary's appeal, adverse or not, no later than 60 days after it received the appeal. If, because of special circumstances, the review process cannot be completed within 60 days, your beneficiary will be notified of the delay within the 60-day period and the special circumstances requiring an extension of time and the date by which ReliaStar Life Insurance (ING) expects to render the decision upon review. ReliaStar Life Insurance (ING) will provide a final written response within 120 days of the date it received your beneficiary's request for review.

### Notice of Appeal Denial

If the decision on appeal affirms the initial denial of your beneficiary's claim, your beneficiary will be notified of the Adverse Benefit Determination in writing. This notice of denial will include:

- The specific reason(s) for the denial;

- The Plan provision on which the decision is based;

- A statement of your beneficiary's right to review (on request and at no charge) relevant documents and other information; and

- A statement of your beneficiary's right to bring suit under ERISA section 502(a).

# When Coverage Ends

## Retiree and Surviving Spouse Participants

Your coverage under the Settlement Plans will end on the date of your death.

## Eligible Dependents

Coverage under the Settlement Plans will end on the earlier of: (i) the date the Eligible Dependent is no longer an "Eligible Dependent" or (ii) the date of the Retiree Participant's or Surviving Spouse Participant's death, whichever is later.

# Administrative Information

The Benefits Committee has the authority to administer the Settlement Plans described in this Summary Plan Description. The Settlement Plans are a component of the Plan.

## Benefits Committee

Responsibility for the general administration of the Settlement Plans and for applying the provisions of the Settlement Plans has been placed with the Benefits Committee, which is a committee of three or more members, each of whom is an employee of El Paso Corporation and each of whom has been appointed by the Chief Executive Officer of El Paso Corporation. The Benefits Committee has all powers necessary for the administration of the Settlement Plans. The Benefits Committee may designate any person, partnership or corporation to carry out any of its responsibilities under the Plan. The Benefits Committee has delegated day-to-day ministerial administration of the Settlement Plans under administrative services or insurance contracts, and the Benefits Committee may change those designations from time to time consistent with the terms of the Settlement Agreement. The Benefits Committee has the sole authority to appoint and remove the Trustee of the Trust.

The Trustee has the sole responsibility for administration of the Trust and the management of the assets held under the Trust.

## Plan Expenses

All Settlement Plan expenses are paid by El Paso.

## Claims and Appeals

The Benefits Committee or its delegate has the authority to apply and interpret the Settlement Plan provisions with respect to individual claims and render claim decisions based on its interpretation.

For any insured benefit offered under the Plan, such as life insurance, the insurance carrier has the authority and responsibility to apply and interpret the terms of the Settlement Plans. This authority to apply and interpret the terms of the Settlement Plans for insured benefits includes but is not limited to determining factual and legal questions, interpreting the factual and legal questions, applying, interpreting and administering the terms and conditions of the insured benefit or granting or denying the insured benefit, correcting any defect, supplying any omission, or reconciling any inconsistency.

For any non insured benefit provided through administrative service contracts, the Benefits Committee or its delegate has the authority and responsibility to apply the terms of the Settlement Plans. This authority to apply and interpret the terms of the Settlement Plans for non insured benefits includes, but is not limited to, determining factual and legal questions under the Settlement Plans, applying interpreting and administering the terms and conditions of the Plan, granting or denying benefits, construing any ambiguous provision of the Plan, correcting any defect, supplying any omission, or reconciling any inconsistency.

Any person who believes that he or she is entitled to any benefit provided under the Settlement Plans has the right to file a written claim with a "Claims Administrator." A Claims Administrator is any person or entity who is authorized by the Benefits Committee to determine claims for benefits under the Settlement Plans, including someone on the Company's human resources staff authorized to decide claims.

The claims and appeals procedures are included in the Claims Procedures section of this SPD.

If you bring suit under ERISA section 502(a), the court will review the insurer's or Claims Administrator's final decision *de novo* and the court's review will be limited to the administrative record.

The names and addresses of the Claims Administrators can be found in the General Information section.

## Right of Recovery and Third-Party Liability

If you receive a payment under the Settlement Plans to which you are not entitled, the Plan shall have the right to recover that payment from you. Alternatively, the Benefits Committee may cause the amount to which you were not entitled to be deducted from future payments under the Settlement Plans.

In some situations, another person (or the person's liability insurance company) may be legally responsible for your health expenses.

The Plan may seek damages from the person if you or an Eligible Dependent suffers an injury or illness as the result of that person's negligent or wrongful act or omission. This might happen, for example, if you are in an automobile accident caused by that person. In that case, the liability for your health expenses is that person's, not this Plan's. When this occurs, this Plan is entitled to repayment of benefits from any settlement you receive from that person.

By accepting payment under the Settlement Plans, you agree to cooperate in recovering expenses from the other party, to notify the Claims Administrator well in advance before settling or compromising any claim you may have brought against another person, to provide any documents that would allow the Plan to recover payments made on your behalf, and to refund to the Settlement Plans the lesser of:

- The third-party settlement you received; or
- The amount the Settlement Plans paid.

## Assignment Prohibited

A covered Participant's right under the Settlement Plans to receive benefits or receive reimbursement for any expenses may not be assigned or otherwise transferred to any other person or entity.

## Plan Amendment

El Paso may modify the design and terms of the Settlement Plans to reduce its cost of the Settlement Plans or reduce any administrative burdens, so long as those modifications do not reduce the level of benefits, or the efficient delivery of benefits to Participants. Without limiting the foregoing, El Paso may modify the Settlement Plans or the manner in which Settlement Plan benefits are provided in order to obtain the benefit provided by (i) any governmental or private program or incentive that reduces the cost of the Settlement Plans, or (ii) any changes in laws or regulations, so long as these modifications do not reduce the level of benefits or the efficient delivery of benefits.

The modifications described above will not reduce "the level of benefits" or the "efficient delivery of benefits" if those modifications:

- Impose no greater costs on Participants (e.g., premium contributions, copayments, deductibles, coinsurance and out-of-pocket maximums);

- Maintain equivalent or better benefit coverage for all Participants through: (a) a governmental or private program or incentive, (b) a separate and/or supplemental plan of benefits paid by El Paso, or (c) some combination of (a) or (b);
- Maintain similar drug formularies;
- Maintain similar access to physicians and pharmacies;
- Are tax-neutral to the Participant; or
- Maintain a similar level of expediency, convenience and accuracy in the processing of claims.

Notwithstanding the foregoing, El Paso has the right to make routine changes to administrative provisions related to the Settlement Plans. El Paso shall also have the right to propose and make changes to the Medicare Advantage plans, networks, insurance providers, trustees, plan administrators and service providers and non-routine changes to utilization review/care management procedures and formulary drug lists. El Paso will provide notice, and a brief explanation, of any such proposed non-routine changes to the "Retirement Committee" and "Class Counsel," described on pages 69-70. Upon request, El Paso will promptly provide the Retirement Committee with information reasonably necessary to evaluate the proposed action, including the qualifications of the proposed insurance provider or other service provider.

## SPD and Settlement Agreement

This summary is known as a Summary Plan Description (SPD), as explained in **"About This Summary Plan Description."** The benefits described in this SPD are offered under the Settlement Plans, and the SPD controls in cases of conflict between the Plan and the SPD. If there is a conflict between the SPD and the Settlement Agreement, then the Settlement Agreement controls. All of the documents governing the Plan are available from the El Paso Benefits Service Center. The statements in the SPD are intended to be read as a whole. You should not rely on statements or explanations taken out of context. Subsequent changes to the Settlement Agreement and Settlement Plans and the SPD may be communicated in written materials such as newsletters, postings, and flyers.

## Continuing Jurisdiction of the Court

Under the Settlement Agreement and the Final Judgment entered in the *Yolton* Litigation, the Court has retained continuing jurisdiction over the Class Representatives and El Paso Tennessee for the purposes and enforcing and administering the Settlement Agreement, including the Settlement Plans.

The Settlement Agreement, including the Settlement Plans, may be modified only by a written instrument signed by the Class Representatives who are then living or Class Counsel and by El Paso Tennessee. Any proposed change that substantially modifies the terms of the Settlement Agreement or the Settlement Plans must be agreed to by the Class Representatives who are then living and approved by the Court after notice to the Class.

## Retiree Committee

The Retiree Committee is a committee of Class Members that monitors the administration of the Settlement Plans and the Settlement Agreement after the **[effective date of the Settlement Plans]**. Whenever a Retiree Committee Member ceases participation in the Retiree Committee, the remaining Retiree Committee Members will appoint a replacement and notify El Paso in writing of the change.

The Retiree Committee has no authority over the provision of benefits or administration of the Settlement Plans. The Retiree Committee has no responsibility for or authority over the processing,

administration or review of individual claims.  These functions are the sole responsibility of the Benefits Committee, the Administrators, Insurance Providers and Other Service Providers in accordance with the procedures set forth above.

The Retiree Committee can be contacted through Class Counsel, Roger J. McClow, Klimist, McKnight, Sale, McClow & Canzano, P.C., 400 Galleria Officentre, Suite 117, Southfield, MI 48034.

## Privacy

The Plan is required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing privacy and security rules to maintain the privacy of your "protected health information" and to safeguard your "electronic protected health information."  These privacy and security requirements apply to all group health benefits, referred to as "HIPAA Benefits."  "HIPAA Benefits" include all Plan benefits, except life insurance benefits.

"Protected health information" is information that identifies you and that relates to your physical or mental health. The Plan provided you with a Notice of Privacy Practices ("Notice") summarizing the Plan's responsibilities and your rights concerning your protected health information.

Generally, the Plan may disclose your protected health information to the Plan Sponsor to enable the Plan Sponsor to carry out the Plan's administrative functions relating to HIPAA Benefits.  Protected health information may not be disclosed to the Plan Sponsor for other employment-related purposes without your prior authorization.  Limited exceptions allowing other disclosures are detailed in the Notice.

You have the right to inspect and obtain a copy of your protected health information. You may access your protected health information by submitting a written request.  You may also request that your protected health information be amended. In certain circumstances your request for access to or amendment of your records may be denied, as outlined in the Notice.

For more information, review the Notice of Privacy Practices you received from the Plan you participate in.  Also, the Plans' responsibilities with respect to HIPAA Benefits and your rights are more fully described in federal regulations which can be found at www.hhs.gov/ocr/hipaa.  Finally, if you have questions about privacy or wish to object to or complain about any use or disclosure of your protected health information as explained above, the contact information is provided in the Notice.  A copy of the Notice may be obtained by writing to the below address and requesting a copy:

> Corporate Benefits
> El Paso Corporation
> 1001 Louisiana
> Houston, TX 77002

# General Information

## Information about the Plan

| | |
|---|---|
| **Name of Plan:** | El Paso Corporation Retiree Benefits Plan |
| **Plan Number:** | 516 |
| **Plan Year** | Calendar Year |
| **Sponsor of Plan:** | El Paso Corporation<br>1001 Louisiana<br>Houston, TX 77002 |
| **Sponsor's IRS Employer Identification Number:** | 76-0568816 |
| **Benefits Committee:** | Benefits Committee of the El Paso Corporation Retiree Benefits Plan<br>c/o El Paso Corporation<br>1001 Louisiana<br>Houston, TX 77002<br>(713) 420-4622 |
| **Type of Administration** | Benefits Committee |
| **Trustee** | State Street Bank and Trust Company<br>225 Franklin Street<br>Boston, MA 02110 |

## Service of Process

The agent for service of legal process is:

> Chairman of the Benefits Committee of the
> El Paso Corporation Retiree Benefits Plan
> El Paso Corporation
> 1001 Louisiana
> Houston, TX 77002

Legal process may also be served on any member of the Benefits Committee or the Plan Trustee.

## Type of Plan

The Plan is a "welfare benefit plan." Insurance contracts may be in place with certain insurers. In addition, the insurers and third-party administrators are responsible for certain aspects of Plan administration (including payment of claims).

## Sources of Plan Funding

The Plan is funded by the contributions made by the Plan Sponsor.

The contributions are held in the El Paso Corporation Employees' Benefit Trust, and payments are made from the Trust as authorized by the Benefits Committee.

## Names and Addresses of Claims Administrators

The following entities are responsible for claims administration:

| Source | Telephone Number | Address |
|---|---|---|
| **El Paso Benefits Service Center** <br> *Eligibility and Enrollment Claims Administrator* | 1-866-301-2359 | P.O. Box 971 <br> Deerfield, IL 60015 |
| **BlueCross BlueShield of Texas** <br> *Medical, Hearing Aid, Vision and Dental Program Claims Administrator* <br><br> *For benefits information, local network providers and claims information* | 1-800-521-2227 | P.O. Box 660044 <br> Dallas, TX 75266-0044 |
| **Medco Health Solutions, Inc.** <br> *Prescription Drug Benefits (retail prescriptions) Claims Administrator* <br><br> *Mail-order prescriptions* | 1-800-903-4710 <br><br><br><br> 1-800-903-4710 | Retail Claims: <br> P.O. Box 14711 <br> Lexington, KY 40512 <br><br> Mail Order: <br> P.O. Box 30493 <br> Tampa, FL 33630-3493 |
| **UnitedHealthcare** <br> *Medicare Supplement Plan Insurer* | 1-800-620-9037 | United Healthcare Insurance Company, Horsham, PA 19044 |
| **United Behavioral Health** <br> *Mental Health and Substance Abuse Benefits Claims Administrator* | 1-866-781-6395 | P.O. Box 30755 <br> Salt Lake City, UT 84130-0755 |
| **Benefit Concepts** <br> *COBRA Administrator* | 1-866-629-1480 | P.O. Box 9222 <br> Chelsea, MA 02150-9222 |
| **ReliaStar Life Insurance Company (ING)** <br> *Life Insurer* | 1-800-955-2009 | P.O. Box 1548 <br> Minneapolis, MN  55440 |

## Statement of ERISA Rights

As a Participant in the Settlement Plans, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended.  ERISA provides that all Plan Participants shall be entitled to:

### Receive Information About Your Plan's Benefits

- Examine, without charge, at the Benefits Committee's office and at other specified locations, such as worksites, all Plan documents.  These may include insurance contracts and a copy of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.
- Obtain, on written request to the Benefits Committee, copies of documents governing the operation of the Plan, including insurance contracts, and copies of the latest annual report (Form 5500 Series) and updated summary plan description.  The Benefits Committee may make a reasonable charge for the copies.
- Receive a summary of the Plan's annual financial report. The Benefits Committee is required by law to furnish each Participant with a copy of this summary annual report.

**Continue Group Plan Coverage**

You may continue health care coverage for your Eligible Dependents if there is a loss of coverage under the Settlement Plans as a result of a qualifying event. Your Eligible Dependents may have to pay for such coverage. Review this summary plan description and the documents governing the Plan on the rules governing your COBRA continuation coverage rights.

**Prudent Actions by Plan Fiduciaries**

In addition to creating rights for Plan Participants, ERISA imposes duties on the people who are responsible for the operation of the employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one may otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

**Enforce Your Rights**

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance:

- If you request a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Benefits Committee to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Benefits Committee.
- If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court.
- If you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court.
- If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.

If you file suit against the Plan, the court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

If you have any questions about the Plan, you should contact the Benefits Committee. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the Benefits Committee, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

# Appendix A
## Defined Terms

*Benefits Committee* means the current or succeeding committee designated in the Plan as the plan administrator responsible for administering the Plan in accordance with its terms and the Employee Retirement Income Security Act, as amended, and as described on page 67 of this SPD.

*Class Member* means the individuals described as "class members" on page 9 of this SPD.

*Eligible Dependent* means the individuals described as "eligible dependents" on pages 9 and 10 of this SPD.

*El Paso* means El Paso Corporation, a Delaware corporation.

*El Paso Tennessee* means El Paso Tennessee Pipeline Co., a Delaware Corporation.

*Formulary* means the Medco Preferred Prescriptions® Formulary.

*Life Insurance Benefits* means the life insurance benefits provided to Retiree Participants and described in this SPD.

*Managed Care Plan* means the comprehensive managed care plan of medical, mental health and substance abuse benefits described in this SPD.

*Medicare Supplement Plan* means Medicare Supplement Plan L, which is the plan of medical, mental and substance abuse benefits that supplements Medicare Part A and Part B benefits insured by UnitedHealthcare.

*Other Benefit Plans* means the dental, vision and hearing aid benefits described in this SPD.

*Participant* means: (i) any Class Member or Eligible Dependent who is not eligible for Medicare on the **[effective date of the Settlement Plans]**; (ii) any individual who becomes an Eligible Dependent after the **[effective date of the Settlement Plans]** and who properly enrolls in the Settlement Plans; (iii) a Class Member or Eligible Dependent who is eligible for Medicare and who properly enrolls in the Medicare Supplement Plan on or after the **[effective date of the Settlement Plans];** or (iv) any individual who becomes Medicare-eligible after the **[effective date of the Settlement Plans]** and who properly enrolls in the Medicare Supplement Plan.

*Pension Plan* means the Case Corporation Pension Plan for Hourly-Paid Employees, as amended and restated effective June 2, 1990.

*Permanently and Totally Disabled* means any medically determinable physical or mental condition which prevents a child, age 25 or over, from engaging in substantial gainful activity and which can be expected to result in death or to be of long continued or indefinite duration.

*Plan* means the El Paso Corporation Retiree Benefits Plan (formerly known as the El Paso Tennessee Pipeline Co. Retiree Benefits Plan).

*Prescription Drug Plan* means the plan of prescription drug benefits provided to all Participants and described in this SPD.

*Retiree* means a Class Member who was a former bargaining unit employee who retired under the Pension Plan on or before July 1, 1994 (other than former employees eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan).

*Retiree Participant* means a Retiree as of the **[effective date of the Settlement Plans**

*Settlement Agreement* means the agreement dated **[insert date]** between El Paso Tennessee and class representatives, on behalf of Class Members, in the class action entitled *Yolton v. El Paso Tennessee Pipeline, Co.*, Civil Action No. 02-CV-75164 (E.D. Mich.).

*Settlement Plans* means the Managed Care Plan, the Medicare Supplement Plan, the Prescription Drug Plan, Life Insurance Benefits, and Other Benefit Plans described in this SPD.

*SPD* means summary plan description and is this document as described on page 6.

*Surviving Spouse* means a spouse who is eligible for or receiving surviving spouse benefits under the Pension Plan, other than a deferred vested pension.

*Surviving Spouse Participant* means a Surviving Spouse as of the **[effective date of the Settlement Plans]**.

*Trust* means the El Paso Corporation Employees' Benefit Trust.

*Trustee* means State Street Bank and Trust Company, or its successor.

*You, you and your* means Participant.

156897

# EXHIBIT L
## to
## Settlement Agreement

## Tolling Agreement

**EXHIBIT L**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

GLADYS YOLTON, WILBUR MONTGOMERY,
ELSIE TEAS, ROBERT BETKER, EDWARD
MAYNARD, and GARY HALSTED, on
behalf of themselves and a class of persons
similarly situated,

       Plaintiffs,

v.

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA, LLC,

       Defendants.

Hon. Patrick J. Duggan

Case No. 02-CV-75164

**CLASS ACTION**

**TOLLING AGREEMENT**

This Tolling Agreement dated [insert date] is by and among CNH America LLC ("CNH America"), the Class Representatives on behalf of the Class, in the class action entitled Yolton v. El Paso Tennessee Pipeline Co., Civil Action No. 02-CV-75164 (E.D. Mich.) ("the Litigation") and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").

## 1.    Settlement of the Litigation Between El Paso and Plaintiffs

1.1    On [date], El Paso Tennessee Pipeline Company ("El Paso Tennessee") and the Class Representatives entered into a proposed Settlement Agreement that, if approved by the Court, will settle the Litigation and dismiss with prejudice the Class Representatives' claims, on behalf of the Class, against El Paso Tennessee.

1.2    Under the Settlement Agreement, El Paso Tennessee is obligated to provide and pay for certain retiree medical and other benefit plans (the "Settlement Plan") for Class Members and their Eligible Dependents. El Paso Tennessee's obligations under the Settlement Agreement will be guaranteed by El Paso Corporation as provided in the Settlement Agreement under a separate Guaranty executed by El Paso Corporation.

## 2.    Dismissal of CNH America from the Litigation

2.1    Upon the Court's entry of the Final Judgment approving the Settlement Agreement, the Court will enter the Stipulated Order, in the form attached as Exhibit A, dismissing without prejudice the Class Representatives' claims, on behalf of the Class, against CNH America in the Litigation.

2.2    CNH America will have no obligation of any kind to any Class Member under the Settlement Agreement and will not be obligated to pay on the underlying claims by Plaintiffs for the period from: (1) the date the Settlement Agreement becomes effective; through (2) the date both El Paso Tennessee and El Paso Corporation default, as defined in Section 4 below, on their respective obligations under the Settlement Agreement and Guaranty to provide and pay for the Settlement Plan.

3.    **Tolling of Statute of Limitations and Defenses**

3.1    For the period October 23, 2002 though the later date(s) on which both El Paso Tennessee and El Paso Corporation default, as defined in Section 4 below, on their respective obligations under the Settlement Agreement and Guaranty to provide and pay for the Settlement Plan:

(a)    Any defense or bar to Plaintiffs' claims based upon the passage of time, such as statute of limitations or laches, shall be tolled and taken away as provided in the Stipulated Order; and

(b)    Any defense that CNH America has asserted to liability for Plaintiffs' claims shall be preserved and shall not be compromised as provided in the Stipulated Order.

4.    **Default by El Paso Tennessee and El Paso Corporation**

4.1    For purposes of this Tolling Agreement, El Paso Tennessee shall be deemed to have defaulted on its obligations under the Settlement Agreement if it fails to provide and pay for the Settlement Plan as provided in the Settlement Agreement.

4.2    For purposes of this Tolling Agreement, El Paso Corporation shall be deemed to have defaulted on its obligations under the Guaranty if it fails, after reasonable demand and

efforts by Plaintiffs to enforce the Settlement Agreement and Guaranty, to fulfill all of El Paso Tennessee's obligations under the Settlement Agreement as required under the Guaranty.

4.3     Class Counsel will notify General Counsel of CNH America in writing, with supporting documentation of default and Plaintiffs' reasonable demand and efforts to enforce the Settlement Agreement and Guaranty, within 21 days of the date that both El Paso Tennessee and El Paso Corporation are deemed to have defaulted under Section 4.1 and Section 4.2.

4.4     Within 21 days after receiving Class Counsel's notice of default in Section 4.3, CNH America must elect in writing to either:

  (a)   Assume and agree to be bound by El Paso Tennessee's future obligations under the Settlement Agreement to provide and pay for the Settlement Plan from the date of El Paso Tennessee and/or El Paso Corporation's failure to provide and pay for the Settlement Plan ; or

  (b)   Refuse to assume and be bound by the Settlement Agreement in any manner.

4.5     In the event CNH America elects to assume and be bound by the Settlement Agreement under Section 4.4(a), it will constitute a complete settlement and release of the Class Representatives' claims for damages, attorney's fees, interest or any other monetary recovery, on behalf of the Class, against CNH America in the Litigation.

4.6     In the event CNH America elects to refuse to assume and be bound by the Settlement Agreement under Section 4.4(b), the Class Representatives or their successors may re-initiate their claims in the Litigation, on behalf of the Class, against CNH America and seek the following relief against CNH America:

  (a)   From the date of El Paso Tennessee and/or El Paso Corporation's failure to provide and pay for the Settlement Plan, restoration of the full retiree

3

health care benefits in effect under the 1990 Group Benefits Plan prior to the effective date of the Settlement Plan;

(b)   All unreimbursed damage claims suffered by Class Members between August 1, 2002 and October 17, 2007, which damage claims were compromised as part of the Settlement Agreement;

(c)   Pre-judgment interest from October 17, 2007 forward on the unreimbursed damage claims at the rate of 6% per year compounded annually.

## 5.   Dismissal of CNH America's Related Lawsuit Against the UAW

5.1   On August 26, 2008, CNH America filed a related lawsuit against the UAW which is captioned CNH America, LLC v. United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO (UAW), Civil Action No. 09-10584 (E.D. Mich.) ("Related Lawsuit").

5.2   On July 10, 2009, the Court issued an Opinion and Order in the Related Lawsuit and, on the same day, entered a Judgment dismissing all of CNH America's claims against the UAW with prejudice.

5.3   On August 6, 2009, CNH America filed a Notice of Appeal with the United States Court of Appeals for the Sixth Circuit appealing the Court's July 10, 2009 Judgment dismissing CNH America's claims against the UAW in the Related Lawsuit.. On May 16, 2011, the Sixth Circuit entered a Judgment on appeal which ordered that the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with the opinion of the Sixth Circuit.

5.4   CNH America agrees to the entry of a Stipulated Order by the District Court dismissing the Related Lawsuit without prejudice and without costs.   Any and all claims by CNH America, and defenses by the UAW, will be preserved as they were on August 26, 2008,

notwithstanding the passage of time, until the condition set forth in Section 5.6(c) below has been satisfied. The Stipulated Order will take effect contingent on and contemporaneous with the Court's granting of a Final Judgment approving the Settlement Agreement of the Litigation.

     5.5    CNH America and the UAW agree that, immediately upon the execution of the Settlement Agreement, they will take all actions necessary to hold in abeyance any and all proceedings in the Appellate Court or in the District Court, as applicable, in the Related Lawsuit until such time as the District Court grants or denies a Final Judgment approving the Settlement Agreement of the Litigation.

     5.6    CNH America may reinitiate its claims in the Related Lawsuit in the event that: (a) both El Paso Tennessee and El Paso Corporation default as provided in Section 4; and (b) CNH America refuses to assume and be bound by the Settlement Agreement as provided in Section 4; and (c) the Class Representatives or their successors reinitiate their claims in the Litigation, on behalf of the Class, against CNH America as provided in Section 4.

## 6.    Signatures

     IN WITNESS WHEREOF, this Tolling Agreement is executed by Class Representatives and Class Counsel, and by Counsel for and a duly authorized representative of each of CNH America LLC and the UAW.

FOR THE CLASS:

By:_____
      Klimist, McKnight, Sale,
      McClow & Canzano, P.C.


Dated: _____

FOR CNH AMERICA LLC.:                    FOR THE UAW:

By: _____             By:_____

Dated:_____             Dated: _____

By: _____             By: _____
        Its: _____                   Its: _____

Dated: _____             Dated: _____

THE CLASS REPRESENTATIVES:

_____                 Dated:_____
Wilbur Montgomery


_____                 Dated:_____
Elsie Teas

_____                 Dated:_____
Robert Betker

_____                 Dated:_____
Mary Maynard

_____                 Dated:_____
Gary Halsted


156227

6

<u>Exhibit A</u>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

GLADYS YOLTON, WILBUR MONTGOMERY,
ELSIE TEAS, ROBERT BETKER, EDWARD
MAYNARD, and GARY HALSTED, on                            Hon. Patrick J. Duggan
behalf of themselves and a class of persons
similarly situated,                                                    Case No. 02-CV-75164

       Plaintiffs,                                          **CLASS ACTION**

v.

EL PASO TENNESSEE PIPELINE CO., and
CNH AMERICA LLC,

       Defendant.

_____/

**STIPULATED ORDER DISMISSING PLAINTIFFS' CLAIMS AGAINST
CNH AMERICA LLC WITHOUT PREJUDICE**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on _____.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Pursuant to a Tolling Agreement and upon the stipulation of Plaintiffs and CNH America

LLC, IT IS HEREBY ORDERED that:

1.  Plaintiffs' claims against CNH America LLC are dismissed without prejudice and

without costs to either party.

2.  As provided in the Tolling Agreement, any defense or bar to Plaintiffs' claims based

upon the passage of time, such as statute of limitations or laches, shall be tolled and taken away.

3.  As provided in the Tolling Agreement, any defense that CNH America has asserted to

liability for Plaintiffs' claims shall be preserved and shall not be compromised.

_____
UNITED STATES DISTRICT JUDGE

So Stipulated:

KLIMIST, McKNIGHT, SALE, McCLOW          McDERMOTT WILL & EMERY LLP
     & CANZANO


By:  s/Roger J. McClow_____     By:s/Bobby R. Burchfield_____
        Roger J. McClow (P27170)                Bobby R. Burchfield
Attorneys for Plaintiffs                 Attorneys for Defendant CNH America,
400 Galleria Officentre                  LLC
Suite 117                                600 Thirteenth Street, N.W.
Southfield, MI 48034-8460                Washington, DC 20005-3096
(248) 354-9650                           (202) 756-8000
rmcclow@kmsmc.com                        bburchfield@mwe.com

Dated:_____              Dated:_____
                                         HONIGMAN MILLER SCHWARTZ
                                         AND COHN LLP

                                         By_s/Norman C. Ankers_____
                                            Norman C. Ankers (P30533)
                                         2290 First National Building
                                         660 Woodward Avenue
                                         Detroit, MI  48226
                                         (313) 465-7306
                                         nankers@honigman.com

Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CNH AMERICA, LLC,

      Plaintiff,

v.                                                               Case No:  09-cv-10584

                                       Honorable Patrick J. Duggan

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS
OF AMERICA,

      Defendant.

_____/

## STIPULATED ORDER OF DISMISSAL WITHOUT PREJUDICE

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on _____.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Pursuant to a Tolling Agreement between the Parties and upon their stipulation:

**IT IS HEREBY ORDERED** that Plaintiff CNH America LLC's claims against

Defendant International Union, United Automobile, Aerospace & Agricultural Implement

Workers of America (UAW) are dismissed without prejudice and without costs to either party.

_____
UNITED STATES DISTRICT JUDGE

So Stipulated:

HONIGMAN MILLER SCHWARTZ AND
COHN LLP

By  s/Norman C. Ankers
   Norman C. Ankers (P30533)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7306
nankers@honigman.com


McDERMOTT WILL & EMERY LLP

By:  s/Bobby R. Burchfield
   Bobby R. Burchfield
   Jason A. Levine
600 13th Street, N.W.
Washington, DC 20005
(202) 756-8000
bburchfield@mwe.com


*Counsel for Plaintiff*

BREDHOFF & KAISER, P.L.L.C.

By:  /Julia Penny Clark
   Julia Penny Clark
   Judith Miller
805 Fifteenth Street, N.W., Ste. 1000
Washington, DC 20005
(202) 842-2600
jpclark@bredhoff.com
jmiller@bredhoff.com

Michael B. Nicholson (P33421)
Michael F. Saggau (P35326)
8000 E. Jefferson Ave.
Detroit, MI 48214
(313) 926-5216
mnicholson@uaw.net
msaggau@uaw.net

*Counsel for Defendant*

# EXHIBIT M
## to
## Settlement Agreement

## Indemnity Plan

## EXHIBIT M

### CASE CORPORATION
### GROUP BENEFIT PLAN

#### June 1990 Negotiations

This Group Benefit Agreement is made effective with the June, 1990 negotiations and developed through collective bargaining between the Case Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America.

The Life, Accidental Death and Dismemberment, and Survivor Income Benefit coverage described herein are provided under a Group Policy issued by the Metropolitan Life Insurance Company to the Case Corporation, and are subject to the terms and conditions of the Group Policy. Each employee will receive a Certificate setting forth, in summary, the essential features of the Plan. The medical, dental, prescription drug, vision, hearing, accident and sickness, layoff disability, and long term disability plans are provided by the Case Corporation on a self-insured basis.

Plan changes which are indicated as being effective on a specific date will be effective as of such date provided the employee is actively at work on such date or the last regularly scheduled working day prior thereto. If not actively at work on such dates, the changes will become effective upon the employee's return to active work.

I.   BENEFITS FOR EMPLOYEES

    A.   Life Insurance Effective:   June 2, 1990   $30,000.00
                                    Dec. 1, 1992   $31,000.00

        Monthly Installment Payout of Group Life Insurance - Total & Permanent Disability -

        An employee, who becomes totally and permanently disabled after attaining two or more years of seniority but prior to attaining age 65, and who does not qualify for a Normal, Regular Early, or Disability Pension under the Pension Plan, may elect to receive his life insurance benefits in fifty monthly installments at the rate of $20 per month for each $1,000 of life insurance in lieu of a death benefit.

        The first of such installments shall be payable on the later of:

        1)   the first day of the month coincident with or next following the date the employee is no longer eligible to receive Weekly Disability Benefits and Monthly Long-Term Disability Benefits;

        2)   the first day of the month following submission of required proof of such disability.

        If the employee dies while monthly installments are being paid, the remaining installments will be paid in a lump sum of not less than $500. If an employee dies after all the installments have been paid, the beneficiary will receive $500.

        In the event an employee returns to active employment with the Company after receiving payments of his life insurance in installments, the amount of insurance in effect after the return to work shall be the amount to which the employee is then entitled under the Plan then in effect. The amount of insurance in effect for further payment of monthly installments in the event of future disability shall be reduced by the total amount of the installment payments previously made.

UAWR108045

Case Corporation
Group Insurance Plan
Effective 1990

Page 2

### Continuation of Life Benefits - Total & Permanent Disability

If an employee does not elect the monthly installment payout option, Life Insurance coverage in the amount listed below will be continued:

| If You Die | June 2, 1990 | Effective on and after Dec. 1, 1992, provided you are at work on that date |
|---|---|---|
| Before age 65 | $30,000 | $31,000 |
| On and or after age 65 | | |
| with 10 or more years of service | $4,500 | |
| with 5 but less than 10 years of service | $2,500 | |
| with less than 5 years of service | No Benefits | |

The continuation of coverage will continue if the employee:

1) Is totally disabled while life insurance coverage is in effect.

2) Under age 65 when the total disability commences.

3) The employee continues to be totally disabled until the date of death.

The life insurance benefit will be payable when:

1) The total disability continued for at least nine months.

2) The employee continues to provide proof that the total disability continues. The employee will not be required to provide proof of continued disability more than once a year.

The employee may be required to undergo an independent medical examination by a doctor of the insurance company's choice, at no cost to the employee. The employee will not be required to undergo the examination more than once a year.

If the employee does not provide proof of total disability, when required, the life insurance benefits will cease.

An employee shall be deemed to be totally and permanently disabled if he is unable, due to physical or mental incapacity, to perform any job for which the employee is qualified for by reason of education, training or experience.

B. Accidental Death & Dismemberment Insurance

| Effective: | | |
|---|---|---|
| | June 2, 1990 | $15,000 |
| | Dec. 1, 1992 | $15,500 |

June 4, 1990

UAWR108046

Case Corporation
Group Insurance Plan
Effective 1990

Page 3

1) If an employee is injured in an accident, Accidental Death or Dismemberment Benefits will be paid:

   (a) if the accident occurs while covered for Accidental Death or Dismemberment Benefits; and

   (b) if that accident is the sole cause of the injury; and

   (c) if that injury is the sole cause of a Covered Loss; and

   (d) if that loss occurs not more than two years after the date of that accident.

2) The maximum benefit for all losses caused by all injuries which an employee sustains in one accident is $15,000; if the accident occurs after Dec. 1, 1992 the maximum amount is $15,500.

3) In the event an employee dies as the result of a work incurred accident for which Worker's Compensation Benefits are payable by Case Corporation, the amount payable is $30,000; this increases to $31,000, effective Dec. 1, 1992.

4) Table of Covered Losses & Benefit Amounts

| Covered Losses (Subject to Exclusions) | Benefits Amount | |
|---|---|---|
| | June 2, 1990 | Dec. 1, 1992 |
| Loss of Life | $15,000 | $15,500 |
| Loss of sight of both eyes | $15,000 | $15,500 |
| Loss of both hands | $15,000 | $15,500 |
| Loss of both feet | $15,000 | $15,500 |
| Loss of one hand or one foot, together with loss of sight of one eye | $15,000 | $15,500 |
| Loss of one hand | $ 7,500 | $ 7,750 |
| Loss of one foot | $ 7,500 | $ 7,750 |
| Loss of sight of one eye | $ 7,500 | $ 7,750 |

Loss of sight of an eye means that the eye is entirely blind and that no sight can be restored in that eye.

Loss of a hand means that all of the hand is cut off at or above the wrist.

Loss of a foot means that all of the foot is cut off at or above the ankle.

5) Exclusions

   Each of the above losses is not a Covered Loss if it in any way results from, or is caused or contributed to by:

   (a) Physical or mental illness, diagnosis of or treatment for the illness; or

June 4, 1990

UAWR108047

Case Corporation                                                    Page 4
Group Insurance Plan
Effective 1990

       (b)    An infection, unless it is caused by an external wound that can be seen and which was sustained in an accident; or

       (c)    Suicide or attempted suicide; or

       (d)    Injuring yourself on purpose; or

       (e)    Hernia, no matter how or when sustained;

       (f)    A war, or a warlike action in time of peace.

C.    Survivor Income Benefit Insurance

The Survivor Income Benefit consists of two elements:

       (a)    Transition Survivor Benefits which may be payable for 24 months.

       (b)    Bridge Survivor Benefits which may be payable after the 24 months of Transition Survivor Benefits.

1.    Transition Survivor Benefits shall be: Effective **June 2, 1990** for persons who become eligible:

       (a)    $450.00 for each month there is no eligible survivor in the class who is eligible for an unreduced benefit under Social Security; and,

       (b)    $300.00 for any month in which any eligible survivor in the class is eligible for an unreduced benefit under Social Security.

The order in which survivors qualify for benefits is as follows:

Class 1 - Spouse -- If he or she was married to the employee for at least one year immediately prior to the date of death.

Class 2 - Child or Children -- If unmarried and under 21 years of age at the time each monthly benefit is payable.

Class 3 - Parent -- If, during the calendar year preceding the year of death the deceased provided at least 50% of the parent's support.

       (d)    The surviving spouse of an employee who dies as the result of work incurred accident or illness for which Worker's Compensation Benefits are payable by the Company, will be entitled to continue Medical, Drug, Dental, Vision and Hearing Aid coverage at no cost. Such coverage shall cease on the surviving spouse's remarriage, attainment of age when such surviving spouse is eligible for Medicare or upon death.

           The coverage during such period will include children who would have been covered as dependents of the employee had he not been deceased. If the spouse's coverage ceases because of death or remarriage, coverage for such children will continue for as long as the children would have continued if the spouse had not died or remarried.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 5

    (e)   The transition survivor benefit will be payable on the first day of the calendar month after the death of the employee. This payment will continue until the earliest of:

        (1)   the date 24 transition survivor benefits have been paid; or,

        (2)   the date there are no eligible survivors left in any class of survivors.

2)   Bridge Survivor Income Benefits shall be $450.00 per month, effective June 2, 1990, for persons who become eligible on/or after that date.

    a)   A surviving spouse will be eligible for Bridge Benefits if the surviving spouse is at least 45 years old; or if the spouse's age at the time of the employee's death, plus the years of service of the deceased employee, total 55 or more.

    b)   Six (6) months of free Medical, Drug, Dental, Vision and Hearing Coverage will be provided to Surviving Spouses eligible for Bridge Benefits for a death occurring on or after the date of this Agreement.

       The Coverage for such period will include children who would have been covered as dependents of the employee. Benefit will be extended one month beyond age 62.

    c)   The first Bridge Survivor Benefit will be payable on the first day of the calendar month after 24 transition survivor benefits have been paid. The Bridge Survivor Benefit will continue until the earliest of:

        (1)   The date the surviving spouse remarries or dies.

        (2)   The date the surviving spouse reaches --

           a.   age 62 and one month.

           b.   any lower age at which full benefits become payable under the Federal Social Security Act.

D.   Optional Contributory Life Insurance

In addition to the basic plan of non-contributory life insurance, employees have the option of choosing an additional amount of contributory life insurance under one of the plans shown below.

| Plan | Amount of Life Insurance |
|------|--------------------------|
| A | $ 5,000 |
| B | $10,000 |
| C | $15,000 |
| D | $20,000 |

The cost for the life insurance is $ .53 per $1,000 per month and is paid monthly via payroll deduction.

June 4, 1990

UAWR108049

Case Corporation                                          Page 6
Group Insurance Plan
Effective 1990

Employees who are on layoff or receiving weekly Accident & Sickness benefits may elect to continue coverage for a period of time equal to the basic life extension, up to one year by paying the appropriate monthly contribution.

After electing an amount of optional contributory life insurance, an employee cannot change to a higher or lower amount unless the employee makes a written request to the Insurance Company to do so. In addition, an employee will be required to submit evidence of good health before the life insurance can be increased to a higher amount.

The Accidental Death & Dismemberment coverage, total and permanent disability provisions which apply to basic non-contributory life insurance do not apply to the contributory coverage.

E.   Weekly Accident & Sickness Benefits

If an employee becomes, while actively employed and eligible for Weekly Accident & Sickness Benefits, totally disabled due to non-occupational illness or injury and is under the care of a physician licensed to practice medicine, the amount of Weekly Benefits provided by the following schedule shall be paid to the employee each week during the period the employee is so disabled and under such treatment, for the duration stated in this section.

<u>Accident & Sickness Benefits</u>

Employee Average Hourly
Rate Earnings of:
<u>Period Commencing: June 2, 1990</u>

| | |
|---|---|
| **Less than 13.95** | 295 |
| 13.95 less than 14.30 | 300 |
| 14.30 less than 14.65 | 305 |
| 14.65 less than 15.00 | 310 |
| 15.00 less than 15.35 | 315 |
| 15.35 less than 15.70 | 320 |
| 15.70 less than 16.05 | 325 |
| 16.05 less than 16.40 | 330 |
| 16.40 less than 16.75 | 335 |
| 16.75 less than 17.10 | 340 |
| 17.10 less than 17.45 | 345 |
| 17.45 less than 17.80 | 350 |
| 17.80 less than 18.15 | 355 |
| 18.15 less than 18.50 | 360 |
| 18.50 less than 18.85 | 365 |
| 18.85 less than 19.20 | 370 |
| 19.20 less than 19.55 | 375 |
| **19.55 or more** | 380 |

2)   Totally disabled means that because of a sickness or an injury that an employee cannot do his job; or the employee cannot do any job which they are fit for by reason of education, training or experience.

3)   Weekly Accident and Sickness Benefits shall not be payable while the employee is retired under a pension plan of the Company, to which the Company has contributed, and is receiving pension benefits from that pension plan.

June 4, 1990

Case Corporation                                                    Page 7
Group Insurance Plan
Effective 1990

4) Effective June 2, 1990, the calculation of employee's "Base Hourly Rate" to determine the benefit amount for Weekly A&S benefits and Long Term Disability Benefits will be continued on the present calendar quarter schedule.  The calculation will include the employee's base hourly rate (Schedule A, B, or C), incentive earnings (for Schedule B employees only), shift premium and the other items which were included under the prior contract, except overtime premium, provided that the COLA to be included for the life of the new contract will be limited to the COLA included in the calculation in effect as of March 1, 1990, which was $1.21.

5) Weekly Benefits will continue during total disability for up to a maximum of 52 weeks for employees who have at least 52 weeks seniority.

6) Employees who have less than 52 weeks seniority when first disabled will receive benefits for a period equal to their seniority when first disabled rather than a full 52 weeks. However, benefits may continue beyond a period equal to seniority up to the full 52 weeks while such an employee is hospitalized or drawing Worker's Compensation Benefits.

7) Weekly Accident and Sickness Benefits are not payable for disabilities resulting from occupational illness or injury.  The Company shall, however, supplement Worker's Compensation weekly benefits in order to provide a total benefit level which is equivalent to the Weekly A&S indemnity rate including such payment during the Worker's Compensation initial waiting period.

8) Weekly Accident and Sickness Benefits shall not be payable for any day the employee receives Holiday Pay.

9) In the event an employee returns from an occupational disability absence and is assigned to a lower rated job because of an occupational disability with a resulting loss of pay, his benefit payments, should he again become disabled, will be based on the highest hourly wage rate the employee received within the last six months prior to the time the occupational injury or disability occurred.  Benefits shall be determined in the aforementioned manner until six months after the employee recovers from his disability and is physically capable of performing a job as highly rated as the job he had prior to the occupational disability.

10) Weekly Sickness and Accident Benefits will be paid commencing with the first day of total disability due to accident or the eighth day of total disability due to illness, except that benefits will commence with the first day of hospitalization occurring during such period of disability or with the day on which a covered surgical procedure is performed without hospitalization for which the physician's fee is $25 or more.

11) The waiting period for A&S Benefits for employees receiving treatment for substance abuse as provided in the Plan, will be eliminated, provided the Company will have the right to designate the approved facility for treatment of repeat confinements.

June 4, 1990

Case Corporation                                                    Page 8
Group Insurance Plan
Effective 1990

12) In the event of a contested claim for Worker's Compensation
benefits, the employee shall receive an amount of money equal to
his current Weekly A&S rate. The employee will be required to
sign a reimbursement form which will provide that any Worker's
Compensation judgment in favor of the employee which duplicates
a payment previously made by the Company, will be returned to
the Company by the employee, or deducted from any final
settlement the Company may be required to make.

13) One-fifth of the Weekly A&S Benefit amount will be paid for each
work day an employee is absent due to total disability.

14) Disabilities resulting from pregnancies will be considered for
Weekly A&S Benefits and Long Term Disability Benefits as other
disabling illnesses or injuries.

15) If an employee is granted a leave of absence due to a clinically
anticipated disability based on the natural course of the
employee's diagnosed condition, upon medical certification
satisfactory to the Company from the employee's attending physi-
cian that the employee is totally disabled, A&S benefits will be
payable.

16) Weekly accident and sickness benefits are payable for a maximum
of 52 weeks for any one continuous period or disability which is
due to one or more causes. Successive periods of disability
which are due to same cause or a related cause will be consider-
ed one continuous period unless separated by a period of at
least 90 days.

17) The amount of weekly accident and sickness benefits for a con-
tinuous period of disability is the amount in effect at the time
that period of continuous disability starts. The amount of
weekly accident and sickness benefits will be reduced by the
amount an employee receives from any fund, other insurance or
other source of disability benefits provided by state or
governmental law.

18) The following guidelines will be used by the Company to imple-
ment the reduction of Accident and Sickness benefits by Social
Security disability insurance benefits.

(a) As early as the thirteenth but no later than the twentieth
week of disability, depending upon the initial prognosis
on the claim, an Employee will be notified of the
eligibility requirements and advised to apply for Social
Security Disability Insurance Benefits (DIB).

The Employee will be advised that, effective with the pay-
ment for the twenty-sixth week of disability, Accident and
Sickness (and Long Term Disability) benefits computations
will presume eligibility for DIB except that if, prior to
such twenty-sixth week, the Employee files for DIB and
completes a reimbursement agreement and an authorization
form allowing the Social Security Administration to advise
the Company or Administrator of its determination, he
shall receive unreduced Accident and Sickness (or Long
Term Disability) benefit payments while he is otherwise
eligible. Further, the Employee will be instructed that,
if his physician anticipates that the Employee's
disability will not extend beyond twelve months, his
physician should complete a statement indicating such a

June 4, 1990

UAWR108052

Case Corporation
Group Insurance Plan
Effective 1990

Page 9

prognosis. Where such a statement is provided, a reduction of Accident and Sickness (or Long Term Disability) benefits, based on presumed eligibility for DIB, will not be instituted in the twenty-sixth week of disability.

If during the ensuing period of disability it becomes apparent that either (1) through deterioration of the Employee's condition; or (2) prolongation of the recovery period, that he will not return to work for a prolonged period, he will be requested to file for DIB and complete reimbursement and authorization forms.

(b)   In the twenty-fourth week of disability, any employee whose physician has not completed the statement referenced in "(a)" above, will be again advised to apply for DIB if he has not done so and instructed to complete a reimbursement agreement and an authorization form allowing the Social Security Administration to advise the Company or Administrator of its determination.

Failure to (1) apply for DIB; (2) complete a reimbursement agreement; or (3) complete the authorization form will result in the suspension of an amount of Accident and Sickness (or Long Term Disability) benefits equal to the presumed amount of DIB (commencing at the 16th week) until the Employee provides satisfactory proof that he has applied for DIB, completed a reimbursement agreement and an authorization form. The Employee also will be advised that he may authorize release of information in the Accident and Sickness (and Long Term Disability) benefit claim files to the Social Security Administration.

(c)   Upon receipt of an initial determination of disallowance of DIB, a notice will be sent instructing the Employee to (1) file a request for reconsideration, within two weeks of the date of the notice; and (2) complete an authorization form allowing the Social Security Administration to advise the Company or Administrator of its determination.

Failure to either (1) request such reconsideration within such time period; or (2) complete the authorization form will result in suspension of an amount of Accident and Sickness (or Long Term Disability) benefit payments equal to the presumed amount of DIB until the Employee provides satisfactory proof that such request has been filed and the authorization form has been completed.

(d)   Upon receipt of a reconsideration determination of disallowance, the Employee will be encouraged to file for a hearing before an administrative law judge of the Social Security Administration. If the Employee files for such a hearing, he will be requested to complete another authorization form as referenced in "(c)" above.

(e)   In the event of a reconsideration determination denying DIB, and provided any subsequent review does not reverse such decision, the Employee will not be required to repay any Accident and Sickness (or Long Term Disability) benefits otherwise payable, unless such denial of DIB resulted from the Employee's refusal to accept vocational rehabilitation. Where such denial occurs, the Employee is

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

obligated to repay Accident and Sickness (and Long Term Disability) benefits in an amount equal to the amount of DIB to which he would otherwise have been entitled for the same period or periods of disability.

(f)   Upon receipt of a notice of award of DIB, any overpayment of Accident and Sickness (or Long Term Disability) benefits caused by the retroactive award of DIB is to be repaid.  The amount of the overpayment will be based on the actual amount of such award.

(g)   In the event of a DIB award resulting from a reconsideration or hearing before an administrative law judge, the amount of Accident and Sickness (and Long Term Disability) benefits overpayment will be reduced by an amount equal to any attorney fees associated with the award, provided that (1) the Employee makes such repayment within thirty days of the date the Employee is notified of the amount to be repaid; and (2) such reduction applies only to attorney fees associated with the successful appeal of a denial of DIB and includes only that portion of the attorney's fee associated with the period of time the Employee was entitled to receive Accident and Sickness (and Long Term Disability) benefits; and (3) such reduction for such attorney fees may not exceed 25 percent of the overpayment.  Attorney fees for services prior to denial of the initial application for DIB will not reduce the amount of overpayment.

(h)   An Employee age 65 or older may be entitled to Old-Age Benefits as early as the first day of total disability.  No reduction of Accident & Sickness benefits shall be made until the Employee provides evidence that he is receiving Old-Age Benefits (through authorization of information disclosure by the Social Security Administration or otherwise).  If requested, such evidence shall be provided by such an Employee.

(i)   In the event an Employee receives an initial determination of disallowance of DIB, all amounts of Accident & Sickness Benefits withheld will be paid to the Employee unless the Employee was denied DIB for failure to accept vocational rehabilitation or for not filing for DIB within the period of time specified by the Social Security Administration as necessary for DIB to commence at the first of the sixth month of disability.

(j)   When the company mails the initial notice to the Employee requesting that the Employee apply for DIB, a copy of such initial notice will be mailed to the Union's Local Insurance Representative, if any, of the facility at which the Employee works.

F.   Lay-Off Disability Benefits (Sub-Plan)

1)   Eligibility - An employee shall be eligible for Lay-Off Disability Benefits if he meets all of the following conditions:

(a)   He is on a qualified lay-off under the Supplemental Unemployment Benefit Plan;

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 11

    (b)   *He was eligible for a regular benefit under the Sub-Plan immediately prior to the time he became disabled, or, if not so eligible, was employed by another employer at such time;

    (c)   He is totally disabled by disease or accidental injury so as to be unable to perform any job for the company;

    (d)   He is under the care of a physician;

    (e)   He is not eligible for Sickness & Accident Benefits or Long Term Disability Benefits.

    *    This requirement shall not apply to an employee who is ineligible for a regular benefit under the SUB-Plan because of failure to meet the requirements of the UC earnings test.

2)   **Amount** - The weekly Lay-Off Disability Benefit shall be equal to the weekly Accident & Sickness Benefit applicable to the employee. For each week that the employee receives a Lay-Off Disability Benefit, SUB Credit Units shall be canceled in the manner provided with respect to receipt of SUB benefits under the SUB-Plan. Lay-Off Disability Benefits shall be reduced by the amount of any disability benefit the employee received for the same week or portion thereof under a plan of another employer.

3)   **Period of Payment** - Payment of Lay-Off Disability Benefits shall commence on the first day of disability, or the day immediately following the last day for which a regular benefit is payable under the SUB-Plan, whichever is later. Payment shall cease upon the earlier of:

    a)   Exhaustion of all full SUB credit units;

    b)   Recovery from total disability;

    c)   Recall from layoff;

    d)   Employees otherwise eligible for Lay-Off Disability Benefits will continue to receive the Benefit until exhaustion of all full SUB Credit Units under the cancellation provisions of the Plan regardless of status of SUB fund. After SUB Credit Units have been exhausted, employees otherwise eligible will continue to receive Lay-Off Disability Benefits for a period of up to 52 weeks from date of lay-off in the amount of the applicable State U.C. benefit or $150, whichever is greater.

4)   **Special Provisions**

    a)   If an employee is recalled from lay-off while receiving Lay-Off Disability Benefits and immediately qualifies for Accident & Sickness Benefits, the maximum number of weeks for which such Accident & Sickness Benefits are payable shall be reduced by the number of weeks for which Lay-Off Disability benefits were paid.

June 4, 1990

UAWR108055

Case Corporation
Group Insurance Plan
Effective 1990

    b)   If an employee ceases to be totally disabled and remains on a qualifying lay-off under the SUB Plan, Lay-Off Disability Benefits shall be payable for the remaining days in the same week (as defined in the SUB Plan) for which he does not receive a regular benefit under the SUB Plan.

    c)   An employee may waive irrevocably any right he may have to receive Lay-Off Disability Benefits with respect to any period of disability by completing a waiver form furnished by the Company.  No Lay-Off Disability Benefits shall be payable for the period covered by such waiver.

G.   Long-Term Disability Benefits

    1)   Eligibility - An Employee with two or more years seniority and who is eligible for Weekly Accident & Sickness Benefits and who, as of the date of expiration of the maximum number of weeks for which he is entitled to receive Weekly Accident & Sickness Benefits and during a continuous period of disability thereafter, is totally disabled so as to be unable to engage in any gainful occupation or employment for which he is reasonably qualified by education, training or experience, receives Long Term Disability for the period described in this section.

### Long Term Disability Benefits

Employees Average Hourly
Rate Earnings of:
Period Commencing:  **June 2, 1990**

| | Less Than 10 Years | 10 Years or More |
|---|---|---|
| **Less than 13.95** | 1045 | 1165 |
| **13.95 less than 14.30** | 1065 | 1185 |
| **14.30 less than 14.65** | 1085 | 1205 |
| **14.65 less than 15.00** | 1100 | 1225 |
| **15.00 less than 15.35** | 1120 | 1245 |
| **15.35 less than 15.70** | 1140 | 1265 |
| **15.70 less than 16.05** | 1160 | 1285 |
| **16.05 less than 16.40** | 1180 | 1305 |
| **16.40 less than 16.75** | 1200 | 1325 |
| **16.75 less than 17.10** | 1220 | 1345 |
| **17.10 less than 17.45** | 1240 | 1365 |
| **17.45 less than 17.80** | 1260 | 1385 |
| **17.80 less than 18.15** | 1280 | 1405 |
| **18.15 less than 18.50** | 1300 | 1425 |
| **18.50 less than 18.85** | 1320 | 1445 |
| **18.85 less than 19.20** | 1340 | 1465 |
| **19.20 less than 19.55** | 1360 | 1485 |
| **19.55 or more** | 1380 | 1505 |

    2)   The Long Term Disability Benefit shall be reduced by:

    a)   Primary Social Security Benefit

    b)   Retirement benefits provided under the Case Corporation Company Pension Plan

June 4, 1990

UAWR108056

Case Corporation
Group Insurance Plan
Effective 1990

  c) Worker's Compensation Benefits

  d) Disability benefits under any State or Government Plan

  e) Disability benefits under any other Company-sponsored Plan

  f) The amount of Widow's benefit available under Social Security.

3) Effective June 2, 1990, the calculation of employee's "Base Hourly Rate" to determine the benefit amount for Weekly A&S Benefits and Long Term Disability Benefits will be continued on the present calendar quarter schedule. The calculation will include the employee's base hourly rate (Schedule A, B, or C), incentive earnings (for Schedule B employees only), shift premium and other items which were included under the prior contract, except overtime premium, provided that the COLA to be included for the life of the new contract will be limited to the COLA included in the calculation in effect as of March 1, 1990 which was $1.21.

4) In the event the employee makes application and is denied benefits under the above specified programs, the Long Term Disability Benefits shall not be reduced. Failure of the employee to make application shall, however, cause the Long Term Disability Benefits to be reduced by an amount which would have been payable except for the failure to apply.

5) The reduction of benefits for which the employee is eligible under Worker's Compensation laws or other laws providing benefits for occupational injury or disease, including lump sum settlements, shall exclude specified allowances for loss, or one hundred percent (100%) loss of use of a bodily member.

6) Long Term Disability benefits will not be payable for any period during which the employee engages in any gainful occupation. However, an employee will not be ineligible for Long Term Disability Benefits because of work which is determined to be primarily for training under a recognized program of vocational rehabilitation. During the first two years Long Term Disability Benefits are payable the earnings from such rehabilitative employment shall not be deducted from the Long Term Disability Benefits. Thereafter, such earnings shall be deducted.

7) Long Term Disability benefit computations shall presume eligibility for Social Security Disability insurance benefits, and if the employee has ten (10) years of service, total and permanent disability pension benefits. Deductions from Long Term Disability benefits will be made on this basis unless the person receiving benefits provides satisfactory evidence that these benefits were applied for and denied; provided however, that a reduction shall be made in the amount equal to Social Security disability insurance benefits that would have been payable except for refusal to accept vocational rehabilitation services.

8) In determining the amount by which Long Term Disability benefits shall be reduced, the monthly equivalent of benefits paid on a weekly basis shall be computed by multiplying the weekly benefit rate by 4.33. In the case of lump sum settlements under Worker's Compensation, the reduction shall be equal to the amount of Worker's Compensation benefit to which the employee

June 4, 1990

UAWR108057

Case Corporation
Group Insurance Plan
Effective 1990

would have been entitled under applicable law had there been no lump sum payment, but not to exceed in total the amount of the settlement.

9) The cumulative total number of months during any previous periods of eligibility for Long Term Disability Benefits, regardless of whether for the same or related disabling condition, reduces the maximum number of monthly benefit payments for which the individual is otherwise eligible should Long Term Disability benefits again commence.

10) Long Term Disability Benefits are not payable for any period of disability resulting from...

    a) intentionally self-inflicted injury or where a contributing cause was the commission of a felony;

    b) war or act of war, or due to any act of international armed conflict, or conflict involving the armed forces of any international authority.

11) Long Term Disability Benefits will continue until:

    a) If the disability commences prior to age 60...

        1. Up to the earlier of

            a. For a period equal to the employee's seniority on the date he became disabled less one year; or,

            b. The day before the employee turns age 65.

    b) If the disability commences after age 60 but prior to age 63...

        1. Up to the earlier of

            a. The date the employee receives sixty months of LTD benefits; or,

            b. The day before the employee turns age 70.

    c) If the disability commences after age 63 but prior to age 65...

        1. The date the employee receives twelve months of LTD benefits.

    d) No disability benefits will be payable if the disability commences on or after the employee is age 65.

12) Increases in Social Security, Worker's Compensation, pension or disability benefits provided under any Government Plan occurring after the initial date LTD benefits are payable will not be offset against LTD benefits. Redeterminations of pension or Social Security benefits which result in greater benefits will be offset.

June 4, 1990

UAWR108058

Case Corporation                                                    Page 15
Group Insurance Plan
Effective 1990

II.  BENEFITS FOR EMPLOYEES & DEPENDENTS

Medical Expense Plan

The Medical Expense Plan described as follows pays benefits for medical
expenses incurred as a result of non-occupational injuries or sickness to
the extent such expenses are reasonable, necessary and customary and are
performed or prescribed by a physician or surgeon licensed to practice
medicine in a legally constituted hospital or elsewhere.

A.   Type A Benefits - Covered Hospital Expenses -

The following will be paid at 100% of reasonable and customary
charges:

1) Length of Stay:  Benefits are provided for a participant for up
   to 365 days of hospital care per disability.

2) Room Accommodations:  Up to the amount of the hospital's semi-
   private room rate; excluding in the case of private room accom-
   modations, any charges over the hospital's most common semi-pri-
   vate room rate.  Coverage for hospital private rooms shall
   include full payment for periods when semi-private rooms or
   other accommodations are not available.

3) Hospital Services:  This covers the full cost of all hospital
   services, equipment, medications and supplies that are
   furnished, provided by, and used in the hospital to the extent
   that they are consistent with and necessary for, the admission,
   diagnosis or treatment of the participant.

4) Maternity Care:  Both mother and child receive full benefits for
   up to 365 days (including newborn infant nursery care).

5) Out-Patient (non-bed) Care:  Benefits are payable for reasonable
   and customary charges made by a hospital for services rendered
   for:

   a) First-aid accident emergency care within 48 hours from the
      time of the accident.

   b) Out-patient surgical procedures.

   c) X-ray, radiation therapy and chemotherapy for proven
      malignancies.  Employees and dependents receiving
      Chemotherapy treatments on an out-patient basis at a
      hospital will not have such days of treatment deducted
      from the total entitlement for in-hospital confinements.

   d) Hemodialysis services.

   e) Emergency care and treatment received immediately after
      the onset of a medical emergency.

      "Medical Emergency" means the sudden and acute onset
      of a medical (non-surgical) condition requiring
      medical treatment which should be secured
      immediately.  Severe symptoms must occur, and
      failure to render treatment could reasonably result
      in placing the patient's life in jeopardy or cause
      serious harm to the patient's health.  "Medical
      Emergencies" include heart attacks, cardiovascular

                                                    June 4, 1990

Case Corporation                                    Page 16
Group Insurance Plan
Effective 1990

accidents, poisoning, loss of consciousness or respiration, and other such acute conditions as may be determined to be "Medical Emergencies" by the Administrator.

6) Nervous, Mental & Sanitaria Care: For care of nervous or mental conditions, care in sanitaria, or care in any hospital that is not a general hospital, the plan provides up to 120 days of protection per calendar year. Each confinement has a maximum of sixty days. To become eligible for additional confinement days, the participant must be out of the hospital or sanitarium for ninety days.

7) Out-Patient Hospital Pre-Admission Screening Tests to meet hospital admission requirements will be covered in full even though billed separately by the Hospital or a Physician. Such tests must be performed within seven days preceding confinement.

8) Hospital admission kits will be paid in full under Type A benefits.

9) If the individual is confined to the hospital as an in-patient as a result of false labor, the hospital and physician's expenses incurred are paid as Type A and Type B benefits.

10) Routine nursery care, including circumcision and the initial pediatric examination by a doctor other than the delivering doctor, of a newborn dependent child while the newborn is confined in the hospital following birth.

11) Facility services by a Surgi-Center.

12) Substance Abuse: Treatment for substance abuse (drugs/alcohol) will be limited to 31 days per calendar year.

B. Type B Benefits – Physician's Charges for Surgery, In-Hospital and Select Medical Care Procedures.

The payment of Physician's charges* will be provided at 100% of reasonable and customary charges with a maximum of $25,000 for any one accident or sickness for each covered individual for the services listed on the following pages.

1) Surgical Services: Physicians' charges* will be paid in full for surgical services wherever performed. Physicians' charges will also be paid for the treatment of accidents.

2) Physicians' charges* will be paid in full for maternity services.

3) Medical Services (In-Hospital): Physicians' charges* will be paid in full for in-hospital medical care rendered to bed patients.

4) Anesthesia Services: Physicians' charges* will be paid in full for anesthesia services which are associated with surgical services, maternity services or accidents.

June 4, 1990

UAWR108060

Case Corporation                                          Page 17
Group Insurance Plan
Effective 1990

5)   Diagnostic X-Ray and Laboratory Services:  Physicians' charges*
     will be paid in full for diagnostic X-ray and Laboratory Ser-
     vices.  X-rays taken to determine whether there is a fracture
     will be paid as Type A or Type B expense, even if there is no
     fracture.

6)   Radiation Therapy:  Physicians' charges* will be paid in full
     for the treatment of proven malignancies by the use of X-ray or
     radioactive isotopes.

7)   Assistant and Consultants (In-Hospital):  Physicians' charges*
     will be paid in full.

8)   Diagnostic Services:  Physicians' charges* will be paid in full
     for diagnostic services rendered to a participant admitted to
     the hospital as an in-patient primarily for diagnostic proce-
     dures and tests.

9)   Medical Emergency:  Physicians' charges* will be paid in full to
     the extent the actual charge is reasonable and customary, for
     the initial emergency treatment of Medical Emergencies by a
     physician in his office, hospital out-patient department, or
     elsewhere if the treatment is not otherwise covered by the Plan.

     a)   "Medical Emergency" means the sudden and acute onset of a
          medical (non-surgical) condition requiring medical treat-
          ment which should be secured immediately.  Severe symptoms
          must occur, and failure to render treatment could
          reasonably result in placing the patient's life in jeo-
          pardy or cause serious harm to the patient's health.
          "Medical Emergencies" include heart attacks, cardiovas-
          cular accidents, poisoning, loss of consciousness or
          respiration, and other such acute conditions as may be
          determined to be "Medical Emergencies" by the
          Administrator.

10)  Prescription Drugs issued by a hospital in connection with an
     emergency, shall be paid in full.

11)  Hemodialysis Services:  Physicians' charges* will be paid in
     full for services rendered in conjunction with hemodialysis
     services.

12)  Newborn medical care rendered while in-hospital, including cir-
     cumcision of a male infant, shall be covered in full.

13)  Full payment of usual, customary and reasonable charges for
     professional ambulance services for emergency and certain non-
     emergency cases, up to a maximum of $100 per trip to transport
     the patient to the nearest hospital or clinic equipped and
     staffed to provide the necessary care.  Such trips must be
     authorized as necessary by the attending physician.  Physician's
     authorization shall not be required for accident cases.  The
     maximum shall not apply to air ambulance services when such
     services are certified as having been necessary by a physician.

14)  Usual, customary and reasonable charges for pap smear tests for
     women 40 years and older will be covered in full.  This includes
     both medical and laboratory charges.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

15) Expenses incurred for the rental, and in certain cases, the purchase of durable equipment such as an iron lung, oxygen tents, or hospital-type beds, continuous passive motion devices used in connection with knee replacement surgery, insulin pumps, continuous positive airway pressure devices used to maintain airflow during sleep, segmental-type lymphedema pump, used in removing excessive lymph fluids, pressure gradient support garments (also known as Jobst appliances) made available for treatment of circulatory insufficiency conditions, as well as for burn treatments.

16) Expenses incurred for the initial purchase of artificial limbs and other prosthetic appliances and their replacement, if the replacement is medically necessary.

17) The reasonable and customary fees for adjustments to or removal of a cast which has been applied as the result of surgery or accidental injury shall be paid in full.

18) The reasonable and customary fees for Rabies injections will be paid in full.

19) The reasonable and customary fees of physicians for services provided at State Board Approved Free-Standing Surgical Centers shall be included as covered medical expenses.

20) A Focused Second Surgical Opinion Program as described in the attached letter (Page 56) will be effective no later than August 1, 1990.

21) Blood transfusions, including cost of blood and blood plasma, will be paid as Type A or Type B expenses.

22) Expenses incurred for the elective sterilization, elective abortion, except for the reversal of a sterilization procedure.

23) Expenses for out-patient physical therapy services including physiotherapy performed for a period of sixty treatment days for a specified condition resulting from disease or injury or prescribed immediately following surgery related to the condition. Such services must be performed by a doctor or by a qualified physical therapist acting on a doctor's instructions.

24) Speech Therapy Program: Speech therapy benefits will provide treatment for speech impairments due to strokes, accidents to head and/or neck, or surgery to head and/or neck. Benefits will cover treatment for congenital and severe developmental speech disorders for children under age six. Up to sixty treatments per year will be payable up to the maximum amount of the following schedule:

| Covered Speech Therapy Services | Maximum Amount Payable |
|---|---|
| Initial Evaluation | $50.00 |
| Subsequent Therapy | $12.50+ |

+per 15 minute interval - max. four intervals per treatment day.

A maximum lifetime benefit of $2,000 (subject to the above limitations) will be paid after attainment of Age 6 for continuous speech therapy for congenital and severe development speech disorders when the treatment commenced prior to Age 6.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

25) Organ Transplants - Active & Retirees

    a) Coverage under the Plan will be provided for human organ transplants.  Up to $25,000 will be payable for surgical expenses for heart, heart/lung, lung or liver transplants. Hospital benefits are also payable in addition to the $25,000 paid for surgical expenses.

    b) If benefits are payable under this Plan to or for the account of an employee or eligible dependent, the initial medical expenses of a donor providing a transplanted organ to an employee or dependent will also be considered expenses for which medical benefits will be payable under the Case Plan to the extent not covered by any other Plan providing similar benefits.

26) The Plan will pay 100% of the reasonable and customary charges without a deductible for the specified test listed below:

    -- Proctosigmoidoscopy every two years for persons age 40 and older.

    -- **Pap smear tests for women under age 40 every two (2) years,** for women age 40 and older once every year.

    -- **Mammography screening for women between age 40 and 49 once every two (2) years, and for women age 50 and older once every year.**

In addition to the test being covered at 100%, the portion of the physician's office call associated with the test will be covered at 100% without a deductible.

* The reasonable and customary charge is the lowest of:

    a) The usual charge by the doctor or other provider of the services or supplies for the same or similar services; or,

    b) The usual charge of most other doctors or other providers in the same geographic area for the same or similar services or supplies; or,

    c) The actual charge for the services or supplies.

C. Type C Benefits -- Other Covered Medical Expenses

Benefits are payable on account of the Type C expenses described below which, during any one calendar year (January 1 to December 31), are in excess of an initial deductible amount of $50.  Benefits will be 80% of all such expenses in excess of the deductible amount subject to a lifetime maximum of $50,000 for each covered individual.

1) Services other than those covered under Type B expenses of physicians including specialists; services of physicians as provided under Type B, after benefits under such portion of Plan have been exhausted.

2) The following when not covered under Type A or Type B Expenses: X-Ray and other diagnostic laboratory procedures, X-Ray or radium treatments, oxygen, anesthetics and their administration, blood transfusions, including the cost of blood or plasma, and local professional ambulance service.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

3)    Services of registered graduate nurses -- other than a nurse who ordinarily resides in the employee's home or who is a member of the employee's immediate family.

4)    Expenses for rental or lease of a kidney machine placed in the patient's place of residence, including normal installation charges including modification of existing plumbing or electrical service in the residence to bring electric or water to the kidney machine.  This includes installing an electrical outlet on a separate fuse if required, running pipe from a water source to the machine and if required, drainage pipe to the nearest outlet, maintenance, and repair of equipment, and consumable and expendable supplies used in connection with such kidney machine (such as dialysis membrane, the dialysis solution, and tubing required during dialysis), provided written permission is given in advance by the owner of the residence for installation of the machine, but only if such repetitive treatment is required because of a chronic irreversible kidney disease.

5)    Treatment of allergies, including testing, physician's diagnosis and desensitization.

6)    Where there is a charge for a doctor's office visit, and such office visit is wholly attributable to a pap smear or proctosigmoidoscopy, the charge will be paid in full.  If an office visit charge is partially attributable to a pap smear or proctosigmoidoscopy, a pro rata portion of the office visit charge will be paid, based upon that portion of the overall charge represented by the pap smear or proctosigmoidoscopy.

7)    If the individual is not confined to the hospital as an in-patient as a result of false labor, the hospital and physician's expenses incurred are paid as Type C benefits.

8)    A running record of Type C medical expenses will be maintained and provided to employees.

9)    I.V. Antibiotic Treatments.

D.    Out-Patient Substance Abuse or Mental Treatment

Benefits for the out-patient treatment of substance abuse or mental conditions are limited to $2,000 per calendar year.

Expenses incurred are payable as shown below to the extent the actual charge is reasonable and customary.

—     First five (5) visits are paid at 100%; then expenses are reimbursed at 90% until $1,000 of expenses are paid; the remaining expenses are reimbursed at 50% until the annual maximum of $2,000 is attained.

1)    A physician, for purposes of this Benefit, means a psychiatrist, psychoanalyst, psychologist, or other physician specializing in the treatment of substance abuse or mental disorders.  Benefits are payable if the provider is licensed by the State in which the service is provided.

June 4, 1990

UAWR108064

Case Corporation                                      Page 21
Group Insurance Plan
Effective 1990

2)   Out-Patient Psychiatric Benefits will be eligible for reimburse-
     ment if treatment is rendered as an out-patient in the office or
     in a Community Mental Health Center.  Out-Patient psychiatric
     treatment due to mental deficiency or retardation are not
     eligible for reimbursement.

If covered members of an employee's family in the aggregate satisfy
deductible amounts totalling $150, then after that date such $150 sum
has been satisfied, no further deductible will be required for any
covered member during the remainder of that calendar year.

Benefits are determined separately for each individual.  However, if
an employee and one or more covered dependents, or if two or more
covered dependents incur Covered Medical Expenses as a result of the
same accident, the deductible amount will be applied only once against
such expenses during the calendar year in which the accident occurs,
regardless of the number of family members injured.

If any part or all of the initial amount of an employee's own expenses
for a calendar year arises from Covered Medical Expenses incurred
during the last three months of that calendar year, then that portion
of such initial amount will be used to reduce the initial amount for
the next ensuing calendar year.  This provision will also apply to
each covered dependent.

If at any time benefits of at least $1,000 have been paid for Type C
Expenses of any employee or covered dependent and evidence of the
complete recovery and insurability of the person on whose account such
benefits were paid is submitted to the Administrator, the amount of
such benefits paid will not be included in determining the $50,000
maximum amount of benefits on account of such person on or after the
date the Administrator accepts as satisfactory such evidence of
insurability.

E.   Special Provisions

     1)   Oral Surgery & Extractions:
          Hospital and Physician's expense benefits as provided under Type
          A Benefits and Type B Benefits of the Plan shall be payable for
          an employee or dependent admitted to a hospital as an in-patient
          for oral surgery or removal of teeth, provided the surgical
          service is performed by, and the hospitalization is certified by
          a licensed physician or doctor of dental surgery, as being
          necessary due to the presence of a concurrently hazardous
          medical condition.

     2)   Maternity Benefits Coverage -- Dependents:
          Benefits as provided by the Policy for medical expenses incurred
          due to pregnancy shall be payable on behalf of all eligible
          dependents for pregnancies commencing on or after the effective
          date.  The Insurance Company may request evidence of dependent
          status.

     3)   Sterilization procedures for employees and eligible spouses
          shall be covered without evidence of medical necessity being
          required.

     4)   Elective abortions shall be covered without restrictions.

June 4, 1990

Case Corporation                                                    Page 22
Group Insurance Plan
Effective 1990

5)  In the event emergency accident medical services, normally per-
    formed within a 48-hour period following an accident are post-
    poned due to medical necessity and later performed more than 48
    hours following the accident, the services shall be paid as
    though performed within 48 hours of the accident.

6)  "Hold Harmless" Provision:
    Employees shall not be obligated for payment of fees in excess
    of the Administrator's determination of the reasonable and
    customary fee, provided the employee does not make payment of a
    charge or enter into any agreement with the physician concerning
    his fee if it is in excess of reasonable and customary fees.

    When resisted, the Company or the Administrator shall assume the
    responsibility for the added fee including legal costs, if
    involved.

7)  Optional Dependent Child Coverage Continuation:

    a)  Children who are permanently and totally disabled upon
        attainment of age 25 shall continue to be covered as
        dependents provided...

        1.  The child was covered as a dependent when the dis-
            ability commenced; and

        2.  Medical certification is submitted as proof of the
            individual's permanently and totally disabling con-
            dition.

    b)  Permanently and Totally Disabled is defined to mean any
        medically determinable physical or mental condition which
        prevents the dependent, age 25 or over, from engaging in
        substantial gainful activity and which can be expected to
        result in death or to be of long continued or indefinite
        duration.

    c)  The Company shall pay the full premium cost of Optional
        Dependent Child Coverage.

    d)  Residence in a home other than the home of an employee
        shall not exclude an otherwise dependent child from cover-
        age provided the employee is legally responsible for the
        medical expenses incurred by the child.

    e)  Children of employees who become employed on a full time,
        permanent basis by an employer which provides Medical
        Benefits shall continue to be covered as dependents for
        Medical Expense benefits for up to four (4) months or
        until they are covered as eligible employees, if earlier,
        as long as they otherwise qualify as dependents.

8.  If an incurred claim for a medical examination is submitted to
    the Administrator without a diagnosis indicating an illness or
    injury exists the claim will not be rejected solely on the basis
    that an illness or injury was not discovered in the course of
    the examination.

9.  Chiropractic services are limited to 30 visits per year, per
    covered individual.  The limited applies whether the claim is
    processed under the Type B or Type C provisions of the Group
    Medical Plan.

                                                    June 4, 1990

UAWR108066

Case Corporation
Group Insurance Plan
Effective 1990

F.  Definitions

1)  Dependents
"Dependents" are (1) an employee's spouse; (2) any unmarried child under 19 years of age of an employee, excluding in any case; (a) any person who is eligible for insurance as an employee of Case Corporation and (b) any person residing outside the United States and Canada.  The term "child" also includes any legally adopted child, any stepchild who resides in the employee's household, and any child supported solely by the employee and permanently residing in the household of which the employee is the head.

2)  Optional Dependent Coverage - Children:
Children age 19 but less than 25 shall be included for coverage provided such children are...

a)  unmarried,

b)  not in the military or similar forces of any country or subdivision thereof,

c)  not employed on a full-time basis,

d)  not residing outside the United States and Canada, and

e)  are principally dependent on the employee for maintenance and support.

3)  The Reasonable & Customary charge is the lowest of:

a)  The usual charge by the doctor or other provider of the services or supplies for the same or similar services; or

b)  The usual charge of most other doctors or other providers in the same geographic area for the same or similar services or supplies; or

c)  The actual charge for the services or supplies.

4)  A "Medical Emergency" means the sudden and acute onset of a medical (non-surgical) condition requiring medical care which should be secured immediately.  Severe symptoms must occur, and failure to render care or treatment could reasonably result in placing the patient's life in jeopardy or cause serious harm to the patient's health.  "Medical Emergencies" include heart attacks, cardiovascular accidents, poisoning, loss of consciousness or respiration, and other such acute conditions as may be determined to be "Medical Emergencies" by the Administrator.

G.  Medical Expenses Not Covered

1)  Dental Services of any kind, except for (a) benefits provided in Paragraph E, 1), (b) or necessary services for correction of damage caused by accidental injury while insured; and (c) expenses for room and board and other special hospital services while a registered bed patient.

2)  Surgery or treatment for cosmetic purposes except expenses for necessary services for correction of damage caused by accidental injury while insured.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 24

3) Eyeglasses and hearing aids or examination for prescription or fitting.

4) Routine health check-ups.

5) Expenses from injury or sickness caused by an act of war.

6) Expenses in connection with any medical or surgical treatments, care or confinement, or services which are or may be obtained without cost to a person covered under this Plan in accordance with laws or regulations of any government. If a charge is made to any such person which he is legally required to pay, any benefits under the Plan will be computed in accordance with the provisions of the Plan, taking into account only such charge. "Any government" includes the Federal, State, Provincial or local government, or any political subdivision thereof, of the United States or Canada.

7) Services for which the person receiving them is not required to make payment.

8) Expenses for which payment or reimbursement has been or may be received by or for the account of a participating employee or covered dependent as the result of settlement or legal action.

9) Any services received because of illness or injury arising out of or in the course of employment, or entitling the employee or dependent to benefits under a Worker's Compensation or Occupational Disease Law.

10) Expenses incurred prior to the effective date of the individual's insurance and expenses covered by any Group Prepayment Plan or any other Group Insurance Plan.

11) Services or supplies which are deemed to be experimental in terms of generally accepted medical standards.

12) Services or supplies to the extent that benefits are otherwise provided under this Plan or any Plan which the company (or an affiliate) contributes to or sponsors.

13) Expenses for drugs and medicine except such expenses that qualify as Type A or Type D expenses.

14) Expenses for orthopedic shoes or their rebuilding; and examinations for their prescription or fitting.

15) Charges for the completion of any insurance forms.

16) Charges for failure to keep a scheduled appointment with a doctor.

17) Covered expenses for services and supplies to the extent that the covered services and supplies are available under any plan or program in which the employee or a dependent is entitled to participate.

18) Replacement of lost, missing or stolen artificial limbs or prosthetic appliances.

19) Any duplicate artificial limb or prosthetic appliances.

June 4, 1990

UAWR108068

Case Corporation                                           Page 25
Group Insurance Plan
Effective 1990

20)  Expenses of the following rendered in connection with
     hemodialysis:

     a)  Expenses for physicians' services, other than services of
         a physician required in evaluation of the patient's condi-
         tion and instruction on use of equipment in conjunction
         with hemodialysis treatment in the out-patient department
         of the hospital.

     b)  Expenses for assistance given to the patient by family
         members or other individuals trained in the dialysis pro-
         cedure.

     c)  Expenses for training of individuals by other than (1)
         staff members of a training program of a legally consti-
         tuted hospitals; or (2) other individuals with whom the
         hospital training center has contracted for such training
         purposes.

     d)  Expenses for electricity or water used in the operation or
         maintenance of the kidney machine, installation cost of
         additional water or electrical service to the residents,
         including cost of additional electrical service lines,
         upgrading present electrical wiring, water or sewer line
         installation or upgrading present plumbing system and/or a
         sanitary waste disposal system in conjunction with or
         necessitated by the need for, or installation of, a kidney
         machine.

     e)  Expenses incurred in the installation of a kidney machine
         which are not essential to the operation.

     f)  Expenses for any costs incurred in moving a kidney machine
         to another location within the patient's place of
         residence subsequent to the initial installation.

     g)  Expenses for the use of an artificial kidney machine if no
         charge would have been made, had coverage not existed
         under this Policy or any other Plan of any other employer.

H.  Coordination of Benefits With Other Group Plans

When services or benefits for covered medical expenses under this
Comprehensive Plan are also provided under any other Group Insurance
or Group Prepayment Plan, the Comprehensive Benefits payable under
this Plan are subject to reduction to the extent necessary to make
such benefits, together with the benefits payable or the value of the
services available under all other such plans, during any one calendar
year, equal to the total amount of "Allowable Expenses" as defined
below.  In no event, however, will benefits payable under this
Comprehensive Plan be more than would have been payable in absence of
the coordination of benefits provision.

An "Allowable Expense" is any reasonable, necessary and customary item
of expense at least a portion of which is covered under any one of the
Group Insurance or Group Prepayment Plans covering the person for whom
claim is made.

Any person claiming benefits under this plan must furnish to the
Administrator and authorize the Administrator to release such
information as may be necessary to implement this provision.

                                              June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

The following procedures will be initiated for the processing of claims:

1)   When a claim is denied, the following written information will be provided to the claimant:

a)   The specific reasons for the denial.

b)   Specific reference to the pertinent plan provisions on which the denial is based.

c)   A description of what type of additional information is needed to support a claim for payment of benefits.

2)   Claims for covered medical expenses which satisfy a part of the Type C deductible will be formally processed and a record of such credit established.  The employee will receive an appropriate notice of the credit being on record.

3)   Upon request, copies of all available material pertinent to the claim, will be given to the claimant or his authorized representative.

On claims involving coordination of benefits, the Company or the Administrator will take action to relieve employees of harassment from creditors or collection agencies in the event payment was not made promptly by another Group Insurance Plan and a balance remains due because of such delay in payment.  In such event, the Company or the Administrator, after being notified by the Employee of such occurrence, will notify such creditor or collection agency that (1) coordination of benefits is involved, benefits under this Plan have been paid in accordance therewith and that an additional payment should be forthcoming from the other Plan; and (2) in the event it is finally determined that benefits are not payable under such other Plan, then benefits will be payable to the provider of service in accordance with the provisions of this Plan.  A copy of the letter to such creditor or collection agency will be sent to the appropriate credit bureau in the area in which the employee resides.

The Administrator or the Company will make an advance payment based on benefits which would be payable under this Plan as if the coordination of benefits provision were not applicable provided the employee submits to such Administrator or the Company (a) a properly completed claim form (or forms) which can be filed on behalf of the employee with the Other Plan to claim benefits under such Other Plan for Covered Services; (b) a form authorizing the Other Plan to release information; (c) an assignment of any benefits payable under such Other Plan to the Administrator or the Company with respect to the Covered Services which are the subject of the advance payment being made by the Administrator or the Company under this special arrangement; and the Employee agrees to immediately repay the amount of any overpayment under this Plan to the Administrator or the Company if such Other Plan does not honor such assignment and remits payment directly to the Employee, dependent, or provider of services.

June 4, 1990

Case Corporation                                            Page 27
Group Insurance Plan
Effective 1990

I.   Prescription Drug Expense Benefits

Prescription drug expense benefits will be payable if an eligible
employee or dependent incurs expenses for covered prescription drugs
as a result of an injury not entitling him to benefits under Worker's
Compensation or an occupational disease law, or an illness not entitl-
ing him to benefits under any such law.

1)   Benefits under the Plan will be paid as follows less the co-
     payment noted in (d) for each prescription and for each refill:

     a)   100% of the charge if dispensed by a Participating
          Pharmacy; or
     b)   75% of the reasonable and customary charge (or 75% of the
          actual charge, if lower) if dispensed by a Non-
          Participating Pharmacy within the local area; or
     c)   100% of the reasonable and customary charge (or 100% of
          the actual charge, if lower) if dispensed by a Non-Parti-
          cipating Pharmacy outside the local area.  (35 mile radius
          of the plant where employed.)
     d)   Co-payment amounts, effective May 12, 1987, to be:

          1.   $5.00 for any prescription for which a non-generic
               (brand name) drug (a product protected by trademark
               registration) is specified by a physician and/or
               dispensed by the pharmacy and for which there is an
               acceptable generic substitute available; or

          2.   $2.00 for any prescription for generic drugs (a
               product not protected by trademark registration and
               for the purposes of this provision only those pre-
               scription drugs listed by the Federal Food and Drug
               Administration for Drug Product Selection).

     e)   The laws and regulations of the State in which the
          prescription is dispensed shall be followed in determining
          the availability of an acceptable generic substitute.

     f)   Where satisfactory evidence is provided demonstrating a
          legitimate medical reason why in an individual case a
          generic substitute should not be used, the co-payment for
          the non-generic drug shall be $2.00.

     g)   Needles and syringes necessary for the injection of
          insulin.  These must be purchased simultaneously with the
          purchase of insulin and may:

          1.   be a 34-day supply if the insulin prescription is
               for a one-month supply; or
          2.   a 100-unit supply if the insulin prescription is for
               a three-month supply.

2)   Prescription Drugs Covered By The Plan Are:

     a)   Legend Drugs - Any medical substance, the label of which
          under the Federal Food, Drug and Cosmetic Act is required
          to bear the legend: "Caution: Federal Law prohibits dis-
          pensing without prescription"; and

                                                     June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

b) Non-Legend Drugs - Only the following non-legend drugs are covered: Adrenaline, Aveeno, Clinistix, Clinitest, Duo-C.V.P., Isuprel (inhalant), Peritrate, Acetaminophen N.F., Acidolate, Insulin, Mercuhydrin, Thiomerin, when prescribed or dispensed by a Doctor of Medicine (M.D.), Doctor of Osteopathy (D.O.), Doctor of Dental Surgery (D.D.S.), or Doctor of Podiatric Medicine (D.P.M.).

c) Maintenance Legend Drugs to be dispensed in maximum quantities of a 34-day supply or 200-unit doses, whichever is greater.

| | |
|---|---|
| Diphenylhydantoin | Natural & Synthetic Thyroid(s) |
| Isoniazid | Para-Aminosalicylic Acid |
| Levothyroxine | Primidone |
| Liothyronine | Prophylthiouracil |
| | Thyroglobulin |

d) Maintenance Legend Drugs to be dispensed in maximum quantities of a 34-day supply or 100-unit doses, whichever is greater.

| | |
|---|---|
| Acetazolamide | Liotrix |
| Acetohexamide | Metaproterenol |
| Albuterol | Methazolamide |
| Allopurinol | Methyclothiazide |
| Amiloride | Methyldopa |
| **Amiloride HL Hydrochlorthiazide** | Metalozone |
| Atenolol | Metoprolol |
| Bendroflumenthiazide | Minoxidil |
| Benzthiazide | Nadolol |
| Bumetanide | Nifedipine |
| Captopril | Nitroglycerin |
| Cardiac glycosides | **Payaverine** |
| Chlorothiazide | Pentecryclhritol tetranitrate |
| Chlorthalidone | Phenformin |
| Clonidine Hydrochloride | Pheylbulazone |
| **Clonidine** | Pindolol |
| Colchicine & Colchicine-probenecid | Polythiazide |
| | Potassium Chloride Liquid |
| Conjugated Estrogens U.S.P. | **Potassium Chloride Tablets** |
| Diltiazem | Potassium Gluconate |
| **Dipyridamole** | Prazosin Hydrochloride |
| **Disopyramide** | Probenecid |
| Furosemide | **Probucol** |
| **Gemifibrozil** | Procainamide |
| Gitalin | Propranolol Hydrochloride |
| **Glipizide** | Quinidine Sulfate |
| Glyburide | Reserpine |
| Hydrochlorothiazide | Spironolactone |
| **Hydrochlorothiazide/ Spironolactone** | Sulindac |
| | Terbutaline |
| **Hydrochlorothiazide/ Triamterene** | Theophylline |
| | Timolol Drops |
| **Insulin, including disposable needles and syringes when prescribed with a prescription for injectable insulin** | Timolol Maleate |
| | Tolazamide |
| | **Tolbutamide (Orinase)** |
| | Triamterene |
| | Trichlormethiazide |
| Isosorbide Dinitrate | Verapamil |

June 4, 1990

Case Corporation                                      Page 29
Group Insurance Plan
Effective 1990

3) Payment will not be made for:

   a) Any drug or medication not previously described even if dispensed on a written prescription from a Physician.

   b) Any Covered Drug furnished to you or your dependent prior to the date Prescription Drug Expense Benefits under the Group Policy became effective.

   c) Any charges for vitamins; dietary drugs, immunizing agents; cosmetic or other health and beauty aids; contraceptives and contraceptive medications; therapeutic devices and appliances; hypodermic needles, syringes (except for injection of insulin); bandages and similar supplies; support garments; and other non-medical substances, regardless of their intended use.

   d) Any charges for other than Covered Drugs or for administration of a Covered Drug, and any charges not directly related and necessary to the dispensing of a Covered Drug.

   e) Any Covered Drug which is furnished as a prescription order refill in excess of the number specified by the Doctor, or any such refill dispensed after one year from the date of the prescription order.

   f) Any drug which may not be prescribed within the scope of the Doctor's license.

   g) Covered Drugs, to the extent that such Covered Drugs or payments are available under any plan or program of any government, in which you or your dependent is entitled to participate.

      The term "any government" includes the Federal, State, Provincial or local government or any political subdivision of the United States or any other country.

   h) Any Covered Drug for which the usual and customary charge is less than the Co-Payment Amount.

   i) Any Covered Drug for which benefits are otherwise provided under the Plan.

   j) Any Covered Drug to the extent that such Covered Drug or payment for or because of such Covered Drug is provided by any other medical, surgical or hospital plan which the Employer (or any company subsidiary to or affiliated with the Employer) contributes to or otherwise sponsors.

   k) Any Covered Drug issued by a hospital for emergency care.

   l) IV Antibiotic treatments.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

J.   Mail Order Prescription Drug Option

Prescription drugs that are dispensed for an extended period can be purchased utilizing the mail order prescription drug option.

Benefits under this option will be paid as follows less the co-payment noted for each prescription and for each refill:

Co-Payment      $2.00
Quantity        Up to a three month's supply

Claim forms for the Mail Order Prescription Drug Option can be obtained from the employee's facility benefit office.


## II.   DENTAL EXPENSE BENEFIT PLAN

Covered dental expenses are the reasonable and customary charges for eligible services.  These services must be performed or prescribed by a dentist and necessary in terms of generally accepted dental standards.  The reasonable and customary charge is the lowest of:

(1)  The usual charge by the Dentist or other provider of the services or supplies for the same or similar services or supplies; or

(2)  The usual charge of most other Dentists or other providers in the same geographic area for the same or similar services or supplies; or

(3)  The actual charge for the services or supplies.

The Administrator has developed a profile on individual dentists for the purpose of establishing guidelines for reasonable and customary charges for each dentist.  Factors considered for each dentist may vary within the same locale, but generally reflect the relative cost to each dentist in conducting his practice.  As a result, the Administrator's determination of reasonable and customary charges may vary slightly from dentist to dentist.

The following dental services may be covered dental expenses, subject to the following Plan limitations:

--   The maximum benefit payable for all covered Type B and Type C dental expenses incurred in any calendar year is $1,200.  This maximum applies individually to each eligible employee or dependent.  The annual maximum will be increased to $1,400 effective January 1, 1991.

--   The maximum benefit payable for orthodontic treatment, Type D, will be $1000 for all expenses incurred during the lifetime of the eligible employee or dependent.  The orthodontic lifetime maximum will increase to $1325 effective July 1, 1990.  These increases will be provided to eligible participants even if the participant is currently undergoing orthodontic treatment.

Type A Expenses

The following will be paid at 100% of the reasonable and customary charges and such procedures shall not be included in the $1,200 annual maximum.

1)   The excision of partially or completely unerupted or impacted teeth;

2)   The excision of the tooth root (apicoectomy) without the extraction of the entire tooth;

June 4, 1990

Case Corporation                                                    Page 31
Group Insurance Plan
Effective 1990

3) Other incision or excision procedures on the gums and tissues of the mouth when not performed in connection with the extraction of or repair of teeth (but not including treatment of periodontal and other diseases of the gums and tissues of the mouth);

4) Multiple extractions while patient is an in-patient/out-patient in a hospital when a concurrent hazardous medical condition exists;

5) Gingivectomy procedures, if performed in connection with the treatment of diseased gums;

6) Topical application of fluoride;

7) Space maintainers that replace prematurely lost teeth for dependent children under 19 years of age;

8) Emergency palliative treatment; and

9) X-rays and anesthesia done as part of an orthodontic procedure.

Type B Expenses

The following procedures shall be paid at 100% of the reasonable and customary charges and are included in the $1,200 annual maximum.

1) Two oral examinations including cleaning and scaling of teeth within each calendar year (January 1 through December 31).

2) Dental X-rays, but not more than one full mouth X-ray in any period of thirty-six consecutive months; and supplementary bitewing X-rays, but not more than twice in any period of twelve consecutive months; and such other dental X-rays as are required in connection with the diagnosis of a specific condition requiring treatment.

3) Extractions.

4) Oral Surgery.

5) Fillings.

6) General anesthetics administered in connection with oral surgery or other covered dental services.

7) Treatment of periodontal and other diseases of the gums and tissue of the mouth but not surgical procedures.

8) Endodontic treatment, including root canal therapy.

9) Injection of antibiotic drugs by the attending dentist.

10) Repair or recementing of crowns, inlays, bridgework or dentures, or relining of dentures.

11) Inlays, gold fillings, crowns (including precision attachments for dentures).

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 32

### Type C Expenses

The following procedures shall be covered at 50% of the reasonable and customary charge and are included in the $1,200 annual maximum.

1) Initial installation of fixed bridgework (including inlays and crowns to form abutments).

2) Initial installation (including adjustments) of partial or full removable dentures. Adjustments are limited to a six-month period following installation.

3) Replacement of, or the addition of teeth to, existing full or partial removable dentures or fixed bridgework if:

   a) Required to replace one or more teeth extracted after the existing denture or bridgework was installed; or,

   b) The existing denture or bridgework was installed at least five years prior to its replacement and cannot be made serviceable. (This five-year rule only applies to dentures or bridgework for which benefits were payable under this Plan or any other group plan); or,

   c) The existing denture is an immediate temporary denture which cannot be made permanent and replacement by a permanent denture takes place within twelve months.

### Type D Expenses

The following procedures shall be covered at 50% of the reasonable and customary charge and are limited to a lifetime maximum of $1000.

Orthodontic treatment consisting of surgical therapy, appliance therapy and functional/myofunctional therapy.

Reimbursement for orthodontic treatment will be made on a claims-incurred basis. Where it is possible to determine the portion of charges for such treatment attributable to the period prior to commencement of coverage and the portion attributable to the period subsequent to commencement, the Dental Plan will pay the portion of the charges determined to be incurred subsequent to the commencement of coverage. Where it is not possible to apportion the charge on a basis of proportionate services, the Administrator will attempt to make a reasonable apportionment.

The following dental services are not eligible dental expenses:

1) Service or supplies received prior to eligibility for dental benefits.

2) Services not performed by a dentist except for those services of a licensed dental hygienist which are supervised and billed by a dentist and which are for:

   a) Cleaning and scaling of teeth; or

   b) Fluoride treatments.

3) Cosmetic surgery, treatment or supplies including charges for personalization or characterization of dentures (such as the capping of healthy natural teeth).

4) Replacement of lost, missing or stolen crown, bridge or denture.

June 4, 1990

UAWR108076

Case Corporation
Group Insurance Plan
Effective 1990

5)  Repair or replacement of an orthodontic appliance.

6)  Services or supplies which are covered by Worker's Compensation or occupational disease laws.

7)  Dentures, bridges, crowns, inlays, onlays and their fittings, delivered or installed more than sixty days after the employee's coverage ended.

8)  Adjustment of a denture or a bridgework which is made within six months after it is installed by the same dentist who installed it.

9)  Services or supplies which are unnecessary, according to accepted standards of dental practice, or which do not meet these standards, or which are experimental in nature.

10)  Any duplicate appliance or prosthetic device.

11)  Use of materials such as sealants used to prevent decay other than fluorides.

12)  Instruction for oral care such as hygiene or diet.

13)  Periodontal splinting.

14)  Myofunctional therapy or correction of harmful habits, other than for orthodontia.

15)  Non-surgical treatment for Temporomandibular Joint Syndrome.

16)  Implantology.

17)  Services or supplies received by a covered person for which no charge would have been made in the absence of Dental Expense Benefits for that covered person.

18)  Services or supplies for which a covered person is not required to pay

19)  Services or supplies received as a result of dental disease, defect or injury due to an act of war, or a warlike act in time of peace, which occurs while the Dental Expense Benefits for the covered person are in effect.

20)  Services or supplies to the extent that benefits are otherwise provided under this Plan or under any other plan which the Employer (or an affiliate) contributes to or sponsors.

21)  Charges for appointments not kept.

22)  Charges by the dentist for completing dental forms.

Alternate Benefits   .

The Dental Expense Benefit Plan provides for payment of expenses based on the materials and method of treatment which is the least costly method, yet meets generally acceptable dental standards.

A.  Fillings, Inlays, Onlays & Crowns

If a tooth can be repaired by a less costly method than inlay, onlay or crown, Dental Expense Benefits will be based on the adequate method of repair which costs the least.

June 4, 1990

Case Corporation                                            Page 34
Group Insurance Plan
Effective 1990

B.   Crowns, Pontics & Abutments

Veneer materials may be used for front teeth or bicuspids.  However,
Dental Expense Benefits will be based on the adequate veneer materials
which cost the least.

C.   Bridge Work & Dentures

Dental Expenses Benefits will be based on the adequate method of
treating the dental arch which costs the least.  In some cases,
removable dentures may serve as well as fixed bridgework.  If dentures
are replaced by fixed bridgework, the Dental Expense Benefits will be
based on the cost of a replacement denture unless adequate results can
only be achieved with fixed bridgework.

<u>Pre-Determination of Benefits</u>

If a dental bill is expected to be $125 or more, before the Dentist starts
the treatment, an employee can find out what Dental Expenses Benefits will
be paid under this Plan.  To do this, the employee should send a claim form
in which the dentist advises:

1)   The work to be done; and,

2)   What the cost will be.

The Administrator will then advise the employee what Dental Expense
Benefits the Plan will pay.  If the employee does not use this method to
find out what Dental Expense Benefits the Plan will pay, the
Administrator's decision will be final and binding with regard to what are
Covered Dental Expenses and what Dental Expense Benefits the Plan will pay.

The pre-determination method should not be used for:

1)   Emergency treatment; or

2)   Routine oral exams; or

3)   X-rays, cleaning and scaling, and fluoride treatments; or

4)   Dental services which cost less than $125.

<u>Dental Expense Coverage After Benefits End</u>

No benefits will be payable for Covered Dental Expenses incurred by a
Covered Person after the Dental Expense Benefits for that person end.  This
will apply even if a pre-determination of benefits for dental services has
been approved.  However, benefits for Covered Dental Expenses incurred for
a Covered Person for the following services will be paid after Dental
Expense Benefits end:

1)   For a prosthetic device if:

a)   The dentist prepared the abutment teeth and made impressions
     while the Dental Expense Benefits for the covered person were in
     effect; and,

b)   The device is installed within sixty days after the date the
     Dental Expense Benefits end; or

June 4, 1990

UAWR108078

Case Corporation                                                Page 35
Group Insurance Plan
Effective 1990

    2) For a crown if:

        a) The Dentist prepared the tooth for the crown while the Dental
           Expense Benefits for the Covered Person were in effect; and,

        b) The crown is installed within sixty days after the date the
           Dental Expense Benefits end; or

    3) For root canal therapy if:

        a) The dentist opened the tooth while the Dental Expense Benefits
           for the Covered Person were in effect; and

        b) The treatment is finished within sixty days after the date the
           Dental Expense Benefits end.

III. Vision Care Plan

Vision Care Plan coverage will be provided for employees and their depen-
dents. The company and/or Administrator will attempt to establish
contracts with suppliers of lenses, contact lenses and frames and with
dispensing services. Such contracts will provide a pre-determined selec-
tion of prescription lenses and frames to be provided without cost to the
employee, except that the employee shall be responsible for the cost of
contact lenses in excess of $15 per lens. If lenses, contact lenses, or
frames are selected and are not included in the pre-determined selection,
the employee will be responsible for the additional cost, if any, in excess
of the amounts in the schedule set forth below.

The Vision Care Plan will provide benefits (apart from arrangements with
contract providers) according to the following schedule:

| Covered Service | Maximum Amount Payable | |
| --- | --- | --- |
| Examinations: | June 2, 1990 | April 1, 1991 |
| Optometrist | $33.45 | $35.00 |
| Ophthalmologist | $41.80 | $43.70 |
| Each Lens: | | |
| Single Vision | $16.75 | $17.50 |
| Bifocal | $25.10 | $26.25 |
| Trifocal | $33.45 | $35.00 |
| Lenticular | $41.80 | $43.70 |
| Contact | $25.10 | $26.25 |
| Frames | $23.75 | $24.80 |

Benefits will be paid for lenses or frames only if twenty-four months have
elapsed since the date of the most recent examination provided by the
Vision Care Plan.

Benefits will be paid for a vision testing examination, only if twenty-four
months have elapsed since the date of the most recent examination provided
by either the Vision Care Plan or by the Company's Safety Eyeglass Program.

Benefits for lenses and examination for children 16 years of age or younger
will be provided every twelve months, if medically necessary, from the date
of the most recent examination.

June 4, 1990

UAWR108079

Case Corporation
Group Insurance Plan
Effective 1990

Page 36

If an employee is referred to an ophthalmologist for an examination by an optometrist within sixty days of the date of the Optometrist's examination, the cost of the ophthalmologist's exam will also be paid in accordance with the above schedule.

### Vision Care Services or Supplies Which are NOT Covered Vision Care Services

1) Services received by a Covered Person before the Vision Care Expense Benefits start for that person.

2) Services not prescribed as medically necessary by a Ophthalmologist, Optometrist or Optician.

3) Services or supplies which are deemed to be experimental in nature.

4) Services received because of an occupational injury.

5) Services received because of an occupational sickness.

6) Sunglass lenses, whether or not prescribed.

7) Service in connection with medical or surgical treatment.

8) Drugs or medications.

9) Special services and procedures, such as

   a) orthoptics

   b) vision training

   c) subnormal vision aids

   d) aniseikonic lenses; and

   e) tonography

10) Services to replace lost, stolen or broken lenses or frames unless at the time of replacement the Covered Person is eligible for new lenses or frames.

11) Eye exam required by an employer in order for the Covered Person to be allowed to work.

12) Services or supplies to the extent that benefits are otherwise provided under this Plan or under any other Plan which the Employer (or an affiliate) contributes to or sponsors.

13) Services or supplies for which Covered Person is not required to pay.

14) Services which do not meet accepted standards of ophthalmic practices.

15) Lenses not requiring a prescription.

16) Eye glass cases.

17) Frames supplied for non-prescription lenses.

18) Safety glasses for use by an Employee.

19) Charges for failure to keep appointments.

June 4, 1990

Case Corporation                                          Page 37
Group Insurance Plan
Effective 1990

   20)  Services rendered or materials ordered after the date the Employee or Dependent ceases to be eligible for coverage except for lenses and frames prescribed prior to cessation of coverage and delivered within thirty days of the date prescribed.

IV.  Hearing Aid Plan

A Hearing Aid Expense Benefits Plan for eligible active employees, retired employees, surviving spouses receiving pensions and the dependents of each of the above, will be provided.

The Hearing Aid Expense Benefits Plan will provide benefits according to the following schedule, and under the terms stated:

1)  Payment for the actual charges to the extent that such charges are usual, reasonable and customary, and do not exceed the maximum amount for such services specified below:

| Covered Hearing Aid Services | Maximum Amount Payable |
|---|---|
| Audiometric Examination | $33.10 |
| Hearing Aid Evaluation Test | $33.10 |
| Hearing Aids | $303.20 |

2)  The following describes the Hearing Aid Expense Service in detail:

    a)  Audiometric examination, when performed by a Doctor or Audiologist, but only when performed following or in conjunction with a Doctor's most recent medical examination of the ear.  The maximum amount payable for such exam is $33.10.

    b)  Hearing aid evaluation tests performed by a Doctor or Audiologist, which may include the trial and testing of various makes and models of hearing aids to determine which make and model will best compensate for the loss of hearing acuity but only when indicated by the recent audiometric examination.  The maximum payment for such tests if $33.10.

    c)  Hearing aids of the following functional design:  in-the-ear, behind-the-ear (including air conduction and bone conduction types) and on-the-body, but only if (1) the hearing aid is prescribed based upon the most recent audiometric examination and most recent hearing aid evaluation examination; and (2) the hearing aid provided by the Dealer is the make and model prescribed by the Doctor or Audiologist and is certified as such by the Doctor or Audiologist.  The maximum payment for a hearing aid is $303.20.

    d)  If a covered Employee or Dependent has received an audiometric examination, a hearing aid evaluation test or a hearing aid for which benefits were payable under the Plan, benefits will be payable for any such subsequent audiometric examination, hearing aid evaluation test or hearing aid only if received more than 36 months after receipt of the most recent previous audiometric examination, hearing aid evaluation test or hearing aid, respectively, for which benefits were payable under the Plan.

    e)  Replacement of a hearing aid will not require a physicians examination prior to the replacement.

June 4, 1990

UAWR108081

Case Corporation
Group Insurance Plan
Effective 1990

3) The Company will attempt to establish provider contracts with suppliers of materials and services described in Paragraph (1) above. The establishment of such contracts shall provide audiometric examination, hearing aid evaluation tests, and pre-determined selection of hearing aids without cost to the employee, except for the cost of such services in excess of the amount in Paragraph (1).

4) The following services and supplies are not covered Hearing Aid Plan services or supplies:

1) Charges for which benefits are otherwise provided under the Group Policy.

2) Charges for audiometric examination by and Audiologist that are not ordered by a Doctor.

3) Charges for medical treatment including medical examination of the ear.

4) Charges for the replacement of hearing aids that are lost, missing or stolen if such replacement takes place within 36 months following the date of the receipt of such device.

5) Charges for failure to keep a scheduled visit with the Doctor.

6) Charges for services or supplies in connection with repairs or servicing of the hearing aids or for replacement parts.

7) Charges for audiometric examinations and hearing aid evaluation tests performed and hearing aids ordered:

a) Before the Covered Person became eligible for coverage; or

b) After the termination of coverage of the Covered Person.

8) Charges for hearing aids ordered while covered but delivered more than sixty days after termination of coverage.

9) Charges for audiometric examinations, hearing aid evaluation tests and hearing aids which are not necessary, according to professionally accepted standards of practice, or which are not recommended or approved by a Doctor.

10) Charges for audiometric examinations, hearing aid evaluation tests and hearing aids that do not meet profession accepted standards of practice, including charges for any such services or supplies that are experimental in nature; and tinnitus maskers or instruments or any other device which does not amplify sound and assist the physiologic process of hearing.

11) Charges for the completion of any insurance forms.

12) Charges for eyeglass-type hearing aids, to the extent the charges for such hearing aid exceeds the covered hearing aid expense for one hearing aid.

June 4, 1990

UAWR108082

Case Corporation                                      Page 39
Group Insurance Plan
Effective 1990

V.   <u>General</u>

    A.   Eligibility

        1)   An employee shall be eligible for coverage on his own account on the day immediately following the completion of the length of continuous service noted below, provided that the employee is actively at work on that day.

            Waiting Periods for Employees Hired or Rehired on or After July 1, 1983:

| | | |
|---|---|---|
| a) | Life, AD&D, SIBI and Medical Expense Coverage | 3 months |
| b) | Weekly A&S Benefits | 3 months |
| c) | Dental Coverage | 18 months |
| d) | Vision Care Coverage | 18 months |
| e) | Hearing Care Coverage | 18 months |
| f) | Long Term Disability | 24 months |

        2)   Dependent's coverage shall be effective:

            a)   On the effective date of the Employee's coverage provided the dependent is not confined in a hospital or other institution for care or treatment; or is not confined at home under the care of a physician or surgeon because of a disabling physical or mental sickness or injury.  If so confined or disabled, coverage for that dependent shall not be effective until he or she has been discharged from the hospital or other institution, or is no longer confined at home under the care of a physician.

            b)   Upon enrollment for Dependent Coverage by the employee, provided enrollment is made within thirty-one days of the date the employee acquires the dependent; in which case coverage will become effective on the date the person becomes the dependent of the employee.

    B.   Cessation of Coverage

        1)   Coverage shall automatically cease on the date employment terminates.  For purposes of coverage, termination of employment means cessation of active work as an employee, except that in circumstances specified below and as provided by Paragraphs C, D and E which follow:

            a)   Life·Insurance benefits shall continue to be payable for thirty-one days thereafter.

            b)   If on the date of cancellation the employee or dependent is totally disabled and under the care of a physician, Major Medical Expense coverage will continue to be paid in accordance with the provisions of the Policy during the continuance of the total disability, but not beyond the end of the calendar year following the calendar year in which such coverage is cancelled.

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

2)   The following Conversion Privileges shall be available upon cancellation of the group coverage:

   a)   Life insurance up to the amount provided under the Group Plan may be continued under an individual policy, without evidence of insurability, provided application is made to the Insurance Company within thirty-one days of the cancellation date.  The amount of such individual policy may, at the option of the Employee, be increased by an amount equal to the total amount of Survivor Income Benefits Insurance payments (Transition and Bridge) that would have been made if the employee had died on the date of termination of employment.

   b)   Medical Expense Insurance may be obtained under an individual policy without evidence of insurability, for the employee and dependents, if the dependents had been insured under the Group Plan as of the cancellation date, provided application is made to the Insurance Company within thirty-one days following the cancellation of coverage under the Group Plan.

C.   Provisions Applicable to Employees on Lay-Off

   1)   The following Group Coverage shall be continued in effect as stated below for employees who cease active work due to a lay-off:

   a)   Coverage for Employees Only

      1.   Group Life Insurance

      2.   Accidental Death & Dismemberment

      3.   Survivor Income Benefits (Transition & Bridge)

   b)   Coverage for Employees & Dependents

      1.   Medical Expense Plan

      2.   Prescription Drug Plan

      3.   Dental Plan

      4.   Vision Plan

      5.   Hearing Plan

   2)   An employee placed on lay-off will have certain group coverages continued according to the following schedule:

   a)   Coverage Based on SUB Credits

      All coverages listed above (1) shall be continued for one full calendar month of lay-off, not to exceed twelve (12) months, for each full four weeks of regular benefits to which the employee's credits would entitle him on the basis of his seniority and credit unit cancellation base as of the last day of work prior to lay-off.

June 4, 1990

UAWR108084

Case Corporation                                                Page 41
Group Insurance Plan
Effective 1990

   b)   Coverage Based on Seniority

        Year(s) of Seniority              Months of
        On Date Lay-Off Begins          Extended Coverage
        Less than 4                             6
        4 but less than 5                       8
        5 but less than 6                      10
        6 and over                             12

        The continuation will be based upon the greater of the
        above calculations.  The employee shall have the conver-
        sion privileges available upon expiration of the period of
        continued group coverages listed above.

        An employee with ten or more years of seniority at the
        time of lay-off due to a full or partial plant closing
        will receive an additional twelve months of Group Life
        Insurance & Medical coverage (including prescription
        drugs), excluding Dental, Vision and Hearing Benefits.

   3)   Conversion Privileges

        The Conversion Privileges described in Paragraph B 2a and b
        above, shall be available to employees upon expiration of the
        period of continued Group Coverage listed above.

D.   Provisions Applicable to Employees on Disability Leave of Absence --
     A disabled employee will be covered for Life, Medical, Dental, Pre-
     scription Drug, Vision and Hearing coverage at the Company's expense
     for the period during which he receives Weekly Accident and Sickness
     benefits and Long-Term Disability benefits.

   1)   Conversion Privilege

        The Conversion Privileges described in Paragraph B 2a and b
        above shall be available to employees upon expiration of the
        period of continued Group Coverage listed above.

E.   Maternity Leave of Absence

     Employees placed on Leave of Absence for maternity will be permitted
     to continue Life, Medical, Dental, Prescription Drug, Vision and
     Hearing coverages without premium contribution required for up to
     twelve (12) months following the date the Leave of Absence commenced.
     The coverage shall include eligible dependents.

F.   Contested Worker's Compensation Claim

     In the event of a contested claim for Worker's Compensation Benefits,
     the following procedure will be followed:

   1)   With regard to medical services, the Company physicians, at
        their discretion, may either treat the employee, refer him to an
        outside physician, or permit him to go to a physician of his
        choice.

   2)   The employee shall receive an amount of money equal to his
        current Weekly Indemnity rate, but this benefit will not be
        considered either Weekly Indemnity or Worker's Compensation
        until such time as the dispute is finally resolved.

                                                        June 4, 1990

3)     The employee will be required to sign a reimbursement form which
       will provide that any Worker's Compensation judgment in favor of
       the employee which duplicates a payment previously made by the
       Company, will be returned to the Company by the employee, or
       deducted from any final settlement the Company may be required
       to make.

The above action taken while the dispute is pending will in no way
impair the rights of the employee or the Company nor be used to
prejudice the position of either.

H.   Leave of Absence

     1)   Union Business

          Medical, Dental, Prescription Drug, Vision and Hearing Coverage
          will be continued at Company expense during an approved leave of
          absence requested by the Local Union to permit an employee to
          work on a full-time basis for the Local Union for a period not
          longer than the balance of the month in which the leave
          commenced plus the following full calendar month.  Thereafter,
          the employee shall be entitled to continue such coverage by
          paying the full cost thereof.

     2)   Personal

          The group coverage (life insurance, accidental death &
          dismemberment, survivor income benefit insurance, medical,
          dental, prescription drug, vision and hearing) shall be
          continued in force for the month following the month in which
          the Leave commences.

I.   Special Age 65 Benefit (Medicare Payment)

     1)   The Special Age 65 Benefit (Medicare payment) shall be payable
          to active employees age 65 or older and on behalf of the
          employee's spouse if covered by Medicare Part B.  The Medicare
          payment shall be payable to disabled employees who are eligible
          for Medicare Part B during the period they are receiving Long
          Term Disability Benefits and monthly installment Life Insurance
          Benefits.

          The Medicare Payment shall be increased on the date(s)
          indicated:

          January 1, 1990        $25.00 or actual amount if less
          January 1, 1991        $33.40 or actual amount if less
          January 1, 1993        $34.40 or actual amount if less

     2)   In addition, the Medicare Payment is payable on behalf of:

          a)   Employees retired on a company-provided pension;

          b)   The eligible spouse of retired employees; or

          c)   Surviving spouses of retired employees receiving a
               spouse's pension or who will receive a spouse's pension
               upon exhausting Transition and Bridge benefit payments.

June 4, 1990

UAWR108086

Case Corporation
Group Insurance Plan
Effective 1990

Page 43

3) If the company provided coverage is primary for active employees and their eligible dependents or disabled employees and their eligible dependents, the company will not reimburse the employee (active or disabled) or eligible dependents the Medicare Part B premium.

The retired employee, spouse, or surviving spouse must be enrolled for Medicare Part B. The benefit is not payable, however, if a Medicare repayment is being paid on behalf of the retired employee or spouse from another source.

This benefit is not applicable to former employees or spouses of former employees receiving a pension due to eligibility under the Pension Plan provisions for deferred, vested benefits.

J. Provisions Applicable to Employees Retired on Company Pension and Surviving Spouses Receiving Company Pension

1) Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group benefits as described in the following paragraphs. All other coverages cease coincident with the date of employment termination due to retirement. (The provisions of this section shall not apply to individuals eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan.)

a) **The following benefits will apply to employees who retire on/or after the dates noted and who have ten (10) or more years of service at the retirement date.**

**Group Life Insurance - Retired Employees Only**

1. **For employees who retire on/or after June 2, 1990 the benefit will be $9,750 until Age 65 and $6,250 thereafter.**

2. **For employees who retire on/or after April 1, 1991, the benefit will be $10,000 until Age 65 and $6,500 thereafter.**

3. **For employees who retire on/or after February 1, 1992, the benefit will be $10,250 until Age 65 and $6,750 thereafter.**

4. **For employees who retire on/or after December 1, 1992, the benefit will be $10,500 until Age 65 nd $7,000 thereafter.**

**Group Health Care**

1. **The following benefits will apply to employees who retire on/or after the dates noted who have ten (10) years of service at the retirement date, or surviving spouse eligible to receive a spouse's pension under the provisions of the Pension Plan.**

| Major Medical | Vision |
| Prescription Drug | Hearing |
| Dental | |

June 4, 1990

Case Corporation                                                Page 44
Group Insurance Plan
Effective 1990

b)    The following benefits will apply to employees who retire
      on/or after the dates noted and who have ten (10) or more
      years of service at the retirement date.

Group Life Insurance - Retired Employees Only

1.    For employees who retire on/or after May 12, 1987,
      the benefit will be $8,500 until Age 65 and $5,000
      thereafter.

2.    For employees who retire on/or after May 1, 1988,
      the benefit will be $9,000 until Age 65 and $5,500
      thereafter.

3.    For employees who retire on/or after May 1, 1989,
      the benefit will be $9,500 until Age 65 and $6,000
      thereafter.

Group Health Care

1.    The following benefits will apply to employees who
      retire on/or after the dates noted who have ten (10)
      years of service at the retirement date, or
      surviving spouse eligible to receive a spouse's
      pension under the provisions of the Pension Plan.

      Major Medical
      Prescription Drug
      Dental
      Vision
      Hearing

c)    The following benefits will apply to all currently retired
      employees and to employees who retire on or after July 1,
      1980 with ten (10) or more years of credited service.

Group Life Insurance - Retired Employees Only

1.    For employees who retired prior to July 1, 1977, the
      benefit will be $4,500, effective January 1, 1984.

2.    For employees retiring on or after July 1, 1977, the
      benefit will be $8,000, effective January 1, 1984,
      until age 65 and $4,500 thereafter.

3.    Employees retiring on Company-provided pensions due
      to permanent and total disability, in which the dis-
      ability commenced after July 1, 1974, shall have the
      amount of their Group Life Insurance continued in an
      unreduced amount until attainment of Age 65.  At Age
      65, the Life Insurance shall be reduced to the
      amount applicable to the employee's length of
      service.

d)    The following benefits will apply to employees who retired
      with five but less than ten years of credited service.

Group Life - Retired Employees Only

Employees who retire on or after July 1, 1980 will have
$2,500 Group Life.

                                                    June 4, 1990

UAWR108088

Case Corporation
Group Insurance Plan
Effective 1990

Page 45

### Group Health Care

The following benefits will apply to all currently retired employees, or surviving spouse eligible to receive a spouse's pension under the provisions of the Pension Plan.

Major Medical
Prescription Drug Plan

The retiree or surviving spouse is not eligible for Dental, Vision, or Hearing coverages.

e)   The following benefits will apply to employees who retire with less than five years of credited service.

### Group Life - Retired Employees Only

No coverage is provided.

### Group Health Care

The following benefits will apply to all currently retired employees, or surviving spouse eligible to receive a spouse's pension under the provisions of the Pension Plan.

Major Medical
prescription Drug

The retiree or surviving spouse is not eligible for Dental, Vision, or Hearing coverages.

2)   Enrollment

Eligible Retired Employees and Surviving Spouses are required to complete an enrollment card in accordance with Group Policy provisions for the continued coverages as described above, and provide evidence of enrollment in Part B, Medicare, as required. In the event of the inability of a Retired Employee or Surviving Spouse receiving a Spouse's Pension to enroll in Medicare Part B because of an enrollment restriction, the requirement of enrollment will be waived until their first opportunity to become enrolled.

3)   Contribution for Coverage

a)   Group Life Insurance as stated above shall be fully paid by the Company.

b)   Major Medical Expense Plan and the Prescription Drug Plan

1.   For eligible Retired Employees and Surviving Spouses who have enrolled, the Company shall pay the full premium cost of the above coverages.

2.   Dependents Age 65 and Over - Not qualified for Medicare

With respect to dependents who are Age 65 and over and who do not qualify for Medicare, for reasons other than non-payment of premium, the Company will either cover the dependent under its HMSD program without a reduction for benefits otherwise provided

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

by Medicare, or provide Medicare reimbursement. The
Company will notify the Union of its decision in
each case.

K.   Deferred, Vested Retirees & Surviving Spouses of Deferred, Vested
     Retirees

     The provisions of this agreement are not applicable to individuals
     eligible for or receiving a pension benefit under the provision for
     Deferred, Vested, Retirement of the Pension Plan, or Surviving Spouses
     receiving a Spouse's Pension resulting from a Deferred, Vested
     Retirement.

L.   Subrogation

     In the event of any payment of medical/hospital, dental, vision or
     hearing benefits under this Plan for which an employee, retiree,
     surviving spouse or a dependent may have a claim or cause of action
     against any person or organization (except a claim or cause of action
     against an employer and except against insurers of policies of insur-
     ance issued to, and in the name of the employee, retiree, surviving
     spouse, or dependent) Case  or the Administrator shall be subrogated
     to all right of recovery of the employee, retiree, surviving spouse or
     dependent with respect to any expenses included in any judgment or
     settlement only to the extent that said judgment or settlement is
     expressly identified as a payment for medical/hospital, dental, vision
     or hearing services paid for under this Plan.  If the employee,
     retiree, surviving spouse or dependent incurs attorney's fees in
     connection with the successful prosecution or settlement of any claim
     or cause of action which includes such benefits, the employer or
     Administrator, as the case may be, shall reduce its right of
     subrogation by a pro rata share of such attorney's fees based on the
     ratio of the amount of any such medical/hospital, dental, vision or
     hearing benefits paid under this Plan to the total amount recovered by
     settlement of judgment.  The employee, retiree, surviving spouse or
     dependent shall, at the request of the Company or Administrator,
     execute and deliver such instruments and papers as may be required and
     to take such other reasonable steps necessary to secure the
     subrogation rights.

     In cases where subrogation is involved, Case will proportionally
     reduce its subrogation interest under the claims of its employees and
     their dependents when the actual amount recovered reflects less than
     the proper value of the case* and a reasonable basis exists for
     accepting such lesser amount in settlement.

     To illustrate, assume a liability case has a value of $100,000, but a
     defendant has only $50,000 coverage and no other available assets, and
     that a settlement between the plaintiff and the defendant is reached
     for $50,000.  Assume also that the monies expended by Case for medical
     and hospital bills for the plaintiff employee or dependent totalled
     $10,000.  If advised of these facts, and having ascertained their
     accuracy, Case would proportionalize its subrogation interest and
     treat its original $10,000 amount expended as if it were only $5,000.
     Thus, to the same extent the employee or dependent is deprived of
     proper compensation for the injury (50% in this example), Case also
     proportionalizes its subrogation interest (50%).

     Assuming such a settlement, the recovery by Case would not be of
     $5,000, but $3,335.
               *A proper value of a case is estimated by multiplying the finan-
                cial loss (medical bills, lost time and property) by five.

                                                        June 4, 1990

UAWR108090

Case Corporation                                                    Page 47
Group Insurance Plan
Effective 1990

M.   To comply with the recent Federal law, Consolidated Omnibus Budget
     Reconciliation Act (COBRA), effective August 1, 1987, the following
     applies:

     The law provides employees, their spouses and dependent children, the
     option of continuing group coverage, for specified periods, after the
     termination of their coverage.

     The period of continuation depends on the reasons coverage terminates,
     as illustrated below:

                                                      Coverage Continuation

     Termination of Employment                        18 months

     The continuation will be provided to
     employee and, if applicable, to employee's
     eligible dependents.

     Death of Employee                                36 months

     The continuation will be provided to
     the surviving spouse and, if applicable,
     dependents of deceased employee.

     Divorce of Employee/Spouse                       36 months

     The continuation will be provided to
     the ex-spouse and, if applicable,
     eligible dependents.

     Dependent Child No Longer Eligible               36 months

     The continuation will be provided to
     the eligible dependent child when no
     longer eligible for coverage.

     The Group Coverage may be continued by paying the applicable premium
     rate.  In situations where the Company already provides continued
     coverage for all or part of the period specified at no cost to
     employee/spouse/dependent, the period of continuation will include the
     months the Company provides.  As an example, in the event of a lay-
     off, if Group Coverage would be continued for twelve months at no cost
     to employee, the employee would be able to continue Group Coverage for
     an additional six months by paying applicable premiums.

     The employee will be provided the option of selecting one of two
     levels of coverage; (1) Medical, Prescription Drug and Hearing; or (2)
     Medical, Dental, Prescription Drug, Vision and Hearing.  In the event
     regulations are issued which require coverage to be unbundled in a
     different manner, the options available to employees will be modified.

N.   Coordination of Benefits - Effective May 12, 1987

     1)   Definitions

          a)   "Plan" means a plan which provides benefits or services
               for or by reason of medical care and which is:

               1.   a group insurance plan; or

               2.   a group blanket plan; or

                                                      June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 48

3.   a group practice plan; or

4.   a group service plan; or

5.   a group prepayment plan; or

6.   any other plan which covers people as a group; or

7.   a government program or coverage required or pro-
     vided by any law, including any motor vehicle no-
     fault coverage which is required by law.

Each policy, contract or other arrangement for benefits or
services will be treated as a separate Plan.  Each part of
such a Plan which reserves the right to take the benefits
or services of other Plans into account to determine its
benefits will be treated separately from those parts which
do not.

b)   "This Plan" means only those parts of This Plan which
     provide benefits or services for medical care.  The
     provisions of This Plan which limit benefits based on
     benefits or services provided under:

1.   Government Plans; or

2.   Plans which the Employer (or an affiliate) contri-
     butes to or sponsors;

will not be affected by this Coordination of Benefits
provision.

For the purpose of applying this provision, if both
spouses are covered as Employees under This Plan, each
spouse will be considered as covered under separate Plans.

c)   "Allowable Expense" means any reasonable and customary
     charge which meets all of the following tests:

1.   It is a charge for an item of necessary medical
     expense; and

2.   It is an expense which an Employee or Dependent must
     pay; and

3.   It is an expense at least a part of which is covered
     under at least one of the Plans which covers the
     person for whom claim is made.

When a Plan provides fixed benefits for specified events
or conditions rather than benefits based on expenses, any
benefits under that Plan will be deemed to be Allowable
Expenses.

When a Plan provides benefits in the form of services
rather than cash payment, the reasonable cash value of
each service rendered will be deemed to be both an
Allowable Expense and a benefit paid.

June 4, 1990

Case Corporation                                          Page 49
Group Insurance Plan
Effective 1990

However, Allowable Expense does not include expense for services received because of:

1.    an occupational sickness; or
2.    an occupational injury.

d)    "Claim Determination Period" means a period which starts on any January 1st and ends on the next December 31st. However, a Claim Determination Period for any covered person will not include periods of time during which that person is not covered under This Plan.

2)    Effect on Benefits

a)    The benefits payable under This Plan will not be reduced on account of benefits payable under another Plan if:

1.    The other Plan has a Coordination of Benefits or similar provision with the same order of benefit determination as Subsection C of this Section 2; and

2.    Under that order of benefit determination, the benefits under This Plan are to be determined before the benefits under the other Plan.

b)    Unless Subsection A of this Section 2 applies, when the total Allowable Expenses incurred for a Covered Person in any Claim Determination Period are less than the sum of:

1.    The benefits that would be payable under this Plan without applying this Coordination of Benefits provision; and

2.    The benefits that would be payable under all other Plans without a Coordination of Benefits or similar provisions;

the benefits described in Item B1 of this Section 2 will be reduced. The sum of these reduced benefits plus all benefits payable for such Allowable Expenses under all other Plans, will not exceed the total of the Allowable Expenses. Benefits payable under other Plans include all benefits that would be payable if the proper claims had been given on time.

c)    When more than one Plan covers the person for whom Allowable Expenses were incurred, the order of benefit determination is:

1.    Non-Dependent/Dependent - The Plan which covers that person other than as a dependent determines its benefits before the Plan which covers that person as a dependent.

2.    Dependent Child/Parents Not Separated or Divorced - Except as stated in Rule 3 below, when this Plan and another Plan cover the same child as a dependent of different persons, called "parents", benefits for that child will be determined in this order:

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

(a) Prior to January 1, 1987, the Plan of the father determines its benefits before the Plan of the mother.

(b) On and after January 1, 1987, the Plan of the parent whose date of birth (excluding year of birth) falls earlier in a year, determines its benefits before the Plan of the parent whose date of birth (excluding year of birth) falls later in that year. If both parents have the same date of birth (excluding year of birth), the Plan which covered the parent for the longer time determines its benefits before the Plan which covered the other parent for the shorter time.

If either Plan which covers the person has not adopted the above rule 2.(b), both Plans will determine their benefits in accordance with the above rule 2(a).

3. <u>Dependent Child/Separated or Divorced Parents</u> – If two or more Plans cover a person as a dependent child of divorced or separated parents, benefits for that child will be determined in this order:

(a) First, the plan of the parent with custody of the child;

(b) Then, the Plan of the spouse of the parent with custody of the child; and

(c) Finally, the Plan of the parent not having custody of the child.

However, if the specific terms of a court decree state that one of the parents is responsible for the health care expenses of the child, and the entity which is obligated to pay or provide the benefits of the Plan of that parent was actual knowledge of those terms, the Plan which covers the child of that parent determines its benefits first. Then follow the above Rules 3.(a), (b) or (c) to determine which Plan pays next. This paragraph does not apply with respect to any Claim Determination period during which any benefits are actually paid or provided before that entity has that actual knowledge.

4. <u>Active/Laid-Off or Retired Employee</u> – The Plan which covers that person as an active employee (or as that employee's dependent) determines its benefits before the Plan which covers that person as a laid-off or retired employee (or as that employee's dependent). If the Plan which covers that person has not adopted this rule, and if as a result, the Plans do not agree on the order of benefits, this Rule 4. will not apply.

June 4, 1990

UAWR108094

Case Corporation                                             Page 51
Group Insurance Plan
Effective 1990

5.  <u>Longer/Shorter Time Covered</u> - If none of the above
    rules 1, 2, 3 or 4 determines the order of benefits,
    the Plan which has covered that person for the
    longer time determines its benefits before the Plan
    which covered that person for the shorter time.

d)  Any reduction in the benefits under this Plan will be
    applied proportionately to each benefit that would have
    been paid in the absence of this Coordination of Benefits
    provision.

3)  Exchange of Information and Payments

a)  We may, without the consent of or notice to any person,
    give or receive any information about coverage, expenses
    and benefits which is needed to apply this provision.

b)  To obtain all benefits available, a claim should be filed
    under each Plan which covers the person for whom Allowable
    Expenses were incurred.  Any person who claims benefits
    under this Plan must give to us the information we need to
    apply this provision.

c)  We have the right to recover any overpayment we make under
    this Plan from any party who benefitted from the
    overpayment.

d)  If payments which should have been made under this Plan
    were made under any other Plans, we may pay the party
    which made the other payments any amounts which we deem
    proper under this provision.  Amounts so paid will be
    deemed benefits under this Plan.  We will be fully
    discharged from liability under this Plan to the extent of
    such payments.

O.  <u>Pre-Certification - Active & Retirees</u>
    (Past and future who are not eligible for Medicare)

1)  This program is designed to involve the employee and the
    physician in controlling health care costs.

    If an employee or one of his dependents is being scheduled for
    non-emergency hospitalization, the physician has to participate
    in the Pre-Certification Review.  The employee has two options:

    --  Complete the Pre-Admission form and give it to his
        physician, who then mails the completed form to the
        Certification team; or

    --  Have the physician call the toll-free Certification
        telephone number and pre-certify the admission.

2)  If admission is not confirmed as being necessary, the
    administrator's physician will review the case with the
    employee's physician.

3)  In an emergency, if the problem is life-threatening, you should
    be taken to the hospital, as pre-certification is not necessary.
    If admitted, the attending physician or hospital must notify the
    Certification Team within 48 hours.

                                                June 4, 1990

UAWR108095

Case Corporation                                              Page 52
Group Insurance Plan
Effective 1990

4)   If the employee does not have a non-emergency hospital admission
     pre-certified through the review program, the employee would pay
     a $200 deductible and 20% of the covered charges.  The maximum
     annual co-payment amount will be $750 per employee or dependent
     and $1,500 per family.

5)   To alleviate concerns about the application of an inappropriate
     co-payment, the following will identify situations where the co-
     payment would not be applied:

     a)   Emergency confinements where patient's condition precludes
          informing the hospital that certification is necessary
          (i.e., unconscious, severe accident, no identification).

     b)   Employee presents Medical Plan Identification Card (which
          contains pre-cert toll free phone number) to hospital and
          hospital does not call to verify confinement.

     c)   Employee advises his physician that pre-certification is
          necessary and the physician does not contact the Pre-
          Certification Center.

     In situations b) and c), the co-payment amount will be deducted
     from the payment made to the respective provider.  In these
     situations, a letter will be sent to the provider advising them
     that their action caused a co-payment.  The employee must
     cooperate with the Company in situations such as described.

P.   **Questions & Answers Concerning Pre-Certification of Non-Emergency
     Admissions Under the Traditional Metropolitan Plan**

     Pre-certification is the process whereby prior authorization from the
     Administrator is obtained before a non-emergency admission to a
     hospital occurs.  Once a decision has been made by the Administrator,
     all parties (doctor, employee and hospital) will be notified of the
     decision in writing by the Administrator.  The questions and answers
     below deal with various situations and whether or not the employee
     will be "held harmless" for charges incurred.

1.   Q.   What if a physician does not initiate the pre-certifica-
          tion process?  The hospital admits the employee based on
          the physician's request and without requesting pre-deter-
          mination.  Is the employee held harmless?

     A.   Yes.  The doctor knew of the pre-certification and had
          responsibility to do so.

2.   Q.   What if a physician initiates the pre-certification pro-
          cess, a denial is issued, and the employee is admitted to
          the hospital after being notified of non-authorization.
          Is the employee held harmless?

     A.   No.  The employee, his physician and the hospital would
          have received a denial letter from the Administrator.

                                                        June 4, 1990

Case Corporation                                        Page 53
Group Insurance Plan
Effective 1990

3.   Q.   What if a physician does not initiate the pre-certifica-
          tion process, and the hospital will not admit without the
          employee assuming risk because authorization has not been
          sought.  If admitted under these circumstances, is the
          employee held harmless?

     A.   No.  However, the employee can and the hospital should
          request prior authorization from the Administrator before
          the admission.

4.   Q.   What if a physician initiates the pre-certification pro-
          cess for a non-covered surgical-medical benefit such as
          cosmetic surgery.  Authorization for the hospital admis-
          sion is granted.  Is the employee held harmless for both
          hospital and surgical-medical services?

     A.   No.  The employee, however, is held harmless up to the
          limits of the coverage.  In this case, payment would be
          made for covered hospital charges in a semi-private room,
          but would not be made for the surgery.  Non-covered bene-
          fits do not become covered as a result of pre-certifica-
          tion being received.

5.   Q.   What if a physician initiates the pre-certification pro-
          cess for non-covered benefit such as cosmetic surgery and
          authorization is denied.  Is the employee held harmless?

     A.   No.  As in earlier questions, everybody has been notified
          and the employee knew he was outside the system.

6.   Q.   What if a dependent is admitted to an out-of-state
          hospital under the situations described in Questions 1
          through 5?

     A.   The answers to Questions 1 through 5 are equally appli-
          cable with regard to non-emergency out-of-state admis-
          sions.

7.   Q.   What if a physician initiates the pre-certification
          process and authorization is granted for a length of stay
          of five days.  The physician seeks authorization to extend
          the stay but an extension is denied and the physician is
          notified of its decision.  The employee is not discharged
          until the seventh day.  Is the employee held harmless?

     A.   Yes.  This issue is to be resolved by the physician and
          the Administrator.

8.   Q.   What if a physician initiates the pre-determination
          process and authorization is denied.  Can the physician
          appeal this decision?

     A.   Yes.  The Administrator has an appeal procedure involving
          a physician which will give a prompt response to the
          appeal.

                                              June 4, 1990

Case Corporation                                              Page 54
Group Insurance Plan
Effective 1990

Q.   The Company agrees to provide each employee with a Summary Plan
     Description, describing the benefits and provisions of the Group
     Coverage.

R.   Severe Delays in Claim Payments

     Whenever payment of a claim covered by the Company's Group Benefit
     Plan has been unduly delayed through no fault of the employee, the
     Company or Administrator will take action to relieve the employee from
     harassment by a creditor or collection agency resulting from such
     delay.

     Upon request from the employee, the Company or Administrator will
     notify the creditor or collection agency that the employee is covered
     by the Plan and that payment will be made in accordance with the terms
     of the Plan when the problem causing the delay has been resolved.  A
     copy of the letter to such creditor or collection agency will be sent
     to the appropriate credit bureau in the area in which the employee
     resides.

S.   The term "Administrator as used in this Plan may mean the company, an
     insurance company, third party claims administrator or other
     intermediary selected by the Company to administer the program of
     benefits provided under the Plan.

                                                        June 4, 1990

UAWR108098

Case Corporation                                               Page 55
Group Insurance Plan
Effective 1990

                                           LETTER OF UNDERSTANDING

RE:  Temporary Disabilities


In the event an employee has medical approval to return to work with medical
restrictions, such employee may be assigned to available work within the
bargaining unit consistent with the medical restrictions.  If the employee is
not assigned to such work, the employee will be considered to be in a period of
disability and continued, if eligible, on Weekly Accident & Sickness Benefits or
Long Term Disability Benefits, whichever is applicable.

For purposes of A&S, an employee shall be deemed to be disabled if he is under
the care of a physician and is unable to perform his normal occupation.

For the purposes of LTD, an employee shall be deemed to be disabled if he is
under the care of a physician and is unable because of his disability to perform
work of the type performed at the plant where he has seniority.

International Union, UAW              Case Corporation




                                                            June 4, 1990

UAWR108099

Case Corporation                                           Page 56
Group Insurance Plan
Effective 1990

LETTER OF UNDERSTANDING

RE:   Focused Second Surgical Opinion Program -
      Active & Past/Future Retirees (Not eligible for Medicare)

A.    The Focused Second Surgical Opinion Program applied to non-emergency
      surgery.  The Focused Second Surgical Opinion Program is elective for all
      surgery, but is mandatory for selected surgical procedures.

B.    If the recommended surgery is for one of those on the mandatory list below,
      your attending physician, using the toll-free number, must contact
      Metropolitan's Medical Action Center to provide the Medical Reviewer with
      pertinent medical information.  The Medical Reviewer will review each case
      to determine the reason for surgery and insure that the proposed surgery
      meets established medical criteria.

      If the clinical criteria for surgery are unclear, the Medical Reviewer will
      advise your physician that a second opinion is required.  The Medical
      Reviewer will then provide you with the names of three qualified physicians
      to consult for a second opinion.  As a result of the Focused/Second Opinion
      program, a second opinion will be recommended for only those cases in which
      the need for surgery is not clearly indicated.  Each call is followed by a
      letter of confirmation.

      If the second opinion does not confirm the first, then a third opinion is
      optional.

      **The following procedures require that your physician contact the medical
      reviewer:**

      -    Bunionectomy
      -    Cataract removal
      -    Cervical fusion
      -    Cholecystectomy
      -    Colonoscopy
      -    Coronary bypass
      -    Gastroscopy
      -    Hemorrhoidectomy
      -    Hysterectomy
      -    Laminectomy
      -    Mastectomy
      -    Meniscectomy
      -    Pacemaker implant
      -    Prostatectomy
      -    Repair of inguinal hernia
      -    Submucous resection/nasal septoplasty
      -    Thyroidectomy
      -    TMJ-plasty or mandibulo plasty
      -    Tonsillectomy/adenoidectomy
      -    Varicose vein ligation

      The specific procedures where a second opinion is required will be reviewed
      on an annual basis, and based on medical recommendation, procedures could
      be added and deleted by mutual agreement.

      If you elect to obtain a second opinion from a surgeon other than
      recommended by the Medical Reviewer, the surgeon/specialist must be
      independent of the first surgeon and also be a board-certified specialist.

                                                           June 4, 1990

UAWR108100

Case Corporation                                          Page 57
Group Insurance Plan
Effective 1990

C.   The Plan will pay for 100% of the reasonable and customary cost of the
     second opinion and third opinion and the tests related to obtain the
     opinion(s).

     -    If an emergency occurs which involves one of the mandatory procedures,
          a second opinion is not required.

     -    When a second opinion is required for surgeries on the mandatory list
          and the employee does not obtain a second opinion, the employee would
          have a 20% co-payment for the surgical expenses incurred.

     -    If, after following the second (third) opinion procedures, the
          employee decides to proceed with the surgery, reimbursement will be
          covered under applicable Plan provisions.

International Union, UAW                    Case Corporation

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 58

LETTER OF UNDERSTANDING

RE: Quad Cities Health Maintenance Organization (HMO) - Heritage

Employees will be entitled to participate in all programs offered by the
Heritage HMO in lieu of comparable programs offered by the Company's, hospital,
medical, surgical, prescription drug, dental, vision and hearing care plans and
the Company will pay the premiums to the Heritage HMO for such programs,
provided that the Company's cost will not be increased. Any additional premium
for HMO programs will be paid by the participating employees. In the event that
the HMO does not provide all coverages of the current Company Group Plan, the
employee will continue to have the coverages through the Company's Group Plan.

International Union, UAW                    Case Corporation

June 4, 1990

Case Corporation                                              Page 59
Group Insurance Plan
Effective 1990

LETTER OF UNDERSTANDING

RE:   CompCare Plan

The Company agrees to make the CompCare Plan (the HMO) available for
participation by employees of UAW Local 180 and their dependents, provided that
such participation is acceptable to the Union and to Case.

International Union, UAW                  Case Corporation

June 4, 1990

Case Corporation                                      Page 60
Group Insurance Plan
Effective 1990

                                        LETTER OF UNDERSTANDING

RE:  Mail Order Maintenance Prescription Drug Programs


The parties will mutually develop procedures to inform employees of the
advantages of the mail order maintenance drug program within 90 days of
ratification of the 1990 agreement.

International Union, UAW                  Case Corporation


June 4, 1990

Case Corporation                                        Page 61
Group Insurance Plan
Effective 1990

                                        LETTER OF UNDERSTANDING

RE:  Vision Care & Hearing Aid Service Providers

During 1990 contract negotiations, the parties discussed participating providers
for the vision care and hearing aid services currently provided under the Group
Benefit Plan with a view toward maintaining quality service at a reduced cost to
covered employees, retirees and their dependents.

The Company is prepared to investigate any participating provider offering the
vision care and hearing aid services covered by the Plan, and if it is found by
mutual agreement of the Company and the Union that such provider or providers
offer high quality covered services at a reduced cost, then steps will be taken
by the Company within a reasonable period of time following such investigation
to provide employees, retirees and their dependents with the option to use such
providers.  The parties intend that this program provide vision care and hearing
aid services at a cost approximating scheduled benefits levels of the Plan.

International Union, UAW                  Case Corporation

                                                        June 4, 1990

UAWR108105

Case Corporation                                          Page 62
Group Insurance Plan
Effective 1990

                                         LETTER OF UNDERSTANDING

RE:  National Health Insurance

This confirms our understanding that if, during the term of the 1990 Collective
Bargaining Agreement, any Federal health security act is enacted or amended to
provide hospital, surgical, medical, prescription drug, dental benefits, vision
care, or hearing care for employees, retired employees, surviving spouses and
dependents, which duplicate or may be integrated with the benefits of the Group
Benefits Plan, then in such event, the benefits under the Group Benefits Plan
will be modified so as to integrate or eliminate the duplication of such
benefits with the benefits provided by such Federal law.

If any Federal health security act is enacted or amended as provided in the
paragraph above, the Company will pay through the term of the 1990 Collective
Bargaining Agreement any premiums, taxes or contributions employees may be
required to pay under the law when they become effective, that are specifically
earmarked or designated for the purpose of financing the program of benefits
provided by law, and any savings realized by the Company from integrating or
eliminating the duplication of benefits provided under the Group Benefits Plan
with the benefits provided by law, shall be retained by the Company.  If such
tax on employees is based on wages, the Company will pay only the tax applicable
to wages received from the Company.

This understanding is conditioned on the Company obtaining and maintaining such
governmental approvals as may be required to permit the integration of the
benefits under the Group Benefits Plan with the benefits provided by any such
law.

International Union, UAW                    Case Corporation

                                                          June 4, 1990

UAWR108106

Case Corporation                                          Page 63
Group Insurance Plan
Effective 1990


                                              LETTER OF UNDERSTANDING


RE:  Substance Abuse


Effective September 1, 1977, the provisions of the Substance Abuse Letter dated
July 1, 1974 with Local No. 180 will be extended to Locals No. 689, 806, 807 and
858, and the limitations on the number of confinement periods will be
eliminated.

The benefits which are now available at the "A" Center of Racine and the DePaul
Rehabilitation Center of Milwaukee shall be made available for confinement at
additional facilities mutually agreed to between the Company and the Union.

International Union, UAW                    Case Corporation




                                                          June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 64

LETTER OF UNDERSTANDING

RE:  Claim Involving a Mandibular Staple Procedure


In the event the above procedure is determined to not be of an experimental
nature, the incurred expense for the procedure will be given further
consideration for payment.

In any event, the Company will investigate and report to the claimant and the
Union, the current position of the Insurance Company regarding this procedure.

International Union, UAW                    Case Corporation

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 65

LETTER OF UNDERSTANDING

RE: HMO

During 1990 negotiations, the Company and the Union discussed Health Maintenance Organizations (HMO) for the purpose of providing health care benefits to employees. The Company will consider an HMO provided it is qualified and has applied for participation in accordance with the Federal law prior to expiration of the 1990 Agreement, subject to the right of the Union to accept or reject implementation of the HMO.

The Company is prepared to investigate any group practice direct service prepayment plan as an alternative to the Company's group health insurance plan in the event that one or more are formed, and if it is found, by mutual agreement between the undersigned and the Union (regardless of whether the Plan is approved by the United States Department of Health, Education & Welfare under the Health Maintenance Organization Act of 1973) that such a plan or plans is of high quality and provides at least the level of benefits specified in the Company's group health insurance plan, at a cost to the Company not to exceed its cost at that time to provide these benefits, then steps will be taken by the Company within a reasonable period of time following such investigation but before the termination of the 1990 Agreement, to permit employees and retirees, and their dependents, an option, annually, to enroll in such a plan.

In this regard, it is understood that where such a group practice plan provides medical, surgical, diagnostic and other physicians' services on a prepayment basis, but does not provide hospital insurance benefits, dental, vision, or hearing care expense benefits, such a limitation shall not necessarily preclude the approval of such plan, where the beneficiaries enrolled in the group practice plan may obtain hospital insurance coverage through another insurance carrier or organization.

International Union, UAW                    Case Corporation

June 4, 1990

Case Corporation
Group Insurance Plan
Effective 1990

Page 66

LETTER OF UNDERSTANDING

RE:  Dentacare Prepaid Group Dental Plan

The Company agrees to continue the Dentacare Prepaid Group Dental Plan available to Racine area employees.

Employees will be offered the opportunity to enroll for the Dentacare Plan once each year.  Election to participate in the Dentacare Plan shall be in lieu of participation in the existing Dental Care Plan of the Company.

In the event the premium of the Dentacare Plan will be greater than the premium of the existing Dental Care Plan, employees shall make monthly premium payments equal to the amount by which the Dentacare Plan premium is greater.

International Union, UAW                    Case Corporation

June 4, 1990

UAWR108110

Case Corporation                                                      Page 67
Group Insurance Plan
Effective 1990

LETTER OF UNDERSTANDING

RE:  Annual Insurance Meeting


During the terms of this Agreement, the Company will schedule annual meetings at plant locations which will be attended by the Local Union President, Bargaining Committee Chairman, Local Union Insurance Representative, and representatives of the Plant Industrial Relations and Insurance Office, and the Corporate Insurance Office to review insurance claim administration if disputes are unresolved.  At the request of the Parties, a representative of the carrier will be in attendance at the meeting.

In addition, an annual meeting will be held at which one representative from the UAW Ag-Implement Department and one representative from the UAW Social Security Department and one insurance representative from each plant location will meet with the Company Benefits and Industrial Relations Directors or their representatives, and representatives of the insurance carrier to discuss insurance plan administration.

International Union, UAW                    Case Corporation


June 4, 1990

erro

Case Corporation
Group Insurance Plan
Effective 1990

Page 68

LETTER OF UNDERSTANDING

RE: Search and Save

The Union and the Company recognize that providers of health care could submit bills for services which are in error. If the bills are audited by the employee, an error found, and a corrected bill obtained and submitted by the employee, Case will pay the employee 50% of the savings between the original bill and the corrected bill up to $500.

To encourage the review of health care charges, the Union agrees to support Search and Save through communications to the local membership -- active employees and retirees.

The Company and Union will plan for the communication of and continuation of this Plan.

The Company will review the effectiveness of the program and report results to each local Union and the International Union on the payments made.

The continuation of the Search and Save Program will depend upon the success of the program for employees and Company. In any event, it will only be continued beyond the expiration of this contract by mutual agreement between the Company and the Union.

International Union, UAW                    Case Corporation

June 4, 1990

Case Corporation                                          Page 69
Group Insurance Plan
Effective 1990


                                              LETTER OF UNDERSTANDING

RE:  Wellness/Fitness Programs


The Union and the Company agree that helping to keep employees and their
dependents healthy is a shared objective.

The Union and the Company agree to work together on specific wellness/fitness
program including but not limited to:  cancer detection, smoking cessation,
weight loss, physical fitness, stress management and nutrition for active and
retired employees and their dependents.

By encouraging employee, retiree, and dependent involvement, it is expected that
in addition to physical well-being there is a potential for reduction in health
care costs.

The specific programs will be designed by a joint Case/UAW task force and
implemented based on local plant employee, dependent, and retiree needs.

Within 90 days following the ratification of the Agreement, representatives of
the Company, Local Union, and International Representatives will meet to review
and discuss preventive programs mentioned above.

International Union, UAW                  Case Corporation




                                                              June 4, 1990

Case Corporation                                         Page 70
Group Insurance Plan
Effective 1990


                                    LETTER OF UNDERSTANDING

RE:  Group Benefit Plan


Republic Service Bureau, Inc. (or as appropriate)


The patient, employee, or deceased named on the attached authorization is an
employee of Case Corporation.  It is understood that the patient, employee, or
deceased is not financially responsible for additional expenses detected during
your firm's review of the charges associated with the care or treatment provided
to the patient, employee or deceased.

If you have any questions, please contact me at (___ ___-____).

                              Sincerely,


                         Industrial Relations Manager


Note:    This letter will be signed by the local Industrial Relations Manager
         and attached to the authorization form the employee returns to the
         outside audit firm.

International Union, UAW                    Case Corporation


                                                        June 4, 1990

Case Corporation                                                    Page 71
Group Insurance Plan
Effective 1990


                                                      LETTER OF UNDERSTANDING

RE:  Claims Procedure and Insurance Meetings


During the 1990 Negotiations, the Company and Union discussed the procedure to
be utilized to handle administrative issues and contested claims.  The parties
agree that the following understanding was reached.

A.   Employees should use the informal procedure in each location to obtain
     answers to insurance matters.

B.   If the employee does not get the matter resolved, a form for referring the
     matter should be submitted by the employee to the Local Insurance
     representative who will review the matter with the Plant I.R. Manager or
     representative.  If not resolved then it will be reviewed at the Plant
     Meeting attended by a Corporate insurance representative and a
     representative from UAW AG Impl. Department referred to in the Letter of
     Understanding - Annual Insurance Meetings.

C.   If the matter is not resolved at that level, the matter will be brought
     before the National - Corporate Committee at mutually convenient times
     during the year.

International Union, UAW                    Case Corporation


                                                          June 4, 1990

UAWR108115

Case Corporation                                      Page 72
Group Insurance Plan
Effective 1990

                                        LETTER OF UNDERSTANDING

RE:  Insurance Eligibility - Recall from Layoff

When a former IH employee is recalled with seniority after August 31, 1985, the
employee will have life, medical, dental, vision, hearing and disability
coverages at date of return to work if at recall the prior IH service equals or
exceeds the regular Case length of service requirements for participation in
these plans.

International Union, UAW                 Case Corporation

June 4, 1990

UAWR108116

Case Corporation
Group Insurance Plan
Effective 1990

Page 73

LETTER OF UNDERSTANDING

RE:  Group Benefit Plan - "Total Control Account"

Metropolitan Life Insurance Company's "Total Control Account" Money Market
Option is available for handling proceeds in excess of $10,000 which are due
beneficiaries from a Metropolitan insured plan.

The beneficiary(ies) are assisted in filing the claim through Case to
Metropolitan; when the claim has been processed, the beneficiary is advised, is
provided confirmation of the account, and is given a personalized checkbook to
write checks as needed.

This option is subject to it's availability from the life insurance carrier.

International Union, UAW                    Case Corporation

June 4, 1990

# EXHIBIT N
## to
## Settlement Agreement

## Cover Letter re: Preliminary Approval

**EXHIBIT N**

[insert date]

To:    Eligible Case Corporation (J.I. Case Company) Hourly Retirees and Surviving Spouses.

From:  Class Counsel

      Re:    Proposed Settlement of the *Yolton, et al v. El Paso Tennessee Pipeline Co. and Case Corporation* Retiree Health Care Class Action Litigation

Greetings:

       This letter, and the enclosed Notice, pertains to certain eligible Hourly Retirees and Surviving Spouses of Case Corporation ("Case").

       As you probably know, several Case Retirees ("Class Representatives") filed a lawsuit on behalf of a Class of Retirees and eligible Surviving Spouses of Case who were represented by the UAW at the time of their retirement. The lawsuit challenged El Paso Tennessee Pipeline Company's requirement that, beginning September 1, 2002, Class Members had to make Premium Contributions to maintain their health care coverage through El Paso Tennessee. The Class Representatives asserted that El Paso Tennessee and Case were required under the collective bargaining agreements with the UAW to provide Class Members with lifetime Health Care Benefits.

       I have represented the Class Representatives as Class Counsel for the Retirees and Surviving Spouses. We are pleased to advise you that a tentative Settlement Agreement has been reached with El Paso Tennessee. Under the terms of the Settlement Agreement, El Paso Tennessee will provide the Health Care Benefits described below for the lifetimes of eligible Retirees and Surviving Spouses. In addition, eligible Retirees and Surviving Spouses will be reimbursed for a significant percentage of their out-of-pocket expenses incurred as a result of the September 2002 changes from the date that the changes were implemented until the date of the Preliminary Injunction that required El Paso Tennessee to pay the full cost of Health Care Benefits during the pendency of the Litigation.

       The Settlement Agreement has been preliminarily approved by the Court. The Court has now required this Notice to the Class Members prior to final approval by the Court.

If the Court finally approves the Settlement Agreement, it will enter a Judgment requiring El Paso Tennessee to comply with its obligations under the Settlement Agreement. In exchange for El Paso Tennessee's promise to provide Health Care Benefits for life and to reimburse eligible Class Members for a significant portion of their out-of-pocket expenses, all other claims asserted by the Class in the litigation will be dismissed with prejudice and El Paso Tennessee will be released from any further liability, other than the obligation to comply with the terms of the Settlement Agreement.

The purpose of this letter is to summarize the terms of the proposed Settlement Agreement, to explain the position of Class Counsel, and to summarize the process for final Court approval.

Attached to this letter is the official Notice of Preliminary Approval of Settlement Agreement that has been approved by the Court. The Notice describes the history of the litigation, the terms of the Settlement Agreement and what remains to be done. Please read it carefully.

The Settlement Agreement, and certain Exhibits including the Authorized Claim Procedure and Summary Plan Description, are also attached. You should read these documents very carefully. THIS LETTER IS INTENDED ONLY AS A GENERAL SUMMARY. The official information on the proposed Settlement Agreement is contained in the Settlement Agreement itself and the Exhibits. The Settlement Agreement, not this letter, is the official legal document governing the settlement of the litigation.

## I.    RECOMMENDATION OF CLASS REPRESENTATIVES AND CLASS COUNSEL

The Class Representatives and Class Counsel strongly support the proposed Settlement Agreement. It accomplishes the three principal goals in this litigation: 1) establishing, in an enforceable Court order, that health care coverage for Retirees and eligible Surviving Spouses is a lifetime benefit; 2) requiring El Paso Tennessee to provide comprehensive Health Care Benefits, without premium contributions, for all Retirees and eligible Surviving Spouses; and 3) compensating Retirees and eligible Surviving Spouses for a significant portion of the out-of-pocket health care expenses they incurred from September 1, 2002 through the effective date of the Preliminary Injunction, resulting from the changes El Paso Tennessee implemented effective September 1, 2002.

El Paso Tennessee and Case have asserted various defenses to liability and have vigorously litigated their positions. While we are confident that we would ultimately prevail before the Court of Appeals and the Supreme Court, there is obviously no guarantee that we would succeed. Under the Settlement Agreement, we will avoid any risk that El Paso Tennessee or Case would succeed in their defense that they have the right to modify or even terminate your Health Care Benefits. By agreeing to the proposed Settlement Agreement, we will avoid the

2

need for further litigation, which would otherwise further delay any resolution of this matter. In short -- faced with the possibility of additional lengthy litigation and the possibility of an adverse outcome -- we believe that the proposed Settlement Agreement represents the best possible result that could be achieved at this time and is in the best interest of the all affected Retirees and Surviving Spouses.

## II.   COURT HEARING

As described in the Notice, the Court will hold a hearing on whether to finally approve the Settlement Agreement on [insert date] at [insert time]. If you object to the proposed settlement, you must file written objections (and serve such objections on other parties listed in the Notice) on or before [insert date]. At the settlement hearing, the Court will consider any objections filed by Class Members and will otherwise evaluate the proposed settlement to determine if it is fair, reasonable, and in the best interests of the Class Members. The Class Representatives, Counsel for the Class and El Paso Tennessee will support the proposed settlement and ask the Court to approve it.

You do not need to attend the hearing. Class Counsel will attend. However, you may file objections and/or attend the Court hearing if you wish. Objections will not be considered unless timely filed and served in writing as required by the attached Notice.

**IF YOU SUPPORT THE PROPOSED SETTLEMENT AGREEMENT, YOU DO NOT NEED TO DO ANYTHING**.

If the Court approves the proposed Settlement Agreement at the [insert date] hearing, it will enter the Judgment incorporating the Settlement Agreement.

## III.   THE HEALTH CARE BENEFITS PLAN

The following is a brief explanation of the Health Care Benefits that El Paso Tennessee will provide under the Settlement Agreement. The Summary Plan Description, which is Exhibit _ to the Settlement Agreement, provides more detail on the various benefit plans. The Settlement Agreement and the SPD are the controlling documents and you should review them carefully.

### A.   MEDICAL BENEFITS

#### *A Managed Care Plan for Class Members Who are Not Medicare Eligible*

Under the Settlement Agreement, El Paso Tennessee will provide a comprehensive Managed Care Plan for Class Members and Eligible Dependents who are not Medicare eligible. The Managed Care Plan provides a full range of hospital, surgical and medical services through a network of health care providers.  Blue Cross Blue Shield of Texas will administer the Managed Care Plan.

For network services, the Managed Care Plan pays 100% of covered services, with no deductible and no co-payment, other than a $10.00 co-payment for certain services like doctor visits.

For non-network services, the Managed Care Plan pays 90% of the reasonable and customary cost of services after an annual deductible of $100.00 per person.  Once a covered individual has paid a total of $600.00 per year (including the deductible), non-network services are paid at 100% of the reasonable and customary charge.

If a Class Member lives outside the network, all services will be paid as if they were network services.

A more detailed summary of the Managed Care Plan is on pages __ of the enclosed SPD.

#### *A Medicare Supplement Plan for Medicare-Eligible Class Members*

Under the Settlement Agreement, El Paso Tennessee will provide the Medical Supplement Plan L for Class Members and Eligible Dependents who are Medicare-eligible.  The Medicare Supplement Plan L generally pays 75% of the amount that Medicare Parts A and B do not pay.  For example, Plan L pays 75% of the annual Medicare Part A deductible and 75% of the 20% co-payment that Medicare Part B does not pay for services like doctors' visits. Plan L also provides an additional 365 lifetime days of hospital coverage beyond what Medicare provides.  The Medicare Supplement Plan L does not pay any part of the Medicare Part B deductible.  The Medicare Supplement Plan L has an out-of-pocket maximum.  In 2011, once a participant has paid $2,320 for the year in out-of-pocket expenses, the Plan pays 100% of the expenses. El Paso Tennessee will initially provide the Medicare Supplement Plan L through AARP.

More details on the Medical Supplement Plan L is on pages __ of the enclosed SPD.

4

***No Monthly Premium Contributions***

El Paso Tennessee will pay the full premium cost for the Managed Care Plan, the Medicare Supplement Plan L and the other Settlement Plans.

***Lifetime Coverage***

El Paso Tennessee will provide the Settlement Plans to Class Members and Eligible Dependents for the lifetime of eligible Retirees and Surviving Spouses.

***Elimination of the Indemnity Plan***

The current Indemnity Plan, which was last changed in the 1990 negotiations, will be eliminated. As you may have experienced, the Indemnity Plan has several serious defects. Under the Indemnity Plan, there is a lifetime maximum benefit of $25,000 for Type B services for any one illness and for organ transplants. There is a 20% co-insurance payment for all Type C expenses such as doctors' visits and expensive outpatient tests such as MRIs and CT Scans, without any annual maximum limit on out-of-pocket expenses. The Indemnity Plan has a $50,000 lifetime maximum benefit for Type C services. This meant that, once the Indemnity Plan had paid $50,000 in Type C expenses for any person, there was no longer any coverage for Type C services for the remainder of the participant's life. While the Settlement Plans are not perfect, we believe that the Settlement Plans are comparable to, and in many ways, superior to the existing Indemnity Plan.

**B.     THE PRESCRIPTION DRUG PLAN**

The Prescription Drug Plan will be modified and will have co-pays of $5 for generic drugs; $10 for brand name formulary brand name drugs; and $15 for non-formulary brand name drugs for a 30-day retail supply. For a 90-day supply of mail order drugs, the co-pays will be $10 for generic drugs; $20 for formulary brand name drugs; and $30 non formulary brand name drugs.

There will be an annual cap of $1,000 per participant on prescription drug costs. Once an individual has paid $1,000 in co-pays, the co-pay for all drugs, including formulary and non-formulary brand name drugs, will be $5 for retail drugs and $10 for mail order drugs.

Medco, the current prescription drug provider, will administer the Prescription Drug Plan, including the mail order program through its mail-order service, the Medco Pharmacy.

Class Members will be required to use generic drugs where available and to purchase maintenance drugs through the mail order (after three months of retail purchases). If a doctor prescribes a brand name drug where there is an available generic equivalent drug, Class

Members will have to obtain approval from Medco before to obtain the brand name drug. There are certain other drugs, such as fertility agents, growth hormones and interferons, that require preapproval.

Full details of the Prescription Drug Plan are set forth on pages ___ of the enclosed SPD.

We realize that the modified Prescription Drug Plan will impose additional costs on Class Members. However, the modified benefits are far superior to prescription drug benefits most retirees and employees have today. Moreover, the prescription drug co-pays will not increase in the future, giving you additional security and certainty in your retirement. Further, although very few Class Members will spend that much, the annual prescription drug cap will protect Class Members and their Eligible Dependents from catastrophic prescription drug expenses.

### C.    OTHER BENEFIT PLANS

El Paso will continue to provide Dental, Vision and Hearing Aid Benefits. In fact, the levels of these benefits will be slightly increased from current levels. For example, the maximum annual payment for certain types of dental expenses is increased by $200.00, from $1,400.00 to $1,600.00 per person per year; certain vision expense benefits were increased by 10%; and the maximum benefit for hearing aids will be increased from $303.20 to $350.00 per ear.

## IV.    LIFE INSURANCE BENEFITS

Under the Settlement Agreement, El Paso Tennessee will maintain the current Life Insurance Benefits for the lifetime of all Retirees. Although El Paso did not modify Life Insurance Benefits, we believed that it was helpful to resolve that issue as well in the Settlement Agreement. Full details of the Life Insurance Benefits are set forth on pages __ of the Summary Plan Description.

## V.    REIMBURSEMENT OF DAMAGE CLAIM AMOUNTS

Under the Settlement Agreement, El Paso Tennessee will pay an Authorized Claim Amount to each Class Member who submits a properly documented Claim Form. The Authorized Claim Amount will include the amount of premium payments paid to continue their Health Care Benefits under the 1990 Group Benefit Plan beginning on September 1, 2002. For Class Members who terminated coverage in the 1990 Group Benefit Plan prior to the effective date of the Preliminary Injunction, the Claim Amount will also include properly documented out-of-pocket expenses for alternate insurance premiums and health care and prescription drug expenses that would have been paid under the 1990 Group Benefit Plan.

6

### A.      Pre-October 3, 1993 Class Members

Pre-October 3, 1993 Class Members, and their surviving spouses, were covered by the Preliminary Injunction that became effective on March 15, 2004. El Paso Tennessee will pay 70% of the Premium Contributions plus 70% of properly documented out-of-pocket expenses for substitute insurance and health care and prescription drug expenses for Pre-October 3, 1993 Class Member. In addition, El Paso Tennessee will pay the full amount of any Excess Premium Contribution to Class Members who did not receive that payment when El Paso Tennessee paid those amounts in late 2008.

### B.      Post-October 3, 1993 Class Members

Post-October 3, 1993 Class Members were not covered by the Preliminary Injunction until October 17, 2007. For each Post-October 3, 1993 Class Member, El Paso Tennessee will pay 75% of the Premium Contributions plus 75% of properly documented out of pocket expenses for substitute insurance and health care and prescription drug expenses . El Paso Tennessee will also pay the full amount of any Excess Premium Contribution made by Post-October 3, 1993 Class Members.

### C.      Authorized Claim Procedure

After entry of the Judgment approving the Settlement Agreement, and under Court supervision, Class Counsel will send each Class Member a Notice of Opportunity to File Claim describing the Authorized Claim Procedure and a Claim Form.

The Claim Form will include the Premium Contribution amounts that El Paso Tennessee records show Class Members paid to continue their coverage under the 1990 Group Benefit Plan. If you terminated coverage prior to the effective date of the Preliminary Injunction, you can also identify and properly document certain claims for additional damages, such as the cost of substitute insurance and out-of-pocket health care and prescription drug expenses that would have been covered under the 1990 Group Benefit Planif you had not terminated coverage. If you have not already done so, you should begin gathering all documentation you have or can get about substitute insurance, health care and prescription drug expenses you paid between the date you dropped coverage in the 1990 Group Benefit Plan and the date the Preliminary Injunction became effective.

Surviving Spouses of Deceased Retirees who died after September 1, 2002 can file a Claim for themselves and the Deceased Retiree. The authorized representative of the Estate of Deceased Class Members can make a Claim on behalf of the Estate.

If the Class Member disagrees with the Premium Contribution amount shown on the Claim Form, he or she must certify that the Premium Contribution amount shown is not correct

7

and provide proper written documentation showing what the correct Premium Contribution amount should be.

After the deadline for filing Claim Forms has passed, Class Counsel will review the returned Claim Forms and determine each Claim Amount. El Paso Tennessee will then have an opportunity to review the Claim Forms and supporting documentation. Any disputes about Authorized Claim Amounts will be submitted to a federal Magistrate Judge for resolution.

After any disputes have been resolved, Class Counsel will mail all Class Members a Notice of Authorized Claim Amount and an Authorized Claim Form setting forth the Authorized Claim Amount for each Class Member. Class Members can file objections to the Authorized Claim Amount. After any objections are resolved by the Court, the Court will enter a Claims Order. Within 60 days after entry of the Claims Order, El Paso Tennessee will send the Authorized Claim Amount checks to Class Counsel who will then distribute them to the Class Members.

### D.  *Early Authorized Claim Amount Payment*

Any Class Member who (1) agrees that the Premium Contribution amount shown on the Damage Claim Form is correct; (2) does not seek additional damages for the cost of substitute insurance and for out-of-pocket health care expenses and prescription drug expenses; and (3) signs a Release of Claims and timely returns the Release to Class Counsel will be eligible for an early Authorized Claim Amount payment from El Paso Tennessee.

## VI.  THE EL PASO CORPORATION GUARANTY

The Litigation was against El Paso Tennessee Pipeline Company, a wholly owned subsidiary of the El Paso Corporation. El Paso Corporation is a large corporation headquartered in Houston, Texas with vast holdings throughout the United States, including the largest natural gas pipeline in the United States.

In order to make your benefits more secure, we demanded, and El Paso Corporation agreed, that El Paso Corporation would guarantee El Paso Tennessee's obligation under the Settlement Agreement. If El Paso Tennessee goes out of business or files bankruptcy in the future, we can enforce the Settlement Agreement against El Paso Corporation. We believe that this gives you substantial additional security that your Health Care Benefits will be provided for your lifetime.

## VII.  CNH AMERICA

We also sued CNH America, formerly known as Case Corporation and J.I. Case Company. The Court's liability judgment requires CNH America, as well as El Paso Tennessee,

to provide you with Health Care Benefits. However, the Court found that, based on a 1994 agreement between CNH America and El Paso Tennessee, El Paso Tennessee assumed CNH America's obligation to provide Class Members with Health Care Benefits.

In order to settle this Litigation, we have agreed to dismiss CNH America without prejudice. In other words, in the unlikely event that both El Paso Tennessee and El Paso Corporation default on their obligations or go out of business, we can reopen the litigation against CNH America if CNH America does not agree to be bound by the terms of the Settlement Agreement. We believe that this aspect of the Settlement Agreement provides further protection that Class Members will enjoy lifetime health care benefits.

## VIII.  ATTORNEY FEES

El Paso Tennessee has agreed to pay Class Counsel reasonable attorney fees and costs for services rendered in the amount of up to $4,000,000 in attorney fees and costs. From this amount, Class Counsel will reimburse the UAW for the attorney fees and costs the UAW advanced during the nine years this Litigation has lasted so far. Class Counsel has filed a motion for approval of these attorney fees and costs, a copy of which is attached. These costs and fees are subject to approval by the Court after a hearing on any objections filed by Class Members.

## IX.   SUMMARY

The Class Representatives and Class Counsel are pleased with the proposed Settlement Agreement. It provides for a comprehensive package of Health Care and Life Insurance Benefits that will not change for the lifetime of Retirees and Surviving Spouses. El Paso Tennessee will pay the full premium cost of these benefits for the lives of Class Members. Class Members will be reimbursed for a significant portion of their out-of-pocket health care expenses incurred for the period from September 1, 2002 through the date their benefits were restored under the Preliminary Injunction.

We were able to achieve this result, with your help and patience, because of the commitment of the Class Representatives to protect your rights and vigorously pursue the litigation. We have also had the lasting and dedicated support of the International UAW and Case UAW Locals who negotiated your benefits and supported this litigation. We believe that we now have the further opportunity to serve your interests by ending the protracted legal battles and the uncertainty and delay of litigation. We strongly recommend the proposed Settlement Agreement.

Remember, if you support the Settlement Agreement, you do not need to do anything at this point. If the Court approves the Settlement Agreement at the [insert date] hearing, it will

9

enter a Judgment approving and incorporating the Settlement Agreement.  After the Judgment becomes Final, we will then begin the Authorized Claims Procedure.

Sincerely,

KLIMIST, McKNIGHT, SALE,
McCLOW & CANZANO, P.C.


Roger J. McClow
Class Counsel

Enclosures

156249

10

# EXHIBIT O
## to
## Settlement Agreement

## Initial Eligibility Attestation

**EXHIBIT O**

# Eligibility Verification for Dependent Spouse
## IMMEDIATE RESPONSE REQUIRED

Date

Firstname Lastname
Address Line 1, Address Line 2
City, State Zip Code
Country

**IDENTIFICATION NUMBER: <<XXXXXXXXXX>>**
BARCODE

El Paso Tennessee Pipeline Company ("El Paso Tennessee") provides you with retiree health insurance benefits. You have received this notice because, according to El Paso Tennessee's records, you have a dependent spouse who is also receiving health insurance benefits and who was not identified as your spouse on your application for pension benefits under the Case Corporation Pension Plan for Hourly-Paid Employees, as amended and restated June 2, 1990.

In order to verify your dependent spouse's eligibility to receive benefits, you must: (1) complete and sign the verification below; and (2) return this form within the next 30 days along with a copy of either your marriage certificate or the signed first page of your most recent joint tax return. DO NOT SEND ORIGINAL DOCUMENTS.

1. **STEP ONE: PROVIDE THE FOLLOWING INFORMATION AND SIGN THE VERIFICATION BELOW**

   Spouse's Full Name: _____

   Spouse's Date of Birth: _____

   Date of Your Marriage: _____

   Location of Marriage (State) _____

I hereby verify that this information is true and correct and that I am legally married to the individual identified above as my spouse.

Date:_____          Signature: _____

2. **STEP TWO: PROVIDE A COPY OF EITHER: (1) YOUR MARRIAGE CERTIFICATE; OR (2) THE SIGNED FIRST PAGE OF YOUR MOST RECENT JOINT TAX RETURN. DO NOT SEND ORIGINAL DOCUMENTS.**

3. **STEP THREE: MAIL OR FAX THIS FORM AND THE REQUIRED DOCUMENTS WITHIN 30 DAYS TO:**

| Fax | Mail |
|---|---|
| 1-xxx-xxx-xxxx | Mercer DEV Service Center<br>P.O. Box 9664<br>Providence, RI 02940-9664 |

156458_2

## Eligibility Verification for Dependent Child

### IMMEDIATE RESPONSE REQUIRED

Date

Firstname Lastname
Address Line 1, Address Line 2
City, State Zip Code
Country

**IDENTIFICATION NUMBER: <<XXXXXXXXXX>>**
BARCODE

    El Paso Tennessee Pipeline Company ("El Paso Tennessee") provides you with retiree health insurance benefits.  You have received this notice because, according to El Paso Tennessee's records, you have a dependent child who is also receiving health insurance benefits.

    In order to verify your dependent child's eligibility to receive benefits, you must: (1) complete and sign the verification below; and (2) return this form within the next 30 days to the address below.

1. **STEP ONE:  PROVIDE THE FOLLOWING INFORMATION AND SIGN THE VERIFICATION BELOW**

   Child's Full Name: _____

   Child's Date of Birth: _____

    I hereby verify that the above information is true and correct and that all of the following statements are true and correct:

1. The child identified above is my biological child, legally adopted child, stepchild residing in my household, or a child supported solely by me and permanently residing in my household. Residence in a home other than the home of a Class Member does not exclude an otherwise eligible dependent child from coverage provided the Class Member is otherwise legally responsible for the medical expenses incurred by the child (please provide evidence of legal responsibility).

2. The child identified above is either: (a) under 19 years of age; or (b) between the ages of 19 and 24.

3. If between the ages of 19 and 24, the child identified above is all of the following:

   a.  Unmarried; and

   b.  Not in the military or similar forces of any county or subdivision thereof; and

   c.  Not employed on a full-time basis (if they became employed full-time within the last four months, please provide initial employment date _____; and

   d.  Resides in the United States or Canada; and

   e.  Is principally dependent upon me for maintenance or support

Date:_____        Signature: _____

2. **STEP TWO:  MAIL OR FAX THIS COMPLETED FORM WITHIN 30 DAYS TO:**

| **Fax** | **Mail** |
|---|---|
| 1-xxx-xxx-xxxx | Mercer DEV Service Center<br>P.O. Box 9664<br>Providence, RI 02940-9664 |

156460_2

Eligibility Verification for Disabled Dependent

**IMMEDIATE RESPONSE REQUIRED**

Date

Firstname Lastname                      **IDENTIFICATION NUMBER: <<XXXXXXXXXX>>**
Address Line 1, Address Line 2                    BARCODE
City, State Zip Code
Country

El Paso Tennessee Pipeline Company ("El Paso Tennessee") provides you with retiree health insurance benefits. You have received this notice because, according to El Paso Tennessee's records, you have a disabled dependent who is also receiving health insurance benefits.

In order to verify your disabled dependent's eligibility to receive benefits, you must: (1) complete and sign the verification below; and (2) return this form within the next 30 days along with a copy of a medical certification by a physician or a copy of Social Security Disability Income award. DO NOT SEND ORIGINAL DOCUMENTS.

**1.      STEP ONE:  PROVIDE THE FOLLOWING INFORMATION AND SIGN THE VERIFICATION BELOW**

Disabled Dependent's Full Name: _____

Disabled Dependent's Date of Birth: _____

Date Disabled Dependent's Disability Commenced: _____

I hereby verify that this information is true and correct and that and that all of the following statements are true and correct:

The disabled dependent identified above was covered under the health insurance plan when the disability commenced.

Date:_____          Signature: _____

**2.      STEP TWO:  PROVIDE A COPY OF EITHER: (1) A MEDICAL CERTIFICATION OF DISABILITY BY A PHYSICIAN; OR (2) A SOCIAL SECURITY DISABILITY INCOME AWARD.  DO NOT SEND ORIGINAL DOCUMENTS.**

**3.      STEP THREE:  MAIL OR FAX THIS FORM AND THE REQUIRED DOCUMENTS WITHIN 30 DAYS TO:**

| Fax | Mail |
|---|---|
| 1-xxx-xxx-xxxx | Mercer DEV Service Center<br>P.O. Box 9664<br>Providence, RI 02940-9664 |

Please Note: If in the future your disabled dependent no longer meets the definition of "Permanently and Totally Disabled" under the Summary Plan Description for the Settlement Plan Provided Pursuant to Settlement Agreement of Class Action Litigation between El Paso Tennessee and Certain Case Retirees, either you or your dependent must notify El Paso Tennessee within 60 days of the dependent's loss of eligibility.

156461_2